**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. ___24-CV-4949___ |
| Plaintiff, | |
| v. | |
| EMPIRE HOLDINGS GROUP LLC, also d/b/a ECOMMERCE EMPIRE BUILDERS and STOREFUNNELS.NET, a limited liability company, and | |
| PETER PRUSINOWSKI, aka PETER PRU, individually and as an officer of Empire Holdings Group LLC, | |
| Defendants. | |

**PLAINTIFF'S EMERGENCY NOTICED MOTION AND MEMORANDUM IN SUPPORT FOR A TEMPORARY RESTRAINING ORDER WITH AN ASSET FREEZE AND OTHER EQUITABLE RELIEF AND FOR AN ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

## Table of Contents

I.      INTRODUCTION AND REQUESTED RELIEF ...................................................... 1

II.     STATEMENT OF FACTS ................................................................................... 2

    A.    Defendants Claim Their Business Opportunities Will Generate Massive Earnings
        Quickly and Easily. ........................................................................................... 2

        1.    Defendants Make Deceptive Earnings Claims. ..................................... 2

        2.    Defendants Tout Deceptive Testimonials. ............................................ 6

        3.    Defendants Deceive Consumers on Phone Calls. ................................. 9

    B.    Defendants Claim Their Self-Study Program Will Generate Massive Earnings
        Quickly and Easily. ......................................................................................... 10

    C.    Defendants' Earnings Claims Are Deceptive. ............................................... 12

        1.    Defendants' Business Model, Strategies, and Tactics Cannot Produce the Massive
        Income Claimed by Defendants. ...................................................................... 12

        2.    Defendants' Clients Report They Do Not Earn the Promised Profits. .................. 14

        3.    Defendants' Own Statements Confirm that Defendants' Earnings Claims are
        Deceptive. ....................................................................................................... 17

    D.    Defendants Fail to Provide the Disclosure Documents Required by the Business
        Opportunity Rule. ............................................................................................ 19

    E.    Defendants' Form Contracts Include an Illegal Non-Disparagement Clause. ............ 19

    F.    Defendant Prusinowski Is Personally and Extensively Involved in Defendants'
        Deceptive Scheme. .......................................................................................... 20

III.    ARGUMENT ................................................................................................... 21

    A.    This Court Has the Authority to Grant the Requested Relief. ....................... 21

    B.    The FTC Has Shown a Likelihood of Success on the Merits. ...................... 25

        1.    Defendants Violated the FTC Act (Count I). ...................................... 26

        2.    Defendants Violated the Business Opportunity Rule (Counts II through IV) ........ 28

        3.    Defendants Violated the Consumer Review Fairness Act (Count V)..................... 30

    C.    The Equities Favor Entry of the Proposed Temporary Restraining Order. ............... 32

    D.    Prusinowiski is Personally Liable. ................................................................ 32

IV.     AN EMERGENCY TRO WITH ADDITIONAL EQUITABLE RELIEF IS
        NECESSARY AND APPROPRIATE.............................................................. 34

    A.    The Court Should Stop Defendants' Ongoing Scam. ................................... 35

    B.    The Court Should Freeze Defendants' Assets to Preserve the Possibility of Redress
        for Defendants' Victims.................................................................................. 35

    C.    The Court Should Appoint a Temporary Receiver. ...................................... 37

D.    The Court Should Grant Expedited Discovery. ........................................................ 38

V.    CONCLUSION ........................................................................................................... 39

## Table of Authorities

### Cases

*Am. Home Prod. Corp. v.* FTC, 695 F.2d 681 (3d Cir. 1982) ........................................................ 27

*AMG Capital Management v. FTC*, 593 U.S. 67 (2021) ........................................................ 22, 24

*Beneficial Corp. v. FTC*, 542 F.2d 611 (3d Cir. 1976) ............................................................ 26, 27

*CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71 (3d Cir. 1993) .................................................... 35

*CFTC v. British Am. Commodity Options*, 560 F.2d 135 (2d Cir. 1977) ..................................... 32

*FTC v. AbbieVie, Inc.*, 976 F.3d 327, 376  (3d Cir. 2020)......................................................... 22, 35

*FTC v. Affordable Media*, 179 F.3d 1228 (9th Cir. 1999) ............................................................ 32

*FTC v. Am. Future Sys., Inc.*, No. 20-2266, 2021 WL 3185777 (E.D. Pa. July 26, 2021)........... 22

*FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994) ................................. 33

*FTC v. Automators LLC*, No. 23-cv-01444 (C.D. Cal. Aug. 11, 2023)................................... 23, 37

*FTC v. BCO Consulting Servs. Inc.*, No. 23-cv-00699 (C.D. Cal. May 3, 2023).................. 23, 37

*FTC v. Beatrice Foods Co.*, 587 F.2d 1225 (D.C. Cir. 1978)......................................................... 25

*FTC v. Car Checkers of Am., Inc.*, No. 93- 623, 1993 WL 56815 (D.N.J. Feb. 8, 1993) ........... 23

*FTC v. Click4Support, LLC*, No. 15-cv-05777 (E.D. Pa. Oct. 27, 2015) ........................ 23, 25, 36

*FTC v. Clifton Telecard All. One LLC.*, No. 08-1480 (D.N.J. Mar. 28, 2008)............................. 23

*FTC v. Credit Bureau Center*, 81 F.4th 710, 718-18 (9th Cir. 2023) .......................................... 24

*FTC v. Cyberspace.com, LLC*, 453 F.3d 1196 (9th Cir. 2006)........................................... 18, 26, 27

*FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1 (1st Cir. 2010) .................................................. 27

*FTC v. Dutchman Enters.*, LLC, No. 09-141 (D.N.J. Jan. 14, 2009) ............................................ 23

*FTC v. Elegant Solutions, Inc.*, No. 20-55766, 2022 WL 2072735 (9th Cir. June 9, 2022) ........ 24

*FTC v. First Consumers LLC*, No. 14-cv-01608 (E.D. Pa. Mar. 18, 2014)................................... 23

*FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000)....................................... 27

*FTC v. Freecom Comm., Inc.,* 401 F.3d 1192 (10th Cir. 2005)...................................................... 33

*FTC v. Graham*, No. 22-cv-00655 (M.D. Fla. June 21, 2022) ............................................... 24, 37

*FTC v. Medical Billers Network, Inc.* 543 F. Supp. 2d 283 (S.D.N.Y. 2008) ................................ 8

*FTC v. Medicor LLC*, 217 F. Supp. 2d 1048  (C.D. Cal. 2002) ...................................................... 8

*FTC v. Millennium Telecard, Inc.*, No. 11-cv-2479 (D.N.J. May 5, 2011) ...................... 23, 33, 34

*FTC v. Money Now Funding, LLC*, No. CV-13-01583, 2015 WL 11120847 (D. Ariz. July 1, 2015) ................................................................................................................ 29

*FTC v. Nat'l Invention Servs., Inc.*, No. 97-3459, 1997 WL 718492 (D.N.J. Aug. 11, 1997)23, 32

*FTC v. Neovi, Inc.*, 598 F. Supp. 2d 1104, 1117 (S.D. Cal. 2008) ................................ 33

*FTC v. NHS Sys., Inc.*, No. 08-cv-02215 (E.D. Pa. May 14, 2008)................................ 23, 33, 34

*FTC v. Noland*, No. cv-20-00047, 2021 WL 4318466 (D. Ariz. Sept. 23, 2021) ...... 24, 26, 35, 37

*FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066 (11th Cir. 2021)................................ 22, 35

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)................................................ 22, 27

*FTC v. Penn State Hershey Med. Cent.*, 914 F.3d 193 (3d Cir. 2019) ........................ 24

*FTC v. Rando*, No. 22-cv-00487 (M.D. Fla. May 3, 2022) ........................................ 24, 37

*FTC v. Simple Health Plans LLC*, 58 F.4th 1322 (11th Cir. 2023) ........................ 23, 24, 37

*FTC v. SL Fin. LLC*, No 23-cv-00698 (C.D. Cal. May 2, 2023) ................................ 24, 37

*FTC v. Smith*, No. 23-cv-04848 (E.D. Pa. Dec. 8, 2023)........................................ 23, 37

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982)................................ 22, 35

*FTC v. Sparta Chem, Inc.*, No. 96-cv-3228 (D.N.J. Nov. 13, 2007) ........................ 23

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009)................................................ 33, 34

*FTC v. Stout*, No. 99-5705, 1999 WL 34833240 (D.N.J. Dec. 8, 1999) ........................ 23

*FTC v. The FBA Machine Inc.*, No. 2:24-cv-06635 (D.N.J. June 3, 2024) ........................ 23

*FTC v. United Credit Adjusters, Inc.*, No. 09-798 (D.N.J. Feb. 24, 2009)........................ 23

*FTC v. Vemma Nutrition Co.*, No. 2:15-CV-1578, 2015 WL 11118111 (D. Ariz. Sept. 18, 2015) ................................................................................................................ 27

*FTC v. Vision Online, Inc.*, No. 23-cv-01041 (M.D. Fla. June 7, 2023) ........................ 23

*FTC v. World Wide Factors, Ltd.*, 882 F.2d 344 (9th Cir. 1989) ........................ 25, 32

*FTC v. Zuccarini*, No. 01-cv-4854, 2001 WL 34131411 (E.D. Pa. Sept. 25, 2001) .................. 23

*Heideman v. S. Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) (" ................................ 26

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 1984 WL 565319 (FTC Mar. 23, 1984)......... 26

*In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424 (D.N.J. 1998) ........................ passim

*In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380 (D. Md. 2019)................................ 36

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700 (3d Cir. 2004)................................ 26

*Leone Indus. v. Assoc. Packaging, Inc.*, 795 F. Supp. 117 (D.N.J. 1992) ........................ 38

*QYK Brands LLC*, 2021 WL 5707477 (C.D. Cal. Nov. 30, 2021) ................................................ 24

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) ..................................................... 18

*SEC v. First Fin. Group of TPX*, 645 F.2d 429 (5th Cir. 1981)...................................................... 38

*SEC v. Infinity Grp. Co.*, 212 F.3d 180 (3d Cir. 2000)................................................................... 35

*SEC v. Keller Corp.*, 323 F.2d 397 (7th Cir. 1963) ....................................................................... 38

*SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866 (S.D. Fla. 1974).......................................... 32

*See State of Washington v. Alderwood Surgical Center, LLC*, No. 2:22-cv-01835-RSM, 2024
   WL 1606143 (W.D. Wash. April 12, 2024) .............................................................................. 31

*Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir. 1995).......................................................... 39

*Trustees of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 527 F.
   Supp. 3d 722 (E.D. Pa. 2021) .................................................................................................. 25

*U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir. 1987) ....................................... 25

## <u>RULES</u>

Fed. R. Civ. P. 1...................................................................................................................39

Fed. R. Civ. P. 26(d)...........................................................................................................39

Fed. R. Civ. P. 33(b)...........................................................................................................39

Fed. R. Civ. P. 34(b)...........................................................................................................39

## <u>REGULATIONS</u>

16 C.F.R. Part 437...............................................................................................passim

## <u>OTHER AUTHORITIES</u>

FTC Policy Statement Regarding Advertising Substantiation, 104 F.T.C. 648 (1984)..............26

Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 C.F.R. § 255.2(b)
(2023)...................................................................................................................8

I.    **INTRODUCTION AND REQUESTED RELIEF**[1]

Plaintiff Federal Trade Commission ("FTC") asks this Court to immediately halt a business opportunity scam causing ongoing harm, and help preserve the possibility of redress to consumers, many of whom have lost tens of thousands of their hard-earned dollars to the scam. Defendants Empire Holding Group LLC (doing business as Ecommerce Empire Builders and Storefunnels.net), (collectively "EEB")[2] and Peter Prusinowski (aka Peter Pru) perpetrate their scam by making false and unsubstantiated earnings claims that consumers can earn substantial income online quickly and easily.

From 2021 to the present, Defendants have taken more than $14 million from consumers who relied on false earnings claims when purchasing EEB's ecommerce programs, hoping to start a profitable ecommerce business online. In executing their scam, Defendants send consumers form contracts for their business opportunities that contain illegal non-disparagement clauses, which attempt to ban all communications about the Defendants. They also fail to give consumers any of the disclosures that companies selling business opportunities are required to provide before accepting consumers' payments.

Defendants' conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business

---

[1] The FTC submits exhibits in support of this motion, including sworn declarations from: (1) a marketing expert; (2) FTC investigators; (3) consumers; and (4) an FTC forensic accountant. All exhibits cited in this Memorandum are referenced as "PX [exhibit number]." References to declarations include a relevant paragraph number, and attachments are designated with a relevant page number. Plaintiff has provided screenshots excerpted from internet video captures. The large files of video captures are available upon request.

[2] Empire Holdings Group LLC does business as Ecommerce Empire Builders and Storefunnels.net. PX 1 (Decl. of Mark Joyner) pp. 23-24 at ¶ 35; PX 2 (Decl. of Reeve Tyndall) p. 246 at ¶ 6; PX 2 Att. C, p. 349; EEB is a Wyoming limited liability company incorporated in 2018, with its principal place of business at 2370 York. Rd., Jamison, Pennsylvania 18929. PX 1 p. 2 at ¶ 6; PX 1 Att. A, pp. 27-35.

Opportunities" ("Business Opportunity Rule" or "Rule") 16 C.F.R. Part 437, as amended; and the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b.

Plaintiff FTC respectfully moves the Court, following notice to Defendants, to enter the proposed Temporary Restraining Order ("TRO") that would enjoin Defendants' illegal practices and order ancillary equitable relief, including an asset freeze, the appointment of a temporary receiver, immediate access to Defendants' business premises, turnover of business records, limited discovery, and an order to show cause why a preliminary injunction should not issue. These measures are necessary to protect consumers, prevent further harm, and preserve the Court's ability to provide complete relief to victims of this scam at the conclusion of litigation.

## II.    STATEMENT OF FACTS

### A.  Defendants Claim Their Business Opportunities Will Generate Massive Earnings Quickly and Easily.

#### 1.  *Defendants Make Deceptive Earnings Claims.*

Defendants target consumers online through social media advertisements and EEB's website, pitching sham earnings claims for their business opportunities. Deceived consumers are bilked out of tens of thousands of dollars.[3]

Prusinowski is the prominent face of EEB and is featured in many of Defendants'

---

[3] PX 1, pp.10-15 at ¶¶ 21-27 (explanations of video captures of EEB's Facebook Ad Library, Instagram profile, and TikTok page); PX 2, p. 243 at ¶ 2; PX 2 Att. A, pp. 249-250 (screenshot of EEB's Facebook Ad Library); PX 4 (Decl. of James Savage), pp. 456-457 at ¶ 2, 5 ("In approximately April 2022, I first came across EEB and Pru on Facebook") ("I paid $25,000 to EEB."); PX 5 (Decl. of Jason Walters), pp. 460-461 at ¶¶ 3, 8 (came across EEB and Pru on Facebook in Oct. 2021) ("I purchased EEB and Pru's done for you program, which also included the self-study program, for $15,000); PX 5, pp. Att. C, 477-478 (two $7,5000 invoices); PX 6 (Decl. of Osasu Joseph), pp. 564-565 at ¶¶ 3, 8 (came across EEB and Pru on Facebook in Sept. 2022) (made three payments of $3,000 totaling $12,000); PX 6, Att. B, pp. 575-577 (three $3,000 invoices); PX 7 (excerpts from PayPal production), pp. 599, 603, 610, 617, 624, 627, 630 (seven contracts for EEB Business Opportunity for prices ranging between $5,000 to $18,000).

Facebook advertisements.[4] For example, in one Facebook advertisement, Prusinowski claims to have launched three online businesses in one week, which on their first day were already selling products and making money.[5] Prusinowski claims he accomplished this through selling products from Chinese dropshipping operations.[6] Moreover, throughout this entire video, next to Prusinowski is a static screenshot of notes with various earnings claims.[7] As seen in the image below, Defendants claim they will provide clients with a "10k/mo Ecom Store Built and Launched by our team."[8] Defendants also claim that they have already built "57 $10k/mo stores," "34 $50k/mo stores," and "6 $1M+ per year stores," and Defendants claim they will complete all the necessary steps to provide purchasers with a "fully functional store."[9] As discussed below, these claims are false and unsubstantiated.

---

[4] PX 1, pp. 11-18 at ¶¶ 24-29; PX 2, pp. 243-245 at ¶¶ 2-4; PX 4, p. 456 at ¶¶ 2-3; PX 5, p. 460 at ¶¶ 3-4; PX 6, pp. 564-565 at ¶¶ 5-6.

[5] PX 1, pp. 1, 14-16 at ¶¶ 3, 27-28.

[6] *Id.*; *see also* PX 9 (Decl. of Prof. Hlavac), pp. 654-655 at ¶¶ 22-23 (explaining that EEB uses a dropshipping model whereby "the customer goes to a website where they are offered a product they want to purchase. They purchase the product and pay retail pricing. EBB's software captures the order and sends the order to a supplier. This supplier can be in China or in the US. When the order is placed with the supplier, the business owner pays them the wholesale rate. The supplier then ships the product directly to the customer and the business owner keeps the profits.").

[7] PX 1, pp. 1, 15-16 at ¶¶ 3, 28. (The screenshot is from a Facebook advertisement posted by Prusinowski on December 6, 2023, and is titled "An E-commerce Business Built and Launched By Our Team.")

[8] *Id.*

[9] *Id.*



(Figure 1, PX 1, pp. 15-16 at ¶ 28)

Defendants also entice consumers with advertisements using false and unsubstantiated earnings claims on Instagram.[10] Defendants' Instagram account, ecommerce.empire.builders, has 4,043 posts and 118,000 followers, and drives consumer traffic to their website.[11] At the top of their Instagram profile is a link to their website, and above the link to their website and next to an emoji of a flying stack of money, Defendants invite readers to "Build Your AI-Powered Ecommerce Empire."[12] The Instagram posts feature Prusinowski making claims like he started a dropshipping business and "got it to make $1,000 a day on its third day."[13] In another post with 14,233 likes, Prusinowski claims that consumers will be able to "copy and paste a million-dollar

---

[10] PX 1, pp. 10-12 at ¶¶ 22-24.

[11] PX 1, p. 10 at ¶ 22 (video capture was made on Jun. 5, 2024).

[12] *Id.*

[13] PX 1, pp. 11-12 at ¶ 24 ("I lost [sic] a dropshipping business and got it to make $1,000 dollars a day on its third day. Here's how.").

ecommerce businesses in seven easy steps," while an image of $17,269,718.29 in total sales floats behind his head.[14] Defendants also highlight purportedly successful stores, like the one featuring a "Kid's Play" niche that is allegedly making $450 in daily income, or $13,500 in monthly income.[15]

Defendants' TikTok posts similarly feature Prusinowski promoting EEB's business opportunities with false and unsubstantiated earnings claims.[16] For example, in one post Defendants tell consumers "Skip the guesswork and start a million-dollar business today," while Prusinowski claims that starting "$1,000,000 Online Businesses Are Simple" using Defendants' strategies.[17] The thumbnail for this post also displays Prusinowski claiming consumers only need one winning product to get started while an image of "$93.17k" floats above his head.[18] Prusinowski then tells interested consumers to "Comment '100k' down below" so they can use his "seven figure funnel template to start selling winning products today."[19]

Defendants' social media profiles direct consumers to their website,[20] which contains embedded videos featuring Prusinowski describing various aspects of Defendants' business

---

[14] *Id.* ("This is gonna blow your mind! Let's go ahead and copy and paste a million-dollar ecommerce business in seven easy steps.") (screenshot of associated Instagram post bottom right).

[15] *Id.* (screenshot of associated Instagram post bottom left).

[16] PX 1, pp. 13-14 at ¶¶ 25-26.

[17] PX 1, p. 13 at ¶ 26.

[18] PX 1, pp. 13-14 at ¶¶ 25-26 (screenshot of associated TikTok post bottom left).

[19] *Id.* (screenshot of associated TikTok post bottom right).

[20] PX 1, pp. 10-11 at ¶ 23. ("The Instagram page also has a hyperlink to EEB's website. This hyperlink brings potential clients to a sign up for EEB to build an AI powered Digital Dropshipping Empire in 30 Days.").

opportunities while making additional earning claims.[21] For example, in a video explaining the advertising management portion of Defendants' "Done For You" business opportunities, Prusinowski claims that Defendants have helped multiple clients start six figure businesses and also scale them to seven figures.[22] Defendants' website also includes numerous graphs and purported screenshots of allegedly successful ecommerce stores.[23] These graphs purport to show thousands to hundreds of thousands of dollars in sales revenue from purportedly successful clients.[24] Defendants also claim, throughout their website, that they have dozens of successful clients. For example, Defendants state that they award clients "Empire Builder trophies for hitting over **$10,000, $50,000, and 7 Figures** in their eCommerce businesses!"[25]

   2. *Defendants Tout Deceptive Testimonials.*

   Throughout Defendants' advertising and marketing, they use misleading testimonials from purportedly successful purchasers of Defendants' business opportunities. These testimonials claim that Defendants' clients are making thousands to tens of thousands of dollars every month from the ecommerce stores Defendants built for them.[26] For example, some of these

---

[21] PX 1, p. 18 at ¶ 29 ("Many of these subpages contain embedded videos featuring Prusinowski making additional earnings claims.").

[22] *Id.* ("In a video explaining EEB's advertising management services, Prusinowski claim that EEB has scaled their 'own company to the 8-figure level,' and they 'have helped multiple people not only start six figure businesses but scaled it into seven figure businesses as well.'").

[23] PX 1, pp. 18-20 at ¶ 29.

[24] *Id.*

[25] PX 1, pp. 16, 21 at ¶¶ 29, 31-32; PX 2, p. 244 at ¶ 4; PX 2, Att. B, p. 290.; PX 5, p. 460 at ¶ 4 ("EEB and Pru also had lists of people that EEB had given awards to for selling large amounts of product from their stores.").

[26] PX 1, pp. 5, 16, 20-21 at ¶¶ 12, 29, 30, 32; PX 1 Att. D, pp. 77-78.; PX 2, pp. 244-45 at ¶¶ 4-5; PX 2, Att. A, p. 252; PX 2, Att. B, pp. 291, 320.; PX 4, p. 456 at ¶ 3 ("EEB would also use testimonials in their advertisements, showing other people who were successful using their businesses. After watching the advertisements and sales pitch video, I expected to make at least

testimonials claim:[27]

- "Selina Made $10,000 In Her Second Month With Our Ecommerce Platinum Program!" and Selina made "Her FIRST $10k With One Product Dropshipping!"

- "Natalia Made $10,000 In Her First Month With Our Ecommerce Platinum Program!" and Natalia made "10k Selling 1 Product"

- "Quanq Made $40,000 In Three Months With Our Ecommerce Platinum Program!" and Quanq went from "$0 to $40,000+ In ONLY 3 Months With Droppshipping Sales Funnels!"

- "Justin & Lindsay Made $12,000 In 12 Days With Their DFY Ecommerce Business"

- "Russ Makes $10,000 Per Month With His DFY Ecommerce Business!"

- "Natasha Makes $5,100 Per Month With Her DFY Ecommerce Business!"

- "Maria Makes $500+ Per Week With Our Ecommerce Platinum Program!"

Defendants also posted such testimonials on their YouTube page, and featured them on their websites with thumbnails highlighting thousands of dollars in profits.[28] An example of the posts is seen in the image below.[29]

---

minimum $1000 a week based on EEB's promises."); PX 5, p. 460 at ¶¶ 4-5 ("After watching the advertisements and testimonials I expected to be profitable."); PX 6, p. 564 at ¶ 4 ("In the testimonials people would say things like 'I was a mechanic and I used Peter's program to make tens of thousands of dollars a week.' EEB and Pru use these testimonials to try and influence your decision making before purchasing their program.").

[27] PX 2, pp. 245 at ¶ 5; PX 2, Att. A, p. 252.

[28] PX 1, pp. 5, 16, 20-21 at ¶¶ 12, 29, 30, 32; PX 1 Att. D, pp. 77-78.; PX 2, pp. 244-45 at ¶¶ 4-5; PX 2, Att. A, p. 252; PX 2, Att. B, pp. 291, 320.; *see also supra* at n. 26.

[29] PX 2, Att. A, p. 252.



(Figure 2, PX 2, Att. A, p. 252)

Even if one assumes for the sake of argument that these and other testimonials represent

the results of Defendants' actual clients, they are misleading because a reasonable consumer

would believe that he or she could achieve a similar outcome using Defendants' program.[30] As

Defendants themselves admit in statements that do not appear concurrently with the testimonials,

---

[30] *See FTC v. Medical Billers Network, Inc.* 543 F. Supp. 2d 283, 306 (S.D.N.Y. 2008) (holding that the "actual impression created by Defendants' various earning representations was that a typical purchaser earned" the amounts claimed with Defendants medical billing opportunity); *see also FTC v. Medicor LLC*, 217 F. Supp. 2d 1048, 1053-1054 (C.D. Cal. 2002) (finding that even if earning representations were qualified with the statement "results may vary…consumers could reasonably believe that the statements of earnings potential represented typical or average earnings"); *see also* Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 C.F.R. § 255.2(b) (2023) ("An advertisement containing an endorsement relating the experience of one or more consumers on a central or key attribute of the product will likely be interpreted as representing that the endorser's experience is representative of what consumers will generally achieve with the advertised product in actual, albeit variable, conditions of use.").

the sales figures used in their advertising and marketing do not reflect typical results for their clients.[31]

### 3. Defendants Deceive Consumers on Phone Calls.

Once they get prospective clients on an audio or video call, Defendants' representatives make more false and unsubstantiated claims to consumers.[32] Defendants' representatives hype Defendants' supposed business strategies—promising to build the entire business, do "all the product selection, 100 percent for you," and ensure clients' businesses are selling products within a month.[33] Defendants' representatives also claim that after the Defendants build the business for clients, clients will have access to "unlimited one-on-one calls with [their] team Monday through Friday where [their] team helps you through any question literally step-by-step."[34]

Defendants' representatives discuss potential profits and the manner in which consumers will realize profits within thirty days of Defendants' building clients' businesses.[35] They claim that only five to ten hours of work per week is needed to run the business.[36] Defendants claim

---

[31] PX 1, pp. 21-23 at ¶¶ 32- 34.; *see infra* section II.C.

[32] PX 1, pp. 2-6 at ¶¶ 7-14; PX 1, Att. C, pp. 39-76; PX 1 Att. F, pp. 82-116; PX 2, pp. 246-248 at ¶¶ 7-10; PX 2, Att. F, pp. 366-380; PX 2, Att. G, pp. 381-407; PX 2, Att. I, pp. 415-439; PX 4, p. 457 at ¶ 4; PX 5, p. 461 at ¶ 6.; PX 5, Att. A, pp. 466-473.

[33] PX 2, Att. I, p. 425.

[34] PX 2, Att. G, p. 397.

[35] PX 2, Att. G, pp. 391-92 ("The main element is you don't even have to worry about any of that at all. Okay? We're going to build everything for you. And what that means to you is, you know, you're going to be able to, in 30 days, when the store goes live, start bringing in profits at day 30 of starting with us."); *Id.*, p. 393 ("And what that means to you is instead of stressing on the first of the month like a lot of businesses, because they start out at, you know, zero sales, you're already going to have dozens, obviously working towards hundreds, of sales being made from back-end subscriptions to scale your monthly profits a lot easier and faster.").

[36] PX 2, Att. G, p. 396 ("I mean, I'd say you can get away with probably five – five to 10 hours weekly.").

their profit margin goals are "30/40 percent profit" and "50 to 80 percent profit,"[37] and when asked if it would be possible to make around $60,000 a year they stated, "it's definitely, definitely would be feasible . . . we have a hundred-plus people in the 100K club . . . that'd be over 10, 10k per month."[38]

After the calls conclude, Defendants often send the prospective clients their form business opportunity contacts.[39] Prusinowski, as CEO of EEB, frequently signs Defendants' contracts[40] which include illegal non-disparagement clauses, and Defendants require consumers to sign the contracts before the Defendants provide any of their business opportunity services.

**B. Defendants Claim Their Self-Study Program Will Generate Massive Earnings Quickly and Easily.**

Defendants' self-study program (aka "Ecommerce Empire Academy") purports to provide instructional videos that teach clients everything that they need to know to create and implement their own online ecommerce stores, which Defendants claim will quickly start making thousands of dollars selling products online.[41] The self-study program offers the same

---

[37] PX 2, Att. I, pp. 431-32 ("We want to shoot for 30/40 percent profit margin. And the back end subscriptions sales…we want to shoot for like 50 to 80 percent profit margin on that."); PX 2, Att. G, p. 398 ("We're going to shoot around 30 to 40 percent profit, and then our back-end we're going to shoot about…50 to 70 percent profit from back-end subscriptions."); *See also* PX 1, Att. C, pp. 72-73 ("A good rule of thumb, usually people are – are kind of shooting for that – that three-to-one return on ad spend. Sometimes that can be higher; sometimes that can be lower. But that's kind of, like, what people are looking at as far as, like, a – a return on investment.").

[38] PX 2, Att. G, pp. 400-01 ("That definitely can be feasible. I mean, it's going to be a process to work up to that. It's not going to be – you know, obviously a lottery ticket. It's going to take work to work up to that. But it's definitely -- definitely would be feasible. You know, we have – we have hundred – hundred-plus people in the 100K club. You know, that'd be over 10 – 10K per month.").

[39] PX 1, p. 6 at ¶ 15; PX 1 Att. G, pp. 117-23; PX 2, p. 247 at ¶ 9; PX 2, Att. H, pp. 408-14.

[40] PX 1, Att. G, pp. 121, 123; PX 2, Att. H, pp. 412, 414; PX 6, Att. A, pp. 572-73; PX 7, pp. 608, 610, 615, 617.

[41] PX 1, pp. 7, 18, 21 at ¶¶ 17, 29, 31.

business strategies as the business opportunity program, except that the client is required to build the online store and business on their own.[42] The program typically costs between $997 and $1997.[43]

On their website Defendants claim the Ecommerce Empire Academy is Pete's flagship course that will teach consumers how to run a very profitable ecommerce business. Defendants further claim:[44]

- "No Matter if it's an Extra $1000 a Month OR a 6-Figure Online Income, Ecommerce Empire Academy is YOUR FASTEST Path!" to success.

- "Ecommerce Empire Academy is a **proven**, step-by-step **system** for starting or growing a **successful online business** using the **massive power** of eCommerce Subscription Funnels and getting you on the road to **replacing your full time income** in as little as 30 days."

- "**Online Entrepreneurs Have Already Created Massive Success With Ecommerce Empire Academy:** For the **Ecommerce Empire Academy** students who **take action**, follow this course 'to the letter', and **WIN** as a result, we award them our Empire Builder trophies for hitting over **$10,000, $50,000, and 7 Figures** in their eCommerce businesses!"

After these claims, and before a consumer has the option to even make a purchase, consumers must scroll through lists of alleged trophy winners, numerous misleading testimonial videos, and screenshots of purported profits similar to, if not the same as, those used by Defendants when selling their business opportunities.[45]

Contrary to Defendants' claims, consumers who purchase the Ecommerce Empire Academy are given a self-study program that is more resource-intensive and complex than

---

[42] PX 1, Att. F, pp. 88-91.

[43] PX 1, pp. 5, 7-8 at ¶¶ 14, 17-20; PX 1, Att. I, pp. 127-128.

[44] PX 1, p. 21 at ¶ 31.

[45] *See supra* at n. 26.

Defendants represented.[46] The self-study program takes many hours to review, and clients also need to spend significant amounts of time and effort implementing the strategies and instructions explained.[47] Even if clients establish their own ecommerce store, it will be resource intensive for them to maintain.[48] If they're actually able to do so, any income is uncertain, and the level of sales and revenues advertised on Defendants' website is far from likely.[49]

### C.  Defendants' Earnings Claims Are Deceptive.

Compelling evidence demonstrates that EEB's earnings claims regarding its business opportunities and self-study program are false or unsubstantiated—including expert analysis, consumer experiences, and EEB's own admission that the stated results were not typical.

> 1.  *Defendants' Business Model, Strategies, and Tactics Cannot Produce the Massive Income Claimed by Defendants.*

According to an expert in marketing research and digital and social media marketing, Professor Randy A. Hlavac, EEB's earnings claims are deceptive and far from typical because: "(1) EEB's dropship business model, strategies, and tactics could not produce the massive amount of income claimed by EEB, (2) EEB understates the actual costs required to run and maintain a dropship business, especially ongoing marketing costs, and (3) EEB underestimates the resource requirements needed to maintain their clients' e-commerce stores such that any net profits could be sustained."[50] In making his findings, Prof. Hlavac analyzed EEB's marketing

---

[46] PX 1, pp. 24-25 at ¶ 36; PX 1, Att. J., pp. 129-229; PX 4, p. 458 at ¶ 8; PX 9, pp. 647-649, 676-679 at ¶¶ 2, 4(c), 61-69.

[47] *Id.*

[48] PX 9, pp. 647-649, 676-679 at ¶¶ 2, 4(c), 61-69.

[49] PX 9, pp. 647-648, 659-670 at ¶¶ 2, 4(a), 32-51.

[50] PX 9, p. 647 at ¶ 2.

materials, numerous hours of EEB's instructional videos, transcripts and recordings from undercover calls, consumer complaints, and examples of online stores built by EEB.[51]

Prof. Hlavac identified three major areas where EEB deceived prospective clients in its marketing: (1) misleading revenue and profit claims, (2) inefficiencies and lack of management control in the dropship business model, and (3) downplaying of the time and expertise required to maintain an online store utilizing EEB's strategies.[52] While asserting claims of massive revenue and profit, EBB fails to account for the costs required to create a marketing campaign or to manage a dropship business.[53] Furthermore, "their profit margin claims for both campaign and back-end sales are extremely misleading and are performance levels an EBB client will not achieve."[54]

EEB also provides a flawed business development strategy and model that cannot compete with Amazon and other major seller sites.[55] EEB's model requires its clients to offer unbranded Chinese-manufactured products at a price comparable to the same products sold on Amazon.[56] EEB never discloses that its shipping times will be higher by a matter of weeks.[57] The long shipping times of unbranded products put EEB's clients at a significant disadvantage when prospects compare them with faster vendor offerings and name-brand products like those available through Amazon.[58] As explained by Prof. Hlavac, "[d]elivery speed is critical in

---

[51] PX 9, pp. 653-54 at ¶¶ 18-20.

[52] PX 9, pp. 648-649 at ¶ 4.

[53] PX 9, pp. 648 at ¶ 4(a).

[54] *Id.*

[55] PX 9, pp. 648-649 at ¶ 4(b).

[56] *Id.*

[57] *Id.*

[58] *Id.*

buying decisions today and the dropship model cannot compete when time to delivery is important."[59]

2. *Defendants' Clients Report They Do Not Earn the Promised Profits.*

After purchasing Defendants' business opportunities and self-study program, clients complain, *inter alia*, that Defendants' claims of significant profit with little time and effort were false.[60] Multiple consumers reported that their stores never generated sales close to what Defendants claimed, and complained about being forced to pay previously undisclosed fees.[61] One consumer complained that his "store never brought in many sales," and "in addition to shipping issues and low number of sales from [his] website, [he] had to spend thousands of dollars on advertisements and fees."[62] Another consumer stated that his "stores never received even one order," and even a test order he placed was never delivered to him.[63] One consumer also reported that after spending $12,000 of his military retirement "all he got was one sale, no profit, and a banned Facebook ad account."[64] That same consumer said the website Defendants built for him "looked copy and pasted," they found "that a lot of the product images were taken from other places," and the products the stores sold "were all incredibly overpriced."[65]

Consumers also reported that Defendants' business strategies and tactics are more

---

[59] *Id.*

[60] PX 1, pp. 24-25 ¶ 36; PX 1, Att. J, pp. 129-229; PX 4, p. 458 at ¶ 9; PX 5, p. 462 at ¶ 14; PX 6, p. 567 at ¶ 13; PX 7, pp. 580-96, 619-21.

[61] PX 1, Att. J, pp. 129-229; PX 4, pp. 458-459 at ¶¶ 9, 11; PX 5, p. 462 at ¶ 14; PX 6, p. 567 at ¶ 13; PX 7, pp. 619-621 ("What was delivered to me did not match what I had purchased, and my overall experience in this program has been disappointing."); *see generally*, PX 7, pp. 580-596 (complaints and refunds requests sent to PayPal from "Buyer[s]" of Defendants' services).

[62] PX 6, p. 567 at ¶¶ 13-14.

[63] PX 4, p. 458 ¶ 9.

[64] PX 1, Att. J, p. 196.

[65] *Id.*

complicated and labor-intensive than described in Defendants' marketing. For example, one consumer complained after purchasing that "things are getting very complex" to the point it "seems different that [sic] from what they promised."[66] This consumer reported that they sent Defendants an email explaining that "the course is lacking the support system to help student[s] launch the business."[67] According to the consumer, their email was ultimately ignored by Defendants.[68] Another consumer complained that Defendants "claimed that they would build [his] business [opportunity] and get it up and running, but in reality, all they did was build the website and that was the extent of it."[69] This consumer stated he didn't have the "background knowledge or wherewithal needed to continue the business [opportunity] after they built it for [him], so pretty much after the website and funnel were built the business just withered on the vine."[70] The consumer figured out that to run the business on his own and maintain profitability it "would have become a full-time occupation."[71] The consumer reported that he felt something was wrong when he started reviewing the videos Defendants provided.[72] As the consumer stated: "I thought this was all supposed to be a built for you business...it was all pretty dense stuff...I felt troubled because I paid for a business in a box, not to go to ecommerce college."[73]

Consumers reported lack of communication, and poor explanations for underperforming

---

[66] PX 1, Att. J, p. 160.

[67] *Id.*

[68] *Id.*

[69] PX 4, pp. 457-58 at ¶¶ 7-8; *see also* PX 7, pp. 619-621 ("Instead of what I was promised, I was left as a single person business trying to figure out how to pay the bills when my funnel wasn't working and I was not getting the support that I needed.").

[70] PX 4, pp. 457-58 at ¶ 7-8.

[71] *Id.*

[72] *Id.*

[73] *Id.*

stores from Defendants. For example, one consumer reported that after he "bought EEB's program, he didn't receive any communication from them."[74] Another consumer complained that after they raised issues with the performance of their ecommerce stores "that was the last communication…It's now January 2023 and still radio silence from them."[75] Yet another consumer complained he felt mislead by Defendants' team members in "meetings with them [that] were very short and [where] they explained nothing at all" and "whenever [they] had an issue, people either ghosted [them] or gave [them] a vague answer that didn't resolve [their] issues."[76]

Lastly, when consumers sought refunds or initiated chargebacks, Defendants often challenged or threatened them, or made them jump through hoops but nonetheless refused to issue the requested refunds.[77] For example, after one consumer requested a refund, Defendants set up a meeting with that consumer and "begged him not to request a refund."[78] After that consumer insisted on a refund, the consumer stated that Defendants threatened him, "told [him] that [he] signed a contract with the company and that there was nothing [he] could do about it," and "threatened to have the company's lawyer come after [him]."[79] Defendants also told this consumer "that if [he] requested a refund from [his] bank, then EEB would also charge him extra fees."[80] Another consumer stated after they requested a refund, that Defendants "proceeded to

---

[74] PX 6, p. 565 at ¶ 9; *see also* PX7, pp. 619-620.

[75] PX 1, Att. J, p. 201.

[76] PX 1, Att. J, p. 221.

[77] PX 1, Att. J, pp. 129-229; PX 6, pp. 565-567 at ¶¶ 9-10; *see generally*, PX 7, pp. 580-596 (complaints and refunds requests sent to PayPal from "Buyer[s]" of Defendants' services).

[78] PX 6, p. 566 at ¶ 10.

[79] *Id.*

[80] *Id.*

send [them] a questionnaire" they must complete first, and another consumer reported that even after they filled out Defendants' refund form "they show[ed] no interest in refunding [their] money."[81] Additional consumers reported that Defendants' refused to refund their money in full, or ignored their refund requests.[82]

### 3. Defendants' Own Statements Confirm that Defendants' Earnings Claims are Deceptive.

While characterizing them as "disclaimers," Defendants admit in fine print that their earnings claims are deceptive—even while bombarding consumers with false and unsubstantiated earnings claims and testimonials throughout their advertising and marketing. Hidden at the bottom of the webpage for their self-study program, Defendants state in small grey font against a black background, and after numerous earnings claims:[83]



(Figure 3 PX 1, pp. 21-23 at ¶ 32)

> DISCLAIMER: The sales figures stated above are my personal sales figures. Please understand my results are not typical. I'm using these references for example purposes only. Your results will vary and depend on many factors…including but not limited to background, experience, and work ethic. All business entails risk as well as massive and consistent effort and action. If you're not willing to accept that, please DO NOT register for this webinar.

---

[81] PX 1, Att. J, pp. 156, 224.

[82] PX 1, Att. J, pp. 129-229; *see generally* PX 7, pp. 580-596 (Log of Defendants disputing chargebacks/refund requests with PayPal).

[83] PX 1, pp. 21-23 at ¶ 32.

Defendants also briefly admit elsewhere on webpages for their business opportunities and self-study programs, next to more deceptive earnings claims, that the results described are not typical. Defendants state in small font:[84]

> "All businesses have inherent risk. Results not typical, results may vary. We cannot guarantee these results as they are dependent on the client's ability and desire to grow their business."

These two purported disclaimers—actually admissions—are wholly absent from the overwhelming amount of advertising claiming that consumers are likely to earn substantial income with Defendants' business opportunities and self-study programs.[85] Thus, these statements do not cure the false impression created by Defendants' overwhelming use of deceptive claims and testimonials.[86] Furthermore, the statements falsely suggest that the clients' "ability and desire" or "background, experience, and work ethic" are the probable reason for any failure to make substantial earnings—rather than Defendants' inherently flawed business advice.

---

[84] PX 1, p. 23 at ¶¶ 33-34 (This statement began appearing at the top of one of EEB's webpages for its self-study program in spring of 2024. Therefore, any consumers who purchased Defendants' self-study program from that webpage before spring of 2024 would not have seen this statement. The statement also appears twice on a webpage associated with Defendants' business opportunity. This webpage is accessed by consumers **after** they book a call with Defendants. The statements are in small font and near numerous deceptive earnings claims.).

[85] PX 1; PX 2.

[86] *See FTC v. Cyberspace.com, LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)(holding that fine print disclaimer did not preclude liability under Section 5 of FTC Act, because "solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."). *See also Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) ("Disclaimers or qualifications in any particular ad are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression. Anything less is only likely to cause confusion by creating contradictory double meanings.").

**D.  Defendants Fail to Provide the Disclosure Documents Required by the Business Opportunity Rule.**

In clear violation of the Business Opportunity Rule's requirements,[87] Defendants fail to provide prospective clients with a disclosure document substantiating the earnings and profit claims that they made in their advertising and marketing and in materials provided to prospective clients.[88] Further, Defendants fail to provide prospective clients with a list of customers and contact information of individuals who purchased their business opportunities within the last three years.[89]

Two FTC investigators engaged with Defendants' representatives about the possibility of purchasing Defendants' business opportunities.[90] In both cases, Defendants failed to provide any of the required disclosure documents and information required by the Business Opportunity Rule before purchase.[91] Former clients also reported that they never received any of the required disclosure documents and information before they purchased Defendants' business opportunities.[92] Furthermore, as explained above, Defendants have no substantiation for the earnings claims they make.

**E.  Defendants' Form Contracts Include an Illegal Non-Disparagement Clause.**

Defendants require clients to sign form contracts that contain illegal non-disparagement clauses, which prohibit or restrict clients' ability to write and post truthful reviews of their

---

[87] For a discussion on the requirements of the Business Opportunity Rule, see section II.B.2.

[88] PX 1, p. 26 at ¶ 38; PX 2, p. 248 at ¶ 11; PX 4, p. 457 at ¶ 6; PX 5, p. 461 at ¶ 9; PX 6, p. 565 at ¶ 7.

[89] *Id.*

[90] PX 1, p. 26 at ¶ 38; PX 2, p. 248 at ¶ 11.

[91] *Id.*

[92] PX 4, p. 457 at ¶ 6; PX 5, p. 461 at ¶ 9; PX 6, p. 565 at ¶ 7.

negative experiences with Defendants. The provision states:[93]

> Each Party agrees for itself and all others acting on its behalf, either directly or indirectly: (i) Not to publish, repeat, utter and/or report any statement or observation, nor to take, encourage, induce or voluntarily participate in any conduct or action, that would negatively comment and/or reflect on, disparage, defame, impugn and/or call into question any other Party and/or any other Party's business operations, policies, practices and/or conduct or that of its directors, officers, members, shareholders, agents, employees, and/or affiliates; (ii) Not to act in any way with respect to any other Party's business operations, practices, policies and/or conduct that would impugn and/or damage any other Party's reputation, business relationships or present or future business, or the reputation of any other Party's past or present directors, officers, members, executives, shareholders, agents, employees or affiliates; and (iii) Not to comment about any other Party to any person or entity, including, but not limited to, the press (in any medium or format) or any other Party's customers and/or vendors concerning any Party's business operations, policies or conduct and/or actions. All Parties acknowledge that this provision is a material term of this Agreement, the violation of which shall be deemed a material breach hereunder.

This non-disparagement clause attempts to prevent customers from giving their honest reviews of Defendants' business opportunities. The clause, as written, would ban virtually all communications or statements about the Defendants, which is illegal under the CRFA as explained below.

### F. Defendant Prusinowski Is Personally and Extensively Involved in Defendants' Deceptive Scheme.

Prusinowski is the owner, CEO, and public face of EEB.[94] He is the only authorized signatory on its bank account,[95] and he registered and paid for the domain ecommercempirebuilders.com.[96] Prusinowski is prominently featured in the deceptive

---

[93] PX 1, p. 6 at ¶ 15; PX 1, Att. G, p. 119; PX 2, p. 247 at ¶ 9; PX 2, Att. H, p. 410; PX 6, Att. A, p. 570; PX 7, pp. 606, 613.

[94] PX 1, Att. G, pp. 121, 123; PX 2, Att. H, pp. 412, 414; PX 6, Att. A, pp. 572-73. PX 7, pp. 608, 610, 615, 617; PX 8, pp. 632-633, 639-641, 645.

[95] PX 8, pp. 632-633, 639-641, 645.

[96] PX 1, pp. 25-26 at ¶ 37; PX 1, Att. K, pp. 230-242.

advertising and marketing videos for EEB's self-study programs and business opportunities, which make extensive use of earnings claims. Prusinowski also signed consumer contracts containing non-disparagement clauses on behalf of EEB,[97] often directs consumers to contact him using his EEB email address,[98] and he is aware of client complaints and refund requests.[99]

## III. ARGUMENT

The FTC seeks an emergency TRO to immediately halt the Defendants' ongoing violations of the FTC Act, the Business Opportunity Rule, and the CRFA. The FTC requests that the Court enjoin Defendants from its ongoing violations, freeze Defendants' assets to preserve them for restitution to victims, appoint a temporary receiver over EEB, allow the FTC immediate access to EEB's business premises, permit limited expedited discovery, and enter an order to show cause why a preliminary injunction should not issue against Defendants. As set forth below, and supported by the accompanying exhibits, the evidence overwhelmingly supports entry of the proposed TRO.

### A. This Court Has the Authority to Grant the Requested Relief.

Sections 13(b) and 19 of the FTC Act empower federal courts to immediately halt Defendants' illegal conduct. Section 13(b) authorizes this Court to enjoin violations of "any provision of law enforced by" the FTC, which "includes the ability 'to grant any ancillary relief

---

[97] PX 1, Att. G, pp. 121, 123; PX 2, Att. H, pp. 412, 414; PX 6, Att. A, pp. 572-73. PX 7, pp. 608, 610, 615, 617.

[98] PX 1, p. 7 at ¶ 17; PX 1, Att. G, p. 122; PX 1, Att. I, p. 127; PX 2, p. 246 at ¶ 6; PX 2, Att. C, p. 355; PX 2, Att. D, pp. 361-363; PX 2, Att. E, p. 365; PX 2, Att. H, p. 413; PX 5, p. 461 at ¶ 7; PX 5, Att. B, pp. 474-476; PX 5, Att. C, p. 477; PX 6, Att. A, p. 573; PX 7, pp. 597, 601, 609, 616, 622, 625, 628.

[99] PX 5, pp. 462-464 at ¶¶ 15-22; PX 5, Att. F, p. 562.; *see also* PX 1, Att. J, pp. 129-229; *see generally*, PX 7, pp. 580-596 (complaints and refund requests sent to PayPal from "Buyer[s]" of Defendants' services).

necessary to accomplish complete justice.'"[100] Such ancillary relief includes a TRO, preliminary

injunction, and other prospective relief.[101] In addition to prospective relief, Section 19

additionally authorizes this Court to grant retrospective relief, including monetary relief, for

violations of FTC rules[102]—here, the Business Opportunity Rule and the CRFA.[103] This ancillary

relief may encompass the full range of equitable remedies, including the relief sought by the FTC

here, and any other measures that the Court deems necessary to protect the public and preserve

the possibility for complete and permanent relief.[104]

---

[100] *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424, 462 (D.N.J. 1998) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994).

[101] *AMG Capital Management v. FTC*, 593 U.S. 67, 75-77 (2021) (holding that Section 13(b) of the FTC Act authorizes the issuance of temporary restraining orders and preliminary injunctions ancillary to permanent injunctions); *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1079 (11th Cir. 2021) (same); *FTC v. AbbieVie, Inc.*, 976 F.3d 327, 376, 379 (3d Cir. 2020) (holding that Section 13(b) authorizes preliminary injunctive relief).

[102] 15 U.S.C. § 57b(b). Although the CRFA is a statute, a violation of the statute "shall be treated as a violation of a rule defining an unfair or deceptive act or practice prescribed under section 18(a)(1)(B) of the Federal Trade Commission Act (15 U.S.C. 57a(a)(1)(B))"). 15 U.S.C. § 45b(d).

[103] *AMG*, 593 U.S. at 73-78; *FTC v. Am. Future Sys., Inc.*, No. 20-2266, 2021 WL 3185777, *1 n.1 (E.D. Pa. July 26, 2021).

[104] *AMG*, 593 U.S. at 75-77; *On Point Cap. Partners LLC*, 17 F.4th at 1079; *FTC v. AbbieVie, Inc.*, 976 F.3d 327, 376, 379 (3d Cir. 2020); *FTC v. On Point*, 17 F.4th at 1078; *see also FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 719-21 (5th Cir. 1982) (holding that an asset freeze under Section 13(b) is appropriate when "… final, complete relief … may entail consumer redress through a Section 19 proceeding"). In *AMG*, the Supreme Court held that the FTC does not have the authority to seek equitable monetary relief when proceeding solely under Section 13(b), but confirmed that the Commission may obtain consumer redress and other remedies under Section 19 of the FTC Act, 15 U.S.C. § 57b. *AMG*, 593 U.S. at 77-82. The FTC brings this action under Section 19, in addition to Section 13(b). *See* Complaint at ¶ 1.

Courts in the Eastern District of Pennsylvania,[105] elsewhere in the Third Circuit,[106] and

across the country[107] have granted the type of preliminary relief the FTC seeks here, including

---

[105] *See, e.g.*, *FTC v. Smith*, No. 23-cv-04848 (E.D. Pa. Dec. 8, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, turnover of business records, and expedited discovery); *FTC v. Click4Support, LLC*, No. 15-cv-05777 (E.D. Pa. Oct. 27, 2015) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, and immediate access); *FTC v. First Consumers LLC*, No. 14-cv-01608 (E.D. Pa. Mar. 18, 2014) (granting *ex parte* TRO with conduct prohibitions, asset freeze, access to business records, and expedited discovery); *FTC v. NHS Sys., Inc.*, No. 08-cv-02215 (E.D. Pa. May 14, 2008) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, access to business premises, and expedited discovery); *FTC v. Zuccarini*, No. 01-cv-4854, 2001 WL 34131411 (E.D. Pa. Sept. 25, 2001) (granting *ex parte* TRO with conduct prohibitions, access to defendant's business records, and expedited discovery).

[106] *See, e.g.*, *FTC v. The FBA Machine Inc.*, No. 2:24-cv-06635 (D.N.J. June 3, 2024); *FTC v. Millennium Telecard, Inc.*, No. 11-cv-2479 (D.N.J. May 5, 2011) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery); *FTC v. United Credit Adjusters, Inc.*, No. 09-798 (D.N.J. Feb. 24, 2009) (granting *ex parte* TRO with conduct prohibitions and asset freeze); *FTC v. Dutchman Enters.*, LLC, No. 09-141 (D.N.J. Jan. 14, 2009) (granting *ex parte* TRO with conduct prohibitions, asset freeze, and expedited discovery); *FTC v. Clifton Telecard All. One LLC.*, No. 08-1480 (D.N.J. Mar. 28, 2008) (granting TRO with conduct prohibitions and appointment of monitor); *FTC v. Sparta Chem, Inc.*, No. 96-cv-3228 (D.N.J. Nov. 13, 2007) (granting *ex parte* TRO with asset freeze, appointment of receiver, immediate access, and expedited discovery); *FTC v. Stout*, No. 99-5705, 1999 WL 34833240 (D.N.J. Dec. 8, 1999) (granting *ex parte* TRO with conduct prohibitions, immediate access, and expedited discovery); *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 461–63 (granting preliminary injunction with asset freeze and appointment of receiver); *FTC v. Nat'l Invention Servs., Inc.*, No. 97-3459, 1997 WL 718492, at *1 n.1 (D.N.J. Aug. 11, 1997) (noting court's previous grant of *ex parte* TRO with conduct prohibitions, asset freeze, immediate access, and expedited discovery); *FTC v. Car Checkers of Am., Inc.*, No. 93- 623, 1993 WL 56815 (D.N.J. Feb. 8, 1993) (granting *ex parte* TRO with conduct prohibitions, asset freeze, immediate access, and expedited discovery).

[107] *See, e.g.*, *FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1329–30 (11th Cir. 2023) (affirming validity of *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery because the complaint alleged violations of Section 19); *FTC v. Automators LLC*, No. 23-cv-01444 (C.D. Cal. Aug. 11, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, turnover of business records, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. Vision Online, Inc.*, No. 23-cv-01041 (M.D. Fla. June 7, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of monitor, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. BCO Consulting Servs. Inc.*, No. 23-cv-00699 (C.D. Cal. May 3, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery in action seeking Section 19

asset freezes, temporary receiverships, expedited discovery, immediate access to business

premises, and preliminary injunctions.[108]

To obtain a TRO, the FTC must show: (1) a likelihood of success on the merits and (2)

that the public equities outweigh any private equities in favor of granting the requested relief.[109]

---

relief); *FTC v. SL Fin. LLC*, No 23-cv-00698 (C.D. Cal. May 2, 2023) (same); *FTC v. Graham*, No. 22-cv-00655 (M.D. Fla. June 21, 2022) (same); *FTC v. Rando*, No. 22-cv-00487 (M.D. Fla. May 3, 2022) (same); *FTC v. Noland*, No. cv-20-00047, 2021 WL 4318466 (D. Ariz. Sept. 23, 2021) (affirming validity of *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery because complaint alleged violations of Section 19).

[108] Asset freezes premised solely on Section 13(b) liability are no longer available in FTC enforcement actions following the Supreme Court's decision in *AMG Capital Management v. FTC*, 593 U.S. 67 (2021). In *AMG*, the Supreme Court held that the FTC does not have authority to obtain equitable monetary relief when proceeding solely under Section 13(b), but noted that "[n]othing we say today . . . prohibits the Commission from using its authority under § 5 and § 19 to obtain restitution on behalf of consumers." 593 U.S. at 75, 82. Since this ruling, courts in this district, circuit, and across the country have continued to grant equitable monetary relief, including temporary asset freezes, where Section 19 applies. *See, e.g., FTC v. Credit Bureau Center*, 81 F.4th 710, 718-18 (9th Cir. 2023) (affirming award of refund of monies under Section 19); *FTC v. Elegant Solutions, Inc.*, No. 20-55766, 2022 WL 2072735, at *2 (9th Cir. June 9, 2022) (non-precedential) ("[A]lthough *AMG* held that monetary relief is not available under section 13(b) of the FTC Act . . . section 19 of the Act separately and specifically authorizes the FTC to seek monetary relief to address violations of certain rules. . . ."); *Simple Health Plans, Inc.*, 58 F.4th at 1329-30 (affirming award of asset freeze and other relief preliminary relief under Section 19 post-*AMG*); *Noland*, 2021 WL 4318466, at *5 (D. Ariz. Sept. 23, 2021) (holding asset freeze remains appropriate under Section 19, post-*AMG*); *FTC v. QYK Brands LLC*, 2021 WL 5707477, at *4 (C.D. Cal. Nov. 30, 2021) (holding monetary relief remains available for violations of FTC rules under Section 19, post-*AMG*); *FTC v. Cardiff*, No. 18-CV-2104, 2021 WL 3616071, at *1-2 (C.D. Cal. June 29, 2021) (same); *FTC v. Am. Vehicle Protection Corp.*, No. 22-CV-60298, 2022 WL 14638465, at *7-8 (S.D. Fla. Oct. 25, 2022 (same); *FTC v. RCG Advances LLC*, No. 20-cv-4432, 2023 WL 6281138, at *11 (S.D.N.Y. Sept. 27, 2023) (same).

[109] *See FTC v. Penn State Hershey Med. Cent.*, 914 F.3d 193, 197 (3d Cir. 2019) ("[W]e said that the question of preliminary injunctive relief under Section 13(b) of the FTC Act is resolved by weighing the equities and considering the Commission's likelihood of ultimate success to determine whether such action would be in the public interest") (internal quotation marks omitted).

Unlike private litigants, the FTC need not prove irreparable injury,[110] which is presumed under

Section 13(b).[111] The Court "need only . . . find some chance of probable success on the merits"

in order to award preliminary relief.[112] Moreover, when weighing the equities, the public interest

should receive greater weight than private interests.[113]

The evidence submitted in support of this motion demonstrates that the FTC has a strong

likelihood of success in establishing that Defendants' conduct violates the FTC Act, the Business

Opportunity Rule, and the CRFA. The record further shows that the equities favor the requested

relief. Exercise of the Court's equitable powers is warranted to immediately stop Defendants'

deceptive scheme and preserve funds for eventual return to injured consumers.

### B.  The FTC Has Shown a Likelihood of Success on the Merits.

The FTC "meets its burden on the likelihood of success issue if it shows preliminarily, by

affidavits or other proof, that it has a fair and tenable chance of ultimate success on the

merits."[114] As summarized in Section II above, the FTC has presented substantial evidence

---

[110] *See id.* ("[T]he Section 13(b) standard is not only different from, but easier to satisfy than the traditional standard for injunctive relief. . . ."); *Click4Support,* 2015 WL 7067760, at *3-4 (the standard for a preliminary injunction under Section 13(b) "differs from the traditional test").

[111] *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 346-47 (9th Cir. 1989).

[112] *Id.* at 347 (quoting *U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987)).

[113] *Id.*

[114] *FTC v. Beatrice Foods Co.*, 587 F.2d 1225, 1229 (D.C. Cir. 1978) (internal quotation marks omitted); *see also Odessa Union Warehouse Co-op*, 833 F.2d at 176 ("Because irreparable injury must be presumed in a statutory enforcement action, the district court needed only to find some chance of probable success on the merits. . ."). In considering an application for a TRO or preliminary injunction, the Court has the discretion to consider hearsay evidence. *See Trustees of Gen. Assembly of Lord Jesus Christ of Apostolic Faith, Inc. v. Patterson*, 527 F. Supp. 3d 722, 768 (E.D. Pa. 2021) ("[T]his Court is not strictly bound by the Federal Rules of Evidence" when considering a preliminary injunction and may "consider affidavits and other hearsay materials, to the extent appropriate") (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 718 (3d Cir.

showing that Defendants are violating Section 5 of the FTC Act, the Business Opportunity Rule, and the CRFA. The evidence also shows that EEB's owner and CEO, Prusinowski, is personally liable for the violations of EEB, because he controlled, participated in, and had knowledge of that business's deceptive practices in marketing for EEB.

    *1.  Defendants Violated the FTC Act (Count I).*

Section 5 of the FTC Act prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). An act or practice is deceptive under Section 5(a) if it involves a material representation or omission that is likely to mislead consumers acting reasonably under the circumstances.[115] Section 5 also requires marketers to have a reasonable basis for their claims at the time they are made.[116]

A representation is material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."[117] Moreover, "[e]xplicit claims or deliberately-made implicit claims . . . are presumed to be material."[118] "Courts consistently conclude that misrepresentations regarding income potential are material

---

2004)); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings").

[115] *Beneficial Corp. v. FTC*, 542 F.2d 611, 617-18 (3d Cir. 1976); *NHS Sys.*, 936 F. Supp. 2d at 531; *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 462 (extending application beyond affirmative representations to "omissions or practices").

[116] FTC Policy Statement Regarding Advertising Substantiation, 104 F.T.C. 648, 839 (1984) (appended to Thompson Med. Co., 104 F.T.C. 648 (F.T.C. 1984), aff'd, 791 F.2d 189 (D.C. Cir. 1986), cert. denied, 479 U.S. 1086 (1987)). The FTC's Policy Statement Regarding Advertising Substantiation is also available at https://www.ftc.gov/legal-library/browse/ftc-policy-statement-regarding-advertising-substantiation.

[117] *Cyberspace.com*, 453 F.3d at 1201(quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 1984 WL 565319, at *37 (FTC Mar. 23, 1984); s*ee also NHS Sys.*, 936 F. Supp. 2d at 531 (holding same).

[118] *NHS Sys.*, 936 F. Supp. 2d at 531 (quoting *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 441).

and violate the FTC Act."[119] A representation is likely to mislead consumers if: (1) the express or implied message conveyed is false; or (2) the Defendant lacked a reasonable basis for asserting that the message was true.[120] Where the Defendant lacks adequate substantiation evidence, the Defendant necessarily lacks any reasonable basis for its claims.[121] In determining whether a representation is likely to mislead consumers, courts consider the overall net impression it creates.[122] "A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."[123]

As discussed in Section II, Defendants' earnings claims are false or unsubstantiated and therefore deceptive. Defendants have no reasonable basis for their claims and repeatedly make them at every stage of their marketing campaigns. Express claims are presumed material and virtually all of Defendants' earnings claims are express. Indeed, earnings go to the very heart of a consumers' decisions to buy a business opportunity.[124] Consumers paid thousands of dollars, sometimes more than $35,000, for EEB's business opportunities based on deceptive claims. Defendants' purported disclaimers—even if seen by consumers—cannot dispel the powerful net

---

[119] *FTC v. Vemma Nutrition Co.*, No. 2:15-CV-1578, 2015 WL 11118111, at *5 (D. Ariz. Sept. 18, 2015) (citing *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 528-29 & 532-33 (S.D.N.Y. 2000)

[120] *Pantron I Corp.*, 33 F.3d at 1096.

[121] *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010).

[122] *See Am. Home Prod. Corp. v.* FTC, 695 F.2d 681, 687 (3d Cir. 1982) (citing *Bakers Franchise Corp. v. FTC*, 302 F2d 258, 261 (3d Cir. 1962); *Beneficial Corp.*, 542 F.2d at 617.

[123] *Cyberspace.com*, 453 F.3d at 1200.

[124] *Vemma Nutrition Co.*, 2015 WL 11118111, at *5 (citing *Five-Star Auto Club, Inc.*, 97 F. Supp. 2d at 528-29 & 532-33).

impression of the endless earnings claims.[125] Based on this evidence, the FTC has demonstrated a likelihood of success on Count I of the Complaint.

### 2. *Defendants Violated the Business Opportunity Rule (Counts II through IV)*

The Business Opportunity Rule requires sellers of business opportunities that fall within its purview (1) to provide prospective purchasers with specified information in a disclosure statement; (2) if making earnings claims, to provide an earnings claim statement; and (3) to abide by a number of common-sense truth-in-advertising principles.[126] The Rule applies to "commercial arrangement[s] in which:

> (1) A seller solicits a prospective purchaser to enter into a new business;
>
> (2) The prospective purchaser makes a required payment; and
>
> (3) The seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will: . . .
>
>> (ii) Provide outlets, accounts, or customers, including Internet outlets, accounts, or customers, for the purchaser's goods or services."

16 C.F.R. § 437.1(c). A "designated person" is "any person, other than the seller, whose goods or services the seller suggests, recommends, or requires that the purchaser use in establishing or operating a new business." *Id.* § 437.1(d). "Providing locations, outlets, accounts, or customers means furnishing the prospective purchaser with existing or potential locations, outlets, accounts, or customers . . . or otherwise assisting the prospective purchaser in obtaining his or her own locations, outlets, accounts, or customers." *Id.* § 437.1(m).

---

[125] *See* Section II.C.6. above; *see also supra* at nn. 30, 86.

[126] *See generally* 16 C.F.R. Pt. 437. Violations of the Rule constitute violations of Section 5(a) of the FTC Act. 16 C.F.R. §§ 437.2, 437.3, 437.4, 437.6.

Here, Defendants offer business opportunities when they promise internet outlets, in the form of ecommerce stores and dropshipping arrangements, and promise to provide customers for clients' goods.[127] Defendants are sellers of business opportunities, they must comply with the Business Opportunity Rule. They fail completely.

### a.  Misrepresentations Regarding Income or Profits (Count II)

The Business Opportunity Rule prohibits sellers of business opportunities from "[m]isrepresent[ing] the amount of sales, or gross or net income a prospective purchaser may earn, or that prior purchasers have earned." 16 C.F.R. § 437.6(d). As discussed in Section II, Defendants have misrepresented the amount of sales, income, and profits prospective purchasers can expect to achieve by buying a business opportunity through Defendants. Accordingly, the FTC is likely to prevail on Count II.

### b.  Earnings Claims to Prospective Purchaser Violations (Count III)

The Business Opportunity Rule prohibits sellers from making earnings claims unless they (1) have a reasonable basis for the claim at the time it is made, (2) have in their possession written materials that substantiate the claim at the time the claim is made, (3) make the written substantiation available upon request to the prospective purchaser and the FTC, and (4) furnish the prospective purchaser with an earnings statement, in the form of and using the language set forth in the Rule, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the

---

[127] *See FTC v. Money Now Funding, LLC*, No. CV-13-01583, 2015 WL 11120847, at *3 (D. Ariz. July 1, 2015)(holding that "providing an Internet outlet in the form of a website on which small businesses could sign up and be referred by the consumer to [defendant] for cash advances" constitutes providing "outlets, accounts, or customers" under 16 C.F.R. § 437.1(c)(3)(ii)).

stated level of earnings. 16 C.F.R. § 437.4(a)(1)-(4).

Although Defendants have made earnings claims in connection with the marketing and sale of their business opportunities, they have not provided prospective purchasers with an earnings claim statement. Therefore, the FTC is likely to prevail on Count III.

### c. Disclosure Document Violation (Count IV)

Under the Business Opportunity Rule, sellers of business opportunities must provide prospective purchasers with a disclosure document, in the form and using the language set forth in Appendix A of the Rule, at least seven days before the earlier of a prospective purchaser signing a contract or making a payment to the seller. 16 C.F.R. § 437.2. The disclosure document must disclose five categories of information: basic identifying information about the seller, an earnings claim statement, the seller's litigation history, the material terms of any cancellation or refund policy, and the contact information of prior purchasers as references. *Id.* §437.3(a)(1)-(5).

Here too, Defendants failed to provide potential clients or undercover FTC investigators with the required disclosure document.[128] Accordingly, the FTC is likely to prevail on Count IV.

### 3. Defendants Violated the Consumer Review Fairness Act (Count V).

The CRFA was enacted to prohibit clauses in form contracts that restrict consumers' ability to communicate reviews, performance assessments, and similar analyses of a seller's goods, services, or conduct. Congress enacted the CRFA, and directed the FTC to enforce it, to protect people's ability to share their honest opinions about a business's products, services, or conduct, in any forum, including on social media. Specifically, the CRFA renders void any provision of a form contract that "prohibits or restricts the ability of an individual who is a party

---

[128] See Section II above; PX 1, p. 26 ¶ 38; PX 2, p. 248 at ¶ 11; PX 4, p. 457 at ¶ 6; PX 5, p. 461 at ¶ 9; PX 6, p. 565 at ¶ 7.

to the form contract to engage in a covered communication," 15 U.S.C. § 45(b)(b)(1), and

violations of the CRFA are treated as violations of rules defining unfair and deceptive acts or

practices, 15 U.S.C. § 45(b)(d)(1). Under the CRFA, "form contract" means a contract with

standardized terms that is used by a person in the course of selling goods or services and

"imposed on an individual without a meaningful opportunity for such individual to negotiate the

standardized terms." 15 U.S.C. § 45(b)(a)(3)(A). A "covered communication" "means a written,

oral, or pictorial review, performance assessment of, or other similar analysis of, including by

electronic means, the goods, services, or conduct" of the seller. 15 U.S.C. § 45(b)(a)(2).

Defendants employ standardized contracts that violate the CRFA. They contain

non-disparagement provisions prohibiting or restricting consumers from sharing reviews

or performance assessments of Defendants' conduct.[129] The contracts at issue are

typically non-negotiable and appear to be form contracts on their face.[130] Once

consumers agree to purchase EEB's business opportunities, EEB's representative simply

sends the form contract for the consumer to sign.[131] This contract's standardized non-

disparagement clause attempts to prevent customers from giving their honest reviews of

Defendants' business opportunities—and would ban virtually all communications or

statements about the Defendants. Because such provisions clearly violate the plain

language of the CRFA, the FTC is likely to prevail on its CRFA count.

---

[129] *See State of Washington v. Alderwood Surgical Center, LLC*, No. 2:22-cv-01835-RSM, 2024 WL 1606143 (W.D. Wash. April 12, 2024)(granting partial summary judgment and finding contract violated CRFA).

[130] PX 1, Att. G, pp. 117-23; PX 2, Att. H, pp. 408-14; PX 6, Att. A, pp. 569-74; PX 7, pp. 605-18.

[131] PX 1, p. 6 at ¶ 15; PX 2, p. 247 at ¶ 9.

### C. The Equities Favor Entry of the Proposed Temporary Restraining Order.

Once the FTC establishes the likelihood of ultimate success on the merits, preliminary injunctive relief is warranted if the Court, weighing the equities, finds that relief is in the public interest. "[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight."[132] The public interest in this case is compelling—halting unlawful and injurious conduct and preserving assets for restitution to injured consumers.[133] Defendants, by contrast, have no legitimate interest in continuing their fraudulent scheme.[134] Based on the facts before the Court, the FTC is likely to succeed on the merits, and the equities tip decidedly in the public's favor. The proposed TRO is warranted.

### D. Prusinowiski is Personally Liable.

Defendant Prusinowski is personally liable for his actions in violation of the FTC Act, the Business Opportunity Rule, and CRFA. An individual defendant is personally liable for injunctive relief based on corporate violations if the individual participates directly in the

---

[132] *FTC v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999) (quoting *World Wide Factors*, 882 F.2d at 347); *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 460 (court should afford "greater weight to the public interest").

[133] *See World Wide Factors*, 882 F.2d at 347 ("'no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment'") (quoting district court); *Nat'l Invention Servs., Inc.*, 1997 WL 718492, at *3 ("[P]articularly given that deception appears to be involved, the public interest in preventing further violations of the law and preserving viable assets outweighs an individual's interest in protecting potentially ill-gotten profits."); *see also CFTC v. British Am. Commodity Options*, 560 F.2d 135, 143 (2d Cir. 1977) ("A court of equity is under no duty to protect illegitimate profits or advance business which is conducted (illegally).") (internal citation omitted).

[134] *Five-Star Auto Club*, 97 F. Supp. 2d at 536 ("[P]ast illegal conduct is highly suggestive of the likelihood of future violations."); *SEC v. R.J. Allen & Assocs., Inc.*, 386 F. Supp. 866, 877 (S.D. Fla. 1974) (holding that past misconduct suggests likelihood of future violations); *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979).

violations or had authority to control those violations.[135] An individual's controlling ownership of a closely held entity creates "a substantial inference" that the individual had the requisite authority to control.[136] Further, "a corporate officer is presumed to be in control of a small, closely held corporation and assuming the duties of a corporate officer is probative of an individual's participation or authority."[137] Here, Prusinowski clearly has the authority to control EEB as its principal and CEO with sole signatory authority on known EEB contracts and bank accounts, as well as control over its website domains.[138] He regularly signs contracts on behalf of EEB and plays an active role in its management.[139] Accordingly, he maintains authority to control the misconduct at issue.[140] Moreover, Prusinowski directly participates in the violations.[141]

An individual is personally liable for monetary relief under Section 19 for corporate violations if, in addition to direct participation or authority to control, "he had knowledge of the

---

[135] *NHS Systems, Inc.*, 936 F. Supp. 2d at 533-34.

[136] *FTC v. Freecom Comm., Inc.,* 401 F.3d 1192, 1205 (10th Cir. 2005).

[137] *FTC v. LoanPointe*, No. 2:10-CV-225DAK, 2011 U.S. Dist. LEXIS 104982 (D. Utah Sep. 16, 2011), *26 (citations omitted); *see also FTC v. Am. Standard Credit Sys., Inc.,* 874 F. Supp. 1080, 1089 (C.D. Cal. 1994) ("Authority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy"); *FTC v. Neovi, Inc.,* 598 F. Supp. 2d 1104, 1117 (S.D. Cal. 2008) (opining that the "authority to sign documents on behalf of the corporate defendant" can prove authority to control); *see also Millennium Telecard*, 2011 WL 2745963, at *9.

[138] PX 1, pp. 25-26 at ¶ 37; PX 1, Att. K, pp. 230-242; PX 8, pp. 632-633, 639-641, 645.

[139] PX 1, Att. G, pp. 121, 123; PX 2, Att. H, pp. 412, 414; PX 6, Att. A, pp. 572-73. PX 7, pp. 608, 610, 615, 617.

[140] *See NHS Systems,* 936 F. Supp. 2d at 534 ("Authority to control can be demonstrated by a defendant's active involvement in business affairs, establishment of corporate policy, or assumption of the duties of a corporate officer.") (quoting *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009)).

[141] Section II above.

misrepresentations, was recklessly indifferent to the truth or falsity of the misrepresentation, or was aware of a high probability of fraud along with an intentional avoidance of the truth."[142]

As described in Section II above, Prusinowski knowingly and directly makes deceptive earnings claims in numerous marketing videos. In his videos, Prusinowski repeats a multitude of egregiously false earnings claims, such as EEB's "8-figure team" will build and launch a "$10k/mo AI-powered Ecom Store" and that clients will be able to "copy and paste a million-dollar ecommerce business in seven easy steps," while an image of $17,269,718.29 in total sales floats behind his head.[143] He has also received numerous complaints, chargebacks, and refund requests from EEB clients regarding the poor performance of EEB's programs, and specifically directs consumers to his email address, peter@ecommerceempirebuilders.com.[144] Any doubt that he knows his claims do not reflect actual consumers' experience is resolved by his purported disclaimers/admissions.[145]

Because Prusinowski is personally liable for injunctive and monetary relief for the charged violations, the FTC asks that the proposed TRO apply to him.

## IV.    AN EMERGENCY TRO WITH ADDITIONAL EQUITABLE RELIEF IS NECESSARY AND APPROPRIATE.

Plaintiff FTC seeks an order to immediately halt Defendants' ongoing illegal conduct, preserve the possibility of redress to Defendants' victims, and prevent Defendants from dissipating assets and destroying evidence. To that end, the FTC seeks an emergency TRO that will freeze Defendants' assets, appoint a temporary receiver, grant a turnover of Defendants'

---

[142] *NHS Systems,* 936 F. Supp. 2d at 533-34 (E.D. Pa. 2013) (citing *Millennium Telecard, Inc.,* 2011 WL 2745963, at *9 (quoting *Stefanchik,* 559 F. 3d at 931).

[143] *See supra* at n. 14.

[144] *See supra* at n. 98.

[145] *See supra* Section III.C.

business records and other relevant information, grant immediate access to Defendants' business premises, and permit the FTC limited expedited discovery. Courts have granted the requested relief in similar cases.[146]

**A.  The Court Should Stop Defendants' Ongoing Scam.**

To prevent ongoing consumer injury, the proposed TRO would prohibit Defendants from making false or unsubstantiated earnings claims and violating the Business Opportunity Rule and CRFA (*see* Sections I and II of the proposed TRO). These measures simply require Defendants to comply with the law and are squarely within the Court's injunctive authority under Section 13(b) of the FTC Act.[147]

**B.  The Court Should Freeze Defendants' Assets to Preserve the Possibility of Redress for Defendants' Victims.**

To preserve the possibility of redress for Defendants' victims, the FTC asks the Court to temporarily freeze Defendants' assets and order financial disclosures and an immediate accounting to prevent concealment or dissipation of assets pending final resolution (*see* Sections III, IV, and V of the proposed TRO). An asset freeze is appropriate once the Court determines that the FTC is likely to prevail on the merits of a Section 19 claim and it is an appropriate way to preserve money to redress injured consumers.[148] "A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets."[149] Where "the law presumes

---

[146] *See supra* nn. 105-8 in Section III.A.

[147] *Id.*

[148] *FTC v. AbbieVie, Inc.*, 976 F.3d 327, 376, 379 (3d Cir. 2020); *On Point*, 17 F.4th at 1078; *see also Southwest Sunsites, Inc.*, 665 F.2d at 719-21 (holding that an asset freeze under Section 13(b) is appropriate when "… final, complete relief … may entail consumer redress through a Section 19 proceeding"); *Noland*, 2021 WL 4318466, at *5.

[149] *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (citing *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993)).

irreparable harm, as in an FTC enforcement action, the FTC need only establish 'a possibility of dissipation of assets'" to obtain an asset freeze.[150] "When . . . business operations are permeated by misrepresentations and fraud, the likelihood that assets may be dissipated during the pendency of the legal proceedings is strong."[151]

Here, a temporary asset freeze will preserve the status quo, ensuring funds that have not already been dissipated are available for possible consumer redress. As explained in Section II, Defendants have bilked consumers of more than $14 million through their deceptive earnings claims and rule violations.[152] Furthermore, the evidence below demonstrates that Defendants have dissipated assets for personal and other use unrelated to the running of the business.[153] Financial records show that Prusinowski has dissipated significant corporate assets. He has spent corporate funds for personal use, including vehicle payments, luxury watches, brokerage and investment accounts, art, landscaping services, home improvement services, personal retirement accounts for his wife and himself, and a payment to a golf club.[154] He also took $681,685.83 from EEB's corporate account to his personal bank account and moved more than $2.5 million from EEB's corporate account to Star Active Sports, another business, which is associated with

---

[150] *In re Sanctuary Belize Litig.*, 409 F. Supp. 3d 380, 419 (D. Md. 2019).

[151] *Nat'l Credit Mgmt. Grp.,* 21 F. Supp. 2d at 462; *see also Click4Support,* 2015 WL 7067760, at *6 (citing *Nat'l Credit Magmt. Grp.*'s "finding that when a court determines that a reasonable consumer would be misled by representations made by defendants, a freeze of assets is appropriate to preserve those assets for possible restitution awards").

[152] PX 3, pp. 443-444 at ¶ 9 (Decl. of Rufus Jenkins). Defendants processed net revenue of $14,326,961.86 through Stripe, Inc. PayPal, and TD Bank. *Id.* The FTC has evidence that Defendants used other merchant accounts, including Veem Inc. and Wave Money Inc. *Id.*, p. 450 at ¶ 21. Therefore, the total consumer injury inflicted by Defendants may be significantly greater than $14 million.

[153] PX 3, pp. 447-453 at ¶¶ 14-35.

[154] *Id.*

Prusinowski but not EEB.[155] Prusinowski has also used EEB's corporate funds to pay for cryptocurrency and gold and silver bars.[156] Many of these assets are highly liquid and easily moved outside the Court's purview. In addition, FTC experience shows that defendants engaged in fraudulent schemes—similar to Defendants here—often withdraw funds from bank accounts, sell or hide assets, or move funds abroad.[157] Defendants' conduct in dissipating corporate assets for personal use, along with the nature of Defendants' ongoing illegal scheme, make it highly likely that Defendants would dissipate assets during the pendency of the litigation absent an asset freeze. Courts have, on numerous occasions, frozen assets in similar FTC enforcement actions.[158] A temporary asset freeze is warranted in this matter so that some of consumers' stolen money can be preserved for eventual redress payments.

### C. The Court Should Appoint a Temporary Receiver.

The Court should also appoint a temporary receiver over Empire Holdings Group LLC pursuant to the Court's equitable powers under Section 19 of the FTC Act.[159] Appointment of a

---

[155] PX 3, pp. 447-48 at ¶¶ 15-16.

[156] PX 3, pp. 448, 452 at ¶¶ 16, 33.

[157] See Rule 65 Declaration of R. McAuliffe, submitted in conjunction with this memorandum (citing numerous instances in which FTC defendants have dissipated assets or destroyed evidence when given notice of an FTC action).

[158] *See supra* nn. 105-8 in Section III.A.

[159] *See, e.g., Simple Health Plans LLC*, 58 F.4th at 1329–30 (affirming validity of *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery because the complaint alleged violations of Section 19); *Smith*, No. 23-cv-04848; *FTC v. Automators LLC*, No. 23-cv-01444 (C.D. Cal. Aug. 11, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, turnover of business records, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. BCO Consulting Servs. Inc.*, No. 23-cv-00699 (C.D. Cal. May 3, 2023) (granting *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery in action seeking Section 19 relief); *FTC v. SL Fin. LLC*, No 23-cv-00698 (C.D. Cal. May 2, 2023) (same); *FTC v. Graham*, No. 22-cv-00655 (M.D. Fla. June 21, 2022) (same); *FTC v. Rando*, No. 22-cv-00487 (M.D. Fla. May 3, 2022) (same); *FTC v. Noland*, 2021

temporary receiver is appropriate where, as here, there is "imminent danger of property being lost, injured, diminished in value or squandered, and where legal remedies are inadequate."[160] When a corporate defendant has used deception to obtain money from consumers, "it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste" to the detriment of victims.[161]

Appointment of a temporary receiver is particularly warranted here because Defendants' deceptive acts and practices demonstrate that they are likely to frustrate the FTC's law enforcement efforts by destroying evidence and dissipating assets.[162] A temporary receiver will help prevent EEB from disposing of ill-gotten funds by identifying, securing, and controlling the use of EEB's assets, as well as marshaling and preserving its records. The temporary receiver should be afforded immediate access to Defendants' business records and location. At this time, however, the FTC is unaware of a business location. A temporary receiver will also assist in determining the full extent of the fraud and identifying additional victims of EEB's scheme, as well as identifying any parts of the business that may be legitimate. For these reasons, the Court should appoint a temporary receiver over EEB.

### D.  The Court Should Grant Expedited Discovery.

To locate wrongfully obtained assets, the FTC requests that this Court permit limited expedited discovery and production of business records (*see* Sections XIX and XXII of the

---

WL 4318466 (affirming validity of *ex parte* TRO with conduct prohibitions, asset freeze, appointment of receiver, immediate access, and expedited discovery because complaint alleged violations of Section 19).

[160] *Leone Indus. v. Assoc. Packaging, Inc.*, 795 F. Supp. 117, 120 (D.N.J. 1992).

[161] *SEC v. First Fin. Group of TPX*, 645 F.2d 429, 438 (5th Cir. 1981); *SEC v. Keller Corp.*, 323 F.2d 397, 403 (7th Cir. 1963).

[162] Rule 65 Declaration of R. McAuliffe.

proposed TRO). District courts are authorized to depart from normal discovery procedure and fashion a discovery schedule that meets the needs of the particular case.[163] Both the turnover of business records and expedited discovery are necessary to ensure that the FTC and the Court are fully informed of: (1) the scope and scale of Defendants' business operations; (2) the range and extent of Defendants' unlawful conduct; (3) the identity of injured consumers; (4) total consumer harm; and (5) the location, nature, and extent of Defendants' assets. Moreover, turnover of business records will allow the FTC to secure relevant records and prevent destruction of relevant evidence.

The proposed TRO also requires Defendants to promptly provide certain financial records and information, including through depositions if necessary, and requires financial institutions served with the order to disclose whether they are holding any of the Defendants' assets. These limited expedited discovery provisions will assist in implementing the asset freeze and preventing dissipation of assets.

## V.    CONCLUSION

Plaintiff FTC respectfully requests that the Court grant this motion for an emergency TRO with provisions for a temporary asset freeze, temporary receivership, immediate access to Defendants' business premises, turnover of business records, limited expedited discovery, and other equitable relief, and require Defendants to show cause why a preliminary injunction should not issue against them.

---

[163] *See, e.g.*, *Sempier v. Johnson & Higgins*, 45 F.3d 724, 734 (3d Cir. 1995) ("[D]istrict courts have broad discretion to manage discovery."); Fed. R. Civ. P. 1, 26(d), 33(b), and 34(b).

Respectfully submitted,

Dated:  September 18, 2024

/s/Amanda Grier _____
Amanda Grier (DC Bar No. 978573)
Ryan McAuliffe (MD Bar No. 2012170072)
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-8543
Washington, DC 20580
(202) 326-3745; agrier@ftc.gov
(202) 326-3044; rmcauliffe@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION