## DECLARATION OF OSASU JOSEPH

## PURSUANT TO 28 U.S.C. § 1746

I, Osasu Joseph, declare as follows:

1. I reside in Camp Hill, Pennsylvania and am over the age of 18. I have personal knowledge of the facts in this declaration, and if called as a witness, I could and would testify to the facts stated herein.

2. I currently work as an information technology engineer. I got into information technology after I received my masters in information security management. Previously, I worked as a corrections officer in Washington, DC, and as a contractor for the Department of Defense.

3. In approximately September 2022, I first came across Ecommerce Empire Builders ("EEB") and Peter Pru ("Pru") on Facebook. During the pandemic I started searching for other options for making money and I started to look through some advertisements online for ecommerce businesses.

4. I looked through a few different advertisements from people selling ecommerce stores online, and then I saw some advertisements for EEB and Pru. The advertisements for EEB and Pru made claims like "leave your nine to five job and make money," and "this is how I made millions." EEB and Pru also claimed to use artificial intelligence to leverage the businesses they sold and used testimonials throughout their advertisements. In the testimonials, people would say things like "I was a mechanic and I used Peter's program to make tens of thousands of dollars a week." EEB and Pru use these testimonials to try and influence your decision making before purchasing their program.

5. Pru was the only person in the advertisements I saw. Pru was the face of the company, and outside of the advertisements I never had any interactions with him. Pru claimed to have lots of other businesses, and he explained in the advertisements how I could make six figures in a year, and how I could make a lot of money.

6.  After watching EEB and Pru's advertisements I followed a link connected to their advertisements to fill out an online screening and call scheduling form. After I filled out this form, I scheduled a call with one of the company's representatives named Anthony. Anthony told me that EEB would do everything for me and set up my entire ecommerce business. They then offered me different packages at different prices, for example one package was for $25,000, but I ultimately choose the cheapest package for $12,000.

7.  Before I bought EEB's program, I didn't receive any documents from EEB substantiating the earning and profit claims contained in their advertisements. I also didn't receive any documents from EEB telling me whether the company had been subject to legal action or a list of consumers who purchased EEB's services in the past three years. All I received from EEB was a five-page contract. The contract was between myself and EEB doing business as Empire Holdings Group, LLC. The contract was for the Ecommerce Platinum Program, which cost $12,000. The contract also contained a chargeback policy that said EEB would charge me additional fees if I initiated and lost a chargeback with my bank. I signed the contract on January 19, 2023, and Pru signed the contract twice as CEO of their company. Attached as **Attachment A** is a true and correct copy of this contract.

8.  I believe I paid EEB through Stripe, because I had to break my payment up into three smaller payments of $3,000 each. I completed my payments in full to EEB on January 13, 2023. Attached as **Attachment B** is a true and correct copy of the three invoices of my payments to the company.

9.  After I bought EEB's program, I didn't receive any communication from them. I started going through EEB's academy program, and reached out to them for a status update, but never heard back. After about a week or two of not receiving any communications, I decided that I couldn't trust them and wanted a refund. I decided to send EEB a message and request a refund because I didn't receive any help or information from EEB after I paid them $12,000—which is a lot of money for me.

10. I sent my refund request to someone at EEB, and then EEB's COO, Ali, set up a call with me. Ali and a few other people from the company were on the call with me and I told them all during this call that I didn't want to do business with them anymore. At first, they begged me not to request a refund, but I told them: "no I don't want to do business with you anymore." After that Ali began to threaten me. Ali told me that I signed a contract with the company and that there was nothing I could do about it. Ali threatened to have the company's lawyer come after me. Ali also told me that if I requested a refund from my bank, then EEB would also charge me extra fees for requesting a refund from my bank. After Ali told me this, I decided to give EEB a chance to make my business for me because Ali's threats convinced me that I didn't have any real choice.

11. After this meeting all EEB did was create a website for me, and the website was connected to companies in China like CJ Drop Shipping and Aliexpress. The website took them two to three weeks to build, but I felt like the website that I paid $12,000 for was very simple. There was none of the automation that EEB had promised. It was just a website that connects people to different drop shipping companies. I also had to set up Stripe and PayPal accounts for my stores to process customers' payments.

12. EEB didn't disclose before I purchased the program that I was going to have to spend all of this money on advertisements, website fees, and shipping fees. Through EEB's business model, I had to buy products with my own money from the dropshipping companies in China when customers made purchases from my website. For example, when a customer bought a product from me, I would have to buy the products with my credit card first and pay for shipping from China. After customers bought products from my website it would then take the dropshipping companies in China about twenty additional days to get my products to my customers. This down time between purchase and when customers received my products destroyed any business I had from my website. This was the biggest issue for me, because customers won't wait twenty days for products they purchased when they could buy it somewhere else and get it faster.

13. My store never brought in many sales. I tried to sell different products, but none of them worked. For example, I tried selling filters for cooking oil and that product failed, then I tried selling Christmas lights around Christmas and my store didn't sell a single one. I tried to do some research for other products, but none of them worked out. EEB had promised that they would find a winning product niche, but they never did.

14. In addition to shipping issues and low numbers of sales from my websites, I had to spend thousands of dollars on advertisements and fees for the website EEB built for me. I was paying at least eighty-five dollars a month for the website hosting, and also paying for Facebook advertisements. No profits were coming into my business whatsoever.

15. After having these issues with the business, and no one from EEB reaching out to me for days after I bought the program, I realized this was just all a pipe dream and I wasn't going to make any money. EEB sold their business to me as "it was all done for you." EEB offered a coaching program for people who wanted to learn on their own, but I paid EEB a higher price for a business that was promised to be completely done for me. They claimed that AI would help my business a lot, and they claimed that they would teach me how to get rich, while flaunting the things they bought with all their money. But I never made any profits with their business, and I lost all of my money.

16. After watching EEB's advertisements and speaking to their representatives on the phone I was hoping to make an extra two thousand dollars a month. But I know business, profits come over time. I figured at first, I could make one thousand to two thousand dollars and then I could scale the business EEB built for me. The money I had to spend on advertising and shipping, however, made that impossible. EEB just took my money, didn't rush anything, and then had companies from China do all their fulfillment with delays. I don't remember EEB ever disclosing the China part of the business before I paid them. The entire business EEB sold me was built on lies. I was sold a lie.

17. I understand people exaggerate claims, but no one should be able to use fake claims. These people are taking other people's money and not doing anything about it. Pru was

an American, so I trusted that what he said about making money was true, but they sold you something that was not true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ___06 | 22___, 2024, in [City, State.] Camp Hill, PA

*[signature]*

Osasu Joseph

# Master SERVICE AGREEMENT

This Master Service Agreement ("Agreement") is entered into and effective as of __01 / 19 / 2023__ ("Effective Date"), between EMPIRE HOLDINGS GROUP, LLC a Wyoming Limited Liability Company with its principal place of business at 2370 York Rd., Jamison, PA 18929 ("EMPIRE") and __Osasu Joseph__ ("CLIENT"), with a principal place of business at ____. EMPIRE and CLIENT are each a "Party" and together are the "Parties".

WHEREAS, EMPIRE is in the business of offering services, including Business Consulting, Business Development, Team Building, Organizational Consulting, and Business Coaching (collectively, "Services");

WHEREAS, CLIENT seeks to retain the services of EMPIRE;

Now, therefore, for adequate consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. <u>Services</u>. Subject to the terms and conditions of this Agreement, EMPIRE agrees to provide, or arrange for a third-party to provide, at Client's expense, the Services, as defined in the Statement of Work ("SOW") annexed hereto and made a part hereof as Exhibit A ("Services") or which may be agreed to by the parties in the future. To the extent that the terms of a SOW conflict with the terms of this Agreement, the applicable SOW shall control.

2. <u>Term.</u> This Agreement is effective as of the Effective Date and continues in full force and effect for the period stated in the last expiring SOW ("Term") subject to CLIENT's strict compliance with the terms of this Agreement, unless terminated in accordance with the terms of this Agreement.

3. <u>Termination</u>. EMPIRE may terminate this Agreement upon thirty (30) days prior written notice to the CLIENT.

4. <u>Fees/Commissions</u>. Fees and/or commissions payable hereunder shall be paid in accordance with applicable SOWs or Fee Agreements agreed to by the Parties.

5. <u>Work Made for Hire</u>: The results and proceeds of EMPIRE's Services hereunder shall be deemed a "work-made-for-hire" specifically ordered by CLIENT. EMPIRE acknowledges and agrees that all copyrightable material, including writings, software, drawings, recordings, videos, audios, workbooks and designs, and all ideas, inventions, improvements, developments and discoveries made, conceived or reduced to practice by EMPIRE, whether individually or in collaboration with others, during the course of performance under this Agreement, are the sole property of CLIENT (the "Work"); and EMPIRE agrees to assign (or cause to be assigned) to CLIENT all right, title and interest in and to all such intellectual property associated with the Work, including without limitation any worldwide copyright(s), moral rights, patent(s) and any and all other such rights of whatever kind, and the right to obtain registrations, renewals, reissues and extensions of the same. EMPIRE shall ensure that all contractors working on this account shall agree to these terms. Notwithstanding the foregoing, it is acknowledged that EMPIRE and its staff have years of experience in connection with the Services and that EMPIRE's expertise, approaches, proprietary copy, templates and the like are EMPIRE's property. To the extent such materials incorporated into materials prepared hereunder for CLIENT, such materials are granted to CLIENT subject to a perpetual, irrevocable, non-exclusive, royalty-free license, solely for use in the Work.

6. <u>Representations and Warranties.</u>

    a. Neither Party shall use, copy nor disclose in any manner the Confidential Information of the other Party except as may be expressly permitted by this Agreement. "Confidential Information" means each Party's customer records, accounting records, and any technical, business, and financial information and data of a Party including, but not limited to, know-how, compilations, programs, inventions, methods, applications, techniques, processes, patents, trademarks and other intellectual property, trade secrets, ideas, pricing, customers and prospective customer identities, strategies, and other types of information similar to any or all of the above, whether the information is oral, visual or written and regardless of whether it is marked or identified as confidential. Each item of Confidential Information is independent of every other item of Confidential Information and the use, copying or disclosure of one such item shall not permit the use, copying or disclosure of any other item of Confidential Information.

    b. Confidential Information does not include the following, provided the Party receiving the information ("Receiving Party") can establish that the information: (i) was previously known to Receiving Party without any obligation to keep it confidential; (ii) was or became available to the public, provided the disclosure was not unauthorized and was not given under circumstances where it was intended to remain confidential; (iii) was developed by or on behalf of Receiving Party independent of any information Receiving Party learned through its engagement with the other Party or arising out of this Agreement or any prior relationship between the Parties; or (iv) was received from a person or entity other than the Party disclosing the information ("Disclosing Party") and the disclosure does not violate the Disclosing Party's rights to keep the information confidential unless there is a written agreement between the Parties to share such data between them.

7. <u>Data Privacy and Information Security</u>. Each Party will maintain administrative, physical and technical safeguards for the protection of the security, confidentiality and integrity of the other Party's Confidential Information and/or data that are consistent with industry standards for similar information and/or data. Each Party agrees that it will not take any steps to avoid or defeat the purpose of security measures associated with the Services, including without limitation: (i) the sharing of login information and/or passwords; (ii) attempts to compromise authentication protocol; (iii) reverse engineering of security measures or any software used in providing the Services; (iv) deconstruction or

public sharing of proprietary code; or (v) any other steps that would use any means to avoid or defeat (or allow others to avoid or defeat) existing security measures associated with the Services. Each Party shall notify the other immediately if it detects a breach of security.

8. <u>Mark Licenses</u>. Each Party hereby grants to the other a limited, revocable, non-exclusive, non-assignable, non-transferable license, without right to sublicense, to use its logos, brand names, and/or other trademarks or service marks, whether registered or unregistered ("Marks"), solely for use in connection with the Services. Marks must be reproduced as exact copies and all use of the Marks is subject to the licensor's usage guidelines as revised from time to time and available from the licensor. The licensee of the Marks ("Licensee") acknowledges and agrees that all right, title and interest in the Marks licensed by such other Party ("Licensor") is exclusively owned by Licensor, or its licensors (in which case Licensor has the right to sublicense its rights to the Marks as described in this paragraph), and that all use of Licensor's Marks inures to the benefit of Licensor. Licensee shall not assert any intellectual property or other ownership rights in the Licensor's Marks or in any element, derivation, adaptation, or variation thereof. Licensee shall not contest the validity of, or Licensor's ownership of, or licensed rights in, any of Licensor's Marks. Licensee shall not, in any jurisdiction, adopt, use, or register, or apply for registration of, whether as a corporate name, trademark, service mark or other indication of origin, or as a domain name, any of Licensor's Marks, or any word, name, symbol or device, in any combination confusingly similar to any of Licensor's Marks. Licensee may not alter Licensor's Marks in any manner, or use Licensor's Marks in any manner that may dilute, diminish, or otherwise damage Licensor's rights and goodwill in its Marks. Licensee may not use Licensor's Marks in any manner that implies sponsorship or endorsement by Licensor of Licensee services and products other than those expressly authorized by Licensor.

9. <u>Indemnity</u>. CLIENT shall defend, indemnify and hold harmless EMPIRE and its agents, employees, officers, directors, members, owners, successors and assigns from and against any and all claims, costs, damages, losses or expenses (including without limitation reasonable attorney fees and costs) arising out of CLIENT'S or any third party's negligence or willful misconduct, or CLIENT'S breach of this Agreement, including any warranty or representation made by CLIENT herein, or of any applicable laws or regulations. EMPIRE shall defend, indemnify and hold harmless CLIENT and its agents, employees, officers, directors, shareholders, owners, successors and assigns, from and against any and all claims, costs, damages, losses or expenses (including, without limitation, reasonable attorney fees and costs) arising out of EMPIRE's negligence or willful misconduct, or its breach of this Agreement, including any warranty or representation made by EMPIRE herein, or of any applicable laws or regulations.

10. <u>Limitations of Liability</u>. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER OR TO ANY THIRD PARTY FOR INCIDENTAL, CONSEQEUNTIAL, INDIRECT, EXEMPLARY, PUNITIVE OR OTHER SPECIAL DAMAGES REGARDLESS OF WHETHER SUCH PARTY HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES IN ADVANCE. THE LIMIT OF EMPIRE' LIABILITY FOR ANY DAMAGES ARISING HEREUNDER SHALL IN ANY EVENT BE NO MORE THAN THE TOTAL FEES PAID TO EMPIRE HEREUNDER, IF ANY.

11. <u>Non-Disparagement</u>. Each Party agrees for itself and all others acting on its behalf, either directly or indirectly: (i) Not to publish, repeat, utter and/or report any statement or observation, nor to take, encourage, induce or voluntarily participate in any conduct or action, that would negatively comment and/or reflect on, disparage, defame, impugn and/or call into question any other Party and/or any other Party's business operations, policies, practices and/or conduct or that of its directors, officers, members, shareholders, agents, employees, and/or affiliates; (ii) Not to act in any way with respect to any other Party's business operations, practices, policies and/or conduct that would impugn and/or damage any other Party's reputation, business relationships or present or future business, or the reputation of any other Party's past or present directors, officers, members, executives, shareholders, agents, employees or affiliates; and (iii) Not to comment about any other Party to any person or entity, including, but not limited to, the press (in any medium or format) or any other Party's customers and/or vendors concerning any Party's business operations, policies or conduct and/or actions. All Parties acknowledge that this provision is a material term of this Agreement, the violation of which shall be deemed a material breach hereunder.

12. <u>General Provisions</u>.

a. <u>Relationship of the Parties.</u>  The relationship of the Parties established by this Agreement is solely that of independent contractor, and nothing contained herein shall be construed to (i) give any Party the power to direct and control the daytoday activities of the other Party; or (ii) constitute such Parties as partners, joint venturers, coowners or otherwise as participants in a joint or common undertaking; or (iii) make either Party an agent of the other Party for any purpose whatsoever except as otherwise agreed in writing by the Parties hereto.  Neither Party shall be treated as an employee of the other Party for federal or state tax purposes, unemployment or disability benefits, or for any other withholding tax or insurance purposes.  Under no circumstances shall a Party hold itself out as an agent, employee, joint venturer, or partner of the other Party. Neither Party shall have any authority to bind the other Party to any contract or agreement unless expressly agreed to in writing.

b. <u>Amendments</u>.  This Agreement may only be amended by an instrument in writing signed by both Parties.  This Agreement shall be construed without regard to the Party that drafted it.  Any ambiguity shall not be interpreted against either Party and shall, instead, be resolved in accordance with other applicable rules concerning the interpretation of contracts.

c. <u>Compliance with Laws</u>.  Each Party shall comply with all applicable federal, state, local, or other laws and regulations applicable to such Party relevant to this Agreement.

d. <u>No Conflict with Other Agreements</u>. CLIENT represents that it is free to enter into this Agreement and that this engagement does not violate the terms of any agreement between the CLIENT and any third party.  Further, CLIENT, in rendering its duties, shall not utilize any invention, discovery, development, innovation or trade secret in which it does not have a proprietary interest.  During the term of this Agreement,

CLIENT shall devote as much of its productive time, energy and abilities to the performance of its duties hereunder as is necessary to perform the required duties in a timely, professional and productive manner as is specified by EMPIRE. EMPIRE represents to CLIENT that it may hold itself out as an independent contractor to other firms and companies, and may continue to do so during the term of this Agreement and thereafter, and such services shall not be deemed to be competitive with the services provided hereunder.

e. Governing Law. This Agreement and all Exhibits hereto shall be governed by and construed and enforced in accordance with Pennsylvania law, without giving effect to any state's conflicts of law principles. All disputes and claims relating to this Agreement, the rights and obligations of the parties hereto, or any claims or causes of action relating to the performance of either party that have not been settled through mediation will be settled by arbitration by the American Arbitration Association in Bucks County, PA in accordance with the Federal Arbitration Act and the Commercial Arbitration Rules of the American Arbitration Association. The costs of the arbitration proceedings will be borne by the losing party if such party is found to have been in material breach of its obligations hereunder. Each Party waives its right to a trial by jury for resolution of any disputes between the Parties arising from or in connection to this Agreement.

f. Attorneys' Fees and Costs. In any litigation or arbitration arising out of or related to this Agreement, the non-prevailing Party shall pay the prevailing Party's costs and expenses including, but not limited to, reasonable attorneys' and expert witness fees.

g. Force Majeure. EMPIRE shall not be liable for delays or any failure to perform the Services or this Agreement due to causes beyond its reasonable control. Any such excuse for delay shall last only as long as the event remains beyond EMPIRE's reasonable control. However, EMPIRE shall use its best efforts to minimize any such delays. EMPIRE must keep CLIENT reasonably informed of its plans to resume performance.

h. No Waiver. The failure of either Party at any time to require performance by the other Party of any provision of this Agreement shall in no way affect that Party's right to enforce such provisions, nor shall the waiver by either Party of any breach of any provision of this Agreement be taken or held to be a waiver of any further breach of the same provision or any other provision.

i. Binding Agreement. This Agreement shall benefit and be binding upon the Parties and their respective successors and permitted assigns.

j. Severability; Contract Construction. If any provision contained in this Agreement is held unenforceable, such provision shall be modified so that such provision is enforceable to the fullest extent allowed by law. In the event the provision cannot be so modified, it will be stricken without affecting the remaining provisions of this Agreement provided that without the provision this Agreement will continue to satisfy the intent of the Parties as set forth in this Agreement. The use of a term in the singular shall include the term in the plural. The headings are for reference only. Any reference to days is to calendar days, unless otherwise specified.

k. Notices. All notices, demands and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when (a) personally delivered, (b) deposited prepaid with a nationally recognized delivery service (such as Federal Express), (c) deposited prepaid in the United States mail, certified with return receipt requested, or (d) transmitted electronically by fax or electronic mail provided the sender receives an automated confirmation of delivery. All notices must be addressed to the Party at the address in the signature block below. A Party may change its address in writing in accordance with this Section 10(k), except that notices of change of address shall be effective only upon receipt.

l. Assignment. Either Party may assign or subcontract this Agreement, or the rights or duties created by this Agreement only with the prior written consent of the other Party. Either Party, at the Party's sole election, may assign any and all of its rights and obligations under this Agreement to any entity in which or with which the Party is sold, merged or consolidated.

m. Cumulative Remedies. All rights and remedies of each Party shall be in addition to all other rights and remedies available at law or in equity, including, without limitation, specific performance, and temporary and permanent injunctive relief.

n. Controlling Provision. To the extent of any express conflict between the provisions of this Agreement and the provisions of an Exhibit, the provisions of the Exhibit shall control.

o. The terms of EMPIRE's Privacy Policy and Terms of Service are incorporated herein by reference.

p. Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. Electronically transmitted signature pages shall be deemed originals for all purposes.

In witness whereof, the Parties have duly executed this Master Service Agreement effective as of the Effective Date.

| Empire Holdings Group, LLC<br><br>By: _____<br>Name: Peter Pru<br>Title: CEO | [ Osasu Joseph         ]<br><br>By: _____<br>Name: ~~Osasu Joseph~~<br>Title: _____ |
|---|---|

EXHIBIT A

STATEMENT OF WORK (SOW)

THIS STATEMENT OF WORK (this "Statement of Work" or "SOW") is made and entered this day of __01 / 19 / 2023_____ (the "SOW Effective Date") by and between Empire Holdings Group, LLC a Wyoming Limited Liability Company with offices at 2370 York Rd., Jamison, PA 18929 ("EMPIRE"), and __Osasu Joseph_____ having a principal place of business at ▆▆▆▆▆▆▆▆▆▆ ("Client") and shall be incorporated into the Master Services Agreement ("MSA") agreed to amongst the Parties as even date with the SOW Effective Date. By signing below, Customer acknowledges and agrees that it has read the MSA and agrees to be fully bound to its terms. Words in initial capital letters not defined herein shall have the meaning set forth in the MSA. EMPIRE and Client are each a "Party" and collectively the "Parties" hereto. In consideration of the mutual covenants and conditions contained in this SOW, and intending to be legally bound hereby, the Parties mutually agree as follows:

1. Services. Subject to the terms of the Agreement, EMPIRE shall provide "Services" including but not limited to:

"Ecommerce Platinum Program"

1. Ecommerce Subscription Sales Funnel Build

- Niche Selection & Validation
- Offer Selection & Creation
    i. Frontend Offer
    ii. Order Bump
    iii. Upsell Products
    iv. Subscription Upsell Product
    v. Thank You Page
    vi. 2 Bonus Information Products
- Subscription Sales Funnel Build
    i. Landing Page
    ii. Order Form
    iii. Order Bump
    iv. Upsell #1
    v. Upsell #2
    vi. Upsell #3 - Subscription Product
    vii. ThankYouPage
- Abandoned Cart Email Automation - 3 Emails
- Post Purchase Email Automation - 1 Email
- Sales Funnel Copywriting
    i. Landing Page
    ii. Order Form
    iii. Order Bump
    iv. Upsell #1
    v. Upsell #2
    vi. Upsell #3 - Subscription Product
    vii. ThankYouPage
- Advertising
    i. At least 1 piece of advertising copy
    ii. At least 3 pieces of advertising creatives
    iii. $250 in advertising spend to test funnel
- Phone Call Support

      i.    Two strategy calls during funnel build process

2. Team Support Access For __3 months__

- Access To Inner Circle Recordings Library
- Access To Inner Circle Advanced Trainings Library
- Three Inner Circle Zoom Calls Per Week
- On Demand Support Within BaseCamp Dashboard

2. Term. This SOW shall be effective as of the SOW Effective Date and shall continue until terminated in accordance with the MSA between the parties.

3. Fees/Commissions. Client agrees to pay the following Fees and/or Commissions in accordance with the terms of the MSA. Except as expressly provided in this SOW, Client shall pay all Fees net thirty (30) days from the invoice date.

Chargeback Policy: In the event CLIENT files a Chargeback against Empire Holdings Group accidentally or otherwise and the Chargeback is not decided in CLIENT's favor – CLIENT will be charged an administrative response processing fee of $500.00 on behalf of Empire Holdings Group. It is strongly encouraged that CLIENT contact our Customer Processing Department at peter@ecommerceempirebuilders.com to assist CLIENT with any billing concerns before considering filing a Dispute or Chargeback with CLIENT's bank or Credit Card Company.

Guarantee of Service: In the event EMPIRE provides services that do not conform to this agreement, EMPIRE will re-perform Ecommerce Platinum Program services as well as extend support at no additional cost.

Payment Terms: The service is billed one time or monthly basis and is non-refundable. There will be no credits or refunds for partial months of service. If CLIENT subscribes to any of the paid portions of the Services, CLIENT understands that once CLIENT has become a Subscriber, CLIENT's subscription will be automatically renewed and CLIENT's credit card will be charged based on the subscription program (e.g., monthly). Payment is due on the defined recurring billing date. Service will be interrupted on accounts that reach 10 days past due. In the event a payment installment plan is indicated per agreement and is not paid within 30 days or less, Customer will only receive completed services (Ecommerce Platinum Program) in Customers account. No further services will be provided by Empire Holdings Group in reference to but not limited to advertising or Team Support Access.

SERVICES: Ecommerce Platinum Program Billing Amount $ __$12,000__

4. General. Amendments to this SOW are governed by the MSA and must be in writing and executed by both Parties. The MSA, together with this SOW (as incorporated under the MSA) and any associated SOWs referenced herein constitute the entire agreement between the parties with respect to the subject matter of this SOW. To the extent that there is any inconsistency between the MSA and this SOW, the terms of this SOW shall control. This SOW is accepted and agreed by the Parties as of the SOW Effective Date. The individuals signing below represent they have authority to bind the named Parties to this SOW.

| EMPIRE HOLDINGS GROUP LLC | |
|---|---|
| By (Signature): *[signature]* | By (Signature): *[signature]* |
| Name (Printed): Peter Pru | Name (Printed): Osasu Joseph |
| Job Title: CEO | Email: *[redacted]* |
| | |
| | |

Doc ID: 387cfb916c5aa7507224f033ae3bd54a2467a3b7

 **Dropbox Sign**                                              Audit trail

| | |
|---|---|
| Title | Ecommerce Platinum Program |
| File name | Ecommerce Platinu...Agreement (1).pdf |
| Document ID | 387cfb916c5aa7507224f033ae3bd54a2467a3b7 |
| Audit trail date format | MM / DD / YYYY |
| Status | ● Signed |

## Document History

**SENT** — **01 / 19 / 2023** 18:01:23 UTC
Sent for signature to Osasu Joseph (████████████)
from peter@ecommerceempirebuilders.com
IP: 108.226.136.156

**VIEWED** — **01 / 19 / 2023** 18:27:41 UTC
Viewed by Osasu Joseph (████████████)
IP: ████████

**SIGNED** — **01 / 19 / 2023** 18:55:01 UTC
Signed by Osasu Joseph (████████████)
IP: ████████

**COMPLETED** — **01 / 19 / 2023** 18:55:01 UTC
The document has been completed.

Powered by **Dropbox Sign**





| INVOICE TO | DATE | INVOICE |
|---|---|---|
| **Osasu Joseph** | **January 13, 2023** | **1539** |

| DESCRIPTION | AMOUNT (USD) |
|---|---|
| E-Commerce Platinum Program payment 1 | 3,000.00 |

**TOTAL** / USD   **$3,000.00**

This purchase is subject to the terms of our Privacy Policy and Terms of Service

Attachment B

PX6   FTC-000575





| INVOICE TO | DATE | INVOICE |
|---|---|---|
| **Osasu Joseph** | **January 13, 2023** | **1540** |

| DESCRIPTION | AMOUNT (USD) |
|---|---|
| E-Commerce Platinum Program payment 2 | 3,000.00 |

**TOTAL** / USD     **$3,000.00**

This purchase is subject to the terms of our Privacy Policy and Terms of Service

**Attachment B**



| INVOICE TO | DATE | INVOICE |
|---|---|---|
| **Osasu Jospeh** | **January 13, 2023** | **1542** |

| DESCRIPTION | AMOUNT (USD) |
|---|---|
| E-Commerce Platinum Program final payment (3 months) | 3,000.00 |

**TOTAL** / USD  **$3,000.00**

This purchase is subject to the terms of our Privacy Policy and Terms of Service

Attachment B