IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____
                                                        )
FEDERAL TRADE COMMISSION            )
                                                        )
    Plaintiff,                                     )
                                                        )
    v.                                                )  Case No.  2:24-CV-4949
                                                        )
EMPIRE HOLDINGS GROUP LLC,         )
d/b/a ECOMMERCE EMPIRE BUILDERS )
and STOREFUNNELS.NET, a limited liability )
company, and PETER PRUSINOWSKI    )
Individually and as officer of                    )
Empire Holdings Group LLC                     )
                                                        )
    Defendants.                                  )
_____ )

## DEFENDANTS' OPPOSITION TO
## FTC'S MOTION FOR TEMPORARY RESTRAINING ORDER

Defendants Empire Holdings Group LLC d/b/a E-Commerce Empire Builders ("EEB") and Peter Prusinowski, by counsel, submit their opposition to the FTC's Motion for a Temporary Restraining Order (ECF No. 2) ("TRO Motion").  The FTC has grossly overreached, offering an incomplete and slanted factual and legal presentation to this Court on an emergency basis without meaningful notice to Defendants.  The issues and arguments should not be decided so fast.  Although the FTC clearly spent months preparing its filings, Defendants have received approximately twenty-four hours to oppose and therefore request that this Court consider extending the current hearing date (September 20, 2024, 10:30 am ET) so the FTC's TRO Motion can be decided on a more complete, accurate, and balanced record.  Nevertheless, for the reasons set forth herein, the FTC's TRO Motion should be denied.

## INTRODUCTION

To attack EEB's advertising as false and deceptive, the FTC's TRO Motion relies on

1

advertising snippets, speculative expert opinion that is at odds with the actual evidence, and three declarations from dissatisfied clients who are not representative of the whole.

As for its legal argument in support of an asset freeze and receiver, the FTC overlooks the U.S. Supreme Court's *AMG Capital* decision holding that the FTC cannot recover money under Section 5 of the FTC Act and the FTC overlooks the Business Opportunity Rule's plain language and the FTC's own statements confirming it does not apply to services like those here.

Further, the extraordinary order the FTC seeks would inflict extraordinary harm not only on Defendants, but on approximately 250 clients who rely on EEB's valuable educational, consulting, and/or software services so they can better operate their own successful e-commerce businesses.

The Court should not accept the FTC's factual record and legal arguments at face value, but should either continue the hearing so that Defendants have a meaningful opportunity to respond or should now deny the FTC's TRO Motion.

**FACTUAL BACKGROUND**

EEB takes great pride in helping clients build and scale their own, independent e-commerce businesses by providing education, consulting, and software services. The declaration by Ali Akbar Gulshan, Chief Operating Officer, provides a detailed description of these services, from assisting with niche and domain selection, to helping clients with market research, to helping clients with copywriting and creative assets, all the while providing ongoing support. *See* A. Gulshan Declaration, attached as Exhibit 1. In every respect, however, the client is making their own decisions and operating their own e-commerce business. *Id.*

EEB also takes great pride in the success of its approximately 250 clients. As explained in the declaration by Peter Prusinowski, he and others founded the company in 2018. *See* P.

Prusinowski Declaration, attached as Exhibit 2.  Mr. Prusinowski has himself built, grown, and scaled several six and seven-figure e-commerce businesses across various product niches, including fishing tackle and sporting goods.  *Id.*  With EEB, he set out to leverage his in-depth industry knowledge, experience, and success to help others understand how to build and scale their own e-commerce businesses.  *Id.*  He, Mr. Gulshan, and other personnel have learned firsthand, sometimes from their own mistakes, how to handle, navigate, and overcome the variety of challenges associated with e-commerce.

The services provided by EEB have, in turn, led to industry knowledge, experience, and success for the company's clients.  Over the past twenty-four hours, several clients have come forward to attest to this.

- Ms. Crista Jones explains that she launched her business "Dave Gourmet Seafood" in April 2024, her business sells gourmet canned seafood caught in the North Pacific, she has generated $34,000 in total revenue, and she is currently averaging $18,000 in monthly revenue.  *See* C. Jones Declaration, attached as Exhibit 3.

- Mr. Russ Clark explains that he launched his fishing tackle business in May 2022, he has generated approximately $30,000 in total revenue, and he is currently averaging approximately $5,000 in monthly revenue.  *See* R. Clark Declaration, attached as Exhibit 4.

- Mr. Anthony Begert explains that he launched his crystals and gemstones business in November 2019, he has generated over $2 million in total revenue, and he is currently averaging approximately $25,000 in monthly revenue.  *See* A. Begert Declaration, attached as Exhibit 5.

- Mr. Zach Florez explains that he launched his gadget home labs business in February

2021, he has generated $10,300 in total revenue, and he is currently averaging approximately $2,000 in monthly revenue.  *See* Z. Florez declaration, attached as Exhibit 6.

- Mr. Joel Monge explains that he launched his craft supply business in April 2023, he has generated $55,248.52 in total revenue, and he is currently averaging approximately $10,000 in monthly revenue.  *See* J. Monge Declaration, attached as Exhibit 7.

- Mr. Marc Ladner explains that he launched his "North Star Originals" business in November 2023, his business sells embroidery products, he has generated $111,419.21 in total revenue, and he is currently averaging approximately $11,100 in monthly revenue.  *See* M. Ladner Declaration, attached as Exhibit 8.

The declarants each explain that they are proud to have earned EEB $10K, $50K, Six Figure, or Seven Figure awards based on their business revenues and success.  *See* Exhibits 3-8.

Importantly, the declarants each explain that they started their own business, chose their own product, selected their own manufacturer or product source, and run their own business.  *See* Exhibits 3-8.  Likewise, the declarants each explain that EEB and Mr. Prusinowski did not attempt to sell them a business or provide them with any outlets, accounts, or customers for their business.  *Id.*  Rather, the declarants each explain that EEB provided them with consulting services on how their business could market and sell the products they selected to customers, that they were and remain very pleased with EEB's services, and that they would not have been able to develop and launch their successful business without EEB's services.  *Id.*

The above evidence is more current and far more compelling than what the FTC has presented despite an investigation apparently spanning months. The reality is that, notwithstanding a handful of client complaints, EEB provides valuable services and helps its clients.  With the

benefit of additional time, EEB and its clients would be able to furnish the Court with many similar declarations from many satisfied and successful clients.

## ARGUMENT

I.  **Because Monetary Relief Is Not Available Under Section 5 of The FTC Act, The FTC Cannot Obtain An Asset Freeze Under Section 5 of the FTC Act**

As a properly developed evidentiary record would show, Defendants have not violated Section 5 of the FTC Act, 15 U.S.C. § 45(a).  The advertising claims the FTC relies upon are true, not misleading, and substantiated.  Indeed, contrary to the FTC's speculative argument that EEB's advertising is false or misleading, the declarations of Crista Jones, Russ Clark, Anthony Begert, Zach Florez, Joel Monge, and Marc Ladner alone confirm that EEB's clients *have* generated "$10,000, $50,000, and 7 Figures in their eCommerce businesses." *See* Exhibits 3-8.  In its advertising and as confirmed by the declarants, EEB also conspicuously highlights that its most successful clients are just that, rather than typical, including by awarding "Empire Builder Trophies" to its most successful clients and thus emphasizing that these clients have achieved award winning, rather than average, success.  *Id.*

The FTC nevertheless asserts that this information and testimonials from successful clients "are misleading because a reasonable consumer would believe that he or she could achieve a similar outcome."  The assertion is not grounded in evidence or common sense.  By the FTC's logic, a university could not tout its successful alumni in marketing materials without prospective students being misled.  The FTC presents no evidence that reasonable consumers or any statistically significant percentage of Defendants' clients have been misled.  The fact that a small number of EEB clients were dissatisfied or that the FTC's expert believes it is hard to generate revenue as a start-up e-commerce business does not mean that Defendants have engaged in "deceptive acts or practices in or affecting commerce" in violation of Section 5 of the FTC Act.

5

Putting aside the merits, the FTC's reliance on Section 5 of the FTC Act in support of an asset freeze or receiver is entirely misplaced because the FTC is not permitted to obtain consumer redress, penalties, or other monetary relief on this claim.  The U.S. Supreme Court made this clear in *AMG Capital Management, LLC v. FTC*, 593 U.S. 67, 82 (2021), unanimously holding that the FTC Act "does not grant the Commission authority to obtain equitable monetary relief."  *See also FTC v. Am. Future Sys., Inc.*, No. CV 20-2266, 2024 WL 1376026, at *2 (E.D. Pa. Mar. 29, 2024) ("Courts may not award monetary damages for prior violations of the FTC Act").  The FTC has acknowledged this prohibition and tried to remedy it with its March 2022 Advance Notice of Proposed Rulemaking on Earnings Claims, explaining that *AMG Capital* prevents it from seeking "monetary relief under section 13(b) of the FTC Act for violations of the FTC Act and other statutes."  87 Fed. Reg. 13951, 13952.  Thus, the FTC has proposed (but not yet issued) a rule to allow the FTC to pursue monetary relief when challenging misleading earnings claims in various contexts including "coaching or mentoring, education, work-from-home, 'gig' work, and other job opportunities, multi-level marketing opportunities, franchise, e-commerce or other business opportunities, chain referral schemes, and other investment opportunities as well as other types of business or money-making opportunities."  87 Fed. Reg. 13951, 13953.

Because the FTC cannot pursue consumer redress, penalties, or other monetary relief for alleged violations of Section 5 of the FTC Act, the FTC cannot rely on this claim as support for an asset freeze or a receiver.  It simply cannot obtain money on this claim.  Further, provided that the order not mandate an asset freeze or receiver, Defendants have confirmed to the FTC that they are willing to enter into a stipulated order by which Defendants are ordered to comply and agree to comply with Section 5 of the FTC Act going forward.

## II.     EEB's Services Are Not A "Business Opportunity" Under the FTC's Business Opportunity Rule

The extraordinary order sought by the FTC's TRO Motion is, in fact, entirely dependent on its claim under the Business Opportunity Rule, 16 C.F.R. § 437. If the FTC cannot demonstrate a likelihood of success on this claim, the FTC cannot meet its burden and the TRO Motion must be denied. This issue is not a close call. Based on the Business Opportunity Rule's plain language as well as the FTC's own statements about it, the Business Opportunity Rule does not apply to EEB's educational, consulting, and software services and the FTC cannot prevail on this claim.

The Business Opportunity Rule narrowly defines what constitutes a "business opportunity." The Rule provides:

> (c) **Business opportunity** means a commercial arrangement in which:
>
> (1) A seller solicits a prospective purchaser to enter into a new business; and
>
> (2) The prospective purchaser makes a required payment; and
>
> (3) The seller, expressly or by implication, orally or in writing, represents that the seller or one or more designated persons will:
>
>> (i) Provide locations for the use or operation of equipment, displays, vending machines, or similar devices, owned, leased, controlled, or paid for by the purchaser; or
>>
>> (ii) Provide outlets, accounts, or customers, including, but not limited to, Internet outlets, accounts, or customers, for the purchaser's goods or services; or
>>
>> (iii) Buy back any or all of the goods or services that the purchaser makes, produces, fabricates, grows, breeds, modifies, or provides, including but not limited to providing payment for such services as, for example, stuffing envelopes from the purchaser's home.

16 C.F.R. § 437.1(c). In issuing the Business Opportunity Rule, the FTC also made clear that the final rule's definition of "business opportunity" was intentionally narrow, explaining:

> [T]he IPBOR would have unintentionally swept in numerous commercial

arrangements, including retail product distribution, training and/or educational organizations, where there was little or no evidence that fraud was occurring. Recognizing this legitimate concern, the Commission, in the RNPR, proposed to narrow the definition of "business opportunity." Specifically, the RPBOR provided that the "required payment" prong of the business opportunity definition would not include payments for the purchase of reasonable amounts of inventory at bona fide wholesale prices; eliminated as an element of the business opportunity definition the making of an earnings claim; and narrowed the types of "business assistance" that would trigger the business opportunity definition to just those types of assistance that are the hallmark of business opportunity fraud: Location, account, and "buy-back" assistance.

76 Fed. Reg. 76816-01, 76819, 76820 (Dec. 8, 2011). Indeed, the FTC made clear that the final rule's definition of "business opportunity" would not even include multi-level marketing companies, explaining "the Commission determined that the IPBOR was unworkable with respect to MLMs and would have imposed greater burdens on the MLM industry than other types of business opportunity sellers without sufficient countervailing benefits to consumers." 76 Fed. Reg. 76816-01, 76819 (Dec. 8, 2011).

More recently, the FTC has further highlighted the narrow scope of the Business Opportunity Rule. In its November 2022 Advance Notice of Proposed Rulemaking Concerning the Business Opportunity Rule, the FTC explained:

> The Commission is … soliciting comments to inform its consideration of whether the Rule should be extended to include business opportunities and other money-making opportunity programs not currently covered by the Rule, including business coaching and work-from-home programs, investment coaching programs, and e-commerce opportunities.

87 Fed. Reg. 72428-01, 72429 (Nov. 25, 2022). Accordingly, the FTC asked:

> Should the Rule be expanded to more broadly include coaching or mentoring programs, work-from-home opportunities, e-commerce opportunities, other investment opportunities, or other types of business or money-making opportunities not currently covered by the Business Opportunity Rule?

87 Fed. Reg. 72428-01, 72430 (Nov. 25, 2022). In her accompanying statement, FTC Chair Lina Khan further explained:

> [The Business Opportunity Rule is] written in a way that doesn't necessarily capture some business models and practices that have become more widespread in the decade since it was last amended. …. The ANPR notes several varieties of scams that may fall outside the scope of the existing rule. These include certain kinds of business coaching and work-from-home programs, investment programs, and e-commerce opportunities.

87 Fed. Reg. 72428-01, 72433 (Nov. 25, 2022). To date, the FTC has not issued a new and broader Business Opportunity Rule. Yet, it is exactly because the current Business Opportunity Rule is so narrow, and does not include activities like business coaching and e-commerce opportunities, that the FTC wants to issue a new and broader rule.

In this case, however, the FTC is ignoring its prior statements as well as the rulemaking process and simply trying to expand the scope of the Business Opportunity Rule in litigation. EEB's services do not constitute a "business opportunity" under the Business Opportunity Rule because EEB does not sell a business to their clients, nor does it provide clients with any customers, outlets, or accounts, nor does it provide any kind of "buy back" assistance. Rather, as explained in the accompany declarations, EEB provides e-commerce education, consulting, and software services to clients who form and have their *own* independent e-commerce businesses and who make their *own* decisions about products, product fulfillment, and customer acquisition. *See* Exhibits 1-8.

The fact that the Business Opportunity Rule does not apply here is further reinforced by the FTC's past cases and its statements about them. In its Advance Notice of Proposed Rulemaking, the FTC cited several cases where it did not bring, and apparently recognized it could not bring, a claim under the Business Opportunity Rule. The FTC identified the following cases concerning "coaching or mentoring programs": *FTC* v. *OTA Franchise Corp.,* No. 8:20-cv-287 (C.D. Cal. filed 2020); *FTC* v. *Ragingbull.com, LLC,* No. 1:20-cv-3538 (D. Md. filed 2020); *FTC* v. *Zurixx LLC,* No. 2:19-cv-713 (D. Utah filed 2019); *FTC* v. *Nudge LLC,* No. 2:19-cv-867 (D.

9

Utah filed 2019); *FTC* v. *Mobe Ltd.,* No. 6:18-cv-862 (M.D. Fla. filed 2018); *FTC* v. *Digit. Altitude,* No. 2:18-cv-0729 (C.D. Cal. filed 2018).  The FTC identified these cases concerning "work-from-home opportunities": *FTC* v. *Moda Latina BZ Inc.,* No. 2:20-cv-10832 (C.D. Cal. filed 2020); *FTC* v. *8 Figure Dream Lifestyle LLC,* No. 8:19-cv-1165 (C.D. Cal. filed 2019).  The FTC identified these concerning "e-commerce opportunities": *FTC* v. *Nat'l Web Design, LLC,* No. 2:20-cv-846 (D. Utah filed 2020); *FTC* v. *Advert. Strategies, LLC,* No. 2:16-cv-3353 (D. Ariz. filed 2016).  Even though the activities at issue may have qualified as promoting a "business opportunity" under the ordinary meaning of the words, the activities were not a "business opportunity" within the scope of the Business Opportunity Rule.  The same is true here.

Tellingly, the FTC's TRO Motion does not cite a single case to support that the Business Opportunity Rule applies to EEB's services.  The only case the FTC cites and relegates to a footnote, *FTC v. Money Now Funding LLC*, 2015 WL 11120847, *2 (D. Ariz. July 1, 2015), was a default judgment that bears no relation to the facts here.  It involved an alleged cash advance referral business opportunity scheme where Money Now Funding ("MNF") and other defaulting defendants (i) solicited consumers to enter into a new business as sales agents for MNF; (ii) required consumers to make a payment to enter into the MNF business opportunity; (iii) represented that MNF would provide consumers with a website on which small businesses could sign up and be referred by the consumer to MNF for cash advances; and (iv) told consumers they would market the consumer's services to purchased leads and pay consumers when businesses they referred obtained MNF loans.  *Id.* at *3.  This has nothing in common with a business like EEB that provides educational, consulting, and software services to clients who form and run their own independent e-commerce businesses.

The Business Opportunity Rule section of the FTC's TRO Motion cites no supporting case

10

law because there is none.  The FTC should not be permitted to now bypass the rulemaking process and broaden the scope of the Business Opportunity Rule through litigation.  Because the Business Opportunity Rules does not apply to EEB's services, the FTC cannot demonstrate a likelihood of success on its claim and its TRO Motion should be denied.

**III.     The CRFA Claim Does Not Warrant An Asset Freeze Or Receiver**

The FTC's claim under the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b(b)(1)(A), does not warrant the grant of the FTC's TRO Motion.  The gravamen of the FTC's action is that consumers are suffering ongoing, immediate harm by allegedly deceptive earnings claims.  It is not that consumers are suffering similar harm because of a mutual non-disparagement provision in EEB's client agreement.  Nor could any possible harm flowing from this provision warrant an emergency freeze against all assets of a business and its owner or warrant the appointment of a receiver over that business.

Further, in many instances, the FTC has pursued CRFA claims only at an administrative level, without any asset freeze or receiver, and without seeking or obtaining monetary relief.  *See In the Matter of Shore To Please Vacations LLC, A Limited Liability Company, and Robert Aaron Stephens, Individually and As Manager of Shore To Please Vacations LLC*, No. 182-3088, 2019 WL 3935307 (F.T.C. July 19, 2019); *In the Matter of Staffordshire Property Management, LLC*, No. 182-3084, 2019 WL 3935301 (F.T.C. July 25, 2019); *In the Matter of A Waldron Hvac, LLC, A Ltd. Liab. Co., d/b/a Waldron Elec. Heating & Cooling, LLC, & Thomas J. Waldron, Individually & As A Manager of A Waldron Hvac, LLC.*, No. 182-3077, 2019 WL 2118887 (F.T.C. May 8, 2019); *In the Matter of National Floors Direct, Inc., A Corporation*, 2019 WL 3935303 (F.T.C. Aug. 14, 2019); *In the Matter of Lvtr LLC, A Ltd. Liab. Co., d/b/a Las Vegas Trail Riding, & Tomi A. Truax, Individually & As A Manager of Lvtr LLC*, No. 182-3098, 2019 WL 3935309 (F.T.C. June 19, 2019).  It would be unprecedented and punitive for the FTC to destroy the future

of a business and its owner here.

Most importantly, there is no need for a temporary restraining order compelling compliance with the CRFA because Defendants recognize the issue and are working as quickly as possible to remedy it. To that end, EEB is now preparing to contact all past and present clients in writing to inform them that the mutual non-disparagement provision in EEB's client agreement is not valid and not enforceable. Defendants will likewise agree to a stipulated order requiring they do the same. Because EEB is now taking prompt action to remedy the issue and because any possible harm in connection with the CRFA claim does not warrant an asset freeze or a receiver, the FTC's TRO Motion should be denied.

**IV.     There Is No Evidence of Any Ongoing Consumer Harm and Defendants' Evidence Instead Demonstrates Ongoing Client Success**

The FTC has identified no recent evidence to support any ongoing or imminent consumer harm. Although the FTC relies on declarations from three past EEB clients, one used EEB's services in 2021 and the two others used EEB's services in 2022 and thus all would have relied on advertising published and services provided years ago. *See* PX 4-6. Additionally, while the FTC notes that it has complaints in its Sentinel database, there are only three in 2024 and none since April 1, 2024. *See* PX 1 at pp. 188, 196, 200.

By contrast, EEB has quickly provided impactful evidence that squarely focuses on the present and overpowers the FTC's evidence. Crista Jones, Russ Clark, Anthony Begert, Zach Florez, Joel Monge, and Marc Ladner, all current EEB clients, each explain that EEB has provided valuable services, they were not misled, and they have achieved and continue to achieve business success. *See* Exhibits 3-8. Ali Akbar Gulshan explains that EEB works tirelessly and in a variety of ways to help clients and their success. *See* Exhibit 1. Further, Mr. Prusinowski explains again and again that, contrary to the FTC's speculation, the past earnings claims at issue were true. *See*

Exhibit 2. While the FTC's declarations indicate an investigation spanning several months, the FTC was not able to present day evidence. Yet, Defendants have furnished the relevant present day evidence in approximately twenty-four hours.

The FTC uses rhetoric, *i.e.*, "ongoing scam," rather than present day evidence. With the benefit of additional time, Defendants would be able to introduce even more impactful evidence to support that the FTC's rhetoric is unfounded, that EEB's clients are generally satisfied and successful, and that there is no ongoing or imminent consumer harm. In all events, the FTC has not met its burden and its TRO Motion should be denied.

## V. The Requested TRO Would Cause Severe Harm For EEB's Clients

Finally, the FTC's TRO Motion ignores the grave and permanent harm that the requested TRO would impose on EEB's clients. As explained by Mr. Prusinowski, EEB's services include the Storefunnels.net software solution, similar to the software provided by Shopify. *See* Exhibit 2. In the event of an asset freeze and appointment of a receiver, Mr. Prusinowski, Mr. Gulshan, and other EEB personnel would no longer be in a position to support the 250 e-commerce businesses that use Storefunnels.net and these businesses would suffer immediate disruption affecting their advertising campaigns, websites, and orders. *Id.* Their businesses could come to an abrupt end.

The FTC may argue that a receiver would be able to maintain these services without disruption. This is simply not realistic. A court-appointed receiver is likely an excellent lawyer, but it takes entirely different and specialized knowledge, experience, and skill to support e-commerce business owners selling all variety of different products with education, consulting, and software services. The notion that a lawyer could run the day-to-day operations of EEB without disruption to 250 e-commerce businesses would be akin to asserting that a lawyer could seamlessly run the kitchen of a popular restaurant, the operating room of a busy hospital, or the cockpit of a

passenger airplane.  It is neither practical, nor necessary.

## CONCLUSION

As explained above, Defendants are willing to enter into a stipulated order providing that they will comply with Section 5 of the FTC Act and will notify all past and current clients that the mutual non-disparagement provision of EEB's client agreement is not valid or enforceable. Defendants are further willing to enter into a stipulated order providing that they will preserve all potentially discoverable evidence and will not dissipate any business or personal assets.

The FTC's request for an asset freeze and appointment of a receiver, however, goes too far.  The FTC's request is not supported by its claim under Section 5 of the FTC Act, its claim under the Business Opportunity Rule, or its claim under the Consumer Review Fairness Act.  Nor has the FTC presented evidence to establish any imminent or ongoing consumer harm or addressed the grave and permanent harm the requested TRO would inflict on many other businesses.

For the foregoing reasons, the Court should deny the FTC's TRO Motion.

Date:  September 20, 2024

Respectfully submitted,

*/s/ Clair E. Wischusen*
Clair E. Wischusen (Bar No. 306752)
Ryan Poteet (*pro hac vice* pending)
Stephan Freeland (*pro hac vice* pending)
GORDON REES SCULLY MANSUKHANI, LLP
277 S. Washington Street, Suite 550
Alexandria, Virginia 22314
Tel. (202) 399-1009
Fax (202) 800-2999
cwischusen@grsm.com
rpoteet@grsm.com
sfreeland@grsm.com

*Counsel for Defendants*
*Empire Holdings Group LLC and*
*Peter Prusinowski.*

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on this 20th day of September 2024, a true and accurate copies of the foregoing Defendants' Opposition to FTC's Motion for Temporary Restraining Order was electronically filed via the Court's ECF system, and were thereby served upon all counsel of record.

                                            By:    */s/ Clair E. Wischusen*
                                                       Clair E. Wischusen