UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　Plaintiff,<br><br>　　v.<br><br>EMPIRE HOLDINGS GROUP LLC, also d/b/a ECOMMERCE EMPIRE BUILDERS and STOREFUNNELS.NET, a limited liability company, and<br><br>PETER PRUSINOWSKI, aka PETER PRU, individually and as an officer of Empire Holdings Group LLC,<br><br>　Defendants. | Case No. 2:24-CV-4949-WB<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' EMERGENCY MOTION TO AMEND TEMPORARY RESTRAINING ORDER** |

**I.     INTRODUCTION**

Defendants' Emergency Motion to Amend the Court's TRO Order, Doc. 24, seeks, prior to the preliminary injunction stage, a second bite at the apple regarding the asset freeze and the receivership following the Court's careful consideration of the issues based on extensive live argument and written submissions.  As the Court explained during the TRO hearing, it granted the freeze "specifically premised on maintaining the status quo and [e]nsuring that the assets can be located" for a short time until it determines after the hearing whether to issue a preliminary injunction.  Hrg. Tr. at 50:19-20 (attached as PX 10). At that time, Defendants may make their legal and factual arguments against a preliminary injunction and continued freeze.  Although Defendants are correct about some aspects of the law and record, their overall conclusion that the TRO's asset freeze is tainted by fatal legal error is incorrect.  And even assuming *arguendo* that

1

their argument has merit, the TRO can readily be cured and a future preliminary injunction may address it.

## II.     ARGUMENT

FTC submits that Defendants' motion is premised on an overly limited interpretation of the law permitting a TRO asset freeze during the short time period until consideration of a preliminary injunction.

### A. Relevant Background

As an initial matter, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes enjoining violations of "any provision of law enforced by" the FTC, "includ[ing] the ability 'to grant any ancillary relief necessary to accomplish complete justice.'" *In re Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d 424, 462 (D.N.J. 1998) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994)). After *AMG*, such ancillary relief continues to include TROs and preliminary injunctions. *See AMG Capital Mgmt. v. FTC*, 593 U.S. 67, 72, 76 (2021); *see also FTC v. On Point Cap. Partners*, 17 F.4th 1066, 1079 (11th Cir. 2021) (post-*AMG*, "[p]rospective injunctive relief is still allowed under § 53(b)").[1]

To obtain a TRO, the FTC must make "a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public

---

[1] Nothing in *AMG* limits FTC's ability to obtain monetary relief necessary to redress injury to consumers under section 19 of the FTC Act. *AMG*, 593 U.S. at 82 ("Nothing we say today, however, prohibits the Commission from using its authority under § 5 and § 19 to obtain restitution on behalf of consumers.")  Where, as here, defendants violate FTC rules and statutes, FTC may obtain consumer redress directly in federal court.  15 U.S.C. § 57b(a)(1).  FTC may also obtain consumer redress for Section 5(a) violations by proceeding administratively, obtaining a final cease and desist order, and then commencing a federal court action pursuant to Section 19(a)(2) if "the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent." *Id.* § 57b(a)(2).  Even where FTC proceeds administratively, it may seek preliminary injunctive relief in federal court pursuant to Section 13(b).  15 U.S.C. § 53(b).

interest." 15 U.S.C. § 53(b); *see also FTC v. Penn State Hershey Med. Ctr.*, 914 F.3d 193, 197 (3d Cir. 2019). On the record during the TRO hearing, the Court found a likelihood of success on the Section 5 deception claims (Count I) and that the public equities outweighed the private equities, favoring granting preliminary injunctive relief. Hrg. Tr. 44:23-25, 49:9-11.

Defendants' motion specifically takes aim at the asset freeze provision of the TRO. "A freeze of assets is designed to preserve the status quo by preventing the dissipation and diversion of assets." *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000) (citing *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993)). "When . . . business operations are permeated by misrepresentations and fraud, the likelihood that assets may be dissipated during the pendency of the legal proceedings is strong." *Nat'l Credit Mgmt. Grp.*, 21 F. Supp. 2d at 462.

As set forth in FTC's TRO motion and exhibits, Defendants have a history of dissipating corporate assets for personal and other use unrelated to the running of the business, including vehicle payments, luxury watches, brokerage and investment accounts, art, landscaping services, home improvement services, personal retirement accounts, and a payment to a golf club. Doc. 2 Br. at 35-36 & nn. 153-56.

In fact, the FTC has recently learned that once Defendants received notice of this action, on September 19, 2024, Mr. Prusinowski transferred $477,000 to the law firm of Gordon Rees Scully Mansukhani, which represents Defendants in this action. PX 11 (Joyner Decl. at ¶ 12). $77,000 of those funds were transferred directly from Empire Holdings Group LLC ("Company") and $400,000 was transferred from an asset protection account controlled by Defendant Prusinowski and his wife, PX11 (Joyner Decl. at ¶ 12). The $400,000 from the asset protection account also represents dissipated corporate assets because at least from January 2024

to August 2024, Defendant Prusinowski often transferred large sums of money from bank accounts, including at least one transfer directly from the Corporate account, to personal accounts—thereby placing the company in a precarious financial position as it operated on a month-to-month basis where funds entered the account and were immediately transferred out.

### B. Defendants' Arguments and Cited Authority

Without contesting the dissipation evidence, Defendants' central contention is that "the grant of an asset freeze premised on Section 13(b) violates *AMG Capital* and its progeny." Doc. 24-1, at 2-3. They rely on the Eleventh Circuit decision *FTC v. On Point Capital Partners LLC*, 17 F.4th 1066 (11th Cir. 2021). In that case involving Section 5 claims only, the panel vacated the asset freeze and receivership in a preliminary injunction "premised *solely*" on Section 13(b). *Id.* at 1078 (emphasis added). According to the panel, because "monetary relief is no longer available under § 53(b), there [was] no need to preserve resources for a future judgment." *Id.*[2]

By contrast, the asset freeze and receivership provisions of a preliminary injunction survived an *AMG* challenge in the more recent Eleventh Circuit decision *FTC v. Simple Health Plans LLC*. 58 F.4th 1322, 1330 (11th Cir. 2023). That case involved both a Section 5 and a Telemarketing Sales Rule claim, with the latter providing a basis for Section 19 monetary recovery. *Id.* at 1327. The district court had found a likelihood of success on both the Telemarketing Sales Rule claim and the Section 5 claim. *Id.* Although pre-*AMG* the district court based the preliminary injunction on Section 13(b), it denied a motion to dissolve the injunction after *AMG*, "ground[ing] its authority to issue the preliminary injunction in § 19." *Id.* The Eleventh Circuit affirmed. *Id.* at 1330. In this respect, *Simple Health Plans* is similar to the

---

[2] The panel observed that the same district court had, in another action not on appeal with an overlapping defendant where FTC sought contempt, entered a preliminary injunction with an asset freeze "contain[ing] the same terms and cover[ing] the same property" to "preserve funds for money damages in a future contempt hearing." 17 F.4th at 1076.

4

*Noland* case cited by Defendants. *FTC v. Noland*, No. CV-20-00047-PHX-DWL, 2021 WL 4318466, at *5 (D. Ariz. Sept. 23, 2021) (post-*AMG*, Section 13(b) "no longer provided a basis for keeping the asset freeze," but likelihood of Section 19 recovery justified continued freeze and "maintenance of the status quo" to preserve possible redress where FTC had prevailed on the merits but the amount of injury was not established).[3]

### C. The Asset Freeze and Receivership Should Remain in Place

Two key points regarding the non-*AMG* authority Defendants rely on: (1) these are non-binding cases; the Third Circuit has addressed the *AMG* decision only once, and not in a manner relevant to this motion;[4] and (2) these cases dealt with relatively limited factual scenarios and therefore did not contemplate facts or arguments that likely support the TRO freeze in this matter, which distinguish authority such as *On Point* critical of premising preliminary injunction asset freezes *solely* on the basis of Section 13(b).

First, FTC does not understand the asset freeze to be "premised solely" on Section 13(b) because the record reflects that FTC has pled Business Opportunity Rule and Consumer Review Fairness Act (CRFA) claims that support Section 19 equitable monetary recovery. *See* Hrg. Tr. at 23:15-17 ("We can proceed on the request for injunctive relief under Section 5 through Section 13 and also the Business Opportunity Rule."); *id.* 23:7-11; TRO, Doc. 19, at 1 (stating FTC has filed Complaint "pursuant to Sections 13(b) and 19 . . . , and has moved pursuant to Fed. R. Civ. P. 65(b), for a temporary restraining order, asset freeze, other equitable relief, and an order to show cause why a preliminary injunction should not issue"). That makes this case

---

[3] The other cases cited by Defendants, *Acro Services* and *Automators*, are post-*AMG* cases where district courts based temporary restraining order asset freezes and receiverships on claims supporting Section 19 monetary recovery.
[4] In *In re Imerys Talc America, Inc.*, the Third Circuit discussed *AMG* in relation to the unrelated proposition of whether a Congressional failure to act represented approval of a court's statutory interpretation. 38 F.4th 361, 377 (3d Cir. 2022).

5

unlike those involving Section 5 claims only.  And Defendants have not cited any authority for the proposition that the presence of such operative claims[5] in the record fails or is incapable of lending support for a short duration asset freeze at the TRO stage.  Similarly, Defendants have not cited authority requiring the Court to have made a likelihood of success determination on the Section 19 claims at the TRO stage to justify a short duration asset freeze where the Court has made a likelihood of success finding on a Section 5 deception count (Count I) and where, as here, there is strikingly significant, substantive mirroring between that deception count and Business Opportunity Rule Counts II (misrepresentations about earnings claims) and III (lack of substantiation for earnings claims), *see* Hrg. Tr. at 43:1-14, and Counts II and III could be the basis for the asset freeze and related receivership provisions in a future preliminary injunction.[6]

Second, during the TRO hearing, the Court referenced (as does *AMG*, 593 U.S. at 77) the possibility of FTC seeking a TRO in federal court, proceeding administratively to obtain a final cease and desist order, and then bringing a follow-on Section 19(a)(2) action to obtain equitable monetary relief.  *See* Hrg. Tr. 11:5–12:3; *see also FTC v. Am. Future Sys.*, No. CV 20-2266, 2021 WL 3185777, at *1 (E.D. Pa. July 26, 2021) (after *AMG*, FTC can still obtain preliminary injunctive relief pursuant to Section 13(b) even if proceeding administratively).  That route is available even in cases involving Section 5 claims only ("if the Commission satisfies the court

---

[5] This analysis would be different if the Court had decided the merits of Defendants' arguments to find against FTC.  Defendants have filed a motion to dismiss Business Opportunity Rule Counts II-IV, Doc. 23-1, to which FTC will respond in due course.  FTC will argue the motion to dismiss is without merit, as briefly addressed below, *infra* Section D.

[6] Defendants' motion references this proposition without disputing it.  Doc. 24-1, at 2.  The unstated implication is that the Court erred by not reaching the merits of the Business Opportunity Rule and CFRA claims.  As discussed below, if the Defendants' motion prompts the Court to amend the text of the TRO's findings supporting the temporary asset freeze, the Court could elect to reach the merits of these claims, based on the record, and include a determination of likelihood of success on these claims, if it so finds.

that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent," 15 U.S.C. § 57b(a)(2)).  *See supra* n.1.

Moreover, the purposes for the short duration TRO asset freeze articulated by the Court make good sense in light of the facts of this case.  In some cases (and the Court concluded that this is such a case), it is critical and inherently desirable to maintain the status quo temporarily, *not* to preserve a potential future monetary recovery.  Hrg. Tr. 65:25-66:2; *see also SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367 (S.D. Fla. 2006) (asset freezes are "a well accepted equitable remedy employed" pursuant to the district court's inherent equitable powers in order "to 'preserve the status quo'") (citations omitted). As the Court found here, it can also be important to ensure that the Court knows the whereabouts of assets between a TRO and a possible preliminary injunction.  Hrg. Tr. 50:20-21.  It is particularly helpful to know asset whereabouts in cases like this one with a receivership.  Receivers face notable practical challenges, post-appointment, quickly assuming control of the corporate entities; locating, understanding, potentially gathering, and preserving (in some instances by preventing corporate officers from hiding or dissipating) receivership assets; and assisting the Court as its representative.  The receiver here, moreover, is tasked with ensuring that the business operates lawfully and profitably.  Knowledge of assets is especially important given the Court's specific direction to ensure existing customers are not further harmed.  Not adding atop the receiver's challenges the need to track moving and potentially dissipated assets in real time is very beneficial.

Additionally, it is long-standing precedent that TROs (unlike preliminary injunctions) are typically not appealable orders.  *Pennsylvania Motor Truck Ass'n v. Port of Philadelphia Marine Terminal Ass'n*, 276 F.2d 931, 931–32 (3d Cir. 1960) (per curiam); *Hope v. Warden York Cnty.*

7

*Prison*, 956 F.3d 156, 159 (3d Cir. 2020); *accord AT&T Broadband v. Tech Commc'ns*, 381 F.3d 1309, 1314 (11th Cir. 2004).  For example, in *Simple Health Plans*, discussed above, the Eleventh Circuit dismissed an appeal concerning the TRO granted to FTC as "not final or appealable under a statute or jurisprudential exception."  58 F.4th at 1326 (citing dismissal in No. 19-10840 dated Apr. 16, 2019).[7]

Notably, in assessing whether an order labeled as a TRO should be considered an appealable preliminary injunction, appellate court considerations have included if "(1) the duration of the relief sought or granted exceeds that allowed by a TRO . . . , (2) the notice and hearing sought or afforded suggest that the relief sought was a preliminary injunction, and (3) the requested relief seeks to change the status quo."  *AT&T Broadband*, 381 F.3d at 1314; *Hope*, 956 F.3d at 160-62 (examining these considerations).  The fact that appellate courts distinguish TROs from preliminary injunctions on the basis that TROs are "aimed at temporarily preserving the status quo," *Hope*, 956 F.3d at 160, rather than changing it, further underscores that this Court's objective to maintain the status quo should not be disparaged.

At the preliminary injunction hearing, FTC will renew its arguments that its Business Opportunity Rule and CRFA claims are meritorious and support eventual monetary relief pursuant to Section 19 and an ongoing asset freeze in a preliminary injunction.  Defendants will presumably make their contrary arguments.  If the Court is unpersuaded on the likely merits of these FTC claims, it will not award a freeze.  If the Court is persuaded of the likely merit of these claims, substantial FTC Act precedent will support an ongoing freeze during the litigation.

---

[7] The dismissal is available on the Southern District of Florida's docket in matter number 18-cv-62593-DPG at Doc. 129.

If, however, Defendants' motion prompts the Court to amend the TRO or supplement the record regarding the TRO's asset freeze and receivership prior to the preliminary injunction stage, FTC submits the Court could find a likelihood of success on FTC's Business Opportunity Rule Counts II (misrepresentation of earnings claims) and III (substantiation for earnings claims), which significantly mirror the Section 5 Count already found likely to succeed on the merits.

### D. Business Opportunity Rule

When the Court does address the merits of FTC's Business Opportunity Rule claims, it will be clear that Defendants' "Business in a Box,"[8] "Ecommerce Platinum Program," and "Done For You" services all fit under the Rule's definition of what constitutes a "business opportunity."[9] As stated in both Plaintiff and Defendants' pleadings, the Rule defines business opportunities as:

(c) ***Business opportunity*** means a commercial arrangement in which:

    (1) A seller solicits a prospective purchaser to enter into a new business;

    (2) The prospective purchaser makes a required payment; and

    (3) The seller, expressly or by implication, orally or in writing, **represents that the seller or one or more designated persons will**:

        (i) Provide locations for the use or operation of equipment, displays, vending machines, or similar devices, owned, leased controlled, or paid for by the purchaser; or

        (ii) **Provide outlets**, accounts, or customers, **including, but not limited to, Internet outlets**, accounts, or customers, for the purchaser's goods or services; or

---

[8] Defendants repeatedly called their services a "Business In A Box" in their own contracts. *See e.g.* PX 5, p. 475; PX 7, pp. 598, 602, 623, 626, 629; *See also*, Defendants Instagram advertised their "Business In A Box" services. PX 1, pp. 10-11; PX 11, p. 598.

[9] This section is congruent with Section III.B.2 of Plaintiff's Motion for TRO [Doc. 2] but is buttressed by more recent evidence.

> (iii) Buy back any or all of the goods or services that the purchaser makes, produces, fabricates, grows, breeds, modifies, or provides, including but not limited to providing payment for such services as, for example, stuffing envelopes from the purchaser's home.

16 C.F.R. § 437.1(c) (emphases added). An "Internet outlet" can include a website used to engage in commerce with the public.[10]

Defendants' contention in their Motion to Dismiss appears to be that they do not provide Internet outlets – i.e., ecommerce stores – to customers but rather provide only consulting services so that customers can build and operate their own ecommerce outlets. Yet, this is belied by their advertising. Defendants have repeatedly made claims such as:

- "$10k/mo Ecom Store Built and Launched by our team." (PX 1, p. 16)

- "Done For Your [sic] Services: Learn how our team of eCommerce experts builds eCommerce websites that increase your conversions, traffic, & revenue." (PX 1, p. 18)

- "Discover How We'll Build Launch & <u>Bring In Sales</u> To Your AI-Powered Ecommerce Business in <u>The Next 30 Days!</u>" (PX 2, p. 244)

- "We'll Pick Your Winning Products, Find Suppliers, Build Your Storefunnel, and Get Sales within 30 Days!" (PX 2, p. 251)

- "We're going to build everything for you. And what that means to you is, you know, you're going to be able to, in 30 days, when the store goes live, start bringing in profits at day 30 of starting with us." (PX 2, p. 246)

- "So we're going to go over exactly what our e-commerce platinum program entails and how exactly we are going to actually build you an AI-powered e-commerce empire in the next 30 days. And, yes, that means we're going to pick your products, we're going to find your suppliers, we're going to pick your niches, we're going to build your stores, we're going to build your funnels and get sales within 30 days, and your actually going to be covered by our business buy-back program guarantee, which we'll be going over here shortly." (PX 2, pp. 287-288)

---

[10] *See FTC v. Money Now Funding, LLC*, No. CV-13-01583, 2015 WL 11120847, at *3 (D. Ariz. July 1, 2015) ("providing an Internet outlet in the form of a website on which small businesses could sign up and be referred by the consumer to [defendant] for cash advances" constitutes providing "outlets, accounts, or customers" under 16 C.F.R. § 437.1(c)(3)(ii)).

10

- "We build the whole store. ….. So the whole sales page, video, images, all that, is going to be in the funnel, which we write for you. That's going to be making sales." (PX 2, p. 398)

- "Picture this. You invest and they handle the rest, from product listings to customers relations, even marketing and ads, it's all taken care of for you. Basically, you're getting a secondary income stream that's 90 percent hand-off. And with the turmoil in the markets today, we all need a more predictable source of cash flow." (PX 2, p. 286)

- "Get Your Pre Built Ecommerce Store & Funnel For 30% Off." (PX 11, p. 597)

- "What if I could build you a high-leverage 'Digital Dropshipping' store in the next 30 days and teach you how to run it? That's guaranteed to be profitable in the first 3 months, or I'll give you a full refund + $500 for wasting your time." (PX 11, p. 604)[11]

Given the plain language of these claims, Defendants have repeatedly "represent[ed]" that they would provide Internet outlets for customers' businesses, making them a "business opportunity" under 16 C.F.R. § 437.1(c)(3).

Although the applicability of the Business Opportunity Rule turns on the *representation*, the Defendants not only make the covered representations, they *do indeed provide* Internet outlets for customers' businesses. Consumers reported that Defendants built stores for purchasers, though ultimately they made no money.[12] Also, Defendants undermine their arguments in their own court filings. For example, Defendants' purported Chief Operating Officer claims that Defendants' "team of designers is responsible for creating all the visual and functional assets that complement the copywriting and drive the client's business forward." Doc. No. 16-1, at ¶ 16. He then proceeds to list an entire website build from landing pages, upsell pages, and product images and advertising. *Id.* Further, Defendant Prusinowski claims that

---

[11] *See also,* PX 1, p. 11; PX 2, pp. 391-392, 395, 427.

[12] PX 4, p. 459 ("EEB ultimately built something for me, it was a website and a sales funnel, but it as not what I was expecting."); PX 5, p. 462 ("Regardless, however, the ecommerce store EEB built for me never turned a profit."); PX 6, p. 566 ("All EEB did was create a website for me…the website took them two to three weeks to build but I felt like the website that I paid $12,000 for was very simple.")

shutting down Defendants' software, Storefunnels.net, would cause irreparable harm to the existing online businesses.  According to Prusinowski, shutting down the software "would cause our clients' websites and storefronts to cease to exist on the Internet, and it would prevent them from accepting orders from customers." Doc. No. 16-2, at ¶ 14.   Prusinowski's statement contradicts Defendants' convenient newfound characterization of their services as simply "business consulting" services outside of the Rule.  This statement solidifies that Defendants are providing Internet outlets for purchasers in the form of websites and storefronts.  And, as Prusinowski admits, without their services, those purchasers' businesses would "cease to exist."[13]

In sum, Defendants are sellers of business opportunities and they must comply with the Rule.  They did not do so.  FTC has established a likelihood of success on the merits of its Business Opportunity Rule claims, and if the Court so chooses, it can make that finding today on the present record.[14]

### E.  Expedited Discovery

Finally, the Court should not require of the FTC expedited document production and a 30(b)(6) deposition.[15]  This Court, like scores of others before it, ordered Defendants to participate in limited expedited discovery during the pendency of the TRO, with a small number

---

[13] Defendants' reference to FTC's Advance Notice of Proposed Rulemaking on the Business Opportunity Rule in its Motion to Dismiss has no bearing on these issues. The existing Business Opportunity Rule governs Defendants' conduct.

[14] Other courts have found a likelihood of success on the merits of the FTC's Business Opportunity Rule claims for similar schemes. *See, e.g.*, *FTC v. The FBA Machine Inc.*, No. 2:24-cv-06635 (D.N.J. June 3, 2024); *FTC v. Ascend Capventures Inc., et al.*, No. 2:24-cv-07660 (C.D. Cal. Sept. 13, 2024); *FTC v. Automators LLC., et al.*, No. 3:23-cv-1444 (S.D. Cal. Aug. 11, 2023); *FTC v. AWS, LLC et al.*, No. 2:18-cv-00442 (D. Nev. Mar. 14, 2018); *FTC v. Bob Robinson, LLC, et al.*, No. 4:17-cv-02411 (S.D. Tex. Aug. 8, 2017).

[15] Furthermore, the Court should deny Defendants' attempt to revise the TRO to curtail the receiver's responsibilities for the same reasons discussed above regarding the asset freeze.

of defined goals all intended to protect consumers. Defendants claim that the current TRO "requires that Defendants respond to far reaching discovery requests." Contrary to Defendants' claim, the discovery at issue was explicitly limited for "the purpose of discovering: (1) the nature, location, status, and extent of Defendants' Assets; (2) the nature, location, and extent of Defendants' business transactions and operations; (3) Documents reflecting Defendants' business transactions and operations; or (4) compliance with [the] Order." Doc. 19 at 26-27. Defendants have the critical knowledge and information needed to preserve assets, protect relevant documentary evidence, and ensure compliance with the Court's order. The FTC will cooperate in full discovery during the normal course of litigation, but Defendants have no parallel, emergency need for time-sensitive discovery from the FTC.

Defendants claim that their discovery requests are "targeted," but in fact they request a plethora of purported communications and "all documents" in support of the FTC's claims that Defendants' advertising is false or misleading. Docs. 24-1 and 24-2. In addition, Defendants request a deposition on a sweeping array of topics relating to numerous types of communications and topics as broad as "the FTC's investigation of Defendants." Doc. 24-3. These requests are not targeted and are merely a distraction designed to divert the FTC's and the Court's attention from the primary task at this stage in the proceedings: the decision about whether a preliminary injunction should issue.

### III.   CONCLUSION

For the foregoing reasons, the Court should not modify the TRO and should address the legal issues raised by the motion in conjunction with the upcoming preliminary injunction proceedings.

Respectfully submitted,

Dated: October 2, 2024                    /s/Amanda Grier

                                              Amanda Grier (DC Bar No. 978573)
Ryan McAuliffe (MD Bar No. 2012170072)
Federal Trade Commission
600 Pennsylvania Avenue, NW, CC-8543
Washington, DC 20580
(202) 326-3745; agrier@ftc.gov
(202) 326-3044; rmcauliffe@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION