**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** : | |
| : | |
| **Plaintiff,** : | **Civil Action** |
| : | |
| **v.** : | |
| : | **No. 2:24-cv-04949-WB** |
| **EMPIRE HOLDINGS GROUP LLC d/b/a** : | |
| **ECOMMERCE EMPIRE BUILDERS d/b/a** : | |
| **STOREFUNNELS.NET and PETER** : | |
| **PRUSINOWSKI,** : | |
| : | |
| **Defendants.** | |

## RECEIVER KEVIN DOOLEY KENT'S FIRST WRITTEN REPORT

**CLARK HILL PLC**
Robin S. Weiss, Esquire
Vanessa L. Huber, Esquire
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
Phone: (215) 640-8500
Fax: (215) 640-8501
rsweiss@clarkhill.com
vhuber@clarkhill.com

*Attorneys for Receiver, Kevin Dooley Kent*

**<u>TABLE OF CONTENTS</u>**

I.    Introduction ........................................................................................................... 1

II.    Steps Taken by the Receiver to Implement the Terms of the TRO Order ......................... 2

    A.    Notice Regarding TRO Order and Asset Freeze ..................................................... 5

    B.    Notification of TRO Order with other Federal Courts and Authorities ................. 7

    C.    Receivership Bank Account Opening and Transfer of Funds ............................... 8

    D.    Control Over and Preservation of Assets ............................................................. 10

    E.    Control Over and Preservation of Documents .................................................... 15

    F.    Control Over and Preservation of EEB Social Media ......................................... 18

    G.    Diversion of Mail .................................................................................................. 20

    H.    Interviews of EEB Personnel .............................................................................. 20

    I.    Customer Outreach ............................................................................................... 23

    J.    EEB Website and Receivership Website .............................................................. 25

    K.    Managing EEB Business Operations ................................................................... 26

    L.    Accounting Review and Analysis ........................................................................ 29

III.    Value of All Assets and Sum of All Liabilities of the Receivership Entities .................. 33

IV.    Steps the Receiver Intends to Take to Protect Receivership Assets, Recover
    Receivership Assets from Third Parties, and Adjust Receivership Liabilities ................. 34

V.    The Receiver's Opinion on Whether Any Portion of the Business of Any of the
    Receivership Entities Can Continue to Operate Legally and Profitably .......................... 36

VI.    Other Matters the Receiver Believes Should Be Brought to the Court's Attention ......... 44

VII.    Conclusion .......................................................................................................... 46

## I.    Introduction

Following the entry of the September 20, 2024 Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief (ECF No. 19) (the "TRO Order"), Kevin Dooley Kent, in his capacity as Temporary Receiver (the "Receiver"), took over and assumed control of Empire Holdings Group LLC d/b/a Ecommerce Empire Builders d/b/a Storefunnels.net (hereinafter "EEB") and its existing business operations.  The Receiver and his agents learned that EEB has generated significant revenue from customers' initial purchases of its various programs—such as the "Business in a Box" and "Platinum" Programs—and that EEB acquires new customers primarily from its social media advertising and marketing.  Moreover, the Receiver and his agents learned that EEB reported revenue and purported operating expenses of approximately $21.8 million and $17.3 million, respectively, from May 16, 2018 through August 31, 2024 and, based on available accounting records, nearly all funds generated by EEB were transferred to/for the benefit of Defendant Peter Prusinowski after payment of purported expenses.

Based on (1) the Court's preliminary finding that "the FTC has satisfied its burden to obtain a Temporary Restraining Order pursuant to Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)[,]" TRO Order, Findings of Fact ¶ C; (2) the Receiver and his agents' review of EEB's social media; and (3) the accounting analysis conducted by the Receiver's accountants from Alvarez & Marsal Disputes and Investigations, LLC ("A&M"), the Receiver has determined that EEB's business operations cannot be conducted both legally *and* profitably and, therefore, he and his agents intend to take steps to shut down all EEB business operations following the submission of this Report to the Court.  The complexities of EEB's operations have resulted in significant time and effort expended by the Receiver and his agents in maintaining the business operations for existing EEB customers, which has been exacerbated by the fact that EEB does not have a physical office location, operates entirely by Cloud-based/electronic means through various platforms, and has

contractors all over the world. Following the shutdown of business operations, the Receiver and his agents intend to focus their efforts on further identifying, preserving, and recovering Receivership Assets—some of which the Receiver has already identified are in the possession of nonparty entities that the Receiver has named as Receivership Entities.

Pursuant to Section XII, Paragraph W of the TRO Order, the Receiver hereby submits this First Written Report to the Court setting forth (1) the steps taken by the Receiver to implement the terms of the Order; (2) the value of all assets and sum of all liabilities of the Receivership Entities; (3) the steps the Receiver intends to take in the future to protect receivership assets, recover receivership assets from third parties, and adjust receivership liabilities; (4) the Receiver's opinion on whether any portion of the business of any of the Receivership Entities can continue to operate legally and profitably; and (5) any other matters which the Receiver believes should be brought to the Court's attention.

## II.    Steps Taken by the Receiver to Implement the Terms of the TRO Order

The TRO Order defines "Receivership Entities" to include the "Corporate Defendant as well as any other entity that has conducted any business related to the advertising, marketing, and sale of Defendants' Products and Services, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant." TRO Order, Definitions ¶ J. Thus, Corporate Defendant EEB is explicitly identified as a Receivership Entity under the TRO Order, and the Receiver has carried out his duties under the TRO Order with respect to EEB since the time of his appointment.

The TRO Order further provides that "[i]f the Receiver identifies a nonparty entity as a Receivership Entity [he is directed and authorized to] promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court." *Id.* § XII ¶ U. With the assistance of his counsel and accountants, the Receiver

identified nonparty entities Star Active Sports LLC ("Star Active") and Empire Partner Network LLC ("Empire Partner") as Receivership Entities on October 2, 2024, and Atlas Fund Limited Partnership ("Atlas Fund"), Atlas Fund Trust ("Atlas Trust"), and Atlas Fund Land Trust ("Atlas Land") (collectively, the "Atlas Entities") as Receivership Entities on October 14, 2024. The Receiver promptly notified the parties and entities of these determinations via letter, pursuant to the terms of the TRO Order.[1]

In addition to Defendant Prusinowski's ownership and/or control of all of these entities as described in the notice letters, the Receiver specifically identified transactions within EEB's accounting and banking records that indicated Star Active received approximately $3,001,605 from EEB across 278 ACH transactions between 2020 and 2024—most of which were recorded as "Contractor Commissions" in EEB's general ledger.[2] *See* Ex. A at 1-2. As for Empire Partner, it is identified as a source of revenue for EEB within its general ledger, with entries totaling $99,604 for 2022, $77,070 for 2023, and $60,200 for 2024 through the end of August.[3] *See id.* at 2. As for the Atlas Entities, EEB's financial records show that EEB paid $26,100 in apparent attorney's fees to asset protection firm Lodmell & Lodmell P.C. ("Lodmell")[4] on March 11, 2021,

---

[1] Copies of the October 2 and October 14, 2024 letters to the parties and entities notifying them of the Receiver's identification of such nonparties as Receivership Entities are attached hereto as Exhibits A and B, respectively.

[2] The Receiver subsequently determined these transactions benefitted certain third parties based on additional information obtained from TD Bank and from Defendant Prusinowski.

[3] After designating Empire Partner as a Receivership Entity—and after discovering additional information regarding Empire Partner in Defendant Prusinowski's emails—the Receiver believes that Empire Partner likely contracts with third party entities and earns commission for people that it gets to purchase the third party's services; however, EEB lists Empire Partner as a source of revenue in its general ledger because *EEB* is likely the entity that is getting people (EEB customers) to purchase the third party's services.

[4] A few relevant excerpts from Lodmell's website, https://www.lodmell.com, are worth noting:

- "Asset protection works by removing the economic incentive for a person, and that person's attorney to pursue you in a court of law. The best way to protect your assets is to take legal steps to make you unattractive to potential predators."

- "We believe the legal system is broken. Civil litigation has become an attractive source of profit, having surpassed over $300 Billion a year. Your wealth can be an easy target for frivolous lawsuits."

for Lodmell to create the Atlas Entities to protect and shield the assets of Defendant Prusinowski and his wife.  *See* Ex. B at 1-2.  EEB's general ledger also shows additional payments to Lodmell in March 2022, February 2023, and March 2024, which were presumably for continued services to the Atlas Entities (*e.g.*, continued registered agent services).  *See id.* at 2 n.3.  Moreover, EEB's Charles Schwab brokerage account transferred $25,000 to Atlas Fund's Charles Schwab brokerage account in July 2024, and Defendant Prusinowski indicated that EEB may have transferred $100,000 to Atlas Fund a few months ago in connection with a previous attempted sale of EEB. *See id.* at 2 & n.4.  Defendant Prusinowski also informed the Receiver that Atlas Fund has been funded primarily from paychecks he receives from EEB—which are derived directly from the "advertising, marketing, and sale of [EEB's] Products and Services"—and from the conversion of credit card points—which would have been primarily earned from EEB's payment of credit card bills.  *See id.* at 2.

Based on all of the above, the Receiver has concluded that Star Active, Atlas Fund, Atlas Trust, and Atlas Land received assets derived from activities that are the subject of the Complaint, and that Empire Partner conducted business related to EEB's Products and Services.  Accordingly, in addition to EEB, the Receiver has been carrying out his duties with respect to Star Active, Empire Partner, and the Atlas Entities since their identification as Receivership Entities.

---

- "We make it difficult for predatory lawyers to target you. We use legal protection tools and methods that have been tested for over 20 years. We protect your assets from attack, while still giving you full control and use of your assets."

- "The Asset Management Limited Partnership [here, Atlas Fund] is an Arizona Limited Partnership that forms the nucleus of a wealth preservation plan as a 'holding company' for client assets. The AMLP centralizes the management of liquid assets – cash, savings, investments and securities – while placing a legal barrier around them. Effectively drafted and funded, an AMLP can act as a significant hurdle to a creditor seeking to attack your wealth. . . . The AMLP can also own other assets indirectly by owning Limited Liability Companies (LLCs), corporations or other partnerships. The AMLP creates legal defenses that severely limit a creditor's ability to touch partnership assets through 'charging-order' protection laws. These laws prevent a judgment-creditor from touching assets inside the partnership, and limit creditor remedies to only a claim on distributions once they exit the partnership. The General Partner [here, Defendant Prusinowski] has full control over how, if, or when distributions are made, leaving creditors with little power or leverage."

## A.    Notice Regarding TRO Order and Asset Freeze

Upon his appointment as Receiver, the Receiver promptly notified the following banks, financial institutions, and payment processers of the TRO Order and Asset Freeze:[5]

- TD Bank;

- Charles Schwab;

- Stripe;

- PayPal;

- Wave;

- Venmo;

- Citizen's Bank;

- American Express;

- Capital Bank and Trust (American Funds);

- Capital One;

- Coinbase;

- Fidelity Brokerages;

- Gemini Crypto;

- Payoneer;

- Santander Bank;

- Stripe;

- SunTrust Bank (Truist Bank);

- United Bank;

- Veem;

- Wave.

---

[5]    The Receiver has also notified these entities of the October 3 and October 10, 2024 Orders extending the TRO Order and rescheduling the preliminary injunction hearing where appropriate and warranted (ECF Nos. 32, 34).

The Receiver has also served copies of the TRO Order and made various preservation and/or document demands upon the following third parties:

- Active Campaign (notification, preservation, and document demand);

- Slack (notification, preservation, and document demand);

- EEB's former counsel, Peter Hoppenfeld (notification and preservation only);[6]

- Atlas Entities' counsel, Lodmell & Lodmell, P.C. (notification, preservation, and document demand);

- Upwork (notification, preservation, and document demand);

- HelloSign (notification, preservation, and document demand);

- Docusign (notification, preservation, and document demand).

The Federal Trade Commission ("FTC") has likewise served notices, preservation, and document demands upon many of the same entities.

The Receiver has also served copies of the TRO Order on all known EEB contractors for whom Defendants provided contact information.[7]

---

[6]    While the Receiver has so far only served preservation notices upon EEB's former counsel, the Receiver now controls the privilege for EEB as an entity in receivership. *See, e.g.*, *S.E.C. v. Ryan*, 747 F. Supp. 2d 355, 367-68 (N.D.N.Y. 2010) ("Speaking directly to Prime Rate, an LLC, the attorney-client privilege belongs to the corporation or similar organization. . . . As the successor in interest, and as a matter of law, Levine, as Receiver, controls the attorney-client privilege for Prime Rate."); *Commodity Futures Trading Com'n v. Standard Forex, Inc.*, 882 F. Supp. 40, 44 (E.D.N.Y. 1995); *U.S.S.E.C. v. Bravata*, 2011 WL 606745, at *1 (E.D. Mich. Feb. 11, 2011).  This includes the ability to waive privilege. *See Commodity Futures Trading Com'n v. Weintraub*, 471 U.S. 343, 354 (1985) (bankruptcy trustee of a corporation holds the attorney-client privilege and has the power to waive it); *Ryan,* 747 F. Supp. 2d at 368; *S.E.C. v. Elfindepan, S.A.*, 169 F. Supp. 2d 420, 431 (M.D.N.C. 2001) (receiver can waive attorney-client privilege on behalf of companies subject to receivership).  The receiver's right to control the attorney-client privilege of the receivership entities includes the right to obtain attorney-client privileged documents in the possession of the former counsel for the receivership entities or to produce attorney-client privileged documents in response to a subpoena.  *See Ryan,* 747 F. Supp. 2d at 368; *Bravata,* 2011 WL 606745, at *1; *Polycast Technology Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 49 (S.D.N.Y. 1989) (as to files in possession of former counsel for an entity, the entity holds the attorney-client privilege, not any individual officer formerly employed by the entity).  Thus, the Receiver will demand the turnover of client records in the near future.

[7]    Defendant Prusinowski has advised the Receiver that all support staff for EEB are independent contractors, and that he is the only current employee of EEB.

**B.      Notification of TRO Order with other Federal Courts and Authorities**

The Receiver promptly submitted a Tax Form 56 to the Internal Revenue Service for EEB following the entry of the TRO Order.  On October 17, 2024, the Receiver submitted a Tax Form 56 for the additional Receivership Entities Empire Partner, Star Active, and Atlas Fund, and also submitted an updated Tax Form 56 for EEB which recognized the Receiver's authority as fiduciary extended through November 12 (*i.e.*, the rescheduled preliminary injunction hearing date).

Pursuant to 28 U.S.C. § 754,[8] the Receiver also filed notice of the Complaint, TRO Order, and extensions of the TRO Order in the following federal district courts where Receivership Entities are incorporated, registered, and/or where he believes assets of Receivership Entities may be held:

- United States District Court for the Middle District of Pennsylvania;

- United States District Court for the Western District of Pennsylvania;

- United States District Court for the District of New Jersey;

- United States District Court for the Northern District of California;

- United States District Court for the District of Wyoming;

- United States District Court for the District of Columbia;

- United States District Court for the District of Arizona;

---

[8]     Section 754 provides as follows:

> A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.

> He shall have capacity to sue in any district without ancillary appointment, and may be sued with respect thereto as provided in section 959 of this title.

> Such receiver shall, within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for each district in which property is located. The failure to file such copies in any district shall divest the receiver of jurisdiction and control over all such property in that district.

28 U.S.C. § 754.

- United States District Court for the District of Nevada;

- United States District Court for the Western District of Wisconsin;

- United States District Court for the Eastern District of Wisconsin.

If the Receivership is extended by a preliminary or permanent injunction following the November 12, 2024 hearing, the Receiver anticipates potentially filing additional § 754 Notices in other federal district courts in order to obtain complete jurisdiction and control over any Receivership Assets that may be located within other districts.[9]

### C.    Receivership Bank Account Opening and Transfer of Funds

Pursuant to Section XII, Paragraph O of the TRO Order, the Receiver has opened a centralized Receivership Bank Account with WSFS Bank (the "Receivership Account").  The Receiver subsequently requested that TD Bank and Charles Schwab ("Schwab") transfer the entire account balance of accounts in the name of EEB into the Receivership Account.  On October 1, 2024, Schwab transferred the funds from EEB's Schwab brokerage account, totaling $610,672.41, to the Receivership Account.  On October 10, 2024, after working through some delays in securing the transfer of funds from the two frozen EEB TD Bank accounts, funds totaling $51,945.01 were successfully transferred into the Receivership Account.  Additionally, on October 7, 2024, Defendants' counsel, Gordon Rees Scully Mansukhani LLC ("Gordon Rees"), transferred $77,000.00 to the Receivership Account.  This amount represents legal fees that EEB paid to

---

[9]    A court order renewing, extending, or reappointing a Receiver resets the 10-day period to file § 754 Notices with federal district courts.  *See S.E.C. v. Am. Cap. Invs., Inc.*, 98 F.3d 1133, 1142-43 (9th Cir. 1996) (citing *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996) ("[T]he court may reappoint the receiver and start the ten-day clock of § 754 ticking once again.")); *McNamara v. Allen*, 2017 WL 10439830, at *1 (C.D. Cal. Dec. 12, 2017) (citing *Am. Cap. Invs., supra*) ("Under 28 U.S.C. § 754, the receiver must have filed, in the district court where the person and receivership property is believed to be located, copies of the complaint and order of appointment within ten days after the entry of the order of appointment.  The entry of a renewed appointment order starts a new ten-day period."); *Terry v. June*, 2003 WL 22125300, at *3 (W.D. Va. Sept. 12, 2003) (explaining that "[s]ection 754 does not, by its terms, distinguish between initial orders of appointment and later reappointment of the receiver" but "[c]ourts having addressed this issue unanimously suggest that an order of reappointment will renew the ten-day filing deadline mandated by section 754" and collecting cases holding same).

Gordon Rees between the date Defendants were served with notice of this action and the date the TRO Order was entered.

As for Receivership Entities Star Active, Empire Partner, and the Atlas Entities, the Receiver is presently conducting further investigation into the entities' financial accounts and assets in order to identify all financial accounts held by the entities and subsequently direct that the funds in such financial accounts be transferred to the Receivership Account. On October 10, 2024, the Receiver notified TD Bank of the identification of Star Active and Empire Partner as Receivership Entities, requested information and documents for all accounts held by the entities, and requested the transfer of any funds remaining in such accounts to the Receivership Account. On October 16, 2024, the Receiver notified Schwab of the identification of the Atlas Entities as Receivership Entities, and requested the liquidation of all securities and transfer of all funds from the known Atlas Fund account to the Receivership Account. On October 18, 2024, Schwab transferred $613,202.79 to the Receivership Account.[10] Meanwhile, the Receiver is making arrangements with TD Bank for the transfer of the Empire Partner funds to the Receivership Account.[11]

---

[10] Schwab previously advised that as of September 24, 2024, Atlas Fund held a partnership brokerage account containing $945,699.53 in securities and $-342,639.71 in cash due to a margin loan owed to Schwab, thus leaving a net value of $605,730.81. At the time, Schwab was claiming to have a perfected security interest with respect to the Atlas Fund account. Since it appears that Schwab unilaterally deducted the loan amount from the balance transferred to the Receivership Account, the Receiver is demanding all loan documentation forming the basis for that reduction, so the Receiver's counsel can review and analyze Schwab's position and assess whether the loan amounts were improperly withheld.

[11] As of September 23, 2024, TD Bank reported that the balance of funds in the Empire Partner account was $3,859.36. As of October 17, 2024, the balance in the Empire Partner account was $8,461.86. However, on October 10, 2024—in direct violation of the TRO Order and without the Receiver's knowledge—Stripe debited funds out of one of the EEB TD Bank accounts, *after* TD Bank had already transferred the balance in that account to the Receivership Account, thus resulting in an overdraft of $1,908.73. Upon discovering this, the Receiver sent a follow-up letter to Stripe on October 14, 2024, advising that they were in direct violation of Section IV, Paragraph A of the TRO Order and demanding that they immediately reverse the withdrawal and credit the $1,908.73 back to the EEB TD Bank account. The Receiver also reiterated that Stripe must cease the withdrawal of funds from the account. In reality, out of concern that payment platforms like Stripe and PayPal are continuing or may continue to allow customer disputes and associated chargebacks to process, the Receiver has determined that he needs to close the EEB TD Bank accounts to prevent any further overdrafts. However, the EEB TD Bank account that Stripe debited funds out of cannot be closed until the overdraft is covered. Accordingly, if Stripe does not return the funds, the Receiver intends

Additionally, Atlas Fund transferred $400,000.00 to Gordon Rees on September 19, 2024, which Defendant Prusinowski represented was a retainer to secure Gordon Rees's representation of Defendants in this matter. The Receiver understands that these funds are currently being held in Gordon Rees' trust/IOLTA account in light of the TRO Order. On October 11, 2024, Gordon Rees filed, on behalf of Defendants, a Motion and Memorandum for Fees Incurred to Date, and Additional Fees to Continue to Defend or, in the Alternative, to Withdraw as Counsel of Record (ECF No. 35). October 16, 2024, Gordon Rees sent a letter to the Receiver advising that it is asserting a retaining lien as to $231,358.00 held in its trust account for attorney's fees incurred to date. The Receiver has also been advised that Defendants have secured replacement counsel, Greg Christiansen at Guardian Law and Philip Martin at Vallis Legal. Their representation has been secured with resources provided by others. Thus, it seems wholly unnecessary for Gordon Rees to continue to hold any funds for future representation, and the Receiver expects—and will be requesting—that the balance of funds held by Gordon Rees be promptly transferred to the Receivership Account. The Receiver will address Gordon Rees' assertion of a retaining lien at a later time, and reserves all rights.

### D.    Control Over and Preservation of Assets

As described above, the Receiver has secured the transfer of EEB funds from TD Bank and Schwab, and Atlas Fund assets from Schwab, to the Receivership Account, and has made a demand to TD Bank for the transfer of assets of additional Receivership Entity Empire Partner. Additionally, the Receiver has taken possession of the keys to access the Safe Deposit Box at TD Bank in Jamison, Pennsylvania and has taken inventory of the contents in it. Because the Receiver

---

to direct TD Bank to transfer the overdraft amount ($1,908.73) from the Empire Partner account to the EEB account, transfer the remaining funds in the Empire Partner account to the Receivership Account, and then close both EEB TD Bank accounts. Thus, the transfer from Empire Partner to the Receivership Account may be $1,908.73 less than the balance reported.

now possesses the keys and is thus the only person who may currently access the Box, its contents currently remain at TD Bank.

Pursuant to Section XII, Paragraphs B through E of the TRO Order, and in order to prevent further dissipation of assets, the Receiver has changed the passwords for all online financial, payment processing, and credit card accounts that he and his agents have been able to access and for which they were able to do so, including specifically:

- TD Bank (Balances as of 10/20/24 – Empire Holdings 1: -$1,908.73; Empire Holdings 2 - $0.00; Empire Partner $8,461.86);

- Stripe (Balance as of 10/20/24: -$1,097.18);

- PayPal (Balance as of 10/20/24: -$179.33);

- NMI;

- Wave (Balance as of 10/20/24: $0.00);

- Authorize.net;

- American Express (Total Balances as of 10/20/24 – EEB Business Gold Card x24001: $26,880.04;  EEB Business Platinum Card x22007: $66,945.24; EEB Business Gold Card x94002: $0.00; EEB Business Gold Card x93004: $744.41; EEB Business Gold Card x92003: $24,792.66; EEB Business Gold Card x82002: $14,908.53; EEB Business Gold Card x42008: $13,070.87; EEB Business Gold Card x42005: $900.00; Business Gold Card x32000: $24,625.28);[12]

- Charles Schwab (password changed, but unable to log into account due to security restrictions to confirm balance);

- Fidelity Brokerage (Personal Health Savings Account; Balance as of 10/17/24: $5,617.89);

- Capital One (Balances as of 10/17/24 – Personal Savings Account: $0.59; Explore Rewards & Benefits: $1.39; Quicksilver: $0.00);

- Gemini Crypto (Account frozen; Balance as of 10/20/24: $111.55); and

---

[12]    The Receiver has excluded from this list Defendant Prusinowski's personal Charles Schwab Platinum Card (x91000) and High Yield Savings Account ("HYSA") (x8569; Balance as of 10/17/24: $0.03).  The TRO Order does not forbid Mr. Prusinowski from incurring charges on personal credit cards.  *See* TRO Order § III ¶ C & § IV ¶ A.

- Robinhood (Not used since approximately March 2020; Balance as of 10/17/24: $0.00).

However, the Receiver has been unable to access some accounts due entirely to restrictions placed in response to the TRO Order, issues with Two-Factor Authentication codes sent to unknown and/or inaccessible email addresses and/or phone numbers,[13] and/or incorrect and/or non-functioning log-in credentials provided by Defendant Prusinowski. The Receiver has been either unable to access and/or unable to change the passwords for the following financial accounts provided and/or identified by Mr. Prusinowski:

- Binance Cryptocurrency Exchange (log-in attempt failed due to issues with username, password, or account);

- Payoneer (log-in attempts failed; account locked);

- Bitconnect (cryptocurrency exchange shut down 1/16/18 due to cease and desist order);

- Celsius Network (platform closed 1/31/24 due to bankruptcy);

- MetaMask (unable to access due to security restrictions);

- Capital Bank and Trust (log-in not working; however, Capital Bank & Trust advised that it holds a Solo 401K for Defendant Prusinowski, as Trustee for EEB, account x-1362, with a balance of $232,083.69 as of 9/24/24);

- Citizens Bank (unable to access due to two factor authentication issues; however, Citizens Bank advised that the balance in account x5523, apparently belonging to EEB, holds $1 and has not had any activity since 5/21/24);

- Coinbase (log-in not working; however, Coinbase has only been able to locate personal accounts in the name of Defendant Prusinowski, which Mr. Prusinowski identified in his 9/25/24 financial disclosures as having a current balance of $25,077.41, and Coinbase identified as having a balance of $26,771 on 9/26/24); and

- Venmo (account suspended; able to access account but unable to change password; Balance as of 10/17/24: $0.00).

---

[13] To the extent two-factor authentication codes have been sent to Defendant Prusinowki, he has indicated that he has forwarded all codes he received to the Receiver and his agents.

Additionally, the Receiver is having difficulties securing compliance with the TRO Order from American Express ("AMEX"), Stripe, and PayPal.  Although the Receiver changed the passwords on these accounts and has sent multiple notice letters to these institutions regarding the TRO Order, these entities have refused to prevent the incurrence of additional charges.

With regard to AMEX, the Receiver discovered that additional charges were being incurred on multiple EEB accounts since September 20, 2024, many of which do *not* appear to have been initiated by Defendants, but rather by third party service providers, likely partly or largely through automatic recurring payments.  The vast majority appear to relate to advertising and/or marketing charges through sites like Google, Facebook, and Amazon, even though Defendant Prusinowski has advised that all such services have been cut off and cancelled.  However, other charges appear to relate to services that the Receiver believes are necessary for EEB back-office support and/or customer Storefunnels operations to continue.  Most of these charges are through account x2207, and include payments to sites like GoDaddy, Simvoly, Google/GSuite, Twilio, and Digital Ocean. While this account appears to have been used by Mr. Prusinowski for a combination of business and personal purposes prior to the date of the entry of the TRO Order, and features a $20,000.00 payment to Gordon Rees on 9/18/24, it appears that personal use of the card stopped after 9/20/24, with the exception of $1,166.93 paid to Keystone Health Plan East HMO Member Services between two payments on 9/27/24 and 9/30/24, which may have been an automatic payment.[14]

After realizing that AMEX has not honored the asset freeze and has failed to stop charges on the credit cards, the Receiver sent a follow-up letter to AMEX on October 11, 2024, advising that it was in direct violation of Sections IV, Paragraphs A and C of the TRO Order, and directing

---

[14]    On 9/20/24, there was a $40.20 charge at Sunoco, a $4,800.00 PayPal payment to SonnyEnterp 4029357733, and a $15,000.00 mobile payment (possibly to partially cover the $20,000.00 paid to Gordon Rees) on the AMEX account, but it is unknown whether these charges and payments were made before or after the entry of the TRO Order.

it to immediately cancel/freeze all accounts in the name of EEB.  AMEX has not yet responded to this communication.  Meanwhile, the Receiver has begun manually freezing all but one of the EEB credit cards.  The Receiver has not frozen account x2207 out of concern that the consequences of non-payment to websites like GoDaddy could interfere with the operation of customer Storefunnels and/or back-office support for existing EEB customers.  He has, however, directed Mr. Prusinowski to ensure that all personal recurring auto-payments, including payments for his health insurance, need to be taken off of that card.  Mr. Prusinowski confirmed that this was done on October 16, 2024.  As for the other accounts, customer-initiated freezes only last one week, so the Receiver has to repeat this process on a weekly basis.  The freezes may not prevent recurring charges and/or certain electronic transfers, so some of the balances continue to increase despite the Receiver's best efforts to prevent this.  Additionally, AMEX has begun charging late fees for late payments on the accounts, likewise in violation of the TRO Order.

PayPal and Stripe are likewise in violation of the TRO Order because they are processing customer chargebacks despite receiving notice of the asset freeze.  The Receiver sent noncompliance letters to Stripe and PayPal on October 14 and 16, 2024, respectively.  In the letter to Stripe, the Receiver demanded that it immediately reverse the $1,908.73 that Stripe withdrew from one of EEB's TD Bank accounts on October 10 (which caused an overdraft), return the withdrawn funds, and cease the withdrawal of all funds from the EEB TD Bank Account.  In the letter to PayPal, the Receiver noted that he had observed an apparent chargeback of $179.33 identified as an "amount due to PayPal" and demanded that PayPal suspend its internal processes to prevent any further chargebacks during the pendency of the TRO Order.  Stripe and PayPal have not yet responded to these communications.  However, on October 18, 2024, Stripe sent an email to Defendant Prusinowski's personal Gmail account—rather than responding to the Receiver—

advising that EEB's business presents a higher level of credit risk than Stripe is able to support at this time, and that it will be closing EEB's Stripe account on October 31, 2024. Stripe further advised that "[i]n order to cover any disputes or unforeseen refunds on your account, we will also hold 100% of your account balance and future transactions in reserve for 90 days. The remaining funds will be paid out to your bank account at the end of this period." This, too, is a violation of the TRO Order.

### E.    Control Over and Preservation of Documents

Pursuant to Section XII, Paragraphs B, C, and E of the TRO Order, the Receiver and his agents have been working continuously to gain control over, and preserve, the Documents of EEB, as that term is defined in the TRO Order. Since EEB does not have a physical office location and operates entirely via electronic and/or Cloud-based means, and because EEB has contractors all over the world including, *inter alia*, Dubai, the Philippines, Pakistan, Jamaica, and Colorado—and the Receiver has faced challenges accessing various accounts and/or obtaining documents from third parties—this has been a very difficult task that is ongoing. Both the FTC's Digital Forensic Unit and the Receiver's law firm, including its in-house e-discovery vendor and internal staff, are assisting with the preservation of Documents as contemplated by Section XII, Paragraph F of the TRO Order. So far, the following Documents and/or devices have been backed up and/or preserved:

- Defendant Prusinowski's personal cell phone that has also been used for business purposes (preserved by the FTC's Digital Forensic Unit);

- Defendant Prusinowski's personal laptop (together with his personal cell phone, "personal devices") that has also been used for business purposes (preserved by the FTC's Digital Forensic Unit);[15]

---

[15]    There was a several-day delay before Mr. Prusinowski turned over these personal devices. There remains an open question regarding whether any data or information was deleted from these personal devices before they were turned over to the Receiver. After the FTC completed its extraction/preservation of data from Defendant Prusinowki's

- Defendant Prusinowski's personal Gmail account, pruspeter@gmail.com (preserved by Clark Hill's in-house e-discovery team);

- GSuite/Google Drive (preserved by the FTC's Digital Forensic Unit);

- All data from the Google domain @ecommerceempirebuilder.com, including 16 company e-mail addresses (preserved by the FTC's Digital Forensic Unit);

- All data from the three company e-mail addresses that used the Microsoft domain @ecommerceempirebuilders.com, belonging to Defendant Prusinowski (peter@ecommerceempirebuilders.com), EEB Chief Operating Officer Aliakbar Gulshan (ali@ecommerceempirebuilders.com), and Jordan Strauss (jordan@ecommerceempirebuilders.com) (preserved by the FTC's Digital Forensic Unit);

- All extractable data available from Defendant Prusinowski's Basecamp account (preserved by the FTC's Digital Forensic Unit). Basecamp is the primary way EEB contractors communicate with customers;

- All extractable data available from Defendant Prusinowski's Monday account (preserved by the FTC's Digital Forensic Unit). Monday is project management software that EEB's back-office personnel use to manage and track the status of projects;

- All extractable data available from two slack channels accessible with Defendant Prusinowski's log-in credentials: (1) Ecommerce Empire Builders and (2) Ecom-empire-builders (preserved by the FTC's Digital Forensic Unit).[16] Slack is a program through which back-office personnel communicate with one another, including with respect to customer project requests.

The Receiver has learned that complete extraction of all data is difficult and/or not feasible from many websites, but has extracted and/or otherwise compiled select important data from the following sites/programs (excluding social media which will be addressed separately):

---

personal devices, and after confirming that password changes necessary to cut off control to financial and other necessary accounts to the extent feasible had been accomplished, the Receiver returned the personal devices to Mr. Prusinowski following representations from him and his counsel that access to these personal devices was necessary for them to prepare a defense in this action.

[16]    Only public-facing information can be extracted from Slack. Direct and private messages cannot be extracted, though they can be accessed by logging in to the account. There were four other Slack spaces associated with Mr. Prusinowki's account, but Mr. Prusinowski did not have sufficient access to download from those channels because he is not an administrator of those accounts: (3) Aliakbar Ecommerce, (4) The dropshipping council, (5) Scaleable, and (6) eCom Empire. Mr. Prusinowski advised that he does not know what Aliakbar Ecommerce is—though the Receiver suspects it may be a separate channel for EEB's COO, Aliakbar Gulshan—that the dropshipping council and Scaleable slack pages are unrelated to EEB, and that eCom Empire is a slack channel controlled by a former outsourced sales company called Closer Secrets LLC.

- American Express;

- Basecamp data from select back-office personnel;

- Clickfunnels;

- Hellosign;

- Docusign;

- Jotform;

- Morevago;

- PipeDrive

- Storefunnels.net;

- Stripe;

- TD Bank; and

- Wave.

The Receiver has taken over administrative control and/or changed the passwords on the following non-financial accounts:

- Gsuite;

- Google Drive;

- Mr. Prusinowski's company email (peter@ecommerceempirebuilders.com)

- Storefunnels Management Console;

- Cloudfare.com;

- Basecamp;[17]

- Clickfunnels;

- DocuSign;

---

[17]    Other contractors have their own logins for Basecamp, so the back-office is still able to provide services to existing EEB customers through this application.

- Instagram;

- YouTube;

- X/Twitter; and

- Spreaker (podcast platform).

The Receiver has been unable to access the non-financial account ActiveCampaign, which is a customer experience automation platform that helps businesses engage with customers, because EEB has not provided the correct log-in credentials despite multiple requests for such. Since receiving Notice of the TRO Order and Asset Freeze, Active Campaign has suspended EEB's account. The Receiver is attempting to figure out a work-around so that he can gain access and take over administrative control of the account.

In addition to the above, Defendant Prusinowski has turned over certain hard-copy documents in his possession to the Receiver. The Receiver has also obtained financial documents and records from EEB's accountant, Angela Smith at Empire Tax Professionals ("Empire Tax")[18] and has obtained log-in credentials from and/or obtained certain documents from back-office staff as needed.

### F.    Control Over and Preservation of EEB Social Media

Pursuant to Section XII, Paragraphs B, E, and I of the TRO Order, the Receiver and his agents have expended considerable effort to gain control over and preserve EEB's social media accounts and the posts on each account. Based in part on information from Defendant Prusinowski, the Receiver identified the following social media accounts through which EEB markets its Products and Services:

---

[18]    Empire Tax was engaged to provide "CFO Services" to EEB in or around November 2018. It is the Receiver's understanding that Empire Tax and EEB are not related entities, and the naming conventions are coincidental. The discussions with Angela Smith revealed that Empire Tax provided basic bookkeeping and tax return preparation services.

- Instagram: @ecommerce.empire.builders

- YouTube: @ecommerce.empire.builders

- Facebook: @Ecommerce Empire Builders

- X/Twitter: @OffPeterPru

- TikTok: @ecomm.empire.builders

- Spreaker: Ecommerce Empire Builders Podcast

As noted in Section II.E, *supra*, the Receiver has taken over administrative control and/or changed the passwords of all of the above social media accounts except for TikTok, due to security verification issues, and the Facebook page, which the Receiver's agents are still working to gain control over.[19]  Due to the volume of posts and activity on each social media account, the Receiver evaluated various options for preserving the social media in a manner that would be both cost-effective and expeditious.  The Receiver ultimately utilized his law firm's internal e-discovery team to preserve the social media accounts.  To date, EEB's Instagram, Facebook, YouTube,

---

[19]    Unlike EEB's other social media accounts, EEB does not have its own Facebook "account"; rather, it has a Facebook page, which is run and operated by EEB personnel through their own individual Facebook accounts. Therefore, the only way for the Receiver and his agents to gain control over the EEB Facebook page is to either mandate that an existing administrator of the EEB Facebook page make one of the Receiver's agent's individual Facebook accounts the head administrator of the Facebook page, or to gain access to the Facebook page through one of the existing administrator's own individual Facebook accounts.  The Receiver initially requested that Defendant Prusinowski provide the log-in credentials to his own Facebook account so that the Receiver could access the EEB Facebook page, but Mr. Prusinowski informed the Receiver that his Facebook account is deactivated.  Because, understandably, neither the Receiver nor his agents wish to utilize their own personal Facebook accounts in an official capacity to gain administrative control of the EEB Facebook page, the Receiver's agents created a Facebook account (the "Receiver FB Account") solely for the purpose of gaining control of the Facebook page, and subsequently met with one of the Facebook page administrators, Jamie Zeller, via Zoom, during which Mr. Zeller walked Receiver's agents through the administrative functions of the Facebook page and also set up the Receiver FB Account to have full administrative control of the Facebook page.  Unfortunately, the Receiver has not yet been able to access the Facebook page because Facebook has not yet allowed the Receiver to start using the Receiver FB Account.  Facebook, presumably for security reasons, has asked the Receiver's agents to provide more information for the Receiver FB Account, but despite the Receiver's agent's prompt furnishing of such information to Facebook, Facebook has not granted the Receiver access to the Receiver FB Account.  The Receiver's agents are still in ongoing communication with Facebook to rectify whatever issues Facebook believes exist so that the Receiver can access the Receiver FB Account, accept the administrative credentials to the EEB Facebook page that Mr. Zeller provided to the Receiver FB Account, preserve the EEB Facebook page, and subsequently deactivate the EEB Facebook page for the reasons set forth in Section V, *infra*.

X/Twitter, and Spreaker (Podcast) accounts have all been preserved. The e-discovery team is in the process of preserving EEB's TikTok.

### G.    Diversion of Mail

The Receiver submitted change of address/forwarding forms to the US post office in-person on September 21, 2024. The Receiver received the confirmations of the change of address from the United States Postal Service on October 10, 2024. On October 4, 2024, following the entry of the Court's Order extending the TRO (ECF No. 32), the Receiver informed USPS of the TRO extension and requested that mail forwarding be continued through at least November 1.

On September 30, 2024, the Receiver took possession of the keys for EEB's P.O. Box and collected mail from both Defendant Prusinowski and the post office that had arrived since the entry of the TRO Order. The Receiver intends to periodically check the P.O. Box for additional mail until the address change is formally recognized by USPS.

### H.    Interviews of EEB Personnel

The Receiver and/or his counsel and agents have had multiple meetings and calls, and exchanged many emails, with important EEB personnel to gain further information regarding company records, assets, and operations, including Defendant Prusinowski, COO Aliakbar Gulshan, and accountant Angela Smith from Empire Tax.

Receiver's counsel and agents have also communicated with and/or interviewed the following contractors/consultants for EEB who reside in the United States and abroad:

- James Zeller, an advertising manager who is an administrator of EEB's Facebook page. He has assisted/is assisting the Receiver's agents in gaining administrative control over EEB's Facebook page (*see* Note 19, *supra*);

- Steve Swiat, who has been providing consulting services for EEB customers since July 2020. Specifically, Mr. Swiat stated that he assists new customers with onboarding and funnel builds, coaches new customers, and participates in strategy sessions with the customers prior to the launch of their own ecommerce business.

In essence, he is a salesman.  While he executed a Consulting Agreement that defines the scope of services he provides to EEB customers, the agreement is silent as to his compensation structure.  His compensation is solely pursuant to a verbal agreement, which he told Receiver's counsel is purely commission-based and is based upon the products and/or services that he sells for EEB.[20]

- Back-office personnel,[21] including:

  o **Video Editor**, Khalid Angelo Manalundong.  As video editor, Mr. Manalundong makes TikTok ads for customers' Storefunnels brands, which are intended to promote their products.  Mr. Manalundong works full time hours, and services 4-6 customers per day, and 28-30 customers per week.  He does not interface directly with customers, and receives his assignments through Monday.  He is the only current video editor for EEB and is paid a set monthly base fee.

  o **Production Manager**, Sheldon Garwood.  As production manager, Mr. Garwood reviews requests submitted to Slack, puts them into Monday for assignment to back-office staff, and manages Monday overall.  He provides technical assistance with customer Storefunnels, which often requires logging in to customer Storefunnels to make the necessary adjustments.  Mr. Garwood works 6-8 hours per day.  He is the sole production manager and receives a flat monthly base pay.

  o **Account Executives**,  Ruby Gull, Laraib Ahmed Siddiqui, and Kasib Kamil.[22]  The account executives handle customer outreach/ communications and conduct research/make recommendations for EEB customers.  Every EEB customer is assigned an account executive who is their primary point of contact and stays with them through the life of their relationship, including assisting with launches and relaunches.  Account executives primarily communicate with customers through Basecamp or Zoom, help customers determine what services are needed, and then input those requests into Slack for assignment.  The account executives work full-time hours.  Additionally, certain of the account executives work with higher-level customers who purchase additional services/more inclusive packages, *e.g.*, Automated Ads Management ("AAM") or the Automated Executive Platinum Program ("Auto Exec"), in which case they provide

---

[20]    EEB only had four (4) 1099 contractors: Steve Swiat, James Zeller, Jordan Strauss, and Paul Murano.  Mr. Strauss handled marketing for EEB, and Mr. Murano handled automation.

[21]    Back-office personnel are not employees.  They are considered contractors, though they are not issued 1099's.  The vast majority of them are outside the United States.  They have consulting agreements with EEB that are silent as to compensation structure.  They submit an invoice each month and have historically been paid through applications like Payoneer, PayPal, and Stripe.  They are involved with the creation of customer Storefunnels and providing ongoing support to existing customers.

[22]    Receiver's counsel was unable to connect with Account Executive Abdul Ghaffar or Account Executive Manager Tareq Alrefae.  However, based upon information received from the other account executives and from discussions with the COO, the Receiver has a general understanding of the services that these two individuals provide.

additional services including assisting with marketing, tracking performance with greater frequency, etc.  The account executives are paid a set monthly base fee.

o **Website and Funnel Builder**, Muhammad Adeel.  Mr. Adeel designs and builds customers' Storefunnels pages, both for launches and re-launches. He is the only contractor who performs this work for EEB.  He works roughly 25 to 30 hours per week and receives a set monthly base pay.

o **Virtual Assistants**, Haya Kamil and Owais Ali Awan.  Virtual assistants provide customer service for EEB customer Storefunnels.  They assist with fulfilling orders, dealing with vendors and suppliers, and handling other customer service issues.  They work for AAM clients only.  They work approximately 40 hours per week and have set monthly base pays.

o **Copywriter**, Ruben Hernandez.  Mr. Hernandez does research for copywriting and provides copy for EEB customers.  He assists with launches and relaunches.  He provides the copy for informational products, like e-books.  He services 35 to 50 clients per week and works 40 hours per week.  He is the only back-office copywriter and has a set monthly base pay.

o **Graphic Designer**, Arianne Franco.  Ms. Franco uses a combination of Adobe Photoshop, Adobe Illustrator, and CANVA to provide graphic design services to EEB customers.  She handles the design for informational products.  She also assists with advertisements and website graphics. Ms. Franco services an average of 3 to 5 clients at a time.  She generally works 40 hours per week.  Ms. Franco is the only remaining back-office graphic designer for EEB and has a set monthly base pay.

o **Media Buyers**, Muhammad Arsalan and Jijo William Nadar.  The media buyers assist clients with placing ads, primarily through Facebook and Instagram, with the goal of bringing in orders for customers.  For AAM clients, media buyers place and manage the ads directly.  For customers who purchase a lower level of service, media buyers have calls with their clients to guide them on how and where to buy media.  Mr. Arsalan is paid based upon the number of active clients he works for over a specified period of time.  Mr. Nadar is paid a flat rate consulting fee every month.

o **Influencer Marketer**, Rubeena Kousar. Ms. Kousar identifies and coordinates with influencers to market customers Storefunnels' products. She typically works 15 hours per week, and is paid based on the number of influencers she is able to secure who successfully post a product.

I.        **Customer Outreach**

On September 26, 2024, Receiver's counsel emailed 26 individuals (comprised of both current and former EEB customers) attaching the TRO Order, informing them of the Receiver's appointment, and requesting to speak to them about the EEB services provided to them so that the Receiver could gain further insight on EEB's business operations.  These 26 customers were identified and selected from Monday.  Receiver's counsel randomly chose the customers based on package level, assigned account executive, and Storefunnels website launch date in an effort to get a varied mix of customers that may more widely represent the overall customer experience.  On September 29, 2024, Receiver's counsel emailed an additional six (6) individuals who were listed on a parallel EEB website's[23] list of customers who had purportedly amassed 100k, 50k, and/or 10k in profits and who counsel found records for in at least one of EEB's platforms/databases.

To date, Receiver's counsel has spoken to nine (9) of the 32 individuals.  The overwhelming majority stated that they first learned of EEB through EEB's social media advertising on Facebook, Instagram, TikTok, and/or YouTube, that the social media advertising and/or EEB staff (in initial, pre-purchase discussions) touted the ability to achieve high profits within a certain timeframe after purchasing EEB's services, and that—after they purchased EEB's services and had a fully functional online storefront—they did not achieve the number of sales that they expected and ultimately paid far more to EEB than they made in total profits.  Several individuals told Receiver's counsel that they were led to believe that certain costs (*e.g.*, advertising costs) were included in their EEB purchase, only to find out post-purchase that they were *not* included and that they would have to pay those costs out-of-pocket.  Several individuals also told

---

[23]        Receiver's counsel came across https://peter-4.storefunnels.net/, which appears to be either an old landing platform for EEB or a test website for EEB.  The known, existing EEB website, www.ecommerceempirebuilders.com, does not link to https://peter-4.storefunnels.net/ in any way.

Receiver's counsel that they had seen EEB advertise "money back guarantees," but when they asked for a refund, EEB personnel either deflected and tried to convince the customer to stay, or told the individuals that they did not qualify for a refund because they did not invest enough money into their own success. Only one of the nine individuals suggested that they were close to breaking even or surpassing the amount they paid to EEB with the amount of profits from their own online storefront; the other eight individuals explicitly told Receiver's counsel that they paid EEB far more than they made in total profits from their own online storefronts. And notably, while one of the nine individuals did not express dissatisfaction with EEB or the services that EEB provided, the individual stated that they did not achieve the level of profits they thought they would have had since their storefront launched. This individual also told Receiver's counsel that they did not question EEB's products or services because they were promised they would achieve $500,000 in profits over 4 years, and they had only been an EEB customer for less than one year.

The Receiver acknowledges the risk of selection bias when conducting outreach to a sample size of all EEB customers and understands that satisfied customers are likely less inclined to speak to Receiver's counsel as compared to dissatisfied customers. Therefore, after conducting interviews of the nine abovementioned EEB customers, and recognizing the time and expense involved in a more expansive customer outreach, the Receiver sought to collect information from as many current and former EEB customers as possible in a streamlined manner. After placing a Notice of Receivership on the EEB website and creating a Receivership Website—both of which are detailed in Section II.J below—Receiver's agents reviewed all signed contracts between EEB and the customers who purchased EEB's services,[24] compiled customer emails from the contracts,

---

[24]    Receiver's agents extracted all signed Service Agreements found in EEB's HelloSign and DocuSign platforms.

and sent a mass bcc email[25] to those EEB customers informing them of the Receivership and inviting them to complete a Consumer Questionnaire[26] regarding their experience with EEB. As of October 22, 2024, 45 individuals have submitted Consumer Questionnaires to the Receiver, with more continuing to be submitted each day. Of the Consumer Questionnaires reviewed thus far, the overall reported customer experience is generally similar to what customers reported during the aforementioned interviews—customers have reported that their experience did not align with their expectations, that they have had very few sales, if any, and that they suffered significant financial losses. Some notable customer responses include the following:

- "I am extremely disappointed and I have stopped funding the ads and closed the storefunnel. The company has been terrible and I feel taken advantage of. They are amateurs at best, scam artists most likely. . . . I am losing money every day with no sign of any change."

- "The sales tactic[s] to get customers to join was very predatory. I told them this was a big risk for me and my family financially and the sales agent only doubled down on his promise of sales and financial success. wish I had never signed up with [EEB] as I was tricked into a false promise of wealth and only incurred losses."

- "It started out great, but then when the original product that they selected for me had zero sales, I realized I had made a huge mistake."

J.    **EEB Website and Receivership Website**

Pursuant to Section XII, Paragraph V of the TRO Order, and as indicated in the Receiver's October 8, 2024 letter to the Court, the Receiver placed the following notice on the EEB website:[27]

NOTICE: PLEASE NOTE THAT AS OF SEPTEMBER 20, 2024, A TEMPORARY RECEIVER HAS BEEN APPOINTED TO ASSUME FULL CONTROL OF EMPIRE HOLDINGS GROUP LLC AND ITS BUSINESS OPERATIONS OF ECOMMERCE EMPIRE BUILDERS.

2024-09-20 Temporary Restraining Order with Asset Freeze and Appointment of a Temporary Receiver
2024-10-03 Order Extending TRO and Rescheduling PI Hearing

Please visit Empire Holdings Group Receivership for additional information and updates.

---

[25]    The Receiver compiled and sent the mass bcc email to 481 EEB customer emails. Of the 481, 25 emails were returned as undeliverable, and 1 was returned as the recipient's inbox is full.

[26]    A copy of the Consumer Questionnaire is attached hereto as Exhibit C.

[27]    The Court Orders listed in the notice are hyperlinks to the filed copies of the Orders, and "Empire Holdings Group Receivership" is hyperlinked to the Receivership Website.

Additionally, the Receiver has created a website[28] (the "Receivership Website") in order to provide consumers with a centralized platform containing information regarding the Receivership and through which EEB customers can submit the Consumer Questionnaire.

### K.    Managing EEB Business Operations

Pursuant to Section XII, Paragraph X of the TRO Order—and as discussed between the Court and counsel for the parties during the September 20, 2024 TRO Hearing[29]—the Receiver has allowed business operations to continue for existing EEB customers.  Specifically, the Receiver and his agents, using information from Defendant Prusinowski and EEB COO Aliakbar Gulshan, identified all contractors who provide services to current EEB customers as well as the specific platforms through which they provide services.  The Receiver obtained Mr. Prusinowski's login credentials to the identified platforms but allowed such platforms to remain operational and accessible to both EEB contractors and existing customers.  Additionally, the Receiver obtained Mr. Prusinowski's login credentials to Storefunnels but has allowed Storefunnels to remain fully operational, as all current EEB customers operate their own online storefronts through Storefunnels.

In order to continue business operations for existing EEB customers, and pursuant to Section XII, Paragraph O of the TRO Order, the Receiver and his agents have continued making payments to EEB back-office personnel and the White Label service provider, Simvoly Applications Ltd. ("Simvoly"), a Bulgarian-based company that manages the day-to-day operations and customer support for Storefunnels, from the Receivership Account.  Certain staffing cuts and pay reductions were implemented for back-office personnel in order to make such

---

[28]    https://empireholdingsgroupreceivership.com/.

[29]    *See* Sept. 20, 2024 TRO Hearing Trx. at 68:9–69:11.

payments more manageable during the pendency of the TRO, and the Receiver made payments according to that reduced schedule to keep back-office operations running for existing customers.

Through a review of Storefunnels and communications with Simvoly CTO, Ivan Nikolchov, the Receiver learned that Simvoly submits an invoice to Defendant Prusinowski's Storefunnels administrator account every Tuesday, and the amount Simvoly is paid each week depends on the number of active Storefunnels websites that EEB customers either activate or renew. While Mr. Nikolchov informed the Receiver that Simvoly is normally paid through EEB's PayPal, which was connected to Mr. Prusinowski's administrator Storefunnels account, Mr. Nikolchov provided Simvoly's bank information for the Receiver to make further payments to Simvoly via direct bank-to-bank wire transfer. The Receiver has successfully wired payments to Simvoly and Mr. Nikolchov has confirmed receipt of each payment.

That said, due to Simvoly and a majority of EEB personnel residing in international countries, the Receiver and his agents have faced substantial difficulties in making payments to continue business operations. The Receiver's agents created PayPal and Payoneer accounts with the intention of making payments through those platforms since Simvoly has historically been paid via PayPal and, as mentioned in Note 21, *supra*, EEB personnel have historically submitted monthly invoices to EEB to be paid through platforms such as Payoneer, PayPal, and Stripe. However, the Receiver's agents were not ultimately able to make payments through PayPal or Payoneer due to security and verification questions requested by the platforms, which the Receiver could not expeditiously resolve with those platforms due to the nature of the Receivership.[30]

---

[30]    For example, in order to link the WSFS Receivership Account to the Receiver's Payoneer account, Payoneer requested that the Receiver submit verifying information for Empire Holdings Group LLC—which is the name on the Receivership Account and the Receiver's Payoneer account—such as information regarding EEB's owner (Mr. Prusinowski) and entity formation and registration documentation, so that Payoneer could see whether that information matched the information listed on the Payoneer account. Because of the nature of the Receiver having assumed full control of EEB during the pendency of the Receivership, however, the verification information requested by Payoneer would not align with the information listed on the Receiver's Payoneer account, as the account was set

Therefore, the Receiver's WSFS bankers set up wire transfer capabilities for the Receivership Account in order for the Receiver to make payments via direct bank-to-bank wire transfer. The Receiver's agents have not experienced any issues with the wire payments made to Simvoly; however, the Receiver's agents experienced various issues with wire payments made to EEB personnel, some of which still have not been resolved. Several wire payments made to EEB personnel were unilaterally cancelled by Payoneer[31] and thus returned to the Receivership Account, while other wire transfers were returned by the recipient bank for unknown reasons. These issues led the Receiver to work directly with EEB personnel to arrange for alternative methods of wiring payment, such as, for example, wiring a lump sum payment (for three EEB personnel's pay) to their one EEB coworker who did not experience any issues receiving the wire payments to his bank account. A few EEB personnel have informed the Receiver's agents that they still have not received their wire payments, but because neither the Receivership Account nor the Receiver's WSFS bankers have received any indication that the wires failed or are being returned, the Receiver's agents have suggested that the EEB personnel talk to their own banks to alert them of the expected wire payments.

As for EEB's business operations related to the advertising, marketing, promoting, or offering for sale of EEB's products and services to prospective purchasers—and as discussed

---

up in the Receiver's, not Mr. Prusinowski's, name. Any attempts to link the Receivership Account to the Payoneer account would thus require the Receiver or his agents calling Payoneer to explain the nature of the Receivership in order to work through and/or bypass the verification process with the assistance of Payoneer's legal department— which the Receiver and his agents determined would not be a good use of time, effort, or expense in light of alternative methods to make payment (*i.e.*, direct bank-to-bank wire transfer).

[31] It is unclear why Payoneer unilaterally cancelled the wire payments or how Payoneer had the ability to cancel the wire payments in the first place, because the Receiver's agents did not initiate the wire payments in a way that involved the Payoneer platform whatsoever; the Receiver's agents initiated direct wire transfers from the Receivership Account to the EEB personnels' bank accounts. The Receiver believes that Payoneer may have been able to access the EEB personnel's bank activity if the bank account linked to their Payonner account is the same bank account to which Receiver initiated the wire transfer, but the Receiver cannot say for certain.

between the Court and the parties during the September 20, 2024 TRO Hearing[32]—the Receiver

and his agents have taken steps to shut down all aspects of EEB's business operations related to

customer acquisition.   In initial discussions with Defendant Prusinowski to obtain log-in

credentials for EEB platforms, Mr. Prusinowski informed Receiver's counsel that he had already

taken all of the "buy" buttons off of the EEB website, which Receiver's counsel subsequently

confirmed.  After receiving the log-in credentials to/taking control of the EEB payment platforms,

the Receiver and his agents observed that most, if not all, purchases of EEB's products and services

have been processed through Wave since approximately October 2023.  In addition to changing

the password on Mr. Prusinowski's owner account, the Receiver cancelled all pending customer

invoices and changed the status of all other EEB Wave users to "viewer" only, so they could no

longer generate new customer invoices.   The last payment received through Wave was on

September 17, 2024, before the TRO Order was entered.

Upon gaining control of EEB's social media accounts, the Receiver and his agents also

took steps to preserve the social media accounts (as explained in Section II.F, *supra*), and

temporarily deactivate the social media accounts (which is explained in detail in Section V, *infra*).

### L.    Accounting Review and Analysis

Pursuant to Section XII, Paragraph F of the TRO Order, the Receiver engaged Alvarez &

Marsal Disputes and Investigations, LLC ("A&M") to provide accounting support to the Receiver

and assist him in carrying out his duties under the TRO Order.

Based upon discussions with Angela Smith from Empire Tax and a review of the

corresponding records, the Receiver and A&M learned that Empire Tax prepared and maintained

the accounting records for EEB using Quickbooks.  EEB's Quickbooks system was connected to

---

[32]     *See* Sept. 20, 2024 TRO Hearing Trx. at 61:14-17.

EEB's accounts maintained with TD Bank and PayPal, along with the AMEX accounts (collectively, the "Connected Accounts").

The financial transactions from the Connected Accounts were imported into Quickbooks each month.  Empire Tax would then prepare the accounting entries based on the nature of each financial transaction as it was described in the data received from the Connected Accounts.  For example, charges from Amazon and Target would be recorded as "Office Supplies" expenses, while charges from restaurants would be recorded as "Meals and Entertainment" expenses. To the extent Empire Tax was unsure how to record a transaction based on the information available from the downloaded data, they would seek direction from Defendant Prusinowski by sending him an "Ask the Client" or "ATC" Report so that he could direct Empire Tax on how to record certain transactions.  Empire Tax asserts that it did not receive or review any underlying supporting documentation for the financial transactions recorded within EEB's accounting records, and that the accounting determinations were based solely on the information included in the data downloaded from the Connected Accounts and/or direction provided by Mr. Prusinowski.

A&M received access to EEB's Quickbooks file on September 25, 2024.  Given that the accounting records were prepared without the review of any underlying source documentation, A&M conducted limited procedures to verify the completeness and accuracy of the accounting records for the period May 16, 2018 through August 31, 2024 (the "Review Period"), relying upon available source documentation from Stripe, PayPal and Wave, TD Bank documents, and American Express card statements.[33]  A&M has made some important observations through the procedures performed to date:

---

[33]    Additional review of supporting source documentation will likely need to be completed when such information becomes available.  Additionally, further financial analysis will be needed with respect to additional Receivership Entities Empire Partner, Star Active, Atlas Fund, Atlas Trust, and Atlas Land, when the corresponding records become available.

- EEB reported revenue and purported operating expenses of approximately $21.8 million and $17.3 million, respectively, during the Review Period.

- Based on the available accounting records, nearly all of the funds generated by EEB were transferred to Defendant Prusinowski after purported expenses were paid.

- The accounting records contemporaneously maintained for EEB include material errors that understate assets and misstate the operating expenses. For example:

    o EEB's Charles Schwab brokerage account was not recorded as an asset of EEB, nor did Mr. Prusinowski disclose the existence of this account to Empire Tax. Instead, transfers to/from this account were recorded to an account titled "Personal Expenses" and treated as equity transactions.

    o A check written on 1/10/24 to "CB&T" (Capital Group American Funds where Mr. Prusinowski's personal 401K is held) was recorded in the general ledger of EEB as a business expense under the general ledger account "Advertising and Promotion: Google Ads."

- Of the $21.8 million in revenue reported during the Review Period, approximately $5.3 million was recorded as "Consulting Revenue," with the remainder largely based upon the financial accounts from which the funds were derived, *i.e.*, Stripe, PayPal, or Wave. Angela Smith advised that Mr. Prusinowski instructed Empire Tax to record this revenue based on transactions identified in the bank statements. Additional documentation is needed to further analyze the recorded revenue to determine the products and/or services sold to generate the revenue.

- A&M has been unable to verify the legitimacy of the expenses recorded in the accounting records due to a lack of business records. However, based on procedures performed to date, they have determined that certain items were reported as business expenses which appear to have benefitted Mr. Prusinowski personally. More specifically, $3.8 million of the $17.3 million in purported business expenses[34] appear to have benefitted Mr. Prusinowski personally, including $2.1 million in cash transfers made from EEB TD Bank accounts directly to or for the benefit of Mr. Prusinowski, $1.3 million in officer salary for Mr. Prusinowski (roughly $200,000.00 per year), $256,747 of cash payments related to payroll benefits for Mr. Prusinowski and his wife, Kellie Prusinowski, such as personal 401K contributions and tax withholdings, and $25,447 of net cash transfers ($303,273.00 outgoing; $277,826.00 incoming) made from EEB's TD

---

[34]    The remaining purported business expenses primarily consist of (i) $8.1 million related to advertising and promotional expenses, largely for vendors such as Facebook and Google ads; (ii) $6.2 million of contractor expenses largely accounted for as commission expenses paid to Closer Secrets LLC (which Defendant Prusinowski identified as an outside sales company) and other expenses recorded in the general ledger largely as "lead project managers" and "Funnel Builder;" and (iii) $1.8 million related to professional fees recorded in the general ledger largely as "project managers" related to "Facebook Ad Specialists."

Bank account for the purchase of cryptocurrency personally held by Mr. Prusinowski on the Coinbase and Gemini platforms.

- A&M identified $425,674 in total transfers made from Empire Partner to EEB during the Review Period. Specifically, as noted in Section II, *supra*, EEB's general ledger lists Empire Partner as a source of revenue, with entries totaling $99,604 for 2022, $77,070 for 2023, and $60,200 through the end of August 2024. Moreover, journal entries recorded to the "Personal Expenses" account totaled $188,800 for the Review Period, which appear to have been recorded to offset the cash withdrawn from and/or personal expenses charged to EEB by Defendant Prusinowski. It is unclear why certain transactions from Empire Partner were treated as revenue, whereas others impacted equity.

- The accounting records do not include receivables owed by customers because they were prepared on a cash basis. A&M has not seen evidence that EEB tracked amounts owed by customers or quantified any amounts owed on contracts.

- A&M made several observations with respect to the 466 customer contracts available via HelloSign and executed between May of 2022 and September 2024:

  o EEB's accounting records do not provide sufficient detail to support revenue or cost by product offering.

  o It appears that product prices were offered without consideration for a break-even cost required to sustain the business.

  o Using executed contracts, A&M was only able to attribute approximately $305,000.00 and $1.2 million of revenue derived through Wave and accounted for as "Consulting Income" to the customer offering in 2023 and 2024, respectively. It is unclear how the remaining revenue of $5.3 million and $1.4 million, in 2023 and 2024, correlates to customer contracts or products sold for these time periods, based on available documentation.

  o 116 executed contracts included language offering some type of "unlimited" service(s), 28 of which were executed in 2022 and currently rely on revenue generated from new customer contracts to cover back-office costs.

The irregularities in EEB's accounting records and the lack of supporting documentation, along with A&M's observations, raise serious concerns regarding the accuracy of all of Defendants' financial records.

Additionally, because no new customer contracts were initiated or executed following the entry of the TRO Order, there was insufficient revenue generated between September 21, 2024

through the present to cover back-office costs, which average $52,000.00 per month.  Between September 21 and October 10, 2024, there was only $11,108.00 of customer deposits, primarily derived from Storefunnels subscription fees.

### III.    Value of All Assets and Sum of All Liabilities of the Receivership Entities

As of October 20, 2024, the total balance in the Receivership Account was $1,308,273.25. As outlined above, this is based upon the following wire and transfer activity:

Since the opening of the Receivership Account through October 20, 2024, the Receivership Account has received (a) $610,672.41 in funds from Schwab from the EBB account on 10/1/24; (b) $0.07 cents in Preauthorized ACH Credit from PayPal in connection with the Receiver's set up of a PayPal account in an attempt to pay back-office staff through that platform; (c) $77,000.00 from Gordon Rees on 10/7/24, (d) $51,945.01 from TD Bank from the EEB accounts on 10/10/24, and (e) $613,202.79 in funds from Schwab from the Atlas Fund account 10/18/24.  Meanwhile, the Receiver has paid a total of $4,308.19 to Simvoly through weekly payments made on 10/3/24 ($856.19), 10/8/24 ($2,288.65) and 10/15/24 ($1,163.35), and a total of $40,238.84 has been wired to EEB personnel, representing their reduced payments for the month of October 2024.  For the time being, the Receiver intends to continue making payments to Simvoly to keep current EEB customers' Storefunnels pages up and running, until those customers have sufficient time to explore suitable alternatives to Storefunnels to the extent they still wish to maintain their individual Storefunnels.  The Receiver does not intend to make any further payments to EEB personnel, for the reasons set forth in Section V, *infra*.

As shown in the Balance Sheet attached hereto as Exhibit D,[35] A&M has determined that the Receivership Entities had assets totaling $1,410,046 and known liabilities totaling $177,730 as of October 20, 2024.  This is broken down as follows:

- A cash balance totaling $1,314,826 was held at two accounts maintained at TD Bank and one account at WSFS, and a negative balance totaling $179 was held in a PayPal account.

- A Shareholder Loan in the amount of $95,000.

- Liabilities primarily related to amounts due to American Express totaling $172,867.[36]

## IV.    Steps the Receiver Intends to Take to Protect Receivership Assets, Recover Receivership Assets from Third Parties, and Adjust Receivership Liabilities

The Receiver and his agents are still in the process of investigating the assets and liabilities of the Receivership Entities.  Pursuant to Section XXII, Paragraph A of the TRO Order, the FTC has noticed the depositions of Defendant Prusinowski, Mr. Prusinowski's wife, and EEB's COO, which are currently scheduled to take place on October 25 (Mr. Prusinowski) and November 4 (Mrs. Prusinowski and Mr. Gulshan), and Receiver's counsel intends to attend and participate in the depositions to obtain specific information regarding Receivership Assets.  Additionally, the Receiver's agents intend to conduct a thorough review of the materials that have been preserved from various e-mail accounts and drives in order to learn more information regarding the Receivership Entities.  As for the Atlas Entities, the Receiver is actively investigating whether and where they may be holding additional assets. Atlas Land may potentially own property.  Moreover, the Receiver has learned through documents provided by Defendants that certain Atlas funds may

---

[35]    A&M has not reviewed the accounting records for Receivership Entities other than EEB, to the extent they are even available.  As such, A&M's observations on the balance sheet are based on actual account balances and amounts owed by the Receivership Entities as seen in other documentation.

[36]    This balance includes two additional American Express credits cards that were not linked in Quickbooks with a total balance of $25,537 as of October 20, 2024 (x92003 and x93004).

be held in Belize; therefore, the Receiver has asked Mr. Prusinowski to execute a Content Directive, which will allow the Receiver to request documents and information from financial and/or similar institutions located outside of the United States. Mr. Prusinowski executed the Consent Directive on October 22, 2024.

The Receiver and his agents are also investigating other entities owned and operated by Mr. Prusinowski to determine whether they have received assets derived from EEB or would otherwise qualify as Receivership Entities. One of the entities of interest to the Receiver is Empire Realty Holdings LLC ("Empire Realty"), which Mr. Prusinowski transferred property to in March 2024. The Receiver observed in documents provided by Defendants that one of the property transfer documents lists Mr. Prusinowski as the Grantor, Empire Realty as the Grantee, and, notably, lists EEB as the "Customer." It is unclear at this time what EEB's role was as a "Customer" in this property transfer and the Receiver intends to investigate this further.

As for adjusting Receivership liabilities, the Receiver intends to put a stop on additional charges that are being incurred on the AMEX cards. As explained in Section II.D, *supra*, certain financial and payment processing platforms are still allowing charges to be incurred and/or are still processing chargebacks on EEB accounts, despite having received notice of the TRO and Asset Freeze from the FTC and the Receiver and despite the Receiver's subsequent letters to them notifying them that they are violating the TRO Order by allowing charges/chargebacks. The lack of cooperation from these entities may require the Receiver to file a motion with the Court in the near future to address these ongoing issues, if they cannot be resolved.

Additionally, as set forth in further detail below, the Receiver plans to shut down all EEB business operations to further preserve Receivership Assets.

V.      **The Receiver's Opinion on Whether Any Portion of the Business of Any of the Receivership Entities Can Continue to Operate Legally and Profitably**

Pursuant to Section XII, Paragraph T of the TRO Order, the Receiver may "suspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably."  EEB's social media usage is a critical component of its business operations as this is how it advertises, attracts, and acquires new EEB customers.  As noted, EEB markets its services through the following social media accounts:

- Instagram: @ecommerce.empire.builders

- YouTube: @ecommerce.empire.builders

- Facebook: @Ecommerce Empire Builders

- X/Twitter: @OffPeterPru

- TikTok: @ecomm.empire.builders

- Spreaker: Ecommerce Empire Builders Podcast

Through a review of the above social media accounts, the Receiver has formed the opinion that EEB's social media marketing and advertising have not been conducted legally.

EEB's Instagram contains 4,127 posts, most of which the Receiver believes contain Earnings Claims.  Below are examples of captions that are on EEB Instagram posts:

- June 18, 2022: "Here's how I launched a dropshipping business and got it to 1k per day in 3 days!"

- September 14, 2024: "Comment digital to get your $12k per month digital drop-shipping road map."

- August 28, 2024: "$25 MILLION ONLINE SUCCESS STORY! Imagine turning a simple idea into a $25 million empire! What took years for one person to achieve, YOU can now do in a fraction of the time thanks to AI and the latest tools at your fingertips."

- August 23, 2024: "Achieve $70k in sales with one product. Comment 'FREE COURSE' to learn the secrets."

- August 22, 2024: "Learn how to make $50K with these steps. Comment 'LAUNCH ME' to launch your store with our support."

EEB's Instagram videos similarly promote that viewers can "achieve results like this," while showing accounts with the amounts of $40,009.58, $6,325.65, $10,922.84, and $23,888.76. EEB makes no mention of the risks associated with drop-shipping; conversely, EEB regularly posts about the easy and streamlined process of earning large sums of money, *i.e.*, "achieve success with AI IN 5 EASY STEPS," "BOOST YOUR SALES WITH THESE EASY STEPS," "3 EASY STEPS TO MAKE $10K/MONTH," "TRY DROPSHIPING WITH ZERO RISK." Moreover, in nearly every Instagram post, prospective customers are encouraged to seek more information by interacting with the post—examples include "DM 'LAUNCH ME' to launch your success story," "comment digital to get your $21k per month digital dropshipping road map," "Comment 'FREE COURSE' to learn the secrets," and "Comment 'LAUNCH ME' to launch your store with our support." Because EEB regularly asserts in its Instagram posts that its purchasers are likely to earn substantial income in an "easy" manner, it is the Receiver's opinion that EEB's Instagram advertisements are misleading prospective purchasers to believe that that they will easily be able to earn the same or similar amounts of money if they purchase EEB's Products and Services.

EEB's YouTube account contains numerous videos that seemingly demonstrate how a prospective purchaser can earn a specific amount of money through drop-shipping. The Receiver found two notable playlists of videos within the EEB YouTube account—both of which contain videos that claim someone can make a certain amount of money by following the steps outlined within the videos ("Ecom Vault: Spy On & Build 7 Figure Ecommerce Stores + Funnels!" and "[FREE COURSE] From ZERO to $1000/Day with Dropshipping STEP BY STEP"). Similar to the Instagram posts, the Receiver believes that EEB's YouTube videos have deceptive titles that constitute Earnings Claims. Below are examples of EEB YouTube video titles:

- July 5, 2024: "How You Can Replicate $450,000 Dropshipping Store In Your Account! (Download & Start)"

- June 12, 2024: "How To Sell 7 Figures In Digital Products | Digital Dropshipping 2024"

- May 22, 2024: "$6500 Every 2 Weeks With This Digital Dropshipping Store!"

- March 22, 2019: "$0 to $100k First MONTH Dropshipping! – Ecommerce Empire Academy Revie and Student Success!"

- June 3, 2019: "[FREE COURSE] From ZERO to $1000/DAY with Dropshipping STEP BY STEP | Finding Winning Products (1/5)"

Similar to EEB's Instagram posts, nearly every YouTube video encourages prospective customers to seek more information by going directly to EEB's website; videos include captions stating "Have Us Build & Launch Your Entire Ecommerce Business" with a link to the EEB website. Because EEB's YouTube videos focus on inflated earnings and make no attempt to disclose the risks to prospective customers, it is the Receiver's opinion that the YouTube videos misrepresent to prospective consumers what they would be likely to earn if they purchase EEB's Products and Services.

As for EEB's Facebook page and TikTok account, the Receiver found that the majority (if not all) of the videos posted are identical to those posted on EEB's Instagram and YouTube accounts. In fact, most of EEB's posts on X/Twitter are direct links to EEB's YouTube videos. And as for EEB's podcast on Speaker, there are 1,459 episodes that also contain deceptive titles and subject matter, *i.e.*, "How to get FREE $10K/Month Digital Products To Sell TODAY," "This $71,000 Digital Dropshipping Product Method Gets INSTANT PROFITS!," "5 Mins To Build A $20,000 / Month Dropshipping Store With Free AI Tools & Chrome Extensions!". Again, it is the Receiver's opinion that these videos/podcasts are misleading because they misrepresent and overstate the profits that an average person would make, thereby inducing people to purchase EEB's Products and Services.

Accordingly, the Receiver is of the opinion that EEB's social media usage violates of Section 5(a) of the FTC Act.[37]  The Receiver believes that EEB's social media posts constitute "unfair or deceptive acts," as a substantial amount of the social media posts include or display statements that fit within the definition of deceptive "Earnings Claims."[38]  The Receiver also believes that EEB has violated the Business Opportunity Rule[39]—which in and of itself constitutes a violation of Section 5(a) of the FTC Act.  And lastly, the Receiver believes that EEB's social media posts violate Section 5(a) of the FTC Act as neither EEB, nor Defendant Prusinowski personally, provides prospective customers with disclosure documentation[40] substantiating the Earnings Claims made in any social media posts—in fact, Defendant Prusinowski told the Receiver that EEB does *not* keep records of its customer's own sales data, thereby rendering EEB

---

[37]    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

[38]    The TRO Order defines Earning Claims as "[a]ny oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits. Earnings Claims include, but are not limited to: (1) any chart, table, or mathematical calculation that demonstrates possible results based upon a combination of variables; and (2) any statements from which a prospective purchaser can reasonably infer that her or she will earn a minimum level of income."  TRO Order, Definitions ¶ E. This definition parallels the definition of "Earnings Claims" found in Code of Federal Regulations; however, the CFR's definition includes specific examples of prohibited Earnings Claims, such as: "earn enough to buy a Porsche," "earn a six-figure income," or "earn your investment back within one year."  16 C.F.R. § 437.1.  The TRO Order provides that "Defendants . . . in connection with advertising, marketing, promoting or offering for sale of any goods or services, are temporarily restrained and enjoined from making any Earnings Claims to a prospective purchaser."

[39]    The Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachment. The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an Earnings Claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it.  16 C.F.R. § 437.1(b).

[40]    With respect to disclosures, an advertiser will be found liable for failing to provide any consumer, potential purchaser, or investor with disclosure documents in the form and manner required by 16 C.F.R. §§ 437.2, 437.3(a)(1)-(5), and 437.4.  The FTC released "Guides Concerning Use of Endorsement and Testimonials in Advertising," *see* 16 C.F.R. § 255 *et seq.*, in which it details the need for disclosures where an "advertiser does not have substantiation that the endorser's experience is representative of what consumers will generally achieve[.]"  16 C.F.R. § 255.2(b).  The FTC explained that advertisements containing the language "results not typical," or "these testimonials are based on the experiences of a few people and you are not likely to have similar results," do not sufficiently prevent an ad from being deceptive "because consumers will still interpret the ad as conveying that [it is] representative of what consumers can generally expect."  § 255.2(e)(2).

incapable of providing substantiation that the Earnings Claims made in its social media posts are "representative of what consumers will generally achieve."  16 C.F.R. § 255.2.

Based on the foregoing, the Receiver has taken steps to deactivate and/or suspend EEB's social media accounts/posts, as the Receiver indicated in his October 1, 2024 letter to the Court.[41] To date, the Receiver has deactivated the following accounts: Instagram (@ecommerce.empire.builders); TikTok: (@ecomm.empire.builders); and X/Twitter (@OffPeterPru).  TikTok and X/Twitter were deactivated on October 1, 2024, and have been temporarily reactivated in short increments since then for preservation purposes.  Instagram only allows a user to deactivate their account once a week, so EEB's account was first preserved and then deactivated on October 9, 2024.  On October 9, 2024, all EEB Spreaker podcast episodes were made private so that no member of the public can listen to them and, on October 21, 2024, all EEB YouTube videos were changed from "public" to "unlisted," which prevents the public from accessing the videos.  EEB's Facebook page has yet to be deactivated, although the Receiver intends to deactivate it  as soon as possible.  As explained in Note 19, *supra*, the Receiver is in the process of gaining full administrative control over the Facebook page with assistance from one of the administrators, Jamie Zeller, and will thereafter deactivate the page upon receiving control.

As noted in Section II.L, *supra*, due to the lack of detail in the accounting records and limited underlying support in the available documents, A&M was not able to quantify the amount of revenue that EEB generates through the sale of its Products and Services, or the associated operating costs to generate said revenue.  That said, based on A&M's accounting analysis of the available information from the Connected Accounts and information provided by Defendant

---

[41]     Following the submission of the October 1, 2024 letter to the Court, the Receiver learned of EEB's podcast on the platform Spreaker from iHeart.  The Receiver also determined that other social media accounts identified in the letter to the Court are actually imposter EEB accounts created by individuals who are attempting to impersonate Mr. Prusinowski.  Therefore, Mr. Prusinowski was not able to provide log-in credentials for those social media accounts.

Prusinowski, the Receiver believes that EEB cannot be profitable without its social media marketing and advertising—which is the primary, if not sole, method through which EEB acquires new customers.  Various factors have led the Receiver to reach this conclusion.

*First*, EEB's accounting records do not provide sufficient detail needed to support revenue or cost by product offering.  A&M has represented to the Receiver that there is no way to distinguish the income derived from the Ecommerce Platinum Program versus the Business in a Box program; revenue in the accounting records was accounted for based on the payment platform that generated customer payments.[42]  Expenses were similarly accounted for based on the vendor providing the service (*e.g.*, marketing and advertising performed by Google and Facebook were accounted for as "Google Ads" and "Facebook Ads Specialist," respectively).  While A&M was able to attribute nearly $305,000 and $1.2 million of revenue derived through Wave and accounted for as "Consulting Income" to the customer offerings in 2023 and 2024, respectively, the attributed revenue to customer offerings only accounts for a portion of total revenue in 2023 ($5.6 million) and 2024 ($2.6 million).  Moreover, even if sufficient detail had been included, the problems observed with EEB's accounting records, as detailed in Section II.L, *supra*, would raise serious concerns regarding whether that information is even reliable or accurate.

*Second*, a review of the executed customer contracts found in HelloSign show that the pricing of EEB products varies greatly amongst its customers.  Through its accounting analysis, A&M observed that EEB likely determines product prices without consideration for a break-even cost required to sustain its business.  EEB customers were offered contracts with durations ranging from one month to "unlimited" and contract prices ranging from $2,500 to $100,000 and, in certain

---

[42]    For example, per the direction of Defendant Prusinowski, EEB revenue derived from Wave was booked as "Consulting Income."

instances, customers were offered the exact same product at different prices.[43]  Moreover, of the 466 customer contracts found in HelloSign, over 100 contracts included language that offered some form of "unlimited" service(s).  As an example, A&M observed that one customer contract executed in April 2024 for the Ecommerce Platinum Program was priced at $33,000 and offered the following "unlimited" team support access:



The unlimited access to "Three Inner Circle Zoom Calls Per Week" and "On Demand Support Within BaseCamp Dashboard" would necessarily incur expenses to maintain the EEB personnel that are ultimately providing the back-office support to the customer, and according to the EEB COO, the average monthly costs to maintain back-office support for May–September 2024 was approximately $52,000.  Even more notable, A&M observed that 28 customer contracts executed in 2022 included an unlimited service offering and collectively totaled to $846,000.  Based on the information provided by the COO for May–September 2024, A&M estimated at least $624,000 in annual revenue (or $52,000 x 12 months = $624,000) was required to cover back-office costs.  This means that for at least 16 months, EEB was able to independently sustain its operations and rely on the revenue derived from the 2022 contracts to cover the back-office costs required to service the contracts, but after 16 months, EEB would have had to begin relying on revenue generated from new customer contracts to cover costs associated with the 2022 unlimited contracts.  This

---

[43]    For example, A&M identified two identical 6-month contracts for the Ecommerce Platinum Program, with one priced at $8,000 and the other at $16,000.  Why these customers were offered the same contract with different contract prices is not known.

observation—coupled with the fact that EEB only has $485,135 of liquid assets available to finance its business as of October 20, 2024[44]—shows that EEB's unlimited service offering is clearly not sustainable without onboarding new customers.

   ***Third***, following the entry of the TRO Order when EEB halted customer acquisition, the revenue that EEB generated from its existing customers has been minimal.  A&M reviewed the customer activity within Stripe, PayPal, and Wave after the entry of the TRO Order and identified $11,108 in total deposits ($10,193 from Stripe and $916 from PayPal).[45]  Even assuming that the total deposit amount could be extrapolated for an entire month (30 days), it is not enough to cover the monthly costs to maintain back-office support.

   In sum, the Receiver has taken steps to suspend EEB's social media accounts after concluding, through a review of EEB's social media accounts, that EEB's social media marketing and advertising have not been conducted legally.  And with the assistance of A&M's accounting analysis, the Receiver has concluded that EEB cannot be profitable without its social media marketing and advertising.  Based on these two conclusions, the Receiver and his agents intend to suspend *all* EEB business operations pursuant to Section XII, Paragraph T of the TRO Order.  The Receiver places particular significance on the fact that the TRO Order directs him to suspend business operations if "such operations cannot be continued legally ***and*** profitably."  TRO Order § XII ¶ T (emphasis added).  Even *if* EEB personnel are providing legitimate back-office support to existing EEB customers—which is questionable given the methods used to bring in those customers—and Simvoly is providing legitimate services to maintain Storefunnels, these business

---

[44]    The Receivership's cash balance of $1,314,647 as of October 20, 2024 includes $662,617 of cash derived from EEB accounts.  Liquid Assets for EEB of $484,887 equal $662,617 less the outstanding EEB liabilities of $177,730.

[45]    A&M did not identify any customer activity within Wave because, as noted in Section II.K, *supra*, the last payment received through Wave was on September 17, 2024, before the entry of the TRO Order.

operations do not generate profit.  Absent both legality *and* profitability, the TRO Order directs the Receiver to suspend business operations.

Accordingly, the Receiver and his agents intend to start taking steps to suspend all EEB business operations following the Receiver's submission of this Report to the Court.  Receiver's counsel is currently investigating whether alternative companies exist that can provide support services similar to the back-office support currently provided by EEB personnel, so the Receiver can provide that information to existing customers.  The Receiver is also attempting to locate alternative platforms that can host existing EEB customers' online stores, to the extent customers wish to keep their stores operational.  The Receiver and his agents plan to cease all payments to EEB back-office personnel and start taking steps to wind down EEB in the very near future.  The Receiver's decision to suspend all EEB business operations has been made with particular consideration of his duty to "protect the interests of consumers who have transacted business with the Receivership Entities." TRO Order § XII ¶ K.  Given the amount of time and resources expended by the Receiver and his agents to date in maintaining business operations for existing EEB customers, and the overall negative consumer experience being reported through interviews and Consumer Questionnaires, the Receiver believes it is in the best interest of the Receivership Estate—and the consumers—to focus his efforts on preserving and recovering Receivership Assets rather than dedicating further time and expense in keeping the business operational.

## VI.    Other Matters the Receiver Believes Should Be Brought to the Court's Attention

As the Receiver has indicated such in numerous sections of this Report, the Receiver and his agents have faced continued difficulties in carrying out the Receiver's duties pursuant to the TRO Order due to a variety of factors.  Despite Sections XIII, XIV, and XV of the TRO Order, the Receiver experienced difficulties in taking over control of EEB business operations due to

delays from Mr. Prusinowski in responding to the Receiver's requests for information and/or responding to the Receiver's requests for information in a piecemeal fashion, promptly responding to certain questions asked by the Receiver and not responding to other questions until repeatedly reminded to do so by the Receiver and his counsel. Because Mr. Prusinowski did not immediately turn over his laptop and cellphone, which he used to conduct EEB business, the Receiver also faced difficulty in securing those devices and preserving relevant information on those devices.[46] The Receiver likewise faced difficulties in promptly obtaining documents and information from certain third parties, such as EEB's accountant and the individual who is the administrator of EEB's Facebook page.

Additionally, because EEB's entire business is run online/electronically, the Receiver and his agents have faced considerable difficulty accessing and taking control over all electronic platforms through which EEB conducts its business. Two-factor authentication ("2FA") significantly hindered—and continues to hinder—the Receiver and his agents' ability to immediately access certain platforms in order to investigate and/or preserve information, as certain platforms require that 2FA be enabled for security purposes. In order to log into platforms that have 2FA, the ability to access the platform depends upon whether the individual who controls 2FA for that platform is able to immediately provide the 2FA code to the agent seeking access. Because 2FA codes time out rather quickly, the 2FA security measure has impacted the Receiver's agents' ability to consistently access platforms, whenever needed, in order to access information and conduct their investigation simply because the individual who controls 2FA may not always be able to immediately provide the 2FA code. In other circumstances, the Receiver's agents have not been able to log into platforms because the 2FA code goes to unknown and/or inaccessible

---

[46]    *See* Note 15, *supra*.

phone numbers and/or e-mail addresses.  Modern technology security measures have likewise impeded the Receiver's agents' ability to access certain platforms outright.  For example, certain of the Receiver's agents have never been able to log into EEB's PayPal account—they have been prevented from even accessing the 2FA portion of the log-in due to a pop-up that says that PayPal cannot confirm the identity of the person attempting to log-in.

The Receiver brings this to the attention of the Court so that it has context for why the Receiver and his agents have had to expend significant time and effort in fulfilling certain of the Receiver's duties under the TRO Order.  Following the Receiver's suspension of all EEB business operations, as indicated in Section V, *supra*, the Receiver expects that the frequency of such issues with technological security measures will decrease, thereby allowing the Receiver and his agents to focus their time and effort in locating, protecting, and recovering Receivership Assets.

### VII.    Conclusion

In summary, the Receiver will continue to focus efforts on preserving as much evidence and data as possible and protecting the interests of all consumers—including existing EEB customers—by shutting down business operations that in the Receiver's opinion cannot be conducted both legally and profitably.  This includes ceasing all of EEB's business operations in the very near future.  The Receiver's focus will also be on recovering and preserving as many Receivership Assets as possible.

Respectfully submitted,

Dated: October 22, 2024

*/s/ Robin S. Weiss*
**CLARK HILL PLC**
Robin S. Weiss, Esquire
Vanessa L. Huber, Esquire
Two Commerce Square
2001 Market Street, Suite 2620

Philadelphia, PA 19103
Phone: (215) 640-8500
Fax: (215) 640-8501
Email: rsweiss@clarkhill.com
          vhuber@clarkhill.com

*Attorneys for Receiver, Kevin Dooley Kent*