**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

|  |  |  |
|---|---|---|
| FEDERAL TRADE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.  2:24-CV-4949 |
| | ) | |
| EMPIRE HOLDINGS GROUP LLC, | ) | |
| d/b/a ECOMMERCE EMPIRE BUILDERS | ) | |
| and STOREFUNNELS.NET, a limited liability | ) | |
| company, and PETER PRUSINOWSKI | ) | |
| Individually and as officer of | ) | |
| Empire Holdings Group LLC, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## <u>DECLARATION OF RYAN M. POTEET</u>

I, Ryan M. Poteet, hereby declare,

1.      I am above the age of eighteen and competent to make this declaration.  This declaration is based on my personal knowledge and, if called to testify, I would competently testify thereto.

2.      This declaration is offered in support of Defendant Prusinowski's Reply In Support of Its Motion for Fees Incurred to Date and to Withdraw as Counsel of Record.

3.      I am a partner with the law firm of Gordon Rees Scully Mansukhani, LLP, counsel of record for the Defendant Prusinowski.

4.      On Friday, September 27, 2024, I met and conferred with the Receiver Kevin Dooley and the Receiver's counsel Robin Weiss concerning the collection of Mr. Prusinowski's personal Gmail account. We discussed various privilege concerns and ultimately agreed to a privilege screening protocol.

5.      On Saturday, September 28, 2024, I met with Michael Boland, a data preservation specialist employed by Kevin Dooley's law firm. Despite Mr. Prusinowski and my best efforts to deactivate dual factor authentication, we were unable to do so because Mr. Prusinowski did not have access to his cell phone, which was in Mr. Dooley's possession at the time. After several phone calls and Zoom meetings with Mr. Boland, we were able to successfully deactivate Gmail's dual factor authentication and resolve other data collection challenges.  Mr. Boland completed the collection of Mr. Prusinowski's personal Gmail account on Monday, September 30, 2024.

6.      On October 15, 2024, I received an email from Ryan McAuliffe, counsel for the FTC.  The email asserted Defendants' September 25, 2024 Financial Disclosure Forms were "incomplete."  Mr. McAuliffe's email did not specify any deficiencies.  Mr. McAuliffe's October 15, 2024 email was the first time counsel was contacted about Defendants' Financial Disclosure Forms.  Similarly, Mr. Dooley had not expressed any concern about the accuracy or completeness of Defendants' Financial Disclosure Forms.

7.      Attached as <u>Exhibit 1</u> is a true and accurate copy of the Complaint  (ECF No. 1) and Proposed Stipulated Order for Permanent Injunction, Civil Penalty Judgment, and Other Relief (ECF No. 3-1) filed in *United States v. Lyft, Inc.*, Case No. 24-cv-7443 (N.D. Cal. Oct. 25, 2024). A true and accurate copy of the FTC's October 25, 2024 Press Release announcing the parties' settlement, *FTC Takes Action to Stop Lyft from Deceiving Drivers with Misleading Earnings Claims*, is also included in Exhibit 1.

8.      Attached as <u>Exhibit 2</u> is a true and accurate copy of the February 22, 2024 Staff Report of the U.S. House of Representatives Committee on the Judiciary entitled, *Abuse of Power, Waste of Resources, and Fear: What Internal Documents and Testimony From Career Employees Show about the FTC under Chair Lina Khan*.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 29th day of October, 2024.

_/s/ Ryan M. Poteet_
Ryan M. Poteet

# EXHIBIT 1



An official website of the United States government    Here's how you know ⌄

Español

Report Fraud | Get Consumer Alerts | Search the Legal Library | Submit Public Comments

**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

Enforcement ⌄    Policy ⌄    Advice and Guidance ⌄    News and Events ⌄    About the FTC ⌄    🔍

Home > News and Events > News > Press Releases

For Release

# FTC Takes Action to Stop Lyft from Deceiving Drivers with Misleading Earnings Claims

Proposed court order requires Lyft to have evidence to back up earnings claims, clearly notify drivers about terms of incentives, pay more than $2 million civil penalty

October 25, 2024       [f] [X] [in]

**Tags:** Consumer Protection | Regional Offices | Bureau of Consumer Protection | Western Region San Francisco | Jobs | deceptive/misleading conduct | Technology | Advertising and Marketing | Online Advertising and Marketing | Advertising and Marketing Basics

The FTC is taking action against rideshare operator Lyft for making deceptive earnings claims about how much money drivers could expect to make per hour and how much they could earn in special incentives.

Lyft has agreed to a proposed settlement that would require its claims about drivers' pay to be based on typical earnings. In addition, Lyft has agreed to back up with evidence any claims it makes about drivers' pay, clearly notify drivers about the terms of its "earnings guarantee" offers, and pay a $2.1 million civil penalty.

The U.S. Department of Justice filed the lawsuit and proposed settlement upon notification and referral from the FTC.

"It is illegal to lure workers with misleading claims about how much they will earn on the job," said FTC Chair Lina M. Khan. "The FTC will keep using all its tools to hold businesses accountable when they violate the law and exploit American workers."

The complaint against Lyft alleges that as demand for rideshare services increased in 2021 and 2022, Lyft made numerous false and misleading claims in its advertising and marketing about how much money consumers could make if they chose to drive for Lyft.

Ads for Lyft advertised that drivers around the country could make specific hourly amounts. For example, potential drivers in Atlanta were offered up to $33 an hour, potential drivers in Portland were offered $41 an hour and potential drivers in Los Angeles were offered up to $43 an hour. Lyft failed to disclose that these amounts did not represent the income an average driver could expect to earn, but instead were based on the earnings of the top one-fifth of drivers. The complaint notes that these figures overinflated the actual earnings achieved by most drivers by as much as 30%.

In addition, the complaint notes that the hourly earnings claims Lyft made in its ads included tips paid by passengers, even though many drivers would assume any tips they received would be in addition to an hourly pay figure.

In its advertisements, Lyft also tried to entice drivers by touting "earnings guarantees," which supposedly guaranteed that drivers would be paid a set amount if they completed a specific number of rides in a certain time. For example, one guarantee promised drivers they would make $975 if they completed 45 rides in a weekend. But these guarantees did not clearly disclose that drivers were only paid the difference between what they actually earned, and Lyft's advertised guaranteed amount. Drivers complained to the company in large numbers that they believed the amount Lyft guaranteed would be paid as a bonus on top of whatever pay they received for completing the assigned number of rides.

One driver complained to the FTC that: "…This [is] unacceptable and not fair. . . . [Lyft] is misleading their drivers. [Lyft] should pay their driver[s] as stated, it shows I completed the task. As the driver, I expected to be paid for the service I rendered."

The court complaint notes that Lyft continued to make these deceptive earnings claims even after receiving the FTC's Notice of Penalty Offenses that put the company on notice that deceptive earnings claims were unlawful.

In addition to requiring the company to pay a $2.1 million civil penalty, the proposed settlement also will prohibit Lyft from making any earnings claim unless they have meaningful evidence to back that claim up. In addition, Lyft will be prohibited from making any claims about hourly earnings that include tips as part of the stated hourly amount. The settlement will also require Lyft to clearly disclose to drivers that, under its earnings guarantees, drivers will receive only the difference

Related Cases

Lyft, Inc., U.S. v.

Related actions

Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya In the Matter of Lyft, Inc.

Dissenting Statement of Commissioner Melissa Holyoak In the Matter of Lyft, Inc.

Statement of Commissioner Andrew N. Ferguson Concurring in Part and Dissenting in Part In the Matter of Lyft, Inc.

Topics

Protecting Consumers

Competition in the Technology Marketplace

between their regular earnings and the guaranteed amount. The settlement also requires Lyft to provide notice to its drivers about the settlement.

Today's action is part of the FTC's ongoing efforts to protect workers in the gig economy. In 2021, the FTC reached a settlement with Amazon returning more than $60 million to Amazon Flex drivers whose tips were illegally withheld. In 2022, the FTC took action against HomeAdvisor for misleading service providers, and the following year obtained an order barring false claims and providing millions in redress. This year, the FTC challenged deceptive earnings claims and other unlawful practices by Arise and Care.com, securing conduct relief and more than $15 million for affected workers. The FTC has detailed how its authorities apply in the gig economy in its Policy Statement on Enforcement Related to Gig Work.

The Commission vote to authorize the staff to refer the complaint to the DOJ and to approve the proposed consent decree was 3-2, with Commissioners Melissa Holyoak and Andrew Ferguson dissenting. Chair Lina M. Khan issued a statement joined by Rebecca Kelly Slaughter and Alvaro M. Bedoya. Commissioner Holyoak issued a statement. Commissioner Andrew N. Ferguson issued a statement. The DOJ filed the complaint and proposed consent decree upon notification and referral from the Commission in U.S. District Court for the Northern District of California.

**NOTE:** The Commission authorizes the filing of a complaint when it has "reason to believe" that the named defendants are violating or are about to violate the law and it appears to the Commission that a proceeding is in the public interest. Consent decrees have the force of law when approved and signed by the District Court judge.

The staff attorneys on this matter were Evan Rose and Abdiel T. Lewis of the FTC's Western Region San Francisco.

The Federal Trade Commission works to promote competition and protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. Learn more about consumer topics at consumer.ftc.gov, or report fraud, scams, and bad business practices at ReportFraud.ftc.gov. Follow the FTC on social media, read consumer alerts and the business blog, and sign up to get the latest FTC news and alerts.

## Contact Information

## Contact for Consumers

FTC Consumer Response Center
877-382-4357
https://reportfraud.ftc.gov

## Media Contact

Jay Mayfield ✉
Office of Public Affairs
202-326-2656



**Enforcement**
Cases and Proceedings
Premerger Notification Program
Merger Review
Anticompetitive Practices
Rulemaking
Statutes
Competition and Consumer Protection Guidance Documents
Warning Letters
Consumer Sentinel Network
Criminal Liaison Unit
FTC Refund Programs
Notices of Penalty Offenses
Competition Matters Blog

**Policy**
Advocacy and Research
Advisory Opinions
Cooperation Agreements
Federal Register Notices
Reports
Public Comments
Studies
Testimony
Policy Statements
International
Office of Technology Blog

**Advice and Guidance**
Consumer Advice
Military Consumer
Consumer.gov
Business Guidance
Competition Guidance
Bulk Publications

**News and Events**
News
Events
Features
Topics
Data and Visualizations
Contests
Stay Connected

**About the FTC**
Mission
History
Commissioners and Staff
Bureaus and Offices
Budget and Strategy
Office of Inspector General
Careers at the FTC
Contact

Privacy Policy     Policy and Notices     Accessibility     FOIA     No FEAR Act     Office of Inspector General     USA.gov

BRIAN M. BOYNTON, Principal Deputy Assistant Attorney General
BURDEN H. WALKER, Acting Deputy Assistant Attorney General

AMANDA N. LISKAMM, Director
LISA K. HSIAO, Senior Deputy Director
ZACHARY A. DIETERT, Assistant Director

PAULINE STAMATELOS, Trial Attorney (NYRN 4351649)
United States Department of Justice
Civil Division, Consumer Protection Branch
450 5th Street, NW, Suite 6400-S
Washington, D.C. 20530
Telephone: (202) 353-7744
Email: pauline.a.stamatelos@usdoj.gov

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division

EKTA DHARIA (NYRN 5219860)
Assistant United States Attorney
450 Golden Gate Avenue
San Francisco, California 94102
Telephone: (415) 436-7276
Fax: (415) 436-6748
Email: ekta.dharia@usdoj.gov

Attorneys for Plaintiff United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>         v.<br><br>LYFT, INC., a corporation,<br><br>      Defendant. | Case No. 24-cv-7443<br><br>**COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the United States of America, acting upon notification and referral from the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

1

1.      Plaintiff brings this action for Defendant's violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and prior Commission determinations concerning unfair and deceptive acts or practices in commerce.  For these violations, Plaintiff seeks relief, including a permanent injunction, civil penalties, and other relief, pursuant to Sections 5(m)(1)(B) and 13(b) of the FTC Act, 15 U.S.C. §§ 45(m)(1)(B), 53(b).

2.      Defendant Lyft, Inc. ("Lyft") operates a mobile app ride-hailing platform that connects consumers who provide rides ("Drivers") with consumers seeking transportation ("Passengers").  Lyft recruits and approves consumers to become Drivers, sets the rates that Drivers charge for providing transportation, and collects a portion of the fares that Drivers charge for each ride.

3.      Lyft classifies its Drivers as independent contractors rather than employees.  Drivers pay the expenses associated with providing rides through Lyft's platform, such as gas, car payments, and maintenance.  To become a Driver, consumers may incur significant start-up costs.  For example, they may need to secure a qualifying vehicle, acquire rideshare insurance, and pay business license and vehicle inspection fees to local or state regulators.

4.      In early 2021, consumer demand for ride-hailing services began to rise as access to the COVID-19 vaccine became more widespread.  Lyft recognized that it had a shortage of Drivers to meet the renewed demand, a challenge Lyft referred to internally as the "Supply Crunch."

5.      Lyft addressed its Supply Crunch by, among other things, disseminating advertisements that highlighted Drivers' hourly earnings.  Lyft's ads, however, featured hourly earnings based on the top 20% of Drivers.  Thus, most Lyft Drivers were unlikely to earn the advertised pay.

6.      Lyft has also disseminated advertisements featuring "Earnings Guarantees" that misled Drivers into believing that they would receive the guaranteed amount as a bonus in addition to their ordinary earnings.  Lyft is aware that consumers perceive these ads to be misleading because it has received tens of thousands of Driver complaints about the Earnings Guarantees.

7.      On October 26, 2021, the FTC sent a letter to Lyft with a copy of the Notice of Penalty Offenses Concerning Money-Making Opportunities.  The FTC's letter noted that Lyft could be subject to civil penalties if it violated the FTC Act in connection with its advertising claims, pursuant to 15

U.S.C. § 45(m)(1)(B) and 16 C.F.R. § 1.98(e). The accompanying Notice of Penalty Offenses stated, *inter alia*, that it is an unfair or deceptive trade practice to make false, misleading, or deceptive representations concerning the earnings that may be anticipated by a participant in a money-making opportunity. Lyft continued to make deceptive earnings claims in its advertisements even after receiving the Notice of Penalty Offenses.

## PLAINTIFF

8.     The United States brings this action upon notification and referral from the FTC, pursuant to Section 16(a)(1) of the FTC Act, 15 U.S.C. § 56(a)(1). The FTC is an independent agency of the United States Government created by the FTC Act. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

## DEFENDANT

9.     Lyft is a Delaware corporation with its principal place of business at 185 Berry Street, Suite 400, San Francisco, CA 94107. Lyft transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, Lyft has advertised and marketed its mobile app ride-hailing platform throughout the United States.

## COMMERCE

10.     At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## JURISDICTION

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States. The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1337(a) because it arises under an Act of Congress regulating interstate commerce or protecting trade and commerce against restraints and monopolies, and under 28 U.S.C. § 1345 because the United States is the Plaintiff. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1355 because this action is for the recovery or enforcement of a penalty incurred under an Act of Congress.

**VENUE**

12.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), 1395(a), and 15 U.S.C. § 53(b).

**DIVISIONAL ASSIGNMENT**

13.     Pursuant to Rule 3-2(c) of the Civil Local Rules of the Northern District of California, the San Francisco Division serves the county in which this action arises.  A substantial part of the events giving rise to the claims occurred in the City and County of San Francisco.

**DEFENDANT'S BUSINESS ACTIVITIES**

*Background on Driver Earnings*

14.     The primary components of a Driver's earnings are (1) the driver fare, (2) tips from Passengers, and (3) bonuses, Earnings Guarantees, or other incentives.  Earnings Guarantees are discussed in more detail in Paragraphs 30–46 below.  In most cases, the fare consists of a base fare or pick-up fare, plus incremental amounts based on the actual time and distance of the ride.  The applicable fares and time and distance amounts are shown to the Driver in Lyft's driver-facing app.  In some cases, Drivers may receive cancellation or no-show fees when a Passenger cancels a ride request or fails to show up for a ride.  Drivers may also receive surcharges or subsidies, such as fuel surcharges or the California state healthcare subsidy.

15.     Lyft offers ride-hailing services in hundreds of cities throughout the United States.  The company divides its service area into more than 300 geographic regions, which are generally identified by the airport code of the regional airport (*e.g.*, "SFO" for the San Francisco region).  The fare amounts that apply to the region in which the Driver picks up the Passenger will apply to the ride, even if the ride ends in a different region.

*Hourly Earnings Advertisements*

16.     From around April 2021 to June 2022, Lyft widely disseminated inflated hourly earnings claims in web search ads, on social media, on internet job boards, and on Lyft's website.  For example, Lyft ran ads on Facebook and Instagram making the following claims for Driver positions in various markets:

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

| Atlanta, GA | |
|---|---|
| "Start driving and earn up to $33/hour" | July 2021 |
| "Up to $30/hour" | October 2021 |
| "Drivers in Atlanta make up to $29.00 an hour" | December 2021 |
| "Earn up to $29/hour driving with Lyft" | February 2022 |
| **Boston, MA** | |
| "Drivers Earn Up to $42/hr in Boston" | July 2021 |
| "Up to $43/hour" | October 2021 |
| "Earn up to $37/hour driving with Lyft" | December 2021 |
| "Drivers in Boston make up to $33.00 an hour" | February 2022 |
| **Dallas, TX** | |
| "Drivers Earn Up to $31/hr in Dallas" | July 2021 |
| "Start driving and earn up to $29/hour" | October 2021 |
| "Drivers in Dallas make up to $30.00 an hour" | December 2021 |
| "Earn up to $28/hr driving with Lyft" | February 2022 |
| **Los Angeles, CA** | |
| "Start driving and earn up to $43/hour" | July 2021 |
| "Up to $41/hour" | October 2021 |
| "Drivers in Los Angeles make up to $37.00 an hour" | December 2021 |
| "Earn up to $34/hour driving with Lyft" | February 2022 |
| **Miami, FL** | |
| "Start driving and earn up to $31/hour" | July 2021 |
| "Up to $21/hour" | October 2021 |
| "Drivers in Miami make up to $23.00 an hour" | December 2021 |
| "Earn up to $27/hour driving with Lyft" | February 2022 |

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

| New Jersey | |
|---|---|
| "Start driving and earn up to $34/hour" | July 2021 |
| "Up to $34/hour" | October 2021 |
| "Earn up to $28/hour driving with Lyft" | December 2021 |
| "Drivers in New Jersey make up to $28.00 an hour" | February 2022 |
| San Francisco, CA | |
| "Start driving and earn up to $44/hour" | July 2021 |
| "Up to $42/hour" | October 2021 |
| "Drivers in San Francisco make up to $40.00 an hour" | December 2021 |
| "Earn up to $38/hour driving with Lyft" | February 2022 |

17. Many of Lyft's Facebook and Instagram ads making the inflated earnings claims resembled the representative ads presented in Figures A–D below.





**Fig. A: Facebook ad (July 2021)**

**Fig. B: Facebook ad (October 2021)**



**Fig. C: Instagram ad (December 2021)**



**Fig. D: Facebook ad (February 2022)**

18.     Lyft disseminated its search ads with inflated hourly earnings claims on Google and Bing.  Figure E below shows an example of a typical Lyft web search ad from September 2021.



**Fig. E: Google ad (September 2021)**

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

19. Lyft disseminated its job board ads with inflated hourly earnings claims on websites like Craigslist. Figure F below shows an example of a typical Lyft job board ad from February 2022.



**Fig. F: Craigslist ad (February 2022)**

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

20. As noted above, Lyft also widely disseminated its inflated hourly earnings claims on its own website. Figure G below shows an example of a typical earnings claim on Lyft's website from January 2022.



**Fig. G: Lyft website (January 2022)**

21. Lyft also disseminated variations of the hourly earnings claim on its website, including, for example, "Most drivers in New York City earn up to $28 per hour*" in January 2022.

22. The vast majority of Drivers were not likely to achieve the hourly earnings figures cited in Lyft's ads. Lyft's ads regularly exaggerated hourly earnings by 20% more than what most Drivers earned, and in some cases by more than 30%.

23. The hourly earnings figures that Lyft used in its ads were based on internal data related to Driver earnings. Essentially, for each geographic region, Lyft calculated the hourly earnings for each

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

9

day a Driver gave a ride that began in that region.  For the calculations, Lyft used data on Driver earnings and hours from a recent 28-day period.  Lyft included all types of earnings in its calculation, including the Driver fare, bonuses and incentives offered by Lyft (excluding certain types of bonuses, such as sign-up bonuses for new Drivers), earnings guarantees, and fuel surcharges, as well as tips from Passengers.  For the hours portion of the equation, Lyft included the entire time a Driver (a) was logged into the Lyft Driver app and was available to accept ride requests, (b) was driving to pick up a Passenger, (c) or was giving a ride to a Passenger.

24.     After performing its hourly earnings calculations, Lyft ranked the results for each region by percentiles from the lowest hourly earnings to the highest.

25.     In the ads described above, Lyft used the hourly earnings calculation at the 80th percentile for a given region.  As a result, even relying on Lyft's own calculations, only the top 20% of Drivers—that is, only one in five Drivers—earned the hourly earnings figures quoted in the ads.  For example, in August 2021, Lyft claimed that Drivers in New Jersey could earn up to $34 per hour when Lyft's own calculations put the median earnings at only $25 per hour.  In the same month, Lyft claimed that Drivers in Boston could earn up to $42 per hour when median earnings were just $33 per hour.

26.     In addition, as noted above, the hourly earnings figures used in Lyft's ads factored in tips that Passengers paid to Drivers.  Because Lyft presented the earnings claim as an hourly amount and did not disclose that tips were factored into the figure, many Drivers were likely to believe that the tips they earned would be additional to the hourly earnings advertised by the company.

27.     Lyft's deceptive hourly earnings claims were typically preceded with the phrase "up to."  Many consumers were unlikely to notice the phrase or understand that it meant that typical Driver earnings would be significantly less than the figure cited in the ad, and the phrase does not make clear that only one in five Drivers earned the hourly figure.  The hourly earnings figure was more likely to draw their attention.  In addition, Lyft made hourly earnings claims without the "up to" qualification in job board ads.  *See* Fig. F ("compensation: $41.00").

28.     Lyft's hourly earnings claims on its website were followed by small-print language that noted, among other things, that "The hourly earnings communicated above are . . . not indicative of any

specific driver's earnings . . . ."  Consumers were unlikely to read this language, due to its small size, lack of prominence, and legalistic language.  Even those who did read the small-print language were unlikely to understand that typical hourly earnings would be significantly less than the hourly figure cited on the website.  As with "up to," the text does not adequately convey that only one in five Drivers earned the hourly figure, nor does the text adequately convey that the hourly figure already factors in tips.

29.  Lyft's deceptive hourly earnings claims were effective in attracting Drivers.  For example, an internal analysis by Lyft employees concluded that "[d]isplaying hourly earnings in paid campaigns have shown 24% increase in overall leads with the highest increase via job boards and social channels (~35%)."

### *Earnings Guarantee Promotions*

30.  Since at least January 2021, Lyft has also disseminated advertisements touting promotions that the company refers to as "Earnings Guarantees."

31.  Typically, an Earnings Guarantee requires a Driver to complete a specified number of rides within a certain time frame.  If the Driver meets the requirements of the promotion and earns less than the guaranteed amount in the advertisement, Lyft will pay the Driver the difference between what the Driver earned and the guaranteed amount.  For example, if the Earnings Guarantee is $2,200 for 140 rides in the Driver's first month, and the Driver completes 140 rides in their first month but earns only $2,000 in total, Lyft would pay the Driver $200 to make up the difference.

32.  However, if a Driver earns the same or more than the guaranteed amount in the advertisement, the Driver is not eligible for additional compensation.  For example, if the Earnings Guarantee is $2,200 for 140 rides in the Driver's first month, and the Driver completes 140 rides in their first month but earns $2,200 or more, the Driver does not receive any additional payment.

33.  Lyft uses Earnings Guarantee promotions both to attract new Drivers and to incentivize current Drivers to provide more rides.  Internally, Lyft has noted that "[o]ne of the advantages about displaying guarantees is that the face values are much higher than the actual payout (*i.e.*, $200 bonus per

1   130 rides vs $2000 guarantees for 130 rides), which may seem more attractive than the bonus (*i.e.*,

2   $200) to the applicants."

3        34.    Lyft typically sets the ride requirements for Earnings Guarantee promotions at the 80th

4   percentile of the rides in the past 30 days in a given region.  An internal Lyft document points out that

5   "[s]etting the requirement high, such as the 80th percentile, encourages drivers to work more hours in

6   the first 30 days of the activations."  The document goes on to note that "if we use the 80th percentile of

7   the rides as the ride requirement, we can assume that ~20% of drivers may meet the ride requirement

8   and get paid for incentives."

9        35.    Lyft also regularly offers Drivers bonuses in addition to their ordinary earnings for

10  completing a certain number of rides within a certain time frame.  According to consumer complaints,

11  many drivers understood Lyft's Earnings Guarantee advertisements to offer bonus promotions and

12  believed that they would receive the amount cited in the advertisement in addition to their ordinary

13  earnings from providing the rides.

14       36.    The difference between an "Earnings Guarantee" and a "bonus" can be especially

15  confusing to consumers who do not speak English as their first language.  In recent years, Lyft has

16  publicly reported that more than a third of its Drivers speak a language other than English at home.

28  COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
    Case No. 24-cv-7443

37.     Lyft has widely disseminated Earnings Guarantee advertisements via social media, email, text messages, push notifications, and Lyft's website.  For example, many of Lyft's Facebook and Instagram ads making the misleading Earnings Guarantee claims for new Drivers looked like the examples of ads presented in Figures H–I below.



**Fig. H: Facebook ad (July 2021–Mar. 2022)**



**Fig. I: Instagram ad (Nov. 2021–Mar. 2022)**

38.     Figure J below shows an example of an Earnings Guarantee email ad for new Drivers, and Figure K below is an example of an Earnings Guarantee email ad to current Drivers.



**Fig. J: Email ad for new Drivers**



**Fig. K: Email ad for current Drivers**

39.     Lyft has long been on notice that its Earnings Guarantee advertisements are misleading Drivers.

40.     From January 2021 to at least April 2022, Lyft received tens of thousands of complaints from Drivers stating that they were led to believe that the Earnings Guarantee promotions were a lump-sum bonus.  For example:

    a.     In a March 2021 complaint, a Driver wrote:  "That is not right and it's not fair false information on [Lyft's] behalf. . . . This is complete false advertisement . . . . [Y]our promotion that was offered to me was very misleading.  It seemed like if I

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

14

completed 15 rides I would instantly receive an extra $125.  Next time the promotion
needs to be worded differently so that it's not misleading."

    b.    From an April 2021 complaint:  "I'm going to need Lyft to reference the
guarantee thing differently and not put it as you getting this amount for a certain number
of rides because it's makes it confusing between [earnings guarantees and bonuses].  If it
says you get $140/24 rides that's what you should get not a whole different explanation
for something different because it's misleading."

    c.    From a June 2021 complaint (translated from Spanish):  "I don't
understand.  I was told that if I'm a new hire and make 100 or more trips within a
month's period I will get a bonus, but I haven't received anything."

    d.    From a July 2021 complaint:  "[T]he offer said complete 220 rides and get
3,500[.]  [It] never said complete 220 and get the difference of what you make while
driving[.]  [T]his is wrong.  [V]ery very disappointed. . . . I regret working for you. . . . I
was counting on that money. . . . [M]e and everyone would think we will get the offer of
3,500 not including the earnings."

    e.    From a September 2021 complaint:  "[T]he wording was exactly the same
as the wording on the bonus I got over the weekend for $300.  [V]erbatim except $100
for 15 rides and $300 for 30 rides.  [T]he word guarantee was nowhere written down. . . .
[I]f I saw the word guarantee for 15 rides in $100, I never would have busted my butt to
try to get that because I know that I'll way surpass that."

    f.    From a November 2021 complaint:  "This [is] false advertis[ing].  This
[was] not explained to me as the driver and [is] not acceptable.  Maybe [Lyft does] not
understand[] how difficult it is to be out in bad weather, dealing with all kinds of people
and the wear and tear on the driver vehicle and the person, and then [Lyft] [r]efuses to
pay the driver.  This [is] unacceptable and not fair. . . . [Lyft] is misleading their drivers.
[Lyft] should pay their driver[s] as stated, it shows I completed the task.  As the driver, I
expected to be paid for the service I rendered."

g.      From a November 2021 complaint:  "[T]he program was not a guaranteed difference[.]  [I]t was do 100 rides by [November] 29th and get 1400 dollars . . . ."

h.      From a December 2021 complaint:  "I worked late last night to meet it. . . . Some feedback, the[] way it's presented looks [like it's a bonus] to this new driver.  I am very disappointed I misunderstood."

i.      From a January 2022 complaint:  "I feel cheated some how this does not make sense. . . . I thought I was making extra but I'm not."

j.      From a February 2022 complaint:  "I'm very upset [right] now because it's always confusion with this [guaranteed] earnings. . . . I drive hard to complete my work and now I'm not getting paid."

k.      From an April 2022 complaint:  "The verbiage you guys are using is very misleading.  Show me where it says it's a prorated amount and we can help you get up to [$]190?  It specifically says complete 17 rides and get [$]190 . . . .  If [I] was an attorney I would have a very solid case this is very misleading . . . .  You guys need to be more specific and clear with the verbiage on your promotions[.]  I had two other people look at this and they said the same thing. . . . Please send this up to your management team and marketing team . . . ."

41.      Lyft's own employees who handled Driver complaints acknowledged that Drivers were confused about the Earnings Guarantees in their interactions with Drivers.  For example:

a.      In response to a March 2021 complaint, a Lyft employee who stated that they were a manager wrote:  "We understand that this promotion terms and conditions may be a little confusing.  We apologize for this misunderstanding."

b.      In response to a November 2021 complaint, a Lyft employee wrote:  "[D]rivers usually get confused with this Earnings Guarantee promotion.  They often confuse this with the usual Ride Challenge or Weekend Bonus wherein an[] 'additional' bonus is being given."

c.      In response to a February 2022 complaint, a Lyft employee wrote: "Most of the drivers are confused with Earnings Guaranteed but please allow me to explain this further."

42.      In a message thread from May and June 2021, employees from Lyft's "field team," which directly interacts with Drivers, provided feedback concerning the Earnings Guarantee confusion to Lyft's marketing team. A field team employee reported: "We continue to have incredible escalations with Drivers over the 'guarantee' verbiage. Drivers believe they are 'guaranteed' that money as a bonus and when it is explained what the purpose of the guarantee is, they become escalated and believe we are being misleading in our communications."

43.      In the same thread, another field team employee wrote: "I am talking to a driver right now. . . . [T]he main feedback from drivers is that the offer is not explained. . . . [The promotional email from Lyft says] "Complete 20 rides between 5 AM Friday, May 28 and 5 AM Monday, May 31 to earn at least $350 — guaranteed." Especially for an ESL driver [a driver whose primary language is not English], I can see how this can be deceiving. Since we're offering guarantees more often, the issue is becoming more prominent. He's very frustrated with Lyft . . . . Is there a chance we can revisit this language to make it clearer for drivers?"

44.      An internal Lyft report from July 2021 noted "field team feedback that guarantees continue to be a major driver of confusion for drivers who misinterpret the offer structure."

45.      An internal Lyft document from October 2021 described a test of revised Earnings Guarantee ads that Lyft was conducting "in an effort to reduce confusion amongst drivers and new applicants." The document noted that Earnings Guarantees are "often misunderstood by our drivers and result in unintentional dissatisfaction." The test revised ads are presented in Figures L and M below.

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

17





**Fig. L: Revised email ad for new Drivers**

**Fig. M: Revised email ad for current Drivers**

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

46.     Based on the test described in the October 2021 document, Lyft adopted the revised Earnings Guarantee ads for future Earnings Guarantee promotions and widely disseminated the ads. However, Lyft continued to receive thousands of complaints each month from Drivers stating that the Drivers thought the Earnings Guarantees were lump-sum bonuses.  *See, e.g.*, Paragraphs 40(f)–(k).

### *Lyft Continues to Make Deceptive Earnings Claims Despite FTC Warning*

47.     In October 2021, the FTC sent a letter to Lyft, along with a copy of the Notice of Penalty Offenses Concerning Money-Making Opportunities ("Notice") (attached hereto as Exhibit A).  The Notice and accompanying letter identified specific acts or practices that the FTC has determined are unfair or deceptive and violate Section 5 of the FTC Act.

48.     As detailed in the Notice, in a series of litigated decisions the Commission determined, among other things, that it is an unfair or deceptive trade practice to make false, misleading, or deceptive representations concerning the earnings that may be anticipated by a participant in a money-making opportunity (*i.e.*, a person who has been accepted or hired for, has purchased, or otherwise is engaging in the money-making opportunity).  This includes, for example, misrepresenting, explicitly or implicitly, that participants will or are likely to earn any specific amount or percentage; and misrepresenting the profits or earnings that may be anticipated by a prospective participant by failing to disclose conditions or limitations affecting such income.

49.     As the letter accompanying the Notice stated, the above acts or practices were prohibited by final cease and desist orders, other than consent orders, issued in the cases (cited in the Notice) in which the Commission determined they were unfair or deceptive and unlawful under Section 5(a)(1) of the FTC Act.  The letter warned Lyft of its potential liability for civil penalties under Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), if it knowingly engaged in acts or practices determined by the Commission to be unfair or deceptive and unlawful.

50.     Lyft received the Notice and accompanying letter on October 29, 2021.  Lyft continued to make deceptive earnings claims in its advertisements even after receiving the Notice.

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

51.     Approximately four months later, in March 2022, the FTC served Lyft with a Civil Investigative Demand seeking documents and information pertaining to, among other things, Lyft's use of earnings claims in advertisements and any substantiation it had for these earnings claims.

52.     Lyft ceased making hourly earnings claims in its advertisements only after learning of the FTC's investigation into Lyft's practices.

### *Lyft's Unlawful Conduct*

53.     Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Lyft is violating or is about to violate laws enforced by the FTC because, among other things:

      a.       Lyft continues to disseminate misleading Earnings Guarantee claims;

      b.       Lyft disseminated its misleading hourly earnings claims repeatedly over a period of more than a year;

      c.       Lyft continued their misleading hourly earnings claims after receiving the Notice;

      d.       Lyft ceased its misleading hourly earnings claims only after becoming aware of the FTC's investigation; and

      e.       Lyft remains in the mobile app ride-hailing business and maintains the means, ability, and incentive to continue or resume its unlawful conduct.

### VIOLATIONS OF THE FTC ACT

54.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

55.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### Count I

### False or Unsubstantiated Hourly Earnings Claims

56.     Paragraphs 1–55 are incorporated as if set forth herein.

57.     In numerous instances in connection with the advertising, marketing, and promotion of Defendant's mobile app ride-hailing platform, including through the means described in Paragraphs 16–

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

20

29, Defendant has represented, directly or indirectly, expressly or by implication, that Drivers in specific cities or regions are likely to earn specific hourly amounts.

58.     Defendant's representations as described in Paragraph 57 are false, misleading, or were not substantiated at the time the representations were made.  Among other reasons, Lyft's hourly earnings claims were based on the earnings achieved by the top 20% of Drivers and factored in tips that Passengers paid to Drivers.

59.     Therefore, Defendant's representations as described in Paragraph 57 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II

### Failure to Disclose Earnings Guarantee Terms

60.     Paragraphs 1–59 are incorporated as if set forth herein.

61.     In numerous instances in connection with the advertising, marketing, and promotion of Defendant's mobile app ride-hailing platform, including through the means described in Paragraphs 30–46, Defendant has represented, directly or indirectly, expressly or by implication, that Drivers will earn a specified amount of compensation for performing a specified number of rides within a specified time frame.

62.     In numerous instances when Defendant has made the representations described in Paragraph 61, Defendant has failed to disclose or disclose adequately to consumers that it will pay only the shortfall, if any, between the amount the Driver earns from performing the specified number of rides and the amount of compensation specified in the offer.  This fact would be material to consumers in deciding to perform ride-hailing services for Defendant.

63.     In light of the representations described in Paragraph 61, Defendant's failure to disclose or disclose adequately the material information as described in Paragraph 62 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF PRIOR COMMISSION DETERMINATIONS CONCERNING UNFAIR OR DECEPTIVE ACTS OR PRACTICES

64.     Pursuant to Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), if the Commission has determined in a proceeding under Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), that an act or practice is unfair or deceptive and issued a final cease and desist order, other than a consent order, with respect to the act or practice, then a person, partnership, or corporation that engages in such act or practice with actual knowledge that such act or practice is unfair or deceptive and is unlawful under Section 5(a)(1) of the FTC Act shall be liable for civil penalties.

65.     In prior litigated decisions, the Commission has determined that the acts or practices described in Paragraphs 16–46 are unfair or deceptive and violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and issued final cease and desist orders, other than consent orders, with respect to those acts or practices. In particular, the Commission has found it unfair or deceptive to misrepresent, explicitly or implicitly, that participants will or are likely to earn a specific amount or percentage, and to misrepresent the profits or earnings that may be anticipated by a prospective participant by failing to disclose conditions or limitations affecting such income. *See* Exhibit A, Notice ¶¶ 1.d, 1.f.

66.     Pursuant to Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), for the purpose of computing civil penalties, each and every instance that Defendant has made to a consumer a misrepresentation identified in the Notice, including each and every instance that Defendant caused to be disseminated an advertisement that included such a misrepresentation to a consumer, or caused the same to be shown to a consumer, since receiving the letter and Notice, constitutes an act or practice that the Commission has determined in a prior proceeding to be unfair or deceptive and unlawful under Section 5(a)(1) of the FTC Act.

67.     Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, and the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015), and Section 1.98(e) of the FTC's Rules of Practice, 16 C.F.R. § 1.98(e), effective January 10, 2024, authorizes the award of monetary civil penalties of up to $51,744 for each violation of prior Commission determinations concerning unfair and deceptive acts or practices in commerce.

### Count III

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

**Violations of Prior Commission Determinations Known to Defendant**

**Regarding Defendant's False or Unsubstantiated Hourly Earnings Claims**

68.     Paragraphs 1–67 are incorporated as if set forth herein.

69.     Lyft received the Notice and accompanying letter on October 29, 2021.  Since that time, Defendant had actual knowledge that, in connection with the advertising or promotion of money-making opportunities, making false, misleading, or deceptive earnings claims—including, specifically, misrepresenting, explicitly or implicitly, that participants will or are likely to earn a specific amount—is an unfair or deceptive act or practice, unlawful under Section 5(a)(1) of the FTC Act, and subject to civil penalties.

70.     In numerous instances, as set forth in Paragraphs 16–29, Defendant represented, directly or indirectly, expressly or by implication, that Drivers in specific cities or regions were likely to earn specific hourly amounts.

71.     Defendant's representations as described in Paragraph 70 were false, misleading, or were not substantiated at the time the representations were made.  Among other reasons, Lyft's hourly earnings claims were based on the earnings achieved by the top 20% of Drivers and factored in tips that Passengers paid to Drivers.

72.     Defendant engaged in the acts and practices described in Paragraphs 70–71 with the actual knowledge, as set forth in Paragraphs 47–50, that the acts or practices are unfair or deceptive and violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and the Commission issued final cease and desist orders, other than consent orders, with respect to those acts or practices.  Defendant, therefore, is liable for civil penalties under Section 5(m)(1)(B) of the FTC Act.  15 U.S.C. § 45(m)(1)(B).

**Count IV**

**Violations of Prior Commission Determinations Known to Defendant**

**Regarding Defendant's Failure to Disclose Earnings Guarantee Terms**

73.     Paragraphs 1–72 are incorporated as if set forth herein.

74.     As set forth in Paragraphs 47–50, at least since receiving the Notice and accompanying letter, Defendant had actual knowledge that, in connection with the advertising or promotion of money-

making opportunities, making false, misleading, or deceptive earnings claims—including, specifically, misrepresenting the profits or earnings that may be anticipated by a prospective participant by failing to disclose conditions or limitations affecting such income—is an unfair or deceptive act or practice, unlawful under Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and subject to civil penalties.

75. In numerous instances, set forth in Paragraphs 30–46, Defendant represented, directly or indirectly, expressly or by implication, that Drivers will earn a specified amount of compensation for performing a specified number of rides within a specified time frame.

76. In numerous instances when Defendant made the representation described in Paragraph 75, Defendant failed to disclose or disclose adequately to consumers that it will pay only the shortfall, if any, between the amount the Driver earns from performing the specified number of rides and the amount of compensation specified in the offer. This fact would be material to consumers in deciding to perform ride-hailing services for Defendant.

77. Defendant engaged in the acts and practices described in Paragraphs 75–76 with the actual knowledge, as set forth in Paragraphs 47–50, that the acts or practices are unfair or deceptive and violate Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and the Commission issued final cease and desist orders, other than consent orders, with respect to those acts or practices. Defendant, therefore, is liable for civil penalties under Section 5(m)(1)(B) of the FTC Act. 15 U.S.C. § 45(m)(1)(B).

**CONSUMER INJURY**

78. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

**CIVIL PENALTIES**

79. Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), authorizes this Court to award civil penalties for each violation of prior Commission determinations known to Defendant.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act by Defendant;

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

24

B.     Impose civil penalties on Defendant for every instance Defendant participated in an act or practice with actual knowledge that it was unfair or deceptive; and

C.     Award any additional relief as the Court determines to be just and proper.

Dated: October 25, 2024                    Respectfully submitted,


**FOR THE UNITED STATES OF AMERICA:**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BURDEN H. WALKER
Acting Deputy Assistant Attorney General

AMANDA N. LISKAMM
Director

LISA K. HSIAO
Senior Deputy Director, Civil Litigation

ZACHARY A. DIETERT
Assistant Director


*/s/ Pauline Stamatelos*
PAULINE STAMATELOS
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice


ISMAIL J. RAMSEY
United States Attorney
Northern District of California

*/s/ Ekta Dharia*
EKTA DHARIA
Assistant United States Attorney

Attorneys for the United States of America

COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

1   **OF COUNSEL, FOR THE FEDERAL**
    **TRADE COMMISSION:**
2

3   KERRY O'BRIEN
    Regional Director
4   Western Region San Francisco

5   EMILY COPE BURTON
    Assistant Regional Director
6   Western Region San Francisco

7   EVAN ROSE (CABN 253478)
    ABDIEL T. LEWIS (CABN 339339)
8   Attorneys
    Federal Trade Commission
9   Western Region San Francisco
    90 Seventh St., Suite 14-300
10  San Francisco, CA 94103
    Phone: (415) 848-5100
11  Email: erose@ftc.gov, alewis4@ftc.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
    Case No. 24-cv-7443

BRIAN M. BOYNTON, Principal Deputy Assistant Attorney General
BURDEN H. WALKER, Acting Deputy Assistant Attorney General

AMANDA N. LISKAMM, Director
LISA K. HSIAO, Senior Deputy Director
ZACHARY A. DIETERT, Assistant Director
PAULINA STAMATELOS, Trial Attorney (NYRN 4357649)
United States Department of Justice
Civil Division, Consumer Protection Branch
450 5th Street, NW, Suite 6400-S
Washington, D.C. 20530
Telephone: (202) 353-7744
Email: pauline.a.stamatelos@usdoj.gov

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division

EKTA DHARIA (NYRN 5219860)
Assistant United States Attorney
450 Golden Gate Avenue
San Francisco, California 94102
Telephone: (415) 436-7276
Fax: (415) 436-6748
Email: ekta.dharia@usdoj.gov

Attorneys for Plaintiff United States of America

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> LYFT, INC., a corporation, <br><br> Defendant. | Case No. 24-cv-4773 <br><br> **[PROPOSED] STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the United States of America, on referral and notification to the Attorney General by

the Federal Trade Commission ("Commission" or "FTC"), filed its Complaint for Permanent Injunction,

Civil Penalty Judgment, and Other Relief ("Complaint"), for a permanent injunction, civil penalties, and

other relief in this matter, pursuant to Sections 5(a), 5(m)(1)(B), 13(b), and 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(B), 53(b), 56(a)(1). Defendant has waived service of the summons and the Complaint. Plaintiff and Defendant stipulate to the entry of this Stipulated Order for Permanent Injunction, Civil Penalty Judgment, and Other Relief ("Order") to resolve all matters in dispute in this action between them.

THEREFORE, IT IS ORDERED as follows:

## FINDINGS

1. This Court has jurisdiction over this matter.

2. The Complaint charges that Defendant participated in deceptive acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, in connection with its false, misleading, or unsubstantiated claims regarding driver earnings.

3. Defendant neither admits nor denies any of the allegations in the Complaint, except as specifically stated in this Order. Only for purposes of this action, Defendant admits the facts necessary to establish jurisdiction.

4. Defendant waives any claim that it may have under the Equal Access to Justice Act, 28 U.S.C. § 2412, concerning the prosecution of this action through the date of this Order, and agrees to bear its own costs and attorneys' fees.

5. Defendant and Plaintiff waive all rights to appeal or otherwise challenge or contest the validity of this Order.

## DEFINITIONS

For the purpose of this Order, the following definitions apply:

A. **"App"** means any software application or code that can be transmitted or downloaded to any mobile device. App also includes any software referred to as an "app" or "mobile app" by Defendant in the course of its communications or business practices, or in any app store.

B. **"Clearly and Conspicuously"** means that a required disclosure is difficult to miss (*i.e.*, easily noticeable) and easily understandable by ordinary consumers, including in all of the following ways:

1.     In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented.  In any communication made through both visual and audible means, such as a television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2.     A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3.     An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient for ordinary consumers to easily hear and understand it.

4.     In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5.     The disclosure must use diction and syntax understandable to ordinary consumers and must appear in each language in which the representation that requires the disclosure appears.

6.     The disclosure must comply with these requirements in each medium through which it is received, including all electronic devices and face-to-face communications.

7.     The disclosure must not be contradicted or mitigated by, or inconsistent with, anything else in the communication.

8.     When the representation or sales practice targets a specific audience, such as children, the elderly, or the terminally ill, "ordinary consumers" includes reasonable members of that group.

C.    **"Defendant"** means Lyft, Inc. and its successors and assigns.

D.    **"Driver"** means an individual who receives transportation requests from members of the public using Defendant's App.

**ORDER**

## I. PROHIBITION AGAINST DECEPTIVE EARNINGS CLAIMS

IT IS ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any service using Drivers, are permanently restrained and enjoined from making any representation, or assisting others in making any representation, expressly or by implication, regarding Driver earnings, unless the representation is non-misleading, and, at the time such representation is made, Defendant possesses and relies upon competent and reliable evidence that is sufficient in quality and quantity to substantiate that the representation is true and that the claimed earnings are typical for persons similarly situated to those to whom the claim is made.

## II. PROHIBITION AGAINST MISREPRESENTATIONS RELATING TO TIPS

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any service using Drivers, are permanently restrained and enjoined from making any representation, or assisting others in making any representation, expressly or by implication, to Drivers or prospective Drivers regarding Driver earnings on an hourly basis that is based in part on the tips paid to Drivers.

## III. REQUIRED DISCLOSURES FOR EARNINGS GUARANTEES

IT IS FURTHER ORDERED that Defendant, Defendant's officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Order, whether acting directly or indirectly, in connection with promoting or offering for sale any service using Drivers, are permanently restrained and enjoined from making any representation, or assisting others in making any representation, expressly or by implication, regarding guaranteed minimum Driver earnings without disclosing, Clearly and Conspicuously, that eligible Drivers will receive the difference, between their earnings and the guaranteed amount. Provided, however, that this Section does not apply to representations regarding guaranteed minimum Driver earnings where the

STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

4

minimum amount of earnings is mandated or established by law.

### IV.    NOTICE TO DRIVERS

IT IS FURTHER ORDERED that, within 30 days of entry of this Order, Defendant shall publish a notice, in the exact wording set forth in Exhibit A to this Order and in an easily legible format consistent with the format set forth in Exhibit A, using the notification interface of Defendant's App for Drivers.  The notice shall remain in the App's notification interface for a period of 60 days from initial publication.  Defendant shall take reasonable steps to ensure that Drivers can access and read the notice in the App, and shall not include in the notice any other information, documents, or attachments.

### V.    MONETARY JUDGMENT FOR CIVIL PENALTY

IT IS FURTHER ORDERED that:

A.    Judgment in the amount of Two Million One Hundred Thousand Dollars ($2,100,000) is entered in favor of Plaintiff against Defendant as a civil penalty.

B.    Defendant is ordered to pay to Plaintiff, by making payment to the Treasurer of the United States, Two Million One Hundred Thousand Dollars ($2,100,000), which, as Defendant stipulates, their undersigned counsel holds in escrow for no purpose other than payment to Plaintiff. Such payment must be made within 7 days of entry of this Order by electronic fund transfer in accordance with instructions provided by a representative of Plaintiff.

C.    Defendant relinquishes dominion and all legal and equitable right, title, and interest in all assets transferred pursuant to this Order and may not seek the return of any assets.

D.    The facts alleged in the Complaint will be taken as true, without further proof, in any subsequent civil litigation by or on behalf of the Commission in a proceeding to enforce its rights to any payment or monetary judgment pursuant to this Order.

E.    Defendant acknowledges that its Taxpayer Identification Numbers (Social Security Numbers or Employer Identification Numbers), which Defendant must submit to the Commission, may be used for collecting and reporting on any delinquent amount arising out of this Order, in accordance with 31 U.S.C. § 7701.

### VI.    ORDER ACKNOWLEDGMENTS

STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

5

IT IS FURTHER ORDERED that Defendant obtain acknowledgments of receipt of this Order:

A. Defendant, within 7 days of entry of this Order, must submit to the Commission an acknowledgment of receipt of this Order sworn under penalty of perjury.

B. For 5 years after entry of this Order, Defendant must deliver a copy of this Order to: (1) all principals, officers, directors, and LLC managers and members; (2) all employees having managerial responsibilities for conduct related to the subject matter of the Order and all agents and representatives who participate in conduct related to the subject matter of the Order; and (3) any business entity resulting from any change in structure as set forth in the Section titled "Compliance Reporting." Delivery must occur within 7 days of entry of this Order for current personnel. For all others, delivery must occur before they assume their responsibilities.

C. From each individual or entity to which Defendant delivered a copy of this Order, Defendant must obtain, within 30 days, a signed and dated acknowledgment of receipt of this Order.

## VII. COMPLIANCE REPORTING

IT IS FURTHER ORDERED that Defendant make timely submissions to the Commission:

A. One year after entry of this Order, Defendant must submit a compliance report, sworn under penalty of perjury. Defendant must:

      1. Identify the primary physical, postal, and email address and telephone number, as designated points of contact, which representatives of the Commission and Plaintiff may use to communicate with Defendant;

      2. Identify all of Defendant's businesses by all of their names, telephone numbers, and physical, postal, email, and Internet addresses;

      3. Describe the activities of each business, including the goods and services offered and the means of advertising, marketing, and sales;

      4. Describe in detail whether and how Defendant is in compliance with each Section of this Order; and

      5. Provide a copy of each Order Acknowledgment obtained pursuant to this Order, unless previously submitted to the Commission.

STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

6

B.    For 10 years after entry of this Order, Defendant must submit a compliance notice, sworn under penalty of perjury, within 14 days of any change in the following:

    1.    Any designated point of contact; or

    2.    The structure of Defendant or any entity that Defendant has any ownership interest in or controls directly or indirectly that may affect compliance obligations arising under this Order, including: creation, merger, sale, or dissolution of the entity or any subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order.

C.    Defendant must submit to the Commission notice of the filing of any bankruptcy petition, insolvency proceeding, or similar proceeding by or against Defendant within 14 days of its filing.

D.    Any submission to the Commission required by this Order to be sworn under penalty of perjury must be true and accurate and comply with 28 U.S.C. § 1746, such as by concluding:  "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on: _____" and supplying the date, signatory's full name, title (if applicable), and signature.

E.    Unless otherwise directed by a Commission representative in writing, all submissions to the Commission pursuant to this Order must be emailed to DEbrief@ftc.gov or sent by overnight courier (not the U.S. Postal Service) to: Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580. The subject line must begin: FTC v. Lyft, Inc.

## VIII.   RECORDKEEPING

IT IS FURTHER ORDERED that Defendant must create certain records for 10 years after entry of the Order, and retain each such record for 5 years.  Specifically, Defendant must create and retain the following records:

A.    Accounting records showing the revenues from all goods or services sold;

B.    Personnel records showing, for each person providing services concerning the subject matter of the Order, whether as an employee or otherwise, but excluding Drivers, that person's: name; addresses; telephone numbers; job title or position; dates of service; and (if applicable) the reason for

1     termination;

2         C.     Records showing, for each Driver, that Driver's: name; addresses; telephone numbers;

3     dates of service; and (if applicable) the reason for termination, unless the Driver requests deletion of

4     their account or data with Defendant;

5         D.     Records of all Driver complaints concerning the subject matter of the Order, whether

6     received directly or indirectly, such as through a third party, and any response;

7         E.     All materials that were relied upon to substantiate a representation covered by Section I

8     of the Order;

9         F.     All records necessary to demonstrate full compliance with each provision of this Order,

10     including all submissions to the Commission; and

11         G.     A copy of each unique advertisement or other marketing material relating to the subject

12     matter of the Order, except:

13               1.     Defendant need not retain a copy of advertisements or other marketing materials

14               that include an express representation that Drivers can "earn money with Lyft," "make

15               money with Lyft," or a substantially similar and conclusory express representation, and

16               that do not include any other more specific express or implied representations (including

17               representations made via imagery) related to Driver earnings; and

18               2.     For advertisements or other marketing materials that are dynamically generated

19               and disseminated by a third party (*e.g.*, Google search ads), Defendant may instead

20               retain:

21                     a.     Any components supplied by or on behalf of Defendant to the third party

22                     for generating such advertisements or other marketing materials (*e.g.*, text,

23                     images, audiovisual elements);

24                     b.     Any dissemination data and ad performance reporting related to such

25                     advertisements or other marketing materials that Defendant accesses and uses;

26                     and

27                     c.     Any ad monitoring reports related to such advertisements or other

28

marketing materials that Defendant accesses and uses.

## IX. COMPLIANCE MONITORING

IT IS FURTHER ORDERED that, for the purpose of monitoring Defendant's compliance with this Order and any failure to transfer any assets as required by this Order:

A. Within 14 days of receipt of a written request from a representative of the Commission or Plaintiff, Defendant must: submit additional compliance reports or other requested information, which must be sworn under penalty of perjury; appear for depositions; and produce documents for inspection and copying. The Commission and Plaintiff are also authorized to obtain discovery, without further leave of court, using any of the procedures prescribed by Federal Rules of Civil Procedure 29, 30 (including telephonic depositions), 31, 33, 34, 36, 45, and 69, provided that Defendant, after attempting to resolve a dispute without court action and for good cause shown, may file a motion with this Court seeking an order for one or more of the protections set forth in Rule 26(c).

B. For matters concerning this Order, the Commission and Plaintiff are authorized to communicate directly with Defendant. Defendant must permit representatives of the Commission and Plaintiff to interview any employee or other person affiliated with Defendant who has agreed to such an interview. The person interviewed may have counsel present.

C. The Commission and Plaintiff may use all other lawful means, including posing, through its representatives, as consumers, suppliers, or other individuals or entities, to Defendant or any individual or entity affiliated with Defendant, without the necessity of identification or prior notice. Nothing in this Order limits the Commission's lawful use of compulsory process, pursuant to Sections 9 and 20 of the FTC Act, 15 U.S.C. §§ 49, 57b-1.

## X. RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court retains jurisdiction of this matter for purposes of construction, modification, and enforcement of this Order.

SO ORDERED this ___ day of _____, 202_.

STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

9

1

2                                    _____

3                                      HON. [Insert name]

UNITED STATES _____ JUDGE

NORTHERN DISTRICT OF CALIFORNIA

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

1  **SO STIPULATED AND AGREED:**

2  **FOR PLAINTIFF:**

3
   THE UNITED STATES OF AMERICA

4
   BRIAN M. BOYNTON
5  Principal Deputy Assistant Attorney General, Civil Division

6  BURDEN H. WALKER
   Acting Deputy Assistant Attorney General, Civil Division
7
   AMANDA N. LISKAMM
8  Director, Consumer Protection Branch

9  LISA K. HSIAO
   Senior Deputy Director, Civil Litigation
10
   ZACHARY A. DIETERT
11  Assistant Director
    Respectfully submitted,
12

13   _/s/ Pauline Stamatelos_
     PAULINE STAMATELOS
14   Trial Attorney
     Consumer Protection Branch
15   U.S. Department of Justice
     P.O. Box 386
16   Washington, DC 20044
     Phone: 202-353-7744
17   Email: Pauline.A.Stamatelos@usdoj.gov

18  ISMAIL J. RAMSEY
    United States Attorney
19
    _/s/ Ekta Dharia_
20   EKTA DHARIA
     Assistant United States Attorney
21   Northern District of California
     450 Golden Gate Avenue
22   San Francisco, CA 94102
     Telephone: (415) 436-7276
23   Fax: (415) 436-6748
     Email: ekta.dharia@usdoj.gov
24
     Of Counsel:
25
     KERRY O'BRIEN
26

27   Regional Director
     Western Region San Francisco
28

STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

1    EMILY COPE BURTON
     Assistant Regional Director
2    Western Region San Francisco

3    EVAN ROSE (CABN 253478)
     ABDIEL T. LEWIS (CABN 339339)
4    Attorneys
     Federal Trade Commission
5    Western Region San Francisco
     90 Seventh St., Suite 14-300
6    San Francisco, CA 94103
     Phone: (415) 848-5100
7    Email: erose@ftc.gov, alewis4@ftc.gov

8

9     *In compliance with Civil L.R. 5-1(i)(3), the filer of this document attests under penalty of perjury that
      each of the other Signatories has concurred in the filing of this document.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv-7443

                                        12

1 **FOR DEFENDANT:**

2

3    _(signature)_                                    Date: _10/25/24_

   CHRISTOPHER OLSEN
4    Wilson Sonsini Goodrich & Rosati
   1700 K Street, NW
5    Washington, DC 20006
   (202) 973-8803
6    colsen@wsgr.com

7

8    KELLY SINGLETON
   Wilson Sonsini Goodrich & Rosati
9    1700 K Street, NW
   Washington, DC 20006
10    (202) 973-8840
   ksingleton@wsgr.com
11

12    COUNSEL FOR LYFT, INC.

13

14

15    **DEFENDANT: LYFT, INC.**

16

17    _____    Date: _____
   BLAIRE STOKES
18    Senior Director, Litigation
   Lyft, Inc.
19

20

21

22

23

24

25

26

27

28
   STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
   Case No. 24-cv-_7443_

                                    13

**FOR DEFENDANT:**

_____       Date: _____
CHRISTOPHER OLSEN
Wilson Sonsini Goodrich & Rosati
1700 K Street, NW
Washington, DC 20006
(202) 973-8803
colsen@wsgr.com


KELLY SINGLETON
Wilson Sonsini Goodrich & Rosati
1700 K Street, NW
Washington, DC 20006
(202) 973-8840
ksingleton@wsgr.com

COUNSEL FOR LYFT, INC.



**DEFENDANT: LYFT, INC.**

_____       Date: 10/25/24
BLAIRE STOKES
Senior Director, Litigation
Lyft, Inc.

STIPULATED ORDER FOR PERMANENT INJUNCTION, CIVIL PENALTY JUDGMENT, AND OTHER RELIEF
Case No. 24-cv- 7443

13

Exhibit A: Notice to Drivers

**Headline of notification interface update:** Lyft's Settlement with the U.S. Government

**Body of notification interface update:** Click to read more about Lyft's settlement about driver earnings [clicking anywhere will lead to the full notice]

**Headline of full notice:** Lyft's Settlement with the U.S. Government

**Body of full notice:**

Lyft recently reached a settlement in a case brought by the United States Department of Justice upon referral from the Federal Trade Commission (FTC), the nation's consumer protection agency. The government alleged that, between April 2021 and June 2022, we made claims about what Lyft drivers earn on an hourly basis that could mislead drivers into thinking they were likely to earn that amount.

The government also alleged that, since at least January 2021, we failed to explain to drivers how Earnings Guarantee promotions work and that the guaranteed amount was not a bonus.

Although we neither admit nor deny any of the government's allegations, we agreed to resolve the matter. The settlement requires us to pay a fine, explain to drivers how Earnings Guarantee promotions work, and make sure what we say about driver earnings in our advertising is supported and does not mislead drivers.

For more information about our settlement, visit [hyperlink to FTC press release].
To learn about your rights as a consumer, visit the FTC's website at Consumer.ftc.gov.

[Spanish translation]

Lyft recientemente llegó a un acuerdo en un caso presentado por el Departamento de Justicia de los Estados Unidos por recomendación la Comisión Federal de Comercio (FTC, por su sigla en inglés), la agencia nacional de protección al consumidor. El gobierno alegó que, entre abril de 2021 y junio de 2022, hicimos declaraciones sobre lo que ganan por hora los conductores de Lyft que podrían confundir a los conductores haciéndoles pensar que probablemente ganarían ese monto.

El gobierno también alegó que, al menos desde enero de 2021, no explicamos a los conductores cómo funcionan las promociones de garantía de ingresos, conocidas como Earnings Guarantee en inglés, y que el monto garantizado no era una bonificación.

Aunque no admitimos ni negamos ninguna de las alegaciones del gobierno, acordamos resolver el asunto. El acuerdo exige que paguemos una multa, expliquemos a los conductores cómo funcionan las promociones de garantía de ingresos y nos aseguremos de que lo que decimos

sobre los ingresos de los conductores en nuestros anuncios esté respaldado y no confunda a los conductores.

Para obtener más información sobre nuestro acuerdo resolutorio, visite [hyperlink to FTC press release]. Para conocer sus derechos como consumidor, visite el sitio web de la FTC disponible en Consumidor.ftc.gov.

**EXHIBIT B**

## REASONS FOR SETTLEMENT

This statement accompanies the [Proposed] Stipulated Order for Permanent Injunction, Civil Penalty Judgment, and Other Relief ("Order") executed by defendant Lyft, Inc. ("Defendant") in settlement of an action seeking injunctive relief, civil penalties, and other relief for Defendant's alleged violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a). The Order imposes injunctive relief and requires Defendant to pay $2.1 million as a civil penalty.

Pursuant to Section 5(m)(3) of the FTC Act, 15 U.S.C. § 45(m)(3), the Commission hereby sets forth its reasons for settlement by entry of the Order:

Based on the allegations contained in the Complaint and the factors set forth in Section 5(m)(1)(C) of the FTC Act, 15 U.S.C. § 45(m)(1)(C), the Commission believes that entry of the Order is appropriate and in the public interest.

First, the $2.1 million civil penalty and the injunctive provisions in the Order, including the provisions permanently enjoining Defendant from making misleading or unsubstantiated driver earnings claims, constitute an effective means to ensure Defendant's future compliance with the law and deter others from engaging in similar violations.

Second, the Order is consistent with past orders entered in cases involving similar violations of the FTC Act.

Finally, with the entry of the Order, the time and expense of litigation against Defendant will be avoided.

For the foregoing reasons, the Commission believes that settlement by entry of the attached Order is justified and well within the public interest.

# EXHIBIT 2



**ABUSE OF POWER, WASTE OF RESOURCES, AND FEAR: WHAT INTERNAL DOCUMENTS AND TESTIMONY FROM CAREER EMPLOYEES SHOW ABOUT THE FTC UNDER CHAIR LINA KHAN**

Interim Staff Report of the

Committee on the Judiciary
U.S. House of Representatives



February 22, 2024

EXECUTIVE SUMMARY

Based on internal documents and transcribed interviews with Federal Trade Commission (FTC) personnel, this report chronicles Chair Lina Khan's neglect and mismanagement of the agency in furtherance of her personal pursuit of political and ideological aims. Contemporaneous documents from career FTC employees describe Chair Khan as undermining the work of the FTC by consolidating power in her office, micromanaging investigations, and eschewing important work to protect consumers in favor of a radical agenda detached from the FTC's legal mandates.

On June 15, 2021, shortly after the Senate confirmed Lina Khan to be an FTC Commissioner, President Biden elevated her to serve as the Commission's Chair.[1] In a departure from long-standing practice, President Biden did not inform the Senate that Lina Khan would be designated Chair when he nominated her to be a Commissioner.[2] Consequently, the Senate did not assess Lina Khan's ability to lead the agency during her confirmation process.[3] Chair Khan's arrival was heralded as a "victory for progressive activists" and "vital" to "strengthen antitrust enforcement."[4]

From the beginning of her tenure, Chair Khan demonstrated disinterest in leading career FTC staff to enforce the antitrust laws, and instead pursued an agenda set to remake the American economy according to her values.[5] Chair Khan's actions led multiple committees in Congress to engage in oversight of the agency on various topics.[6] Unlike previous FTC leadership, Chair Khan has repeatedly attempted to evade Congressional oversight.[7] Facing significant stonewalling from Chair Khan, the House Committee on the Judiciary turned to

---

[1] *Compare* Press Release, The White House, President Biden Announces his Intent to Nominate Lina Khan for Commissioner of the Federal Trade Commission (Mar. 22, 2021), *and* Makena Kelly, *Biden to Nominate Tech Antitrust Pioneer Lina Khan for FTC Commissioner*, THE VERGE (Mar. 22, 2021), *with* David McCabe & Cecilia Kang, *Biden Names Lina Khan, a Big-Tech Critic, as F.T.C. Chair*, N.Y. TIMES (June 15, 2021).

[2] *Compare id.*, *with* Diane Bartz, *Senate Panel Sets Confirmation Hearing for Four FTC Nominees*, REUTERS (Feb. 7, 2018) ("The U.S. Senate Commerce Committee set confirmation hearings next week for three Republicans and one Democrat nominated to the Federal Trade Commission, the panel said on Wednesday. The hearing was set for Feb. 14 for Republicans Joe Simons, tapped to chair the FTC, along with Noah Phillips and Christine Wilson, who have been nominated to be commissioners. The panel will also hear from Rohit Chopra, a Democrat who has also been nominated to the commission.").

[3] *See id.*

[4] *See* McCabe & Kang, *supra* note 1. *See also* Sheelah Kolhatkar, *Lina Khan's Battle to Rein in Big Tech*, THE NEW YORKER (Nov. 29, 2021) ("Warren, among others, made it known to Biden and those around him, including his chief of staff, Ron Klain, that Khan should be considered for the F.T.C.").

[5] *Infra* section I.

[6] *Compliance with Committee Oversight, Hearing Before the Subcomm. on Responsive and Accountability to Oversight Comm. on the Judiciary*, 118th Cong. (Nov. 30, 2023) (Prepared Statement of the Fed. Trade Comm'n) ("In this calendar year alone, the FTC has received a total of 25 letters with 133 specific requests from House committees . . .").

[7] Letter from Jim Jordan, Chair, H. Judiciary Committee, to Lina Khan, Chair, Fed. Trade Comm'n (Sep. 5, 2023). When Chair Khan has responded with document productions, her productions have lacked substantive information. For example, in response the Committee's letter about merger enforcement dated April 5, 2023, the documents provided by the FTC are largely administrative with almost zero non-public substantive analyses. Specifically, over one third of the documents provided are outlook calendar invites and over 90% are administrative or public documents.

managers and others at the FTC to gain an understanding of current operations at the agency.[8] The Committee requested documents and interviews with career FTC managers, among others, in order to advance its oversight of Chair Khan's out-of-control agency.[9]

The Committee's inquiry focused on mismanagement, waste, and abuse of government resources by senior leadership at the FTC—specifically Chair Khan, her direct staff, and the Bureau of Competition and Bureau of Consumer Protection Front Offices (i.e., the Directors and Deputy Directors chosen directly by Chair Khan for their roles).[10] Only under threat of subpoena did the Committee receive documents from some managers and Front Office employees and secure interviews with career managers.[11] The information obtained by the Committee paints a disturbing portrait of an agency beset by dysfunction and chaos stemming from the poor leadership and ideological bullying of its Chair and her leadership staff. These findings reinforce the results of repeated government-wide surveys that found the FTC to have a toxic work environment under Chair Khan.[12]

- **Managers expressed concern that Chair Khan was making decisions for headlines, and not making decisions to win cases.** One manager told the FTC's Chief of Staff that he "sense[d] that outside influences . . . have an undue impact on [FTC] priorities, investigation management, and enforcement decisions" and warned that the FTC "should never make an enforcement-related decision for the sake of PR."[13] The manager expressed concern that Chair Khan wanted to appear "aggressive," but was actually acting "with little regard for the consequences of losing in a way that negatively affects the enforcement agenda (i.e., bad facts that can result in really bad precedents that haunt us for years)."[14] In the manager's words, "[t]hat's not aggressive - that's reckless."[15] Similarly, as another manager wrote, some of Chair Khan's "stated objectives sound more like progressive buzzwords than actual direction."[16]

---

[8] Letter from Jim Jordan, Chair, H. Comm. on the Judic. & Cathy McMorris Rodgers, Chair, H. Comm. on Energy and Com. to Lina Khan, Chair, Fed. Trade Comm'n (July 12, 2023).

[9] *Id. See also* Letter from Jim Jordan, Chair, Judiciary Committee to Lina Khan, Chair, Fed. Trade Comm'n (June 28, 2023); Letter from Jim Jordan, Chair, Judiciary Committee to Lina Khan, Chair, Fed. Trade Comm'n (July 17, 2023).

[10] *Id.*

[11] The documents provided by the FTC redacted the names of all managers and other FTC staff. The FTC provided a load file to the Committee that allowed the Committee to view all custodians of a document, including who sent and received the top email in an email chain. With the load file and context in documents, it is usually possible for the Committee to identify the author or authors of emails or documents. At times, however, it is unclear which specific manager or managers authored a document or email among the small group listed as custodians. Regardless, in this report, to respect the identity of the career staff, the Committee uses the term "manager" or "managers" to identify all managers. Further, to respect the identity of the career staff who testified to the Committee, all such testimony is cited as "FTC Manager Testimony to the Committee." If any identifiable information appears in a quote, that information is anonymized with the use of brackets. Although the FTC has previously attacked criticism of Chair Khan for relying on anonymous sources, *see* Douglas Farrar (@DouglasLFarrar), TWITTER (Dec. 13, 2023), https://x.com/DouglasLFarrar/status/1735091958811418832, the "sources" in this report are the ordinary course documents and testimony of current FTC managers.

[12] *See infra* section II.C.1.

[13] FTC-M000000077.

[14] *Id.*

[15] *Id.*

[16] FTC-M000000072.

- **The documents and testimony reveal mismanagement and wasted resources by senior leaders at the FTC despite repeated warnings from career staff.** FTC staff routinely requested that Chair Khan clarify her priorities for the agency.[17] These documents show that FTC staff expressed concern that Chair Khan, "who has never tried or even pled a case before," is putting staff, who "actually have to prove [their] case in court," in an untenable situation.[18] One manager expressed concern to another manager that Chair Khan did not want the FTC to be successful, writing: "I'm not sure being successful (or doing things well) is a shared goal, as the Chair wants to show that we can't meet our mission mandate without legislative change."[19] A group of managers that desired aggressive enforcement complained that staff could not achieve these goals under Chair Khan because of "a catastrophic communication breakdown about what [the Chair] want[s]."[20] The managers discussed that "the erratic messaging we've received on our cases, at every stage of investigation, decreases the likelihood we can engage on substance and adequately prepare the cases[.]"[21]

- **Documents from and testimony by FTC managers show that Chair Khan marginalized the litigators and investigators at the FTC who had the skills necessary to win cases.** One manager complained of "zero contact with the Chair" after "a year and a half" into Chair Khan's tenure,[22] while another manager wrote that Chair Khan "has a knee-jerk negative reaction to" some of his staff's work.[23] One manager was told that staff could not "say things or recommend outcomes because it will upset" the Chair.[24] The impression from staff was that Chair Khan was "kept in a bubble and do[es]n't know what's going on at the agency" and "that the people who communicate with [Chair Khan] most are afraid to tell [her] anything [she doesn't] want to hear."[25] One manager consulted with his team and reported to the Chief of Staff that Chair Khan was "[s]capegoating the career staff for the FTC's 'underenforcement' of the antitrust laws"[26] and "contributing to an external narrative that denigrates staff."[27] When the FTC did litigate under Chair Khan, managers expressed concerns about Chair Khan "directing complaint allegations against the evidence"[28] and sending staff into court "unprepared to litigate a particular issue or theory[.]"[29]

- **Chair Khan's indecision stymied FTC staff's ability to enforce antitrust laws, as staff begged Chair Khan to "get the work moving[.]"[30]** Last-minute direction by leadership, according to career FTC staff, "heightens the risk that the areas the [Front Office] wants to emphasize will be poorly presented in court and will end up not advancing the law as they

---

[17] *See infra* notes 189-205 and accompanying text.
[18] FTC-M000000022.
[19] FTC-M000000265.
[20] FTC-M000000222.
[21] *Id.*
[22] FTC-M000000001.
[23] FTC-M000000077.
[24] FTC-M000000222.
[25] *Id.*
[26] FTC-M000000077.
[27] FTC-M000000170.
[28] FTC-M000000193.
[29] FTC-M000000219.
[30] FTC-M000000002.

intend (or even create bad law instead)."[31] In other words, as one manager warned, "raising new theories or concerns late in the day usually means that we are less prepared to litigate those issues successfully."[32] A manager expressed concerns that "it sometimes feels like we are running down marginal theories (given the facts of a specific case) when more problematic deals may go unreviewed."[33] Another manager pleaded with senior leadership to understand that the FTC is "designed to pursue . . . enforcement actions only when they are clearly justified."[34]

- **Managers viewed Chair Khan's actions as attempting to limit transparency and consolidate power.** Concerns with Chair Khan's policies included, for example, that one manager did not "understand what [one policy was] for or how [staff was] supposed to use [the policy], to be honest, other than getting around the need for a Commission majority."[35] The manager commented that certain policies are "bad if they are wielded to limit transparency."[36]

- **Despite Chair Khan's public claim that she was addressing mismanagement within the agency, documents provided to the Committee show that Chair Khan failed to sufficiently address these concerns.** Some managers rejected the assertion that Chair Khan had made improvements well into her tenure, with one manager stating, "[p]latitudes are never substitutes for action[.]"[37] Any attempt at fixing the damage was negligible compared to the continued harms, as one manager stated that the Chair would dig "deeper (into a hole) than the improvements compensate for."[38] A manager reported that Chair Khan continued to cause "self-inflicted wounds" on the agency.[39] When managers made suggestions to improve the work environment, FTC staff commented among themselves that they should not "have any illusions that [senior leadership] will change anything as a result."[40] Career staff also expressed "concerns about retaliation" from Chair Khan and other senior leaders.[41] One manager discussed with a senior leader that "[t]ons of great people have left/are leaving/are thinking about leaving"[42] and one manager asked to another, "[D]o they want us all to quit?"[43]

Although some complaints could be dismissed as employment-related grievances, they are indicative of a deeper problem within the FTC and represent a departure from the work environment under prior Chairs. These complaints also cannot be attributable to political bias against Chair Khan. According to Federal Election Commission data, over 90% of the FTC employees the Committee requested documents from who made federal campaign donations

---

[31] FTC-M000000219.
[32] FTC-M000000172.
[33] FTC-M000000175.
[34] FTC-M000000083.
[35] FTC-M000000211.
[36] *Id.*
[37] FTC-M000000193.
[38] FTC-M000000001.
[39] *Id.*
[40] FTC-M000000219.
[41] FTC-M000000256.
[42] FTC-M000000241.
[43] FTC-M000000170.

gave money to Democrat campaigns and not Republican campaigns.[44] In addition, these findings cannot be blamed on new resource concerns because the FTC has received approximately 30% more funding from Congress in annual appropriations during the Biden Administration.[45]

Repeatedly during the Committee's transcribed interviews of FTC staff, the FTC officials present at the interview—who were there to represent the interests of the FTC and Chair Khan, not the witnesses—attempted to impede the Committee's fact-finding. For example, the Committee's questioning of FTC witnesses was repeatedly interrupted by FTC counsel, and witnesses were directed not to answer the Committee's questions on a number of topics including document productions to the Committee and merger enforcement remedies.[46] In other sensitive portions of the testimony, when presented with emails that managers had authored and asked about their meaning, the managers attempted to soften the plain language meaning of documents.[47] With FTC officials closely monitoring their testimony, it is reasonable that these witnesses feared retaliation for negative testimony—especially in light of internal documents that show staff-level fear about Chair Khan's retaliation.

The Biden Administration inherited an FTC that increased antitrust enforcement during the Trump Administration, including opening investigations into the largest and arguably most powerful companies in the world.[48] Chair Khan's radicalism, inexperience, and imprudence squandered the momentum and continues to hamper the ability of the FTC and career federal civil servants to do their jobs well on behalf of the American people. The documents and other information highlighted in this interim staff report show how the FTC under Chair Lina Khan is in chaos. As Congress considers legislative reforms to federal antitrust law and the FTC, the Committee on the Judiciary will continue its duty of conducting robust, fact-based oversight of the FTC.

---

[44] Individual Contribution Search, FED. ELECTION COMM'N, *available at* https://www.fec.gov/data/browse-data/ (last accessed Feb. 21, 2024).

[45] FTC Appropriation and Full Time Equivalent (FTE) History, FED. TRADE COMM'N, https://www.ftc.gov/about-ftc/bureaus-offices/office-executive-director/financial-management-office/ftc-appropriation (last accessed Feb. 21, 2024) (comparing $331 million in 2020 funding to $430 in 2023 funding, which is a 29.9% increase).

[46] FTC Manager Testimony to the Committee ("Q: And, then, what approximate volume of material did you provide? [FTC Counsel:] Same objection. I'm going to instruct the witness not to answer that question."); FTC Manager Testimony to the Committee ("Q: Has [your merger shop] pursued any behavioral remedies since June 2021? [FTC Counsel:] So, again, I don't view that to be within the scope of what the authorization he received from the Commission has authorized him to talk about. I don't view that to be within the scope of merger review, so I'm directing him not to answer that question."). *See also* FTC Manager Testimony to the Committee ("[Committee Counsel:] Agency counsel's first duty is to represent the Federal Trade Commission and not your personally. So I just want to make sure you understood that and that you were comfortable with that reality."); FTC Manager Testimony to the Committee ("[Committee Counsel:] Congress does not recognize most, if . . . any of the privileges that you have articulated. . . . [A]s someone who is here voluntarily, . . . you are free to advise him not to answer. And then he could choose not to answer the question. Of course, we reserve the right to use compulsory process to have your client come back and/or to answer questions we deem relevant to the congressional investigation, despite any asserted privileges.").

[47] *See, e.g.*, *infra* notes 174, 178, 207, 247, 265, 323, & 335 and accompanying text.

[48] *See* David McLaughlin, Naomi Nix, & Daniel Stoller, *Trump's Trustbusters Bring Microsoft Lessons to Big Tech Fight*, BLOOMBERG (June 11, 2019).

---

TABLE OF CONTENTS

---

EXECUTIVE SUMMARY ............................................................................................................. 1

TABLE OF CONTENTS ............................................................................................................. 6

I.   CHAIR KHAN CONSOLIDATED POWER IN PURSUIT OF A RADICAL PROGRESSIVE AGENDA ....... 7

   A.   Chair Khan has centralized FTC power in the Office of the Chair. ..................................... 9

   B.   Chair Khan refused to delegate powers and did not trust experienced career managers ... 11

      1.   Chair Khan micromanaged investigations ................................................................. 11

      2.   Chair Khan did not provide clear direction despite her micromanagement. .............. 12

   C.   Chair Khan refused to acknowledge the tradeoffs in her resource allocation decisions ... 14

II.  CHAIR KHAN'S POWER GRAB LED TO MISMANAGEMENT AND WASTED RESOURCES ........... 18

   A.   Senior leadership's inability to make timely decisions limited the ability of FTC staff to investigate and bring cases that help consumers ....................................................................... 19

      1.   Chair Khan's indecision wasted the FTC's resources. ................................................ 20

      2.   Indecision weakened the FTC's ability to enforce the law. ........................................ 21

      3.   Senior leadership lacked focus and basic understanding of certain concepts. ........... 23

   B.   Chair Khan made it unnecessarily difficult for litigators and investigators to execute the FTC's mission. .......................................................................................................................... 24

      1.   Career FTC staff expressed concern that Chair Khan purposefully lost cases ........... 26

      2.   Chair Khan alienated the managers and staff who wanted aggressive enforcement .. 27

      3.   Chair Khan's attempts to address strategic concerns were inadequate. ..................... 28

      4.   Managers worried that Chair Khan chased positive press over success ..................... 29

   C.   Chair Khan marginalized the career FTC managers and staff members capable of carrying out the Commission's mandate. ...................................................................................... 31

      1.   The Federal Employee Viewpoint Survey shows significant and ongoing problems. 32

      2.   Managers believed Chair Khan blamed FTC staff for the agency's problems. ........... 36

      3.   Staff felt disrespected by senior leadership. ............................................................... 37

      4.   The career FTC staff were silenced internally and externally. .................................... 38

III. CHAIR KHAN IGNORED WARNINGS AND CREATED A CULTURE OF FEAR .............................. 40

   A.   Evidence provided to the Committee suggests Chair Khan had significant warning about declining morale yet failed to take the problems seriously. ....................................................... 40

      1.   Chair Khan made matters worse faster than problems could be fixed. ...................... 41

      2.   Chair Khan's poor leadership exacerbated staffing and hiring problems. .................. 42

   B.   FTC staff are fearful of senior leadership. ........................................................................ 45

IV.  CONCLUSION ................................................................................................................. 48

## I.    CHAIR KHAN CONSOLIDATED POWER IN PURSUIT OF A RADICAL PROGRESSIVE AGENDA

The Committee's oversight of the FTC has revealed that Chair Khan consolidated power in her office to push through a radical agenda.[49] Chair Khan centralized power in her office despite objections from career staff.[50] Chair Khan regularly refused to delegate power and attempted to micromanage investigations but was unable to provide the direction necessary to move investigations forward.[51] She did not acknowledge the tradeoffs that result from her decisions, which created a chaotic atmosphere for career staff.[52] Chair Khan's radical views and her consolidation of power threaten the legitimacy of the FTC as an honest and fair institution capable of bringing enforcement actions against companies and individuals that violate federal antitrust and consumer protection law.

Chair Khan's nomination to the FTC was a departure from past antitrust enforcers in that Chair Khan sought to make antitrust enforcement about her values that ignore consumer interests, economics, and a duty to faithfully execute the law as a prosecutor. Chair Khan is a disciple of the so-called neo-Brandeisian—also known as "hipster antitrust"—movement that rejects fundamental tenets of modern economics in favor of value judgments.[53] Chair Khan has been open in how she believes markets are political—a view that justifies using the FTC's power to control the market economy.[54] She seems to have no concern with politicizing enforcement of the law as a prosecutor or adjudicator because she believes that "all decisions are political insofar

---

[49] This report discusses the FTC power structure as divided into four levels. The first two levels consist of the Chair, her direct staff, and her appointees in the bureaus: (1) the Chair and the staff in her office, which includes the Chief of Staff and the Chair's Attorney Advisors; and (2) the Bureau of Competition and Bureau of Consumer Protection Front Offices, which consists of the Directors and Deputy Directors chosen by the Chair (referred to as the "Front Office" throughout this report). The first two levels are referred to as senior leadership and the people in these roles typically change when a new Chair is appointed. *See* FTC Manager Testimony to the Committee ("So I think of managers as my level, and I think of senior leadership as above the shop level. So that would include the offices of the chair and her direct reports. And the . . . the bureaus or the offices where there is a director who is [] named."). The third and fourth levels are: (3) shop managers, who are career FTC employees supervising sections of approximately 30 lawyers who investigate and litigate against anticompetitive mergers and other conduct (referred to as "managers" throughout this report); and (4) career staff (referred to as "staff" throughout this report). *See Inside the Bureau of Competition*, Fed. Trade Comm'n. (last accessed Feb. 21, 2024). The third and fourth levels consist of individuals who generally remain at the FTC when administrations change. *See* FTC Manager Testimony to the Committee ("So people at my level and below are typically career staff. Everybody above me in the agency, for the most part, is a political appointee, so the Bureau front office, leadership, the Chair's office, Commissioners."). The concerns expressed in this report overwhelmingly come from documents written by managers (level 3) concerning the negative treatment of career staff (level 4) by senior leadership (levels 1 and 2). The negative treatment shown in internal documents includes treatment by the Chair and her office (level 1) and the Bureau of Competition Front Office (level 2). This report does not include any information provided by the Bureau of Economics.

[50] *See infra* section I.A.

[51] *See infra* section I.B.

[52] *See infra* section I.C.

[53] Rana Foroohar, *Lina Khan: 'This isn't just about antitrust. It's about values'*, FINANCIAL TIMES (Mar. 29, 2019) ("'The new Brandeis movement isn't just about antitrust,' she says . . . Rather, it is about values.").

[54] Zephyr Teachout & Lina Khan, *Market Structure and Political Law: A Taxonomy of Power*, 9 DUKE J. OF CONST. L. & PUB. POL'Y. 37, 37 (2014) ("Market structure is deeply political.").

as government agencies are bringing them."[55] With these radical views, Chair Khan is unconcerned by FTC overreach or abuses.[56]

Chair Khan's previous roles at progressive organizations under her mentor Barry Lynn offer additional color to her actions as FTC Chair. Chair Khan cares about advancing progressive values, not about following economic analysis to help consumers. Lynn hired Khan to work at the left-leaning New America Foundation.[57] Later, Lynn brought Khan to his new, dark-money organization—funded by billionaires and anonymous donations—called the Open Markets Institute.[58] Lynn called Khan's FTC appointment "a revolutionary moment" and stated that if the hipster antitrust movement does not succeed "[o]ur democracy is over, it's done with."[59] Lynn recruited Khan when he sought someone with no experience in economics.[60]

To achieve her progressive ambitions at the FTC, Khan sought to centralize power in the office of the Chair.[61] In doing so, she refused to delegate effectively and never acknowledged the high opportunity costs that came from pursuing progressive policies lacking economic foundation.[62] In taking these steps to pursue a radical agenda, the Chair undermined the FTC's ability to fulfill its statutory mission.[63]

---

[55] Fox Business Networks, *Break Up Amazon as a Monopoly?*, YouTube (June 23, 2017), https://youtu.be/VI_DEYqWxqs (Varney: "To go after Amazon would be a political decision. Not a market decision. Not an economic decision. A politician would have to instigate this." Khan: "I think all decisions are political in so far as government agencies are bringing them.").

[56] Nancy Scola, *Lina Khan Isn't Worried About Going Too Far*, INTELLIGENCER (Oct. 27, 2021) ("Going too far? Doing too much? 'When identifying the top ten threats to this agency,' she said, 'that's not on the list.'").

[57] Foroohar, *supra* note 53; Shannon Bond, *New FTC Chair Lina Khan Wants To Redefine Monopoly Power For The Age Of Big Tech*, NPR (July 1, 2021); Brian Fung & Catherine Thorbecke, *Lina Khan's Rise was Heralded as an Antitrust Revolution. Now She has to Pull it Off*, CNN (Oct. 17, 2023).

[58] David McCabe, *George Soros May Invest More in Fighting Big Tech*, AXIOS (Feb. 20, 2018) ("A spokesman said that [Soros's Open Society Foundations] provided a $180,000 two-year grant to the Open Markets Institute [in 2017] . . ."); Emily Birnbaum, *The Tech Billionaire Aiding the Facebook Whistleblower*, POLITICO (Oct. 20, 2021) ("Omidyar . . . has spent years channeling much of his wealth into bankrolling the fight against big tech companies . . . include[ing] funding groups like the antimonopoly think tank Open Market's Institute"); *see also* Joe Schoffstall, *Biden Admin Agency Quietly Leaned on Soros and Other Billionaire-backed Groups for Key Policy Roles*, FOX NEWS (Dec. 13, 2023); Open Markets Institute, Our Funders and Supporters, https://www.openmarketsinstitute.org/funders-and-supporters (last accessed Feb. 21, 2024).

[59] Bond, *supra* note 57. Lynn's concerns include a list of social ills which he ties to antitrust, including environmental problems and wealth inequality, and he blames antitrust enforcement and lawyers that practice in the area for these problems. He is especially concerned with the use of economics in decision-making, which he described as "a false science, an idiot science[.]" *See* Josh Sisco, *An Agitator Disrupts an Antitrust Garden Party*, THE INFORMATION (Apr. 12, 2022).

[60] Kolhatkar, *supra* note 4 ("Lynn was seeking a researcher without any formal economics training, who would come to the subject with fresh eyes. Khan had studied the 2008 financial crisis and was interested in the effects of power disparities in the economy. She checked out Lynn's book, 'Cornered: The New Monopoly Capitalism and the Economics of Destruction,' from the library and skimmed it the night before her interview. 'When she walked in that door, she had no idea what this entailed or what she would become,' Lynn told me.").

[61] *See infra* section I.A.

[62] *See infra* section I.B. & I.C.

[63] *See infra* notes 112-122 and accompanying text.

### A.  Chair Khan has centralized FTC power in the Office of the Chair.

To achieve her goals, Chair Khan started by consolidating power in her office, which is especially concerning because the FTC is a multi-member commission where staff must work with all Commissioners to be effective.[64] Documents and testimony provided to the Committee show the adverse effect that this centralization of power had on career FTC staff. When Chair Khan began withholding information from other Commissioners,[65] career staff complained that it was "disheartening to see Commissioners fighting about access to what should be easily available documents."[66] Similarly, a manager noted concerns about creating work product that was held only by the Chair and asked that senior leadership "[c]irculate staff memoranda to the entire Commission at the same time."[67] As one manager stated, "It would definitely help if the other Commissioner's [*sic*] could see our memos."[68] When a manager communicated about being "quite upset to learn . . . that our team's work product . . . will not be circulated[,]" the manager requested that at least the Chair's office "send the team a brief note" demonstrating appreciation for the hard work.[69] The Chair's office appeared to follow this advice and sent an email thanking staff for their work the next day, but did not address staff's concerns about sharing information with other Commissioners.[70]

Chair Khan consolidated power through policy changes, including her decision to enact numerous omnibus resolutions. Omnibus resolutions allow the FTC to bypass a Commission

---

[64] Dissenting Statement of Commissioner Christine S. Wilson, Open Commission Meeting on July 1, 2021 ("Unfortunately, the format the Chair has chosen for this meeting omits our knowledgeable staff and precludes a dialogue among the Commissioners. A bipartisan and collaborative approach has been the hallmark of the FTC for years and would be welcome today, particularly given the importance of the matters being considered. We have arrived at the consumer welfare standard, a rulemaking process that respects objectivity and public input, and an appreciation for our limited jurisdiction for very specific reasons. Those reasons are worth discussing, but that requires a thoughtful process. And when we have chaos instead of thoughtful process, it is the American consumer who will suffer."); Oral Remarks of Commissioner Christine S. Wilson, Open Commission Meeting on July 21, 2021 ("Each Commissioner brings varied perspectives and policy preferences to this job that enable the body to consider issues in a far more comprehensive way than any one of us would or could on his or her own. FTC staff have similarly varied perspectives, professional experiences, and comparative advantages. While we may not always agree with each other or with staff, our analysis is deeper and richer because of staff's recommendations and insights, particularly when our analyses diverge. Our agency has come under attack from a variety of quarters in recent years. In the face of these attacks, we could be proud of our robust dialogue and thorough analysis at every stage of each matter and proceeding. Crushing internal dialogue diminishes the quality of our decision making and gives our detractors more ammunition. Process matters, so let's get it right.").

[65] *See, e.g.*, Alex Wilts, *FTC Isn't Sharing Second Request Information with All Commissioners, Wilson Says*, GCR (Sep. 7, 2021).

[66] FTC-M000000022.

[67] FTC-M000000193. *See also* FTC Manager Testimony to the Committee ("That sometimes, at this point in time, it seemed that our memoranda were not making it to the entire Commission. They were getting hung with the Chair's office."); *id.* ("The time it takes for us to get a recommendation to the bureau and then from the bureau to the rest of the Commission is expanded under Chair Khan."); *id.* ("And since the deadline is the same, that means that it is a compressed schedule for the rest of the Commission to think about it and to ask questions and get answers from us.").

[68] FTC-M000000226.

[69] FTC-M000000163-164.

[70] FTC-M000000106.

vote before using subpoenas or other demands in an investigation.[71] In 2021, Chair Khan, through a Commission vote along party lines, grabbed the ability to control virtually all subpoenas and demands for information issued from the FTC by adopting omnibus resolutions.[72] These resolutions in effect gave the Chair of the FTC—instead of all Commissioners—ultimate control over FTC investigations.[73] The Chair could now direct FTC staff to investigate a transaction and individually issue subpoenas without a Commission vote, which was previously necessary in investigations of almost all mergers and antitrust conduct.[74] Through plenary omnibus resolutions, the Commission removed an important tool for minority Commissioners to conduct oversight of antitrust investigations.[75] As then-Commissioners Wilson and Phillips explained when protesting Chair Khan's power grab, "[T]hese broad resolutions eliminate the only layer of Commission oversight concerning the use of compulsory process in the vast majority of the agency's competition-related investigations."[76]

Chair Khan claimed the omnibus resolutions were put in place to increase efficiency and help staff. Internal documents show, however, that some career managers disagreed. One employee wrote, "We have no feedback to offer on [the omnibus resolutions] except to note that we object to their use if using them eliminates transparency to Commissioners other than the Chair into staff's investigative activity, analyses, and recommendations."[77] One manager wrote of the omnibus resolutions, "I don't understand what they're for or how we are supposed to use them, to be honest, other than getting around the need for a Commission majority."[78] Additionally, FTC career staff noted that the omnibus resolutions "are bad if they are wielded to limit transparency."[79]

> "I don't understand what [omnibus resolutions are] for or how we are supposed to use them, to be honest, other than getting around the need for a Commission majority."

Not listening to staff about the omnibus resolutions also created errors that risked the integrity of FTC investigations. Former Commissioners Wilson and Phillips noted that one of the omnibus resolutions resembled a hastily adopted resolution on the same topic from a year earlier.[80] The language of the resolution pushed through by Chair Khan to grab power informed recipients of a subpoena to the existence of a merger review filing, which is information the FTC

---

[71] *See* Dissenting Statement of Commissioners Noah Joshua Phillips and Christine S. Wilson, Regarding the Issuance of Two Omnibus Compulsory Process Resolutions (July 1, 2022); Dissenting Statement of Commissioners Noah Joshua Phillips and Christine S. Wilson, Regarding the Issuance of Eight Omnibus Resolutions (Sept. 14, 2021).

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.*

[76] Dissenting Statement of Commissioners Noah Joshua Phillips and Christine S. Wilson, Regarding the Issuance of Two Omnibus Compulsory Process Resolutions (July 1, 2022).

[77] FTC-M000000211.

[78] *Id.*

[79] *Id.*

[80] Dissenting Statement of Commissioners Noah Joshua Phillips and Christine S. Wilson, Regarding the Issuance of Two Omnibus Compulsory Process Resolutions (July 1, 2022).

must keep confidential under federal law.[81] If Chair Khan accounted for staff feedback and did not rush through the poorly drafted resolutions, errors like this could have been avoided.

**B.  Chair Khan refused to delegate powers and did not trust experienced career managers.**

Chair Khan's refusal to delegate power demonstrates a lack of trust even in her own senior leadership team, including the Bureau Directors she selected. One manager complained to senior leadership that Chair Khan "should trust her Bureau Director more."[82] The manager explained that "[i]n the past [managers] have been able to get direct information from the [Bureau Director] even if the Chair wasn't available."[83] Chair Khan's refusal to delegate to even her own handpicked leadership team—the Bureau Directors—had a negative impact on the ability to conduct even the most basic functions in an investigation. For example, one delegation issue concerned civil investigative demands (CIDs, i.e., the tool the FTC uses to demand information from companies during an investigation). Staff suggested "empower[ing] the Bureau to make decisions on CIDs so [they're] not sitting in the Chair's office."[84] When CIDs sit in the Chair's office, staff investigations stall. Staff explained to leadership, "[T]hat was the prior way of doing things to allow us to handle these more quickly."[85]

*1.  Chair Khan micromanaged investigations.*

Instead of operating efficiently, the Chair's office attempted to micromanage investigations. For example, the Chair's office inserted itself into conversations between FTC staff and targets of investigations regarding discovery negotiations. Staff had to ask whether "the Chair's office approved [staff] telling the parties we want [the companies] to produce data consistent with the proposal laid out in [a] memo[.]"[86] Unfortunately, in what became standard practice at the FTC, even in small instances like these, the Chair would not make a decision or provide clear guidance. Despite laying out options for the Chair to move forward with the investigation, staff was told the Chair was only "comfortable" letting staff discuss the issues with the targets of the investigation "at a high level."[87] These delays in efficiently operating investigations became commonplace at the FTC under Chair Khan.

Staff felt the need to document and demonstrate the wasted resources created by micromanagement in an attempt to effectuate a change by senior leadership. In one investigation, staff tried to document "anything that shows the level of substantive engagement we have provided with every new question we get, and the level of involvement from the Front Office at every turn."[88] Staff explained that it is "not just the doc[ument]s we've sent to the Chair through the [Front Office], but all the really beefy email chains that have soaked up our capacity."[89]

---

[81] *Id.*
[82] FTC-M000000001.
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] FTC-M000000143.
[87] *Id.*
[88] FTC-M000000145.
[89] *Id.*

### 2. *Chair Khan did not provide clear direction despite her micromanagement.*

Despite the micromanagement, the Chair's office did not provide clear direction to staff. One manager wrote about "experiences with [the Chair's Attorney Advisors (AAs)] who are interpreting the Chair's instructions" that resulted in "leav[ing] meetings where the direction is unclear."[90] The manager suggested that "someone who can interpret [the Chair's] directions into concrete deliverables would be helpful if there's someone who can do that."[91] Another manager reported that all of the managers "hear there's some guessing" when the Chair's AAs try to "be a proxy" and provide "direction or guidance" and reported that if managers "can rely on [messaging from AAs] it's really helpful[.]"[92]

Another manager explained the lack of delegation resulted from uncertainty among people in senior leadership. The manager explained that "[t]here are no clear demarcations between [the Chair's] AAs, [the Chief of Staff], and [the Director of the Bureau of Competition]," creating a situation where staff does not "know who ultimately bears the responsibility . . . [b]ut the result is [staff] are not getting the guidance that [staff] need[s] from our management or from [the Chair's] office, or they give us guidance that is later retracted, because [the Chair's team is] either unwilling or unable to predict what [the Chair] want[s]."[93] The manager stressed that staff "cannot do [their] job unless" someone is "empowered and willing to make decisions[.]"[94]

> "Fewer people expressing the Chair's 'interest' in too many conflicting and poorly timed ways and without the Chair's actual input, that ultimately provide nothing to advance our investigations or final work."

Similarly, staff raised that many people around Chair Khan provided conflicting directions. For example, one manager recommended "[f]ewer people expressing the Chair's 'interest'" instead of a process that included too many people "in too many conflicting and poorly timed ways and without the Chair's actual input, that ultimately provide nothing to advance our investigations or final

---

[90] FTC-M000000001. *See also* FTC Manager Testimony to the Committee ("I think I was genuinely aware of other instances in which the Chair either did not follow recommendations from the staff and/or there was a lack of communication whether it was from the Chair, the Chair's office or the front office, I don't know specifically, but, I mean, she is the head of the agency; the buck stops with her so where that kind of disagreement was either not communicated or not communicated clearly or in a timely way and in a way that left staff frustrated.").

[91] FTC-M000000001. *See also* FTC Manager Testimony to the Committee (". . . when someone makes a decision, we should be able to rely on that as the final word on the decision. So it's important to note that a decisionmaker is authorized or has had the authority delegated to make that decision. And, again, I think I said this earlier, too. If it works, great. If it doesn't work, you know, own it and move on, that we were looking for that.").

[92] FTC-M000000001. *See also* FTC Manager Testimony to the Committee (". . . if she really wants to allow the agency to run efficiently, that she needs to trust that we know what we are doing and that, if she gives a specific direction, we will follow it.").

[93] FTC-M000000222.

[94] *Id.*

work."[95] The manager wrote that this problem would be addressed by "[a]ppropriate delegation, consistency, and accountability at the senior management level."[96] Senior leadership's "micro 'gotcha' management" included "[t]oo much uninformed input from too many speakers[.]"[97] One recommendation from career FTC management was to "[d]elegate authority in ways that demonstrate that people purporting to speak for [the Chair] do."[98] The result, according to management, would be that this delegation "necessarily entails that [the Chair's] senior leaders make decisions in real time, that teams can rely on those decisions, and if the ship sails, it's gone."[99]

> "Micro 'gotcha' management. Examples: Too much uninformed input from too many speakers."

Career FTC managers recognized that the Chair's office as a whole lacked the ability to effectively communicate with FTC staff. One manager said that one sign of progress is actually "hav[ing] people in the Chair's office who respect people in the agency and have the skills to collaborate rather than just dictate."[100] Despite improvements from "a lot of effort on the part of the Bureau" of Consumer Protection leadership to improve the situation in that bureau, there was continued concern that the "issues may not improve regarding the way the Chair's office communicates with everyone."[101] These problems were only exacerbated by Chair Khan's inability to place a permanent or acting Director of the Bureau of Economics for nearly ten months after her first Director abruptly resigned amid reports of disputes with the Chair's office.[102]

Another manager told FTC leadership that the "Chair needs a really good [Chief of Staff], if this is not her comfort zone to have these kinds of conversations and managing things."[103] But for the first year and a half of her tenure, Chair Khan chose a Chief of Staff who was known for creating friction with an abusive managerial style.[104] Biden Administration officials leaked to the press that they personally avoided interacting with Chair Khan's Chief of Staff.[105] When Chair Khan made a change, she chose the Director of the Office of Policy Planning to be her new Chief of Staff[106]—even though no single person can fill both of these demanding roles effectively—and the former Chief of Staff continued to engage with staff in a confusing and unwelcome manner.[107] One manager noted that even after the former Chief of Staff reportedly left, "[p]eople [are] get[ting] emails from someone who is supposed to have already left the agency and it raises

---

[95] FTC-M000000193.
[96] *Id.*
[97] *Id. See also* FTC Manager Testimony to the Committee ("'Gotcha' management' is somebody raising an issue late in the day to raise an issue, not because it's necessarily, from our perspective, a substantive question.").
[98] *Id.*
[99] *Id.*
[100] FTC-M000000086.
[101] FTC-M000000001.
[102] Leah Nylen, *FTC's Top Economist Resigned Amid Dispute Over Pharma Study*, POLITICO (Feb. 25, 2022).
[103] FTC-M000000001.
[104] Leah Nylen et al., *Trouble in Khan's corner*, POLITICO (Apr. 5, 2022).
[105] *Id.*
[106] Khushita Vasant, *Wilkins to Take Over as Chief of Staff to US FTC Chair Khan*, MLEX (Mar. 6, 2023).
[107] FTC-M000000001.

questions[.]"[108] Chair Khan's second, and reportedly staff-friendly, Chief of Staff left the agency after a short stint in the role.[109] Chair Khan's desire to micromanage investigations and refusal to delegate power—combined with her failure to provide clear direction—limited the ability of the FTC to operate.

### C. Chair Khan refused to acknowledge the tradeoffs in her resource allocation decisions.

FTC leaders must make challenging decisions regarding what investigations to pursue. Instead of making these decisions, according to career managers at the FTC, Chair Khan shirked this obligation. For example, one manager noted that leadership needed to "[b]etter factor[] staff time and other tradeoffs into decision-making[.]"[110] Another manager described FTC leadership's decision on resource allocation as "add[ing] more to our plates but [they] will not make hard decisions about taking anything off, and staff is crushed."[111]

Some managers pleaded with leadership because staff could not address actual anticompetitive conduct because of Chair Khan's inaction. For example, one manager wrote to the FTC's Chief of Staff that "it sometimes feels like we are running down marginal theories (given the facts of a specific case) when more problematic deals may go unreviewed."[112] Another manager wrote that

> "Simply put, it sometimes feels like we are running down marginal theories (given the facts of a specific case) when more problematic deals may go unreviewed."

---

[108] *Id.*

[109] Elizabeth Wilkins (@ewwilkins), TWITTER (Nov. 17, 2023), https://twitter.com/ewwilkins/status/1725550002385100987.

[110] FTC-M000000228. *See also* FTC Manager Testimony to the Committee ("If the Chair would prefer that we pursue merger A instead of merger B, that is a thing that we can do. What we can't do is pursue merger A and merger B. That's what I mean by it's a zero-sum game, that there's a choice to be made there and it's a resource choice.").

[111] FTC-M000000170. FTC Manager Testimony to the Committee ("So one circumstance related to what we've talked about before is we look at many more cases, many more mergers than we can reasonably issue second requests for, or certainly than we can reasonably litigate. I tend to think about it as a pyramid where we try to put eyes on as many different mergers as we can and filter and triage from there which ones need a deeper look, which ones need a second request, which ones need to be litigated. . . . So, if the decision on whether to close that investigation is slowed, it not only . . . it's not just about that case. It's about the case that that person should be working on or is not working on. . . . And so there are times where if we're not getting an answer, if we're not getting a decision on that closing recommendation, that's triggering a lot more work from the staff that might not need to be done.").

[112] FTC-M000000175. *See also* FTC Manager Testimony to the Committee (". . . what I'm trying to convey, is that these decisions are not purely about is there one discrete open question or is there some remote possibility of an enforcement action. It's intended to be a more holistic determination of is this the right place to put our resources."); FTC Manager Testimony to the Committee ("I can think of instances, without getting particular, where, in my judgment, there isn't an antitrust question."); FTC Manager Testimony to the Committee ("What this is speaking to is a broader perspective, which is, you know, on resource allocation at, you know, sort of, the triage point. Do we open this investigation? Is it something that we want to pile resources on? Because it's a very, very difficult question, sort of, the litigation perspective, litigation risk or investigation risk. What's the likelihood that we're going to get to a problem that the Commission is going to have reason to believe is illegal? All of those things go into play. And, from a priority perspective, it's not as much the Chair's priorities as that this filters down to us at the shop level so that we know how to allocate the people that are working for us.").

"we do not have enough staff to support our teams and their cases, and we cannot take on additional cases without consequence to our existing workload."[113] Another manager had to explain to senior leadership that the FTC is "designed to pursue [investigations] and enforcement actions only when they are clearly justified."[114] This person explained that "one of our key roles as managers is to identify quickly the mergers that present clear problems and the mergers that appear less likely to present competitive concerns."[115] This manager was left to "hope" that the Chair understood the basic concept that any additional work "necessarily comes at the expense of another case" because "it's largely a zero/sum [*sic*] game."[116]

Chair Khan would also leave matters open for investigation even when staff had no viable theories of harm. As one manager wrote, senior leadership needs to "[c]lose matters when we are done" because "leaving matters open repeatedly, without a demonstrable antitrust question to investigate, demonstrates a lack of trust in staff's judgment and results in staff's distrust of senior leadership and discourages creative thinking and initiative."[117] Similarly, a manager noted that staff had "too many matters open and no ability to triage."[118]

---

[113] FTC-M000000259. *See also* FTC Manager Testimony ("So, if a particular investigation is no longer fruitful no longer worth going down, it's harmful, it's affirmatively harmful to keep that open because I can't have that person then devote their time to something else that, at least in my view, is more important. So that's one problem. The other problem is . . . I tend to view our staff time as a highly precious resource in the agency. It's the only one we can use. But, when if you're in a situation where a staff is having to do something like draft a second request, just in case because they don't have an answer, they're having to spend a lot of time doing, that's something that is frustrating for the staff, and it's frustrating for me as a manager.").

[114] FTC-M000000083.

[115] *Id.*

[116] *Id. See also* FTC Manager Testimony to the Committee ("Q: What do you mean here by 'the limits of the agency today'? A: Among my biggest day to day concerns and challenges are the limited resources that we have, the limited people. The limits on the number of people we have is probably the biggest resource limitation. We've also encountered limitations in the past on our ability to fund litigation experts. Antitrust trials are expensive. The experts you typically need for an antitrust trial are expensive, and there's been times when we've run out of or come close to running out of that funding. And so . . . it's always top of my mind for me that there is a resource limitation on what we can do. And I think it is . . . very important for the political leadership of the agency to be aware of those limitations and have those limitations inform all of their discussions and decisions."); FTC Manager Testimony to the Committee ("So we were looking for clear priorities. And that means sometimes the difficult decisions need to be made. The Chair is ultimately responsible for the expenditure of resources, as Congress has allowed, and so I want my Chair's priorities to be clear so that the bureau can act on them, so that we can act on them, and know that if our focus is going to be, you know, under a Chairman, Robinson Patman cases, know we're going to spend time and energy on Robinson Patman, and let us do that. If it's going to be a focus on a particular industry because we need to focus on an industry, let us know that so that we don't go grabbing cases in other industries. Not because we don't want to enforce against potentially illegal transactions, but because we can't do it all. And so I think what I'm suggesting here is that she acknowledge that she's aware of those limitations.").

[117] FTC-M000000193.

[118] *Id.*

In addition to pursuing cases without a viable theory of harm, Chair Khan forced FTC staff to pursue marginal theories of harm within particular matters. This mismanagement caused staff to inform senior leadership about the obvious fact that the "greater the number of potential theories, the less time staff has to focus on the most likely provable theory."[119] Another manager explained to senior leaders that "in our preliminary investigations, staff currently is tasked with addressing every conceivable theory of harm[.]"[120] Yet another manager warned about one case where "staffing needs on the case have become exigent."[121] One manager explained that staff are "spending a lot of our bandwidth right now on internal discussion and advocacy and the uncertainty about what happens next makes that very high stress."[122]

> "Leaving matters open repeatedly, without a demonstrable antitrust question to investigate, demonstrates a lack of trust in staff's judgment and results in staff's distrust of senior leadership and discourages creative thinking and initiative."

Some managers felt the need to explain to senior leadership that different methods are not necessarily better than previous methods, and Chair Khan's management was in fact worse than prior leadership at the FTC. One manager wrote that "[d]ifferent is not necessarily better, and it's important that [the Chair] understand the reasons [staff have] made tough choices in the past and that she understand the tradeoffs involved in changing those choices."[123] A different manager suggested that senior leadership "[l]isten to staff when they push back on new initiatives to understand why they are actually pushing back instead of dismissing all pushback as obstructionist."[124] The manager explained that "[m]ore often than not, [staff] push back not because they oppose the change itself, but rather because they do not have capacity to implement the change or shoulder its predictable side effects without making tradeoffs."[125] The manager clarified that staff are "willing to engage with the necessity of those tradeoffs so that staff can carry forward the current leadership's priorities[.]"[126]

> "Listen to staff when they push back on new initiatives to understand why they are actually pushing back instead of dismissing all pushback as obstructionist."

---

[119] *Id. See also* FTC Manager Testimony to the Committee ("[T]he thrust of the paragraph is that it goes back to the resource limitations that we talked about . . . and that a big part of the decision-making process on whether to issue a second request or to pursue an enforcement action is a resource question. It's a triage question.").
[120] FTC-M000000174.
[121] FTC-M000000277.
[122] FTC-M000000109.
[123] FTC-M000000077.
[124] FTC-M000000170.
[125] *Id.*
[126] *Id.*

\*    \*    \*

Chair Khan needed to consolidate the FTC's power in order to push through her agenda without dissent from staff or the other Commissioners. To accomplish this, Chair Khan centralized power in her office despite the objections of staff.[127] As internal documents show, she refused to delegate her powers, micromanaged investigations, and did not make the necessary decisions in a timely manner that would allow FTC investigations to move forward efficiently.[128] Chair Khan did not come to terms with the tradeoffs that exist in making decisions and moving investigations forward, which harmed the FTC's ability to enforce the antitrust laws.[129] In so doing, Chair Khan hindered the work of the FTC's career staff—all to pursue her progressive ideological goals.

---

[127] *See supra* section I.A.

[128] *See supra* section I.B.

[129] *See supra* section I.C.

## II. CHAIR KHAN'S POWER GRAB LED TO MISMANAGEMENT AND WASTED RESOURCES

Chair Khan's desire to consolidate power and her refusal to delegate or acknowledge tradeoffs negatively affected the FTC's ability to function. The consolidation of power created a situation in which the FTC wasted resources through indecision and a lack of communication, which harmed the ability of the FTC to protect consumers and faithfully enforce the law. Career FTC managers explained that bottlenecks in the Chair's office harmed the FTC's ability to function and hurt the morale of career staff who wanted to enforce the law.[130] Documents of FTC career staff demonstrate that Chair Khan wasted a significant amount of FTC resources because of her refusal to make necessary decisions, which left staff in limbo and created periods of inaction.[131] Chair Khan's inability to make decisions limited the amount of time available to conduct investigations and prepare for litigation, which weakened FTC enforcement.[132] When direction did finally come in any given investigation, staff expressed frustration that senior leadership gave vague instructions with no understanding of the facts of given cases.[133]

Career FTC staff members expressed concern that Chair Khan may not actually want the FTC to succeed in its enforcement and purposefully put staff in a position to lose cases.[134] FTC managers expressed staff's willingness and desire to bring novel and aggressive cases, but expressed concern that Chair Khan was preventing staff from being successful.[135] Additionally, managers warned against leadership directing staff to bring cases unsupported by facts.[136] FTC staff routinely requested that Chair Khan clarify her priorities for the agency, but she routinely refused to communicate with managers.[137]

Documents from managers and survey data show that attempts by senior leadership to address staff's concerns were inadequate and problems at the FTC continue to weaken the agency.[138] Career FTC managers repeatedly documented and explained serious concerns to Chair Khan and her leadership team about her public posturing on issues before the FTC, including broad, lofty statements that could not be translated effectively into actionable direction.[139] At the same time, Chair Khan and her senior leadership team displayed a willingness to see FTC staff villainized publicly, despite early warnings from staff about the harms of this unsupported rhetoric.[140]

---

[130] *See infra* notes 142-150 and accompanying text.
[131] *See infra* section II.A.1.
[132] *See infra* section II.A.2.
[133] *See infra* section II.A.3.
[134] *See infra* section II.B.1.
[135] *See infra* section II.B.2.
[136] *See infra* note 173 and accompanying text.
[137] *See infra* notes 189-205 and accompanying text.
[138] *See infra* section II.B.3.
[139] *See infra* section II.B.4.
[140] *See infra* section II.C.

**A. Senior leadership's inability to make timely decisions limited the ability of FTC staff to investigate and bring cases that help consumers.**

Career FTC managers explained that bottlenecks in the Chair's office affected agency morale and ultimately harmed the FTC's ability to fulfill its mission. Early in the Chair's tenure, managers of the FTC's investigative and enforcement shops in the Bureau of Competition and the Bureau of Consumer Protection were told, despite all the uncertainty at the FTC, "This much is clear: if anything requires a decision by the Chair's office, we will need relevant memos and information quite early."[141] Despite staff's ability to meet this demand and rush work to Chair Khan, staff quickly found out that "[t]hings are a bottleneck at the Chair's office."[142] In a meeting with division leadership, one manager explained that "[b]ottlenecks previously weren't apparent to staff, but [are] very apparent now."[143] The problem was explained to Chair Khan's Chief of Staff in stark terms: "Staff feels disrespected, worked hard to put something together, and it sits for months. Makes them feel their work is disrespected. After sitting, we get unclear or unactionable feedback."[144]

"Staff feels disrespected, worked hard to put something together, and it sits for months. Makes them feel their work is disrespected. After sitting, we get unclear or unactionable feedback."

Another manager explained that the "[b]est thing the Chair can do, from our perspective, to improve morale, is get the work moving[.]"[145] Even Chair Khan's own leadership team acknowledged the problem. A leader in the Bureau of Competition's Front Office—an official appointed by and responsible to the Chair—wrote about efforts to "identify and implement changes in how the Chair's office operates" that "[a]t a minimum, I think we need . . . quicker decisions by the Chair[.]"[146]

According to internal FTC documents, bottlenecks in Chair Khan's office delayed several investigations. In one example, FTC staff noted that the "Chair hasn't signed off yet though, which makes me nervous about" moving forward even though staff was "concerned [about] the delay" and wanted to take action "especially if no one is questioning" staff's proposal.[147] The bottlenecks became so troublesome, staff discussed how "to manifest" action by senior leadership "in the absence of specific guidance about what [leadership] want[s] to see/approve, taking into account that they have made it clear that they want to be in the loop."[148] In one example, the Bureau of Competition's Front Office simply communicated that they "still haven't heard anything yet from the Chair[.]"[149] The apparent indifference from the senior leadership to the position in which staff routinely found themselves made staff question whether members of

---

141 FTC-M000000120.
142 FTC-M000000001.
143 *Id.*
144 *Id.*
145 FTC-M000000002.
146 FTC-M000000040.
147 FTC-M000000152.
148 FTC-M000000147.
149 FTC-M000000156.

the Front Office "ever looked in th[e] mirror" and left staff with the "impression that [one Deputy Bureau Director] doesn't appreciate how merger review occurs or the speed at which we have to make decisions," further stating "I'm not sure he'll ever understand[.]"[150]

    *1.  Chair Khan's indecision wasted the FTC's resources.*

Documents provided to the Committee demonstrate that Chair Khan wasted a significant amount of FTC resources because of her refusal to make necessary decisions, which left staff in limbo and created periods of inaction. In November 2022, the FTC's Chief of Staff admitted to managers that "some of the most frequent themes" in discussions about improving "agency culture, staff morale, communication and decision-making" include "[s]peeding decision-making" and "avoiding inaction[.]"[151] Staff explained to FTC leadership that "[h]aving a decision made is better than people being in limbo" and that having "staff in limbo" creates a situation where staff "feel unsure of their role in the agency because . . . they aren't producing good work[.]"[152]

Chair Khan's indecision wasted resources and resulted in real harm to the FTC's ability to faithfully execute the laws. One manager explained that it is "extremely demoralizing to the team to work the long hours" to complete work product "given that all external indications are inconsistent with" the Chair making a decision to allow the work to be circulated at the Commission level.[153] The manager stressed that "the time finalizing [the unused work product] is time we can't spend doing other things," which is why the manager must "keep pushing for an answer[.]"[154] Another manager provided an example of a specific case in which "a lot of people work[ed] nights and weekends according to the Chair's desire to get [the case] out fast, then it sat and sat."[155] The manager explained the consequence for FTC resources when the Chair does not act, stating that if staff "[s]end [a] case up [and no decision is made], [we] can't have three people sitting around doing nothing[.]"[156] If and when a case finally moves, staff are "now tied up on other major cases[.]"[157] Consequently, the inability to make timely decisions "[c]reates staffing issues."[158] In another example of wasted time and resources, staff were told by senior leadership that requested and completed work product was "premature at this point, so we aren't sending any feedback" and that other work product completed likely would not be used but was "good to have just in case."[159]

> "[A] lot of people working nights and weekends according to the Chair's desire to get it out fast, then it sat and sat."

---

[150] FTC-M000000218.
[151] FTC-M000000228.
[152] FTC-M000000002.
[153] FTC-M000000109.
[154] *Id*
[155] FTC-M000000001.
[156] *Id.*
[157] *Id.*
[158] *Id.*
[159] FTC-M000000138.

In another example of the Chair's indecision wasting resources, staff attempted to explain why a certain strategy would result in a stronger case, but the Chair still would not make a decision. The Director of the Bureau of Competition "told [the Chair] that [a manager] felt very strongly that . . . staff could do a much better job putting together a compelling case if [staff] had another month or two to investigate" and even provided examples of "interesting documents [staff] are seeing[.]"[160] Although the Chair "seemed to warm up to that" and "was open to the idea of having [staff] continue to investigate instead of preparing for a potential" lawsuit, staff were only told that the Chair had "not made up her mind on that, and could swing the other way[.]"[161] This indecision left staff in a position to prepare to litigate and continue to investigate new theories simultaneously, weakening both the litigation and investigation.[162]

### 2. Indecision weakened the FTC's ability to enforce the law.

Chair Khan's inability to make decisions limited the amount of time available to conduct investigations and prepare for litigation, which weakened FTC enforcement actions. As one manager explained about the delays, "In many ways, when we decide is more important than which cases we choose."[163] In requesting that leadership focus on "the Bureau's process for making choices on individual matters," the manager explained that "[i]f we want to refocus the law to original principles, as a practical matter, raising new theories or concerns late in the day usually means that we are less prepared to litigate those issues successfully."[164] The result of late direction and slow decision-making, in the words of this manager, "heightens the risk that we will be unable to present well-developed cases in court and fail to advance the law as intended (or worse, create an opportunity for a court to develop bad law)."[165] The

> "If we want to refocus the law to original principles, as a practical matter, raising new theories or concerns late in the day usually means that we are less prepared to litigate those issues successfully. That heightens the risk that we will be unable to present well-developed cases in court and fail to advance the law as intended (or worse, create an opportunity for a court to develop bad law)."

---

[160] FTC-M000000113.

[161] *Id.*

[162] *See id.*

[163] FTC-M000000172.

[164] *Id. See also* FTC Manager Testimony to the Committee ("The difficulty that we were facing at this time was having new theories, new questions, new interests come up too late in the day in an investigation to be able to address those questions. So great questions; earlier, we would've been able to do more with them. That's a frustration from a morale perspective from staff. If everything's going along and everyone knows what we're doing, why weren't those questions posed earlier?"); *id.* ("Telling us late in the day to do it is a huge scramble for people to try and we're not going to say we can't do it. We have to investigate. So do we have the information? Can we apply that information? It creates an inefficiency and, against a deadline, it creates, quite frankly, terror in the eyes of litigating teams."); *id.* ("We're up against a clock, and we need to be able to support . . . the allegations put forth in the complaint.").

[165] *Id.*

manager had to explain that staff "need time and bandwidth to evaluate thorny questions[.]"[166] The manager warned that if FTC leadership "want[s] to advance the development of case law in the identified areas, and in the absence of a more concrete litigation strategy, the later we hear about Bureau/Commission theories of harm, the more limited our ability to do the things we're asked."[167]

The issue of instructing staff to investigate new theories at late stages of investigations arose repeatedly under Chair Khan. According to a career FTC manager, the late direction by leadership limited the ability of managers to select the best cases to advance the Chair's mission.[168] The manager stressed "that [Front Office] disorganization and lack of focus limits [FTC staff's] ability to do the things they're asking."[169] In another document, a Deputy Director of the Bureau of Competition apologized, telling an FTC manager, "Sorry for the delay/uncertainty, I know it's frustrating!!"[170] In response, the manager explained that the problem is more than simply frustrating staff,[171] and instead the mismanagement is "making it very difficult to take much action because we can't issue subpoenas to third parties" if timely decisions about the direction of the investigation are not relayed to staff.[172]

"Late theory additions and directing complaint allegations against the evidence. Attempting to make every case 'all cases' effectively tells staff they did not do an adequate job."

Managers explained to leadership that mismanagement and distrust creates a situation where leadership directs staff to bring cases unsupported by facts. For example, as one manager wrote, "Late theory additions and directing complaint allegations against the evidence" and "[a]ttempting to make every case 'all cases' effectively tells staff they did not do an adequate job."[173] During a transcribed interview with the Committee, the manager claimed this email was

---

[166] Id. FTC Manager Testimony to the Committee ("We meet at the beginning to describe what we think the issues might be, with the bureau and, you know, with the Chair, the Chair's office. If a second request issues, it issues based on that information, those questions that we've raised. If those questions aren't raised early, then we issue a second request that may not address the questions that are raised. We may take investigational hearings, our version of depositions, and not raise the questions in testimony that somebody wants us to raise. And we can't go back and do that once we have a Hart Scott clock running on the second half.").

[167] Id.

[168] FTC Manager Testimony to the Committee ("Hypothetically, I get five mergers in 1 week because the [industry] is in a period of consolidation. I have to pick among those five. We can't handle all of them. The clearer the direction, the better our ability to pick the one that is going to best advance the Commission's interests. The clearer the priority in that is broader than the case sometimes. It's resources. 'Yeah, that would be great. We're going to have to hire three experts.' Experts are really expensive. Maybe we can't afford it. Knowing what the Chair wants, knowing what the bureau directors want, knowing what we want, that's a conversation we should have.").

[169] FTC-M000000219.

[170] FTC-M000000109.

[171] Id.

[172] Id.

[173] FTC-M000000193. *See also* FTC Manager Testimony to the Committee ("The facts that we elicit are the facts that we have in hand when we're making a recommendation. If you want us to explore a theory that is different than the theory that those facts clearly support, we just don't have the facts to support it. That's what against the evidence

meant to convey a limited amount of time and resources to pursue certain evidence in some investigations.[174] Another document from a career FTC manager explained that when senior leadership is "deemphasizing staff's work in favor of a particular theory, late in the day creates an untenable situation of matching fact to theory" and "creates uncertainty about whether the bureau supports an individual attorney's or team's effort."[175] One manager explained that if new theories appear for the first time from senior leadership when the investigation is over and staff are preparing to litigate, "the less likely that line attorneys and support staff regain trust in the motivations and leadership of the Bureau and the Chair."[176]

Internal FTC documents showed that staff were concerned about walking into a courtroom unprepared because of Chair Khan's mismanagement. As one manager explained, "People are less happy when they have to go in unprepared to litigate a particular issue or theory because the [Front Office] brought it up late."[177] During testimony to the Committee, the manager attempted to blame the negative language on the rumored experience of other managers and used that rationale to avoid providing direct examples during his testimony.[178] Nonetheless, the manager wrote that this problem "is intimately related to the broader issue of failure to delegate, too."[179] Although direction from leadership is necessary and welcome, management explained to senior leadership that "guidance such as it is will only be successful if it's intended to inform staff decision making . . . rather than coming in over the top at the last minute[.]"[180]

> "People are less happy when they have to go in unprepared to litigate a particular issue or theory because the [Front Office] brought it up late."

3. *Senior leadership lacked focus and basic understanding of certain concepts.*

Staff expressed frustration that senior leadership gave vague direction with no understanding of the facts of given cases. For example, the Director of the Bureau of Competition "signal[ed] that Chair Khan and [then-Commissioner Rohit] Chopra might want to pursue" a case, but according to career staff working on the case, the Chair and Commissioner Chopra "know nothing at all of the facts."[181] According to staff, direction from senior leadership on specific cases amounted to nothing more than telling staff to bring a case, even if the case was

---

means. It doesn't mean they don't exist. It doesn't mean they do exist."); *id.* ("Q: Have you or has [your group] ever been asked to direct complaint allegations against the evidence, as you've described it? . . . A: We have been asked to support a case that includes some legal preceden[ts] without the opportunity in our investigation to do the job we would like to do to be able to do that.").
[174] *Id.*
[175] FTC-M000000219.
[176] *Id.*
[177] *Id.*
[178] FTC Manager Testimony to the Committee ("I think again I have to go back to the beginning of the email where a lot of what I am expressing here is an aggregation of things, not just that I have experienced, not really that I have directly experienced, and more that I have experienced indirectly through my conversations with other managers.").
[179] *Id.*
[180] *Id.*
[181] FTC-M000000169.

unwarranted. As one manager explained, "At this point [the instruction] is at the level of '[Commissioner] Chopra and Chair Khan are interested in vertical cases[.]'"[182] Staff expressed frustration that they could explain why certain cases are not worth pursuing if senior leadership "would hear it, but we are very frustratingly starting at zero with this and every case[.]"[183]

Despite the best efforts of career FTC managers and staff to receive direction from senior leaders, investigations and litigations at the FTC suffered from unclear guidance. For example, when managers asked for guidance, what they received was so confusing that one manager stated, "I don't even know what to do with this response[.]"[184] In being told the Chair was interested in challenging a deal, one manager was so confused the manager replied, "Challenge which deal?"[185] At one point, a manager felt the need to state the obvious fact that staff do not make the decisions to challenge mergers—which is up to leadership—instead, staff's job is "investigate and recommend."[186] In another instance of disconnect between leadership and management, a manager had to remind the Bureau of Competition Front Office that a proposed "schedule leaves little time for investigation[.]"[187] Another time, a manager noted a lack of communication by telling the Front Office that career staff "had hoped we could move next to meeting with the Chair directly in the interest of efficiency" because staff did not "think [they could] afford to go another full round on this before [they got] a decision."[188]

## B. Chair Khan made it unnecessarily difficult for litigators and investigators to execute the FTC's mission.

FTC staff routinely requested that Chair Khan clarify her priorities for the agency, but she repeatedly failed to communicate with career staff. When senior leadership asked for feedback on communication and processes in November 2022, a group of managers provided some "[s]uggestions even though we see no progress."[189] The managers recommended "[s]tat[ing] the Chair's clear and detailed priorities, recognize the costs to achieving them, and close cases/do not open cases that conflict with those priorities."[190] Similarly, a Deputy Director in Chair Khan's Bureau of Competition Front Office made the suggestion to have "more explicit guidance re[garding] what outcomes the Chair's office deems acceptable."[191]

On the consumer protection side of the FTC, the problems appear identical. One consumer protection manager told senior leaders that a problem with leadership was that staff still needed to "hear more about [the] Chair's concrete, [Bureau of Consumer Protection] priorities" almost a year and a half after Chair Khan took control of the agency.[192] Another consumer protection manager stated that there is a "lack of direction, at least in [the Bureau of

---

[182] Id.
[183] Id.
[184] FTC-M000000117.
[185] Id.
[186] Id.
[187] FTC-M000000131.
[188] FTC-M000000149.
[189] FTC-M000000193.
[190] Id.
[191] FTC-M000000040.
[192] FTC-M000000087.

Consumer Protection].”[193] More generally, Chair Khan's Chief of Staff admitted to managers that changes were needed to address morale, including "telegraphing vision, and explaining our approach to challenges the agency is facing" as well as "communicating feedback and the reasons for decisions clearly[.]"[194]

Comments from staff to the Bureau of Competition Front Office criticized senior leaders for a lack of direction and communication. One career FTC staff member wrote that "[s]taff would welcome more transparency and input regarding changes to [Bureau of Competition] policies and procedures. It is frustrating to keep having new policies dropped on us suddenly without having had the chance to provide comments or feedback beforehand."[195] The staff member explained that "[s]ince staff, not the [Bureau of Competition Front Office], is having to negotiate with the parties and explain the changes we are put in an awkward position."[196] The staff member elaborated on the Chair's vague policy aims by pointing out that "changes seem not related to our competition mission and we are already seeing potential challenges to our authority[.]"[197] The staff member explained that it was understandable that the Chair, "who has never tried or even pled a case before" is able, through her position, "to make wholesale policy changes," but the staff member explained that the problem is staff "actually have to prove our case in court."[198]

> "It is frustrating to keep having new policies dropped on us suddenly without having had the chance to provide comments or feedback beforehand. Since staff, not the [Bureau of Competition Front Office], is having to negotiate with the parties and explain the changes we are put in an awkward position."

The Director of the Bureau of Competition under Chair Khan was explicitly criticized at times for not even attempting to explain priorities or provide direction to staff. The Director of Bureau of Competition was accused of being "highly dismissive of staff, staff's time, and staff's expertise."[199] According to one employee, the Bureau of Competition Director "told [FTC staff] to accept the change, work more in the face of it, and do things we don't always understand."[200] This employee pleaded that if the Bureau of Competition "Front Office wants to roll out rule or policy changes, the Front Office should engage with staff to explain why and what they are trying to achieve rather than letting it filter down through the press."[201]

---

[193] FTC-M000000072.
[194] FTC-M000000228.
[195] FTC-M000000022.
[196] *Id.*
[197] *Id.*
[198] *Id.*
[199] FTC-M000000043.
[200] *Id.*
[201] *Id.*

One manager aired frustration regarding vague directions that did not provide staff with the guidance necessary to succeed. The staff member wrote that the "Chair talks about wanting to do the 'big cases' or the cases 'that move markets.'"[202] But those platitudes do not provide actual direction, leading the staff member to ask "[W]hat, exactly, does that mean?"[203] The staff member aired concern that protecting Americans from fraud did not fit in the Chair's agenda.[204] Commissioner Rebecca Slaughter was given some credit by staff for answering staff's "question[s] as best she could," but the staff member noted the obvious problem that Commissioner Slaughter is "not the Chair and none of us expect [Commissioner Slaughter] to play mind-reader to what the Chair is thinking."[205]

> "I have found [the Director of the Bureau of Competition's] leadership to be highly dismissive of staff, staff's time, and staff's expertise. Change can be good, but the speed at which it is occurring has in no way been eased by the Front Office. Rather, we have been told to accept the change, work more in the face of it, and do things we don't always understand."

### 1. Career FTC staff expressed concern that Chair Khan purposefully lost cases.

Career FTC staff members expressed concern that Chair Khan did not want the FTC to be successful and purposefully put staff in a position to complete poor work product, and even brought losing cases on purpose. Plainly stated, one manager wrote to another manager that "I'm not sure being successful (or doing things well) is a shared goal, as the chair wants to show that we can't meet our mission mandate without legislative change."[206] During a transcribed interview with the Committee, the manager claimed her email was "a little bit flippant" and she was "frustrated."[207] In other words, it was apparent to staff that the Chair did not share staff's goal of completing quality work and winning cases because the Chair wants to force Congress to enact legislative change instead of winning cases in litigation.[208]

---

[202] FTC-M000000072.
[203] *Id.*
[204] *Id.*
[205] *Id.*
[206] FTC-M000000265. *See also* FTC Manager Testimony to the Committee ("Q: What did you mean by being successful and doing things well? A: Well, so, if you see in the original email, there's a bracket toward the end of this long paragraph, 'trying to do everything will result in doing nothing well or successfully.' I was being a little bit flippant in saying that in agreeing with [Deputy Assistant Director] effectively that if you don't have the resources, it would make it difficult to be successful. . . . So the early period of the chair's tenure was a period where we . . . were not getting enough resources for our cases, and were very concerned about the impact. And so, we were very frustrated. I was personally very, very frustrated. And I think that that's what you see here, that I wasn't sure if it was a shared goal to be successful because we weren't getting the resources that we thought we needed. . . . So in this period of time, . . . we did not consider our cases to be staffed sufficiently for the challenges those cases presented.").
[207] *Id.*
[208] *See id.*

Another manager pleaded with the Bureau of Competition Front Office to understand the importance of winning cases in litigation. The longtime manager explained that "[l]itigation is the most important thing we do[.]"[209] As the manager explained, "[N]ot only does [litigation] create the precedent we'll depend on later, but our entire staffing model is built on the presumption that a significant percentage of merging parties will abandon their merger in the face of a complaint."[210] The manager explained that "[i]f the private bar senses that our litigation teams are weak or understaffed, they will litigate much more frequently, severely compounding our staffing crunch."[211] The consequences, as this merger shop manager explained, is that over time merging parties can become emboldened to attempt more transactions and bring the FTC to court if the FTC attempts to block a merger.

> "I'm not sure being successful (or doing things well) is a shared goal, as the chair wants to show that we can't meet our mission mandate without legislative change."

### 2. *Chair Khan alienated the managers and staff who wanted aggressive enforcement.*

Another group of managers expressed staff's willingness and desire to bring novel and aggressive cases, but expressed concern that Chair Khan was preventing staff from being successful. The managers communicated to the Chair that they are "excited about [the Chair's] vision to expand antitrust enforcement" and explained to the Chair that some of the FTC's past work "has pushed the envelope in bringing complaints that hew less to standard theories and instead add to the body of merger behavior that violates" the antitrust statutes.[212] The managers even pointed the Chair to "novel theories" in "recent complaints[.]"[213] But these managers told the Chair that despite working "hard to make a difference" the FTC staff "are demoralized because they feel that they can't do that today."[214] The managers told Chair Khan that they cannot bring novel theories or make a difference because staff are "not allowed to do anything until [staff] know[s] what [the Chair] want[s], and there [is] a catastrophic communication breakdown about what [the Chair] want[s]."[215]

Other managers agreed with Chair Khan's desire to be aggressive but expressed similar concerns of being unable to achieve this goal because of incoherent communication. One manager expressed that "many [FTC staff members] are in agreement with . . . many of the

---

[209] FTC-M000000083.
[210] *Id.*
[211] *Id.*
[212] FTC-M000000222.
[213] *Id.*
[214] *Id.*
[215] *Id. See also* FTC Manager Testimony to the Committee ("We do our jobs. We're highly successful at doing our jobs. We bring great cases. And I'm as proud of the people I work with now as I have been anywhere in my career. But we need decisions to be made. And, once made, we need to accept that if it's an error, it's an error, we blew it; if it's a success, it's a success. But you just need those communications to flow quickly, accurately, and consistently.").

Chair's goals; the problem is the process."[216] A group of managers expressed the sheer dysfunction of trying to investigate and prepare for litigation under Chair Khan's leadership in the following way:

> To be completely candid, the erratic messaging we've received on our cases, at every stage of investigation, decreases the likelihood we can engage on substance and adequately prepare the cases [Chair Khan] want[s] us to really focus on bringing, let alone the rest of the matters that come in the door.[217]

The managers continued, stating that "[c]lear messaging, and buy-in that doesn't shift without engaging the team in the process works - what we have now doesn't[.]"[218] Another manager explained to senior leadership that it is "[h]elpful for leadership to communicate effectively about change and priorities" because "[s]taff [are] on the frontline negotiating with opposing counsel" and therefore "need certainty and predictability to credibly represent to opposing counsel what Commission's priorities/expectations are for settlements/litigation/processes, etc."[219]

### 3. *Chair Khan's attempts to address strategic concerns were inadequate.*

According to career FTC managers, Chair Khan made inadequate attempts to address staff's concerns about a lack of communication regarding strategy. In one instance when policies came from the Chair's Office, the Chief of Staff simply acknowledged that "staff will have questions" and instead of promising to get answers, simply told staff "[w]e may or may not have answers"—even though the policies came from the Chair's Office and there was no other person at the agency who could answer staff's questions.[220] In the same instance, the Front Office simply told staff, "We are still figuring out the full repercussions of the other guidance, and we'll do our best to come up with solutions."[221]

"It should be conveyed to the Chair that all-staff memos are not going to win us over[.]"

Managers made clear to senior leaders that generic, banal statements from the Chair allegedly praising staff could not replace actual leadership and direction. One manager asked that it "be conveyed to the Chair that all-staff memos are not going to win us over[.]"[222] The manager explained that "questions need to be answered by the Chair."[223] According to the manager, staff never "had any issues with [Commissioner Slaughter regarding] her relationship with staff" and

---

[216] FTC-M000000072.
[217] FTC-M000000222.
[218] *Id.*
[219] FTC-M000000087.
[220] FTC-M000000120.
[221] *Id.*
[222] FTC-M000000072.
[223] *Id.*

instead "[i]t was [Commissioner] Chopra and now the Chair about whom the impression of many staff is that they consider us 'part of the problem[.]'"[224]

### 4. Managers worried that Chair Khan chased positive press over success.

Managers at the FTC routinely raised concerns that Chair Khan was making decisions for headlines and outside pressure was having an undue influence on her decisions. One manager wrote to the Chief of Staff:

> I also continue to get a sense that outside influences . . . have an undue impact on our priorities, investigation management, and enforcement decisions. While public perception of the Commission's performance is vital to institutional legitimacy and I recognize the need to explain to the public what we're doing (or more accurately, what we've done), we should never make an enforcement-related decision for the sake of PR.[225]

Similarly, managers expressed concerns regarding Chair Khan's public claims about the FTC's work. One manager told leadership that "press releases are a big issue."[226] For example, FTC senior leadership provided stern words but no credible action regarding oil and gas prices for consumers.[227] Former Commissioner Christine S. Wilson highlighted a policy statement on gas prices that led to no action from the FTC and pointed out that senior leadership was

*"[W]e should never make an enforcement-related decision for the sake of PR."*

"embrac[ing] the political message" and that staff have become "a convenient scapegoat" for Chair Khan.[228] Managers noticed these concerns around political timing, as one manager noted "[w]ith everything going on with gas pricing I want to be very careful on this one" in discussing sharing a memorandum with the

---

[224] *Id.*

[225] FTC-M000000077. *See also* FTC Manager Testimony to the Committee ("I think the genesis of the sentence is what I felt was too much discussion about what could be achieved in the public sphere with certain[ty] if we took an enforcement action."); *id.* ("In my view, there is a thin but important line between identifying those issues that are of public concern for the agency to inquire about and, on the other hand, dictating a law enforcement result, which I don't think is appropriate. I think that should be determined by the agency and by the evidence that the staff gathers. And that is all nonpublic."); *id* ("I think I meant that they are having an undue impact on questions that we are getting as staff and an undue impact on the focus for our investigation. If we are pursuing an investigation, we are going to pursue it, and . . . if there is an article in the press about our investigation, I am sure I will read it, but I am not going to let it inform the direction of our investigation. I am going to let the facts and the staff determine that."); *id.* ("But, once we are in it, once we are looking at a merger, what should inform us is what we learn . . . what should inform us should be the evidence that we gather, the testimony we gather, the data that we gather, what we hear from our participants.").

[226] FTC-M000000087. *See also* Ankush Khardori, *Lina Khan's Rough Year*, INTELLIGENCER (Dec. 12, 2023).

[227] *See* Holly Vedova, Director of Bureau of Competition, Fed. Trade Comm'n, Protecting Americans at the Gas Pump Through Aggressive Antitrust Enforcement (Sep. 21, 2021).

[228] *See* Christine S. Wilson, Commissioner, Fed. Trade Comm'n, The Neo-Brandeisian Revolution: Unforced Errors and the Diminution of the FTC (Nov. 9, 2021) ("But leadership has embraced the political message that flawed merger review has facilitated collusive practices among gas stations.").

Chair and delaying other action.[229] The general tough talk from the Chair and senior leaders was characterized by career FTC managers as disingenuous, as one manager explained:

> I have heard a lot of discussion about the need to be more 'aggressive' as an agency. . . . But 'aggressiveness' is often characterized as bringing cases quickly on incomplete information; with too few attorneys and paralegals, and too little expert funding to be successful; and with little regard for the consequences of losing in a way that negatively affects the enforcement agenda (i.e., bad facts that can result in really bad precedents that haunt us for years). That's not aggressive - that's reckless.[230]

Other managers expressed concern that the misleading direction of Chair Khan's public claims were harming staff's ability to achieve the FTC's mission. One manager, asking for additional guidance on policy, told leadership that Chair Khan's "descriptions are often general/thematic across the agency; hard for staff to translate that into case targeting."[231] Another manager reported that "[m]any of the Chair's and, to some extent, [the Director of the Bureau of Consumer Protection's] stated objectives sound more like progressive buzzwords than actual direction."[232]

> **"Many of the Chair's and, to some extent, [the Director of the Bureau of Consumer Protection's] stated objectives sound more like progressive buzzwords than actual direction."**

Another example of policies that receive favorable press but achieve no real results is the FTC's use of pre-consummation warning letters. On August 3, 2021, the FTC announced that it would begin sending warning letters in connection with transactions it cannot fully investigate within the time provided by statute before the deal closes.[233] These letters alert parties that their transactions remain under investigation and warn that closing occurs at the parties' own risk.[234] Then-Commissioner Phillips publicly suggested that within the first six months of this practice over 50 letters were sent and raised the question of whether any of these investigations actually remained open or whether this approach was simply a tactic to scare businesses.[235] Testimony from managers leading the FTC's merger shops confirmed that the FTC is not continuing to

---

[229] FTC-M000000152.

[230] FTC-M000000077. *See also* FTC Manager Testimony to the Committee ("I think that that word gets thrown around too much and can mean different things in different contexts. And I am trying to distinguish here between what I perceive as aggressive and what I think would be reckless. . . I don't recall a specific statement sitting here, but I am fairly confident it is at least an idea if not a specific word that Chair Khan has used in public statements . . .").

[231] FTC-M000000087.

[232] FTC-M000000072.

[233] Press Release, Fed. Trade Comm'n, FTC Adjusts its Merger Review Process to Deal with Increase in Merger Filings (Aug. 3, 2021).

[234] *Id.*

[235] Austin Peay, *US FTC Has Sent at least 50 'Close at Your Own Peril' Letters, Fueling Uncertainty, Phillips Says*, MLEX (Feb. 25, 2022).

investigate mergers after pre-consummation warning letters are sent.[236] In fact, these letters are typically sent by senior leaders without the knowledge of the lawyers and managers investigating the mergers.[237]

### C. Chair Khan marginalized the career FTC managers and staff members capable of carrying out the Commission's mandate.

According to career FTC managers, Chair Khan refused to treat career FTC employees as experienced litigators capable of fulfilling her agenda. One manager wrote that it was unclear whether the "Chair views the staff as the tool to implement her agenda" even though "staff conducts investigations with expertise and thoroughness, and they are talented, tenacious litigators[.]"[238] The manager reported to FTC leadership that "staff is a precious resource" and if staff are marginalized or driven out of the agency, the FTC will "lose the skill, experience, and energy they bring" and "implementing any enforcement agenda - much less an aggressive one - will be very difficult."[239] Another manager wrote that "[t]he great people [the FTC has] are essential to achieving that vision - and we can't accomplish it if [staff are] demoralized or if they leave."[240]

*"In short, the staff is a precious resource. If we lose the skill, experience, and energy they bring, implementing any enforcement agenda - much less an aggressive one - will be very difficult."*

Documents provided to the Committee show that Chair Khan continued to distrust staff well into her tenure. One manager wrote that he had "[z]ero contact with the Chair at a year and a half" into Chair Khan's tenure, which is "odd for a Chair and an [Assistant Director.]"[241] One member of Chair Khan's own leadership team wrote in November 2022, almost a year and a half into Chair Khan's tenure, that the "existential problem is still the lack of trust, likelihood of second-guessing and overriding staff's opinions[.]"[242] This member of Chair Khan's leadership

---

[236] FTC Manager Testimony to the Committee ("I'm not aware of any."); FTC Manager Testimony to the Committee ("I don't know if the number is zero, but I can't think of one.").

[237] FTC Manager Testimony to the Committee ("Q: Does [your merger shop] know when a pre consummation warning letter has been sent to parties? A: So this is done through the front office so sometimes we'll know about it, sometimes I think they are sent without us knowing about it."); FTC Manager Testimony to the Committee ("My understanding is that as you noted, these are letters that are sent out by the Bureau of Competition's front office in certain transactions where the second requests may not have issued, but as you know, telling the parties that . . . that's all I know. Q: What purpose does such a letter serve? A: I do not know since I am not involved with sending them out as an AD. Q: . . . is anyone else in [your merger shop] involved in the process of sending out preconsummation warning letters? A: No. [My shop] does not have involvement. Q: Is [your merger shop] made aware of when preconsummation warning letters have been sent out? A: Generally, no."); FTC Manager Testimony to the Committee ("Q: The FTC also provided a sample of preconsummation warning letters. How many of these letters have been sent from your shop, approximately? A: So the letters don't come from our shop. They don't they're not over my name. The preconsummation warning letters come from the front office.").

[238] FTC-M000000083.

[239] *Id.*

[240] FTC-M000000222.

[241] FTC-M000000001.

[242] FTC-M000000040.

team was not optimistic about the situation improving: "I don't think we can solve any of that."[243] In that same time period, one manager connected the lack of trust to the FTC's dismal Federal Employee Viewpoint Survey results, noting that the "trust in senior management and engagement scores demonstrate how managers and staff are disenfranchised." The manager argued that the distrust limited staff's ability to explore "interesting questions and even open new matters."[244] In December 2022, a manager placed the ability to fix the problem squarely with Chair Khan: "I don't think minds will really change unless and until [the Chair] genuinely trusts [career staff]."[245] This manager made clear that trust "doesn't mean we need to agree on cases or antitrust theory," but instead that managers and staff were "still get[ting] a strong sense that [the Chair] has a knee-jerk negative reaction to" some of staff's work.[246] The manager explained in testimony to the Committee that he was communicating concerns about the Chair's "skepticism about a path that we were suggesting but that didn't seem to have a specific problem with it, more of just a more generalized—a more generalized negative feedback" and "a sense of trying to do things differently for the sake of doing them differently."[247] He also claimed that he was "agnostic" as to "whether or not [the Chair] as a human being actually trusts us."[248]

> "The bigger existential problem is still the lack of trust, likelihood of second-guessing and overriding staff's opinions, etc. I don't think we can solve any of that."

1. *The Federal Employee Viewpoint Survey shows significant and ongoing problems.*

Surveys conducted by the U.S. Office of Personnel Management (OPM) provide details about Chair Khan's inability to manage her workforce and her mistreatment of career staff. Each year, OPM administers the government-wide Federal Employee Viewpoint Survey (FEVS) to assess "how employees jointly experience the policies, practices, and procedures characteristic of their agency and its leadership."[249] The purpose of FEVS is to help gauge whether workplace conditions that characterize successful organizations exist in federal agencies.[250]

---

[243] *Id.*
[244] FTC-M000000193.
[245] FTC-M000000077.
[246] *Id. See also* FTC Manager Testimony to the Committee ("I think the Chair's made no secret of the fact that she is wanting to rethink antitrust enforcement and rethink the ways in which we go about enforcement. And I think that is coming from a place where we may have recommended something that may have looked to her like actions that we have done in the past, and there was either a reluctance to go down that path or not necessarily a rejection of the recommendation because I don't think we ever got that far, but questions suggested a skepticism about a path that we were suggesting but that didn't seem to have a specific problem with it, more of just a more generalized - a more generalized negative feedback."); *id.* (". . . a sense of trying to do things differently for the sake of doing them differently.").
[247] *Id.*
[248] FTC Manager Testimony to the Committee ("I am agnostic in the sentence about whether or not she as a human being actually trusts us. I am saying that she needs to trust us. That is a necessary but maybe not sufficient condition. And I don't know if it was present then or not.").
[249] *About, Federal Employee Viewpoint Survey*, U.S. OFF. OF PERSONNEL MGMT. (last accessed Feb. 21, 2024).
[250] *Id.*

Under Chair Khan's leadership, the results of FEVS reflect her destructive leadership—especially when compared to the FTC's survey results during the Trump Administration:[251]

- *Honesty and Integrity*: In 2020, the last year under the Trump Administration, 87% of FTC employees agreed that senior leaders maintain high standards of honesty and integrity.[252] Under Chair Khan's leadership, that figure fell to 53% in 2021, declined further to 49% in 2022, and barely rebounded to 58% in 2023.[253]



---

[251] The FEVS results declined, even though managers explained that the same resource constraints, push to litigate more, and concerns over missing anticompetitive mergers existed under Chair Simons during the Trump Administration. *See* FTC Manager Testimony to the Committee ("I remember having a similar conversation with Chairman Joe Simons when he started because, coincidentally I suppose, that was also at a point where we were coming off of an even bigger run of litigation[.] . . . So it had been, like, a run of almost 4 years of significant litigation. And I remember saying something to the effect of we've had a tremendous amount of success . . . we overwhelmingly won them. And I wanted to be clear that our success should not be viewed as evidence that we had sufficient resources to do that work, that we were able to do that through really the heroic work of the staff and the willingness and energy that they brought to it."); *id.* ("And I think, even under Chairman Simons, he was, from my point of view, was moving much more towards an approach of being fearful that we might fail to block a merger that would be harmful."); *id.* ("I raised somewhat similar concerns with Chairman Simons when he started, when he had been through a lot of litigation, and I wanted him to understand that he shouldn't look at that and think, well, clearly the agency is doing fine. That wasn't the case.").

[252] U.S. OFF. OF PERSONNEL MGMT., 2020 OFFICE OF PERSONNEL MANAGEMENT FEDERAL EMPLOYEE VIEWPOINT SURVEY: REPORT BY AGENCY Q27 (Apr. 26, 2021) [hereinafter 2020 FEVS].

[253] U.S. OFF. OF PERSONNEL MGMT., 2021 OFFICE OF PERSONNEL MANAGEMENT FEDERAL EMPLOYEE VIEWPOINT SURVEY: REPORT BY AGENCY Q33 (Apr. 28, 2022) [hereinafter 2021 FEVS]; U.S. OFF. OF PERSONNEL MGMT., 2022 OFFICE OF PERSONNEL MANAGEMENT FEDERAL EMPLOYEE VIEWPOINT SURVEY: REPORT BY AGENCY Q56 (Oct. 20, 2022) [hereinafter 2022 FEVS]; Fed. Trade Comm'n, Results At-A-Glance: 2023 Federal Employee Viewpoint Survey Results, at Q58, *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/2023_FEVS_Results_At_Glance.pdf [hereinafter 2023 FEVS].

- *Respect for Senior Leaders*: In 2020, 83% of surveyed FTC employees agreed that they have a high level of respect for the FTC's senior leaders.[254] Again, under Chair Khan's leadership, that figure plummeted to 49% in 2021, 44% in 2022, and 53% in 2023.[255]



- *Motivation and Commitment*: In 2020, 80% of FTC employees agreed that senior leaders generate high levels of motivation and commitment in the workforce.[256] Under Chair Khan's leadership, that figure dropped to 42% in 2021, fell to 36% in 2022, and only rose slightly to 46% in 2023.[257]



When compared to other agencies, the results are even more alarming. In each category listed above, the FTC dropped from highest-rated to lowest or second-lowest of the ranked agencies.[258]

---

[254] 2020 FEVS, *supra* note 252, at Q31.
[255] 2021 FEVS, *supra* note 253, at Q37; 2022 FEVS, *supra* note 253, at Q60; 2023 FEVS, *supra* note 253, at Q62.
[256] 2020 FEVS, *supra* note 252, at Q26.
[257] 2021 FEVS, *supra* note 253, at Q32; 2022 FEVS, *supra* note 253, at Q55; 2023 FEVS, *supra* note 253, at Q57.
[258] *Compare* 2020 FEVS, *supra* note 252, *to* 2021 FEVS, *supra* note 253 *and* 2022 FEVS, *supra* note 253, at Q55. *See also* Letter from Christine S. Wilson, Commissioner, Fed. Trade Comm'n to Joseph R. Biden, President (Mar. 2, 2023). The rankings across agencies for 2023 are not available as of the release of this report.

Chair Khan claims that the 2022 FEVS results were too early in her tenure and too close to the 2021 results to account for the changes she made to address the workplace problems.[259] The recent 2023 results, however, show that Chair Khan's supposed actions to address the problems she created are inadequate, even as the FTC tries to claim Chair Khan has made significant progress with staff.[260] Compared to 2020, the final year before Chair Khan, the 2023 numbers still show a drastic decline:

- *Honesty and Integrity*: The 2023 results show a 29 percentage point drop from 2020 in the number of FTC employees who agreed that senior leaders maintain high standards of honesty and integrity.[261]

- *Respect for Senior Leaders*: The 2023 results show a 30 percentage point drop from 2020 in the number of FTC employees who agreed that they have a high level of respect for the FTC's senior leaders.[262]

- *Motivation and Commitment*: The 2023 results show a 34 percentage point drop from 2020 in the number of FTC employees who agreed that senior leaders generate high levels of motivation and commitment in the workforce.[263]

Interviews with managers also confirmed that Chair Khan did not take sufficient action to address certain concerns.[264] During transcribed interviews with the Committee, one manager claimed that "there's been attempts" to implement changes and "actions [senior leaders are]

---

[259] Oversight of the Fed. Trade Comm'n, Hearing Before the Comm. on the Judiciary, 118th Cong. (July 13, 2023) (Chair Khan responding to questions from Representative Fry: "[W]e've engaged in a lot of conversations and meetings to understand what some of the source of those issues were. We've been able to implement a set of steps, including streamlining decision-making, expanding communications around priorities. We clarified what our workplace flexibility policies would be. And I'm hopeful that each of those steps has contributed."); *id.* (Chair Khan responding to question from Representative Van Drew about whether the results will get better as a result of the changes she has implemented: "I'm hopeful."). *See also* Fed. Trade Comm'n, Results At-A-Glance: 2022 Federal Employee Viewpoint Survey Results ("It's likely that one contributing factor is the timing; the 2022 survey administration (returned to the traditional late Spring timeframe—May 2022) and the 2021 survey (administered in the fall—November 2021 and only open for five weeks) were only about six months apart."); U.S. Senate Comm. on the Judiciary Subcomm. on Competition Policy, Antitrust, and Consumer Rights Hearing on September 20, 2022 Oversight of Federal Enforcement of the Antitrust Laws Questions for the Record at 14.d. ("Much of the implementation began just months before the 2022 survey, and the work is still ongoing.")

[260] Emily Birnbaum & Leah Nylen, *FTC Staff Morale Rises, Survey Shows Increased Satisfaction*, Bloomberg (Dec. 5, 2023) ("Farrar said the survey results show staff at the agency are 'buying into Chair Khan's vision and feeling empowered to do the important work of the agency.' Since last year, Khan has worked to improve morale by meeting with each office in the agency and hearing directly from FTC staff about what's important to them."). *But see id.* ("The overall numbers on attitudes toward leadership still lag their 2020 levels . . .").

[261] *Compare* 2020 FEVS, *supra* note 252, at Q27, *with* 2023 FEVS *supra* note 253, at Q58.

[262] *Compare* 2020 FEVS, *supra* note 252, at Q31, *with* 2023 FEVS *supra* note 253, at Q62.

[263] *Compare* 2020 FEVS, *supra* note 252, at Q26, *with* 2023 FEVS *supra* note 253, at Q57.

[264] *See, e.g.*, FTC Manager Testimony to the Committee ("Indirectly. And what I mean by that is senior leadership has addressed the FEVS scores and actions they're trying to take in order to respond to concerns they see in them. But specific to honest and integrity, that's one of the FEVS score questions. So I think that's encompassed in it, but I can't recall them saying specifically to address the honesty and integrity question, we are taking steps X, Y, Z."); FTC Manager Testimony to the Committee ("I think there's been attempts to implement it. I don't know that it's done to my satisfaction.").

trying to take in order to respond to concerns[.]"[265] However, these actions were not enough. Although the 2023 results are slightly improved from the record lows in 2022, all three of the years under Chair Khan's leadership are record low numbers for the FTC.[266] While the FTC claims without evidence that the slight increase from 2022 to 2023 demonstrates that staff are "buying into Chair Khan's vision," the FTC does not acknowledge the more plausible explanation that the record turnover at the FTC means Chair Khan drove many of the unfavorable survey respondents out of the agency.[267]

### 2.  Managers believed Chair Khan blamed FTC staff for the agency's problems.

Another major concern raised by managers in internal FTC documents was Chair Khan's apparent willingness to blame and villainize FTC staff for the FTC's problems. One manager pointed out the errors in Chair Khan's characterization of staff's work and tied her treatment of staff to the FEVS results:

> Scapegoating the career staff for the FTC's 'underenforcement' of the antitrust laws is not just counterproductive, it's factually incorrect. The Bureau of Competition brought and won more litigation cases over the past decade than any time in its history. The FEVS survey results almost certainly reflect staff's view that we're continuing to be blamed for the agency's past shortcomings.[268]

Managers at the FTC pleaded with Chair Khan to understand that staff were on her side and willing to help. One manager wrote that staff "understand [the] Chair is here as a change agent" but explained that cannot happen if the Chair "undermin[es] staff and the agency's past."[269] The manager contrasted Chair Khan's treatment of staff with Commissioner Bedoya's treatment to show that it is not policy goals, but instead management and treatment of people that is creating problems.[270] Another manager had a similar message for Chair Khan: "Stop contributing to an external narrative that denigrates staff."[271]

---

[265] *Id.*

[266] *See supra* notes 252-257 & 261-263 and accompanying text.

[267] *See* Birnbaum & Nylen, *supra* note 260 ("There has been significant churn in the FTC's workforce since 2021. The FTC's senior attorneys have been leaving at a pace not seen in at least two decades, with seventy-one senior attorneys leaving between 2021 and 2022, according to Bloomberg Law. A number of the agency's veteran senior leaders have also left. Meanwhile, the agency has hired more than 150 staff in the last 12 months, according to Farrar.").

[268] FTC-M000000077.

[269] FTC-M000000087.

[270] *Id.*

[271] FTC-M000000170. *See also* FTC Manager Testimony to the Committee ("She is an academic by training and she has written a lot and spoken a lot . . . I would characterize her as part of that public discourse.").

Managers attempted to explain that staff would happily partner with Chair Khan to implement her agenda if only she would empower staff and managers. One manager attempted to explain to leadership that there are a lot "of really good managers, happy to be partners" with the Chair and there is "[n]o interest in being anything else other than completely behind the Chair."[272] The problem, as the manager explained, is that it "[f]eels like the Chair['s] office doesn't believe that because we (managers) aren't asked anything."[273] This career FTC employee went on to explain that managers "can help avoid a lot of missteps if we're asked."[274]

*"No interest in being anything else other than completely behind the Chair. Feels like the Chair['s] office doesn't believe that because we (managers) aren't asked anything."*

### 3. Staff felt disrespected by senior leadership.

Many managers and staff expressed concerns that appeared to be nothing more than requests for basic decency and respect from senior leadership. One manager requested that leadership "[a]sk staff questions about their work with a sincere desire to learn something about why and how they do things."[275] A member of Chair Khan's senior leadership admitted that "[s]taff are overworked and don't feel like some in leadership trust them, listen to them, or value them."[276] One staff member warned that "[a]t some point, we all break" and "[w]ithout trust or respect for each other, our process breaks too."[277]

Chair Khan's senior leaders at times appeared not only uninterested in addressing the problems, but also attempted to claim that staff were unreasonable and that the leaders were the victims. One member of Chair's Khan's leadership team wrote that "[s]ome of our staff may be feeling distrustful or vulnerable or otherwise aggrieved[.]"[278] But instead of addressing the problem, this senior leader complained about "feeling hurt and frustrated that this staff member isn't giving me (as the sender of the guidance email) any benefit of the doubt . . . which I thought I had earned by now. But I guess that's where we are these days, so I'll get over it."[279] This senior leader simply stated: "Hopefully this is an outlier."[280]

---

[272] FTC-M000000002.

[273] *Id.*

[274] *Id.*

[275] FTC-M000000170.

[276] FTC-M000000020.

[277] FTC-M000000043. *See also* FTC Manager Testimony to the Committee ("I think it reflects a level of uncertainty for me about her level of trust with the staff generally.").

[278] FTC-M000000134.

[279] *Id.*

[280] *Id.*

In another instance, Chair Khan's hand-picked Director of the Bureau of Competition sent an email to a manager at 10 p.m. on a Friday night angry that the manager had complained to the Chair about mismanagement.[281] The Bureau Director wrote to the manager that the Chair "explained that you complained to her that there are many instances when you have asked for input from the [Bureau of Competition Front Office] and the Chair's office, and haven't gotten it, and that it has been very frustrating."[282] The Bureau Director turned blame onto the manager by asking the manager to "spell out exactly what it is you are waiting for because I'm not aware of anything . . . no later than COB Monday."[283]

> "Staff are overworked and don't feel like some in leadership trust them, listen to them, or value them."

### 4.  The career FTC staff were silenced internally and externally.

Some trust and mismanagement problems involved staff being forced to act against their recommendations with little direction. Even one member of Chair Khan's senior leadership wrote that staff "understand[] that there is a significant likelihood [that staff] will be ordered to litigate two matters against their recommendation, which is unprecedented and which will have consequences."[284] Chair Khan's own leadership team tried to "raise alarm bells about those consequences."[285] In addition, one career manager explained that at a minimum, "clear communication is critical . . . to maintain morale" if the Commission takes "courses of action inconsistent with staff's recommendations[.]"[286] Acting against staff recommendations, coupled with a lack of communication from senior leadership and late-stage demands regarding theories to investigate, has weakened FTC enforcement under Chair Khan.

> "[U]nderstands that there is a significant likelihood [that staff] will be ordered to litigate two matters against their recommendation, which is unprecedented and which will have consequences."

One action that highlights the unnecessary targeting of FTC staff under Chair Khan was her moratorium on FTC staff accepting speaking engagements. Documents provided to the Committee explained why the moratorium against public speaking was so harmful to the FTC's mission. One career manager wrote to senior leaders that "public speaking is an important way for the agency to advance its competition mission by educating consumers, companies, and other important stakeholders about the antitrust laws and their application and enforcement."[287] This manager explained that it was an incorrect assumption "that staff primarily speak to defense bar

---

[281] FTC-M000001440.
[282] *Id.*
[283] *Id.*
[284] FTC-M000000020.
[285] *Id.*
[286] FTC-M000000176.
[287] FTC-M000000037.

lawyers in the American Bar Association" and that "the reality is quite different" based on statistics maintained by the FTC demonstrating public speaking at a diverse set of organizations.[288] The manager explained other harms of the policy including that "public speaking is an important way to reward our outstanding staff,"[289] "public speaking is an important way for staff to practice their oral advocacy skills,"[290] and the moratorium could have a negative impact on recruiting because "[p]otential candidates may see the moratorium as a sign of distrust of staff[.]"[291] Despite all of these concerns being communicated to senior leadership, Chair Khan kept the moratorium on staff speaking engagements in place for almost a year. The policy was so senseless, one manager commented: "I'm at a loss to understand the problem . . . these steps are trying to address."[292]

*    *    *

Chair Khan's consolidation of power negatively impacted the career FTC staff's ability to do their jobs. Chair Khan's inability or refusal to make timely decisions wasted resources and weakened enforcement actions.[293] Career FTC staff expressed concerns that Chair Khan was not interested in winning cases and made decisions based on her desire for positive press.[294] Chair Khan also made enforcement unnecessarily difficult for career FTC staff by alienating the career staff and inadequately addressing their concerns.[295] Career FTC staff wrote in internal documents that Chair Khan marginalized staff, which was demonstrated in repeated FEVS results, by blaming staff for the FTC's failings, disrespecting career staff, and attempting to silence career staff internally and externally.[296]

---

[288] *Id.*
[289] FTC-M000000038.
[290] *Id.*
[291] FTC-M000000085.
[292] FTC-M000000119.
[293] *See supra* section II.A.
[294] *See supra* sections II.B.1 and II.B.4.
[295] *See supra* sections II.B.2 and II.B.3.
[296] *See supra* section II.C.

## III. Chair Khan Ignored Warnings and Created a Culture of Fear

Internal FTC documents show that Chair Khan received significant warnings from managers about her mismanagement but failed to take the issue seriously.[297] Career managers at the FTC regularly characterized Chair Khan's actions as making the situation at the FTC worse faster than she could make improvements.[298] Documents provided by the FTC show that staff feared interacting with Chair Khan and feared retaliation.[299] Managers at the FTC expressed concerns that Chair Khan's mismanagement was causing staff to leave the agency and harmed its ability to hire new employees.[300]

### A. Evidence provided to the Committee suggests Chair Khan had significant warning about declining morale yet failed to take the problems seriously.

Career FTC managers made clear that the FEVS results reflected failings by senior leaders and needed to be taken seriously. One manager wrote that there is "extreme burnout and that comes through in our [FEVS] numbers," which "highlights the unsustainability of things in their current posture."[301] A manager suggested that the Chair "[t]ry to actually care about employee morale."[302] The Chair was implored to take the FEVS results seriously because, as a manager explained, "[O]ne year is a decline, two years is a trend."[303] A group of managers wrote that the 2022 FEVS results were "[c]rying for a complete change-up, with action items and a schedule of deliverables."[304]

Despite these warnings, documents provided to the Committee suggest that Chair Khan and her senior leadership never seriously attempted to address the concerns raised in the FEVS results. After asking managers to keep the results "close hold" and to "not forward these to anybody" including staff, the Director of the Bureau of Competition gave only a one-day "heads up [to managers] that it looks like OPM is planning to publicly release the FTC FEVS results tomorrow afternoon." The Director of the Bureau of Competition provided no guidance except to tell the managers that she "think[s] the Chair is planning to send around an agency-wide message about it" and asked "if anyone has ideas on ways to make improvements."[305] The Chair took this strategy to address the FEVS results, even though the Chair was previously

"Have you seen any progress in the last few months, and if so, what should we continue? No. Platitudes are never substitutes for action. Look at the 2022 results on key leadership[.]"

---

[297] *See infra* section III.A.
[298] *See infra* section III.A.1.
[299] *See infra* section III.B.
[300] *See infra* section III.A.2.
[301] FTC-M000000107.
[302] FTC-M000000170.
[303] FTC-M000000225.
[304] FTC-M000000193.
[305] FTC-M000000231.

warned that generic all-staff memos were insufficient to address the problems.[306] As one manager wrote, staff have not seen any improvements because "[p]latitudes are never substitutes for action . . . look at the 2022 results on key leadership attributes[.]"[307] Similarly, another manager wrote that it "feels like the Chair's solution is to pat everybody on the head."[308] As one staff member wrote, "[T]elling staff over and over how wonderful they are is likely to invite more cynicism than appreciation. Actions matter much more than words."[309]

The Director of the Bureau of Competition stated that as a result of the FEVS results, the Chair plans, finally in April 2022, to "start[] to do . . . one-on-one meetings with Assistant Directors."[310] Despite this promise, the Chair still had not met with some Assistant Directors even months after this email was sent.[311] After managers spent time together preparing to meet with Chair Khan and compiling a list of problems, one manager commented that he "only ha[s] 30 minutes," so he would have to be "strategic" in what problems he could raise with the Chair.[312]

      *1. Chair Khan made matters worse faster than problems could be fixed.*

Career managers at the FTC regularly characterized Chair Khan's actions as making the situation at the FTC worse faster than she could make improvements. One manager told leadership that Chair's actions "[d]ig[] the Chair deeper (into a hole) than the improvements compensate for."[313] Even when the Chair tried to make improvements, her efforts did not overcome the damage she was inflicting on the agency. In December 2022, at a meeting to discuss concerns with leadership, one manager accused Chair Khan of "making things worse at a faster pace than the efforts that are making things better."[314] At the same meeting, another manager stated that the FTC is not seeing the benefits of improvements because "of the ongoing self-inflicted wounds."[315] Even the Chair's Director of the Bureau of Competition could not state how leadership is addressing problems, writing "I think there have been a few things that have improved, though they aren't coming to mind at this moment!"[316]

---

[306] *See* FTC-M000000072.
[307] FTC-M000000193.
[308] FTC-M000000001.
[309] FTC-M000000042.
[310] FTC-M000000231.
[311] FTC-M000000001.
[312] FTC-M000000231.
[313] FTC-M000000001.
[314] *Id.*
[315] *Id.*
[316] FTC-M000000027.

The "progress" noted by career managers appears to address problems of the Chair's own making. For example, one manager wrote that the "[s]igns of progress include asking for [staff] feedback as you're doing now, [and] rescinding [the] events policy[.]"[317] In February 2023, one manager told another that sending a list of concerns to senior leadership was a good idea, but that the manager should not "have any illusions that they will change anything as a result."[318] Managers viewed providing feedback to senior leadership as nothing more than being "the wheel that squeaks[.]"[319] Two managers hypothesized that the reason a senior leader "always sends things after working hours" was "so that the outrage does not detract from productivity[.]"[320] Most importantly, one manager commented that "[t]hings have improved, but still not getting enough guidance on work."[321]

> "Why does [the Bureau of Competition Front Office] always send things after working hours?"
>
> "So that the outrage does not detract from productivity[.]"

### 2. Chair Khan's poor leadership exacerbated staffing and hiring problems.

Managers at the FTC expressed concerns that Chair Khan's mismanagement was causing staff to leave the agency. Early in Chair Khan's tenure, one manager warned that he was "deeply concerned that if we're not careful, there may soon be an exodus of staff attorneys."[322] During testimony, however, the manager claimed that this language covered "a confluence of a lot of factors" and that his comments were "more atmospheric" because at that point he was not sure he had "ever had a conversation with the Chair."[323] Another manager explained that "late-in-the-day armchair quarterbacking raises serious motivation and morale issues, directly impacting retention."[324] Similarly, a manager "hear[d] concerning things from staff that make it clear that morale has declined significantly since the last FEVS"

> "I am deeply concerned that if we're not careful, there may soon be an exodus of staff attorneys."

---

[317] FTC-M000000086.
[318] FTC-M000000219.
[319] *Id.*
[320] FTC-M000000119.
[321] FTC-M000000002.
[322] FTC-M000000082.
[323] FTC Manager Testimony to the Committee ("Q: Was that concern about demoralization on top of the stress and exhaustion that comes with litigation particular to the Chair and her view of antitrust enforcement? A: No, I don't think that's necessarily true. I think it was really more of a confluence of a lot of factors. Again, our specific situation as a division, that constant concern that we can lose people to outside options if they feel demoralized or if they're ready to leave the agency, and the general public discourse that I've mentioned before. . . . Q: But there's no connection between your concern about demoralization at this point in time and views of the Chair or the Chair's office? A: I think at this point I'm not sure I'd ever had a conversation with the Chair. And I don't think it was her reaction to any specific statement or position. It was more atmospheric.").
[324] FTC-M000000172.

and was "worried we are going to lose people" and "want[ed] to ring the alarm bells."[325] One manager pointed to the "less respect for institutional knowledge these days" and explained that "that hasn't gone unnoticed, even at the staff level."[326] Based on the level of mismanagement, one manager questioned whether it was the "objective of agency leadership - do they want us all to quit?"[327] Another manager warned that "policy/management choices are deeply impacting morale and might lead to more attrition."[328]

These concerns expressed by managers came true, as employees left the FTC at a record rate.[329] A report by *Bloomberg* found that 71 senior attorneys left the agency between 2021 and 2022, which is the highest number of departures in the category for a comparable period since 2000.[330] In internal FTC documents, one manager wrote: "It's so sad. Tons of great people have left/are leaving/are thinking about leaving."[331] Another manager implored senior leadership to "look at the percentages of employees planning on leaving within the next year. And compare that to prior years, recognizing the percentage of new employees has grown."[332]

Despite the record attrition, hiring was unnecessarily stalled under Chair Khan. One senior leader explained delays in hiring because "the Chair's office is closely scrutinizing all of our hiring processes, and they have asked that we not fill any slots, through any mechanisms, until those process issues are resolved."[333] Recognizing the seriousness of the bottleneck, a member of Chair Khan's own leadership team wrote, "It is really, really time for the Chair's office to make decisions so we can finalize our FTE allocations. Otherwise it will be difficult to move forward, and our candidate pool will grow even more stale."[334] Notably, not everyone agreed that the timing was a problem. One manager told the Committee in her transcribed interview that the delay allowed her shop "to go through the resumes" and "the timing actually worked out well for us[.]"[335]

---

[325] FTC-M000000171.

[326] FTC-M000000241.

[327] FTC-M000000170.

[328] FTC-M000000020. *See also* FTC Manager Testimony to the Committee ("I think we were doing far more work and achieving far more than we have the infrastructure to support and that the only way that that happens well, a necessary condition for that is to have people working very, very hard. And that doesn't just mean hours. Sometimes it means hours. But it also means people working really creatively, having really talented people at the agency. And I think that you need to be careful about how you treat . . . that sort of resource, because if those people decide to leave or if they decided to simply work less hard or care less, the effect on the quality and quantity of the agency's work is going to be dramatic.").

[329] Dan Papscun, *FTC Lawyers Leave at Fastest Rate in Years as Khan Sets New Tone*, BLOOMBERG (Mar. 16, 2023).

[330] *Id.*

[331] FTC-M000000241.

[332] FTC-M000000194.

[333] FTC-M000000135.

[334] FTC-M000000025.

[335] FTC Manager Testimony to the Committee ("We, during this time period, were able to go through the resumes and materials of the candidates in the pool. . . . So I think the timing actually worked out well for us, that, as soon as we were ready with kind of our lists in order of rank just based on the materials that we had, that we wanted to interview, then we were allowed to go set up the interviews.").

When the FTC did attempt to hire new employees, low morale at the FTC harmed its ability to convince candidates to join the agency. One staff member wrote, "I do believe that the morale at the FTC is hurting recruiting. I did my very best to convince [a candidate] to come here, but at times I felt as if I was being a bit hypocritical or hedging my answers to some of her questions regarding the work life at the FTC currently."[336] Chair Khan's Director of the Bureau of Competition commented on the FTC's inability to convince lawyers to come work at the agency despite open slots, writing to managers:

> "I do believe that the morale at the FTC is hurting recruiting. I did my very best to convince [a candidate] to come here, but at times I felt as if I was being a bit hypocritical or hedging my answers to some of her questions regarding the work life at the FTC currently."

> But even without supplemental hiring authority, here's our reality right now: the Bureau has a fair number of unfilled FTE. I know that's not for lack of trying! You and your staff have made heroic efforts to screen, interview, and recommend lateral hires, and we've extended many offers. Sadly, these offers haven't all been accepted. Meanwhile, we've also continued to lose lots of great folks. As a result, we haven't grown as much as we hoped/expected to, which is making it even more difficult to keep up with intense workloads.[337]

Chair Khan's Director of the Bureau of Competition expanded on this issue with a proposal to "consider whether it might be worth using some of our vacant FTE for term hires, instead of waiting for supplemental hiring authority."[338] Unfortunately, as one manager stated, there is a dwindling amount of qualified employees at the FTC that "have antitrust litigation experience, which is something we cannot get from [consumer protection] detailees or the term appointments who are only a couple of years out of law school."[339]

These internal FTC documents highlight that the FTC's claimed resource constraints arguably do not stem from inadequate funding. Instead, the Committee's investigation suggests that the FTC has the resources to hire more lawyers but, under Chair Khan, has struggled to retain talent and at times convince new employees to join the agency. In other words, it is not a lack of appropriated funds that explains the staffing challenges at the FTC under Chair Khan. Instead, those challenges stem largely from Chair Khan's mismanagement.

---

[336] FTC-M000000252.
[337] FTC-M000000242.
[338] *Id.*
[339] FTC-M000000269.

### B. FTC staff are fearful of senior leadership.

Internal FTC documents show that FTC staff, and even some senior leaders on the Chair's own team, feared interacting with Chair Khan. In preparing for a meeting with Chair Khan in April 2022, one manager wrote:

> I keep hearing that we can't say things or recommend outcomes because it will upset you. It adds to an impression I've heard too often that you're being kept in a bubble and don't know what's going on at the agency. That impression benefits no one. Neither does the increasing impression that the people who communicate with you most are afraid to tell you anything you don't want to hear. If we can't talk about things we disagree about we cannot have the debate that is essential to thorough investigation and prosecuting creative, groundbreaking cases.[340]

Other managers emailed among each other explaining that one of them "created a kerfuffle by expressing some concerns about the management . . . (e.g., no clear guidance for expected scope of investigation/timing/goals)."[341] Other managers, in discussing a plan of action when waiting for the Chair's direction, noted that if the managers acted without continuing to wait for her feedback, the Chair "could get really mad[.]"[342] Even a member of Chair Khan's own leadership team, in analyzing one complaint about mismanagement, stated "I've heard similar things from others, but everyone is afraid to say anything."[343]

**"I keep hearing that we can't say things or recommend outcomes because it will upset you."**

Managers feared retaliation and were chastised for raising concerns. One manager documented "concerns about retaliation in the leadup to submitting the climate survey memo."[344] This manager documented "a very difficult call with [Chair Khan's Director of the Bureau of Competition and two other managers]."[345] The manager was "concerned [about] the way [a] case

**"It adds to an impression I've heard too often that you're being kept in a bubble and don't know what's going on at the agency."**

---

[340] FTC-M000000222. *See also* FTC Manager Testimony to the Committee ("My concern, preparing for this meeting in April 2022, is, since the Chair arrived in June of 2021, that we did not have a good appreciation that the people speaking for the Chair were speaking for the Chair, and we did not have an appreciation that people were willing to speak for the Chair, because I had been told, 'We don't want to upset her.'"); *id.* ("Q: Anyone from the Chair's office who would've been giving you or your team the impression that staff couldn't say or recommend certain things? A: I'll say, people in the office of the Chair . . . [The Director of the Bureau of Competition], who's not in the Chair's office but is her direct report . . . And others in the front office. By 'front office,' I mean the people that report to the director of the Bureau of Competition.").

[341] FTC-M000000264.

[342] FTC-M000000152.

[343] FTC-M000000020.

[344] FTC-M000000256.

[345] *Id.*

unfolded" and the understanding that the Chair's process was going to "result in precisely [the] type of frustrating press, which . . . casts staff in a bad light[.]"[346] Specifically, the manager noted that while at the FTC:

> I had never before been asked to change my recommendation, and I was uncomfortable asking my staff to consider changing their recommendation, as [Chair Khan's Director of the Bureau of Competition] had previously requested in this case. [347]

This manager reported that Chair Khan's Director of the Bureau of Competition "immediately became upset with" the manager. [348] The Director "said that she had never asked staff to change their recommendation, just the title,"[349] but the manager noted that "there is no title to a recommendation memo" because the title is "just a recommendation line[.]"[350] The manager explicitly noted that Chair Khan's Director of the Bureau of Competition asked [the managers] "to ask staff to change the recommendation line from 'close[.]'"[351] The manager "asked the staff on two separate occasions at [the Director's] request, and [staff] were uncomfortable with the recommendation line [the Director] preferred as [staff]

"I had never before been asked to change my recommendation, and I was uncomfortable asking my staff to consider changing their recommendation."

considered it to alter the meaning of their memo."[352] The manager reported that Chair Khan's Director of the Bureau of Competition "rais[ed] her voice and stat[ed] that 'this is not all about your feelings' and that [the manager has] been 'a hassle' [and] 'irritating[.]'"[353] The manager concluded that the interaction with the Director:

> continued to trouble me for the last several days, and gives me concern in advocating for my staff's recommendations up the chain of command in the future and in voicing my opinion on matters like the climate survey. I would be very hesitant to conduct another climate survey under our current leadership after this interaction.[354]

---

[346] Id.
[347] Id.
[348] Id.
[349] Id.
[350] Id.
[351] Id.
[352] Id.
[353] Id.
[354] Id.

A similar situation arose with Chair Khan's Director of the Bureau of Competition when a manager raised concerns about leaks to a publication called *Capitol Forum* coming from the Bureau's Front Office. The manager wrote that the "timing of this article troubles me" considering that the material in the leak was new and that a new senior leader just "joined [the Front Office] from the Capitol Forum."[355] Chair Khan's Director of the Bureau of Competition denied that the new member of Chair Khan's team had anything to do with the leak and instead attempted to blame the leak on a staffer who had recently left the FTC.[356] The manager noted the staffer was "[n]ot that recent an Alum," so could not be responsible for the leak because he left the agency before he could have learned about the leaked information, and ended the fruitless conversation with the Bureau Director.[357]

"[The Director of the Bureau of Competition] continued, raising her voice and stating that 'this is not all about your feelings' and that I had been 'a hassle,' 'irritating,' and 'throwing up flags all over the place.' She continued to raise her voice at me for much of the remainder of the call."

---

[355] FTC-M000000206.

[356] *Id.*

[357] *Id.*

---

### IV. CONCLUSION

---

This report builds on the data provided by OPM and articles by journalists interviewing FTC personnel that show mismanagement, abuse, and waste by Chair Khan and her senior leadership team.[358] The Committee's investigation has confirmed, through ordinary course documents and testimony from the managers who execute the agency's mission as administrations come and go, that the situation is even worse than many feared. The lost opportunity from selecting Lina Khan as Chair may be the most unfortunate aspect of what is transpiring at the FTC. The Trump Administration ramped up antitrust enforcement in light of public and Congressional concerns about the market power of certain companies, but the FTC under Chair Khan is weaker and less effective today than when she took over. As former FTC Chair William Kovacic stated recently about Chair Khan's tenure:

> Do you realize you could come out of this with a much-diminished agency? And Congress is not coming to the rescue for you. You could come out of this with an agency that is much weaker than the one that you went in with—permanently weaker.[359]

After two and a half years, Chair Khan has had ample opportunity to put the FTC on a path to success. The damage is done, and it may be too late for the President to select a new Chair. Congress is considering consolidating the two antitrust agencies.[360] Of course, the destruction of the FTC may be a feature, not a bug, of Chair Khan's plan for legislative change.[361] Further, the result will not impact Chair Khan. As one former official was recently reported as saying:

> "I think a lot of the staff at the agency — and a lot of observers, anybody close to the FTC — are asking a good question," one former official told me. "What is her long game in this? And is the long game aligned with the interests of the FTC?" That person pointed to the eventual divergence between Khan's career path and the long-term fate of the agency that she currently leads. "It's one thing to be very aggressive now, starting a lot of things and going to court a lot," the person said. But Khan will eventually move on, and it will fall to the agency's rank and file to endure any harm to the agency's power and standing that results on her watch.[362]

While Chair Khan will eventually move on and leave the FTC behind, the damage of her tenure will remain. Career FTC staff and, most importantly, American consumers will be left with a weak and dysfunctional FTC.

---

[358] *See supra* section II.C.1. *See also* Mike Swift, Kathleen Murphy, and Michael Acton, *Under Khan's Leadership, Staffers Air Frustrations in Wake of Survey*, MLEX (Jun. 6, 2022); Khardori, *supra* note 226.
[359] Khardori, *supra* note 226.
[360] *See, e.g.*, One Agency Act, H.R. 2926, 117th Cong. (2021).
[361] *See supra* section II.B.1 (discussing beliefs shared by some inside and outside of the FTC that Chair Khan is losing on purpose to force Congress to act).
[362] Khardori, *supra* note 226.