# Exhibit B

```
 1                    FEDERAL TRADE COMMISSION
 2   IN THE MATTER OF:           )
 3                               )
 4   FTC                         )
 5   v.                          )
 6   EMPIRE HOLDINGS GROUP       )  Case No. 24-CV-4949
 7                               )
 8
 9
10
11
12
13                              Friday, October 25, 2024
14                              Via Zoom Videoconference
15
16              The above-entitled matter came on for
17              deposition, pursuant to subpoena, at
18              10:06 a.m. Eastern Time.
19
20
21
22
23   Reported by Kristy L. Clark, RPR, NV CCR #708, CA CSR
24   #13529
25
```

2

Prusinowski

FTC v. Empire Holdings Group                            10/25/2024

```
 1   APPEARANCES:
 2   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3            AMANDA GRIER, ESQ.
 4            RYAN MCAULIFFE, ESQ.
 5            U.S. Federal Trade Commission
 6            600 Pennsylvania Avenue N.W.
 7            Washington, DC 20580
 8            (202) 326-2443
 9            agrier@ftc.gov
10            (VIA ZOOM)
11
12   ON BEHALF OF EMPIRE HOLDINGS COMPANY:
13            PHILIP L. MARTIN, ESQ.
14            Vallis Legal, PLLC
15            1445 North 1200 West
16            Orem, Utah 84057
17            (385) 429-0484
18            philip@vallislegal.com
19            (VIA ZOOM)
20
21
22
23
24
25
```

3

Prusinowski

FTC v. Empire Holdings Group                                    10/25/2024

```
 1   APPEARANCES (CONTINUED):
 2   ON BEHALF OF THE RECEIVER:
 3               VANESSA HUBER, ESQ.
 4               Clark Hill
 5               2001 Market Street
 6               Suite 2620
 7               Philadelphia, Pennsylvania 19103
 8               (215) 422-4428
 9               (VIA ZOOM)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Prusinowski

FTC v. Empire Holdings Group                                        10/25/2024

```
 1   company?
 2       A.   Like contracts for, like, independent
 3   contractors?
 4       Q.   Any contracts that were needed that would
 5   bind the company.
 6       A.   Yes, but I don't really -- I don't believe I
 7   did that, really, ever.
 8       Q.   Did you sign contracts on behalf of the
 9   company?
10       A.   Yes.
11       Q.   Did you have contracts with your contractors?
12       A.   Yes.
13       Q.   Were they the same contracts for all your
14   contractors?
15       A.   Yes.
16       Q.   Who drafted those contracts?
17       A.   Our attorney, Peter Hoppenfeld.
18       Q.   You had expense approval authority; correct?
19       A.   Yes.
20       Q.   Was there a limit on your authority to
21   approve expenses for the company?
22       A.   No.
23       Q.   Did anyone else have authority to approve
24   expenses?
25       A.   Ali.
```

```
 1   compliance companywide across the whole sales team?
 2        A.   Across the whole -- so like companywide or
 3   across a whole sales team or just companywide?
 4        Q.   Yeah, across the whole sales team.
 5        A.   Yes, so over the past six months, we were
 6   heavily working with, you know, Peter Hoppenfeld to go
 7   through all of our advertising and our marketing and
 8   our messaging to make us more compliant.  And I'm
 9   not -- besides the point, but that's part of the reason
10   why a lot of our business suffered the past six months
11   is because, you know, we did make a lot of changes, you
12   know, we ...
13        Q.   Can you tell me about how that came about,
14   how you -- how the company came to start instituting
15   some compliance measures six months ago?  What --
16   what's the date that that first began?
17        A.   I don't know the exact date.  I would have to
18   go look on the initial conversations that I had with
19   Peter, but he would often, you know, reach out to me if
20   he saw an advertisement or something we were doing,
21   that he said, "Hey, like, stop that."
22             And -- and we would.  We would turn those ads
23   immediately off.  And he would, you know, then advise
24   us on different --
25             MR. MARTIN:  Peter, Peter, don't disclose
```

63

Prusinowski

FTC v. Empire Holdings Group                          10/25/2024

```
 1        A.   Yes.  So I started working with -- with Pete
 2   to, you know, get these disclosures in place.  We
 3   didn't make a ton of progress through it, because I was
 4   kind of just fighting fires in the business at the time
 5   with how kind of bad it got.  But, yeah, I mean, it was
 6   something that I was actively working with Pete on.
 7        Q.   I didn't mean to interrupt.  If there's
 8   something more you want to say, go ahead, please.
 9        A.   No, no.
10        Q.   What do you mean by fighting fires in the
11   business?
12        A.   It was just a slowdown.  We were just losing
13   a lot of money every month, and I was just trying to
14   find ways to keep us alive, essentially.
15        Q.   And -- and is it your belief that the
16   slowdown was happening because you removed the
17   testimonials from the marketing?
18        A.   Yes.
19        Q.   Besides the testimonials, was there anything
20   else that -- that you were told needed to be removed?
21        A.   I do believe Peter said other things.  I
22   don't remember --
23             MR. MARTIN:  Objection.
24             Peter, Peter, don't -- be very careful in how
25   you answer, please.
```

```
 1        Q.   Okay.  And then what would happen on that
 2   call?
 3        A.   The sales guy would essentially try to close
 4   the sale.  I don't know the kind of the scripts they
 5   would follow for it, but that's what they would be
 6   trying to do, to close the deal.
 7        Q.   Would you direct the sales team to close the
 8   deal at certain price points, for example?
 9        A.   We did have different price points, depending
10   on how long they wanted our support for.
11        Q.   And what were those different price points?
12        A.   So our, like -- it would -- it would vary
13   kind of widely, depending on -- on, like -- like,
14   again, time, but our main one that kind of we sold the
15   most of was, like, between 10- and 12,000, and that was
16   obviously, you know, they got access to our course,
17   they got access to the buildout.
18             And then they would get access to our base
19   camp where, after they've been, you know, handed over,
20   that's where they can engage with our team on a daily
21   basis, you know, asking questions, let's say, about
22   advertising or, you know, any business-related
23   questions they could ask in there and get support.
24        Q.   Okay.  And who determined the prices of the
25   products?
```

 1      A.   So I would initially, but then the sales team
 2 would sometimes, you know, close a deal -- they
 3 wouldn't necessarily always follow like, "Hey, this
 4 $10,000 deal gets three months of support."
 5           Sometimes they would do, you know, it's a
 6 $10,000 deal and they get six months of support.  They
 7 kind of did their own thing in that regard.
 8      Q.   Uh-huh.  So the sales team had -- had a
 9 foundation, but they would set the prices?
10      A.   Yeah.  Yeah.
11      Q.   Okay.  Okay.  So there would be a sales call
12 where the individual sales representative would make a
13 pitch and hope to close the deal; correct?
14      A.   Yes.
15      Q.   Okay.  And, say, maybe after one call or two
16 calls or more, the customer -- the client decided, "I'm
17 going to purchase."  They verbally say, I -- "I'm
18 interested in this, I want to purchase your platinum
19 program."  What would be the next step?
20      A.   So the salesperson would send out the
21 contract to get signed, along with the invoice.
22      Q.   And is this a form contract?
23      A.   Sorry.  What was that?
24      Q.   Is this a form contract that would -- that
25 would be sent to the customer?

Prusinowski

FTC v. Empire Holdings Group                                    10/25/2024

```
 1   products.
 2        Q.   And what -- what would happen to the customer
 3   if they -- once their customer service contract ran out
 4   of time?
 5        A.   I -- we were never -- I was never strict
 6   about it.  You know, if somebody was over their
 7   contract, we would still offer support if they were
 8   asking questions.  You know, we wouldn't be, like,
 9   "Hey, you have to pay us more to get this, like, we
10   would just still support them."
11        Q.   Did that increase the cost to the business?
12        A.   Yes.  I just don't know the amount in terms
13   of time because, obviously, if we're supporting clients
14   that are no longer paying for a service, that's taking
15   time away from another client.  But I wouldn't say it
16   was such a drastic amount that it added a ton of time.
17        Q.   How many hours would you say are used by the
18   back-end support services aspect of the business?
19        A.   In terms of, like, support or, like, the
20   buildout?
21        Q.   The support only.
22        A.   I really -- I don't know.  Ali would be able
23   to much better answer that question.  I don't want to
24   just throw a number out there.
25        Q.   Do you know how much the back-end support
```

Prusinowski

FTC v. Empire Holdings Group                                10/25/2024

```
 1        A.   It was my --
 2             MR. MARTIN:  Objection.
 3             Let me make my objection.
 4             Objection.  Calls for solicitation of legal
 5   advice.
 6             And I instruct you not to answer.
 7   BY MS. GRIER:
 8        Q.   Okay.  So you met with the receiver, Kevin
 9   Kent, in the courthouse after the September 20 hearing;
10   correct?
11        A.   Yes.
12        Q.   And you told him that you didn't have your
13   cell phone; correct?
14        A.   No.
15        Q.   You didn't tell him that you didn't have your
16   cell phone?
17        A.   I don't think he asked if I had my cell phone
18   or not.  We only met for like a couple minutes in the
19   hallway.
20        Q.   And what was that conversation?
21        A.   Just an introduction, from what I remember.
22        Q.   When did you hand over your cell phone and
23   laptop to the receiver?
24        A.   I think it was that -- that following week.
25   I don't know the exact day.
```

```
 1   then we kind of obviously looked at, hey, how much does
 2   our team cost, how much advertising would cost, and
 3   make a decision off of that.
 4        Q.   Was any of that analysis recorded anywhere?
 5        A.   No.
 6        Q.   And I know the price points you had mentioned
 7   earlier were a general range that you would offer per
 8   product.  Is there a lowest minimum price established
 9   for each product?
10        A.   Again, the kind of -- the closers kind of had
11   free reign to adjust the pricing but kind of like the
12   lowest was around 3- to 4,000.
13        Q.   Was that established in writing anywhere?
14        A.   Like the packages and stuff?
15        Q.   The lowest would be 3- to 4,000, was that
16   established anywhere in writing?
17        A.   I think it was like in the sales playbook
18   somewhere.
19        Q.   Is the sales playbook something that would be
20   in the records in your laptop or in any reference you
21   provided?
22        A.   I believe Randall and his team controlled the
23   playbook.  Well, I don't -- yeah, they did.  They did.
24        Q.   What factors or considerations went into
25   determining the lowest minimum price per product?
```

```
 1      A.   Just really cost of kind of labor.  That was
 2   our biggest cost and obviously advertising.
 3      Q.   Was Randall the one who made the final
 4   determination for the minimum prices?
 5      A.   No, that was me.
 6      Q.   Okay.  Does EEB have any formal or internal
 7   policies when it comes to offering discounts on
 8   products to prospective customers?
 9      A.   No.
10      Q.   Does EEB have any guidelines or budgets for
11   how much it normally spends on marketing and
12   advertising each month?
13      A.   We were spending around the same, kind of
14   over the course of many months.  But, no, there was no
15   like, oh, we can only spend XYZ.
16      Q.   Did you or anyone else perform any analysis
17   or track any data to determine how successful the
18   marketing and advertisement was in ultimately
19   generating revenue for EEB?
20      A.   Yes, so that would be Jamie that would help
21   with that.
22      Q.   Did he record that anywhere?
23      A.   Yeah.  I think he had his own sheets that he
24   used for that.
25      Q.   Did he share those sheets into that Google
```

202
Prusinowski
FTC v. Empire Holdings Group                           10/25/2024

1   A.   Yes.
2   Q.   Okay.  So in the boxes under current balance
3   next to Acorns Securities, LLC, and Fundrise Real
4   Estate Investment Trust, LLC, you have written that you
5   have no access to the accounts because the receiver
6   assumed access and changed the log-in and password
7   information.  Are you claiming that you provided the
8   receiver with these log-in information for Acorns and
9   for Fundrise?
10  A.   Yeah, I believe I provided all of that --
11  those log-ins, yes.
12  Q.   At the time when you were drafting these
13  financial disclosures, had you attempted to log into
14  these two accounts?
15  A.   I did not.  I don't believe I had my laptop,
16  though, when I was drafting this.  I think that was --
17  I think that's what it was.  I didn't have my laptop or
18  anything to be able to get into anything of mine.
19       Yeah.  That is actually correct, because I
20  literally did.  I was using my wife's laptop and I had
21  no access to any of my accounts.
22  Q.   Had you reviewed the log-in information that
23  you had provided to the receiver to confirm whether or
24  not you had, in fact, given the log-in information to
25  these two accounts?

203

Prusinowski

FTC v. Empire Holdings Group                               10/25/2024

```
 1          A.   I'm not sure.
 2          Q.   We can look at page 5 on this same exhibit.
 3     At the bottom of the page, Item 14, Deferred Income
 4     Arrangements, the first thing listed under this section
 5     is Betterment Securities, Broker-Dealer.
 6               Do you see that?
 7          A.   Yes.
 8          Q.   You also wrote here, Unavailable/Lost Access
 9     in the box titled Surrender Value Before Taxes and
10     Penalties.
11               Do you see that?
12          A.   Yes.
13          Q.   Why did you write Unavailable/Lost Access?
14          A.   Because I didn't have my laptop.
15          Q.   Okay.  After the laptop was returned back to
16     you post preservation, have you tried to log into this
17     account?
18          A.   No.
19          Q.   Okay.  The second item under this section is
20     Capital Group/AmeriFunds, which I believe is short for
21     American Funds.
22               Do you see that?
23          A.   Yes.
24          Q.   And you wrote that the name on the account is
25     Peter Prusinowski; correct?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555