# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION | : |
| | : |
| *Plaintiff,* | : Civil Action |
| | : |
| vs. | : |
| | : No.: 2:24-CV-04949-WB |
| EMPIRE HOLDINGS GROUP LLC d/b/a | : |
| ECOMMERCE EMPIRE BUILDERS d/b/a | : |
| STOREFUNNELS.NET AND PETER | : |
| PRUSINOWSKI, | : |
| | : |
| *Defendants.* | : |

## DECLARATION OF MICHAEL R. SHANAHAN

I, Michael Shanahan, declare under penalty and perjury as follows:

1.     I am a Managing Director at Alvarez & Marsal Disputes and Investigations, LLC ("A&M"), which is a global professional services firm specializing in turnaround and interim management, performance improvement, and business advisory services.

2.     I am a Certified Public Accountant ("CPA"), a Certified Fraud Examiner ("CFE"), and Certified in Financial Forensics ("CFF") with over twenty-five (25) years of accounting, audit, and investigative experience.  I hold a B.S. in Accountancy from Villanova University. I have consulted on a variety of financial matters in various industries advising both plaintiffs and defendants. A copy of my professional biography is attached at **Exhibit 1**.

3.     I am over the age of 18 years and am authorized to submit this declaration in my role as accountant for the Receiver Kevin Dooley Kent and his Counsel.  If called to testify, I could and would testify competently to the facts set forth herein.

4.     As such, my analyses, opinions, and conclusions are based on the work performed by me and those under my supervision, as well as my training, education, and experience and are rendered to a reasonable degree of professional certainty.

5.     I am not being specifically compensated for this testimony other than through payments received by A&M as a professional retained by the Receiver Kevin Dooley Kent and his Counsel.

## RECEIVERSHIP ENTITIES

6.     On September 20, 2024, Kevin Dooley Kent was appointed as temporary receiver ("Receiver") for the Receivership Entities as defined by the Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief [DK#19] ("TRO Order").[1]

7.     Initially following his appointment, the Receiver took over and assumed control of Empire Holdings Group, LLC ("Empire Holdings") and its existing business operations.

8.     The Receiver subsequently determined the following entities to be Receivership Entities based on the definition included in the TRO Order: Star Active Sports ("Star Active")[2], Empire Partner Network ("Empire Partner"), Atlas Fund Limited Partnership ("Atlas Fund"), Atlas Fund Trust ("Atlas Trust"), and Atlas Fund Land Trust ("Atlas Land").

9.     On November 8, 2024, the United States District Court for the Eastern District of Pennsylvania entered a Stipulated Preliminary Injunction, in connection with which it re-appointed the Receiver over Empire Holdings, Star Active, Empire Partner, Atlas Fund, Atlas Trust, and Atlas Land [DK#49] ("Stipulated PI").

## ASSIGNMENT / SCOPE OF WORK

10.     A&M was retained by the Receiver and his counsel to assist with the review and analysis of the available accounting documentation, including identifying additional Receivership assets, analyzing revenue, and preparing the accounting of the Receivership Entities as required by Section XII of the TRO Order and Section XIII of the Stipulated PI, among other tasks.

11.     In connection with the assignment, Counsel and the Receiver provided A&M access to the available accounting records of Empire Holdings and Empire Partner, as well as access to financial accounts available to the Receiver, among other documents.

12.     The procedures performed in preparing the accounting are summarized below:

---

[1] The TRO Order defines Receivership Entity as "Corporate Defendant as well as any other entity that has conducted any business related to the advertising, marketing, and sale of Defendants' Products and Services, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant" (See, p. 3 at Case 2:24-cv-04949-WB Dkt. 19).
[2] Star Active has since been determined to be a dormant entity.

a. Reviewed available transaction data to verify completeness and accuracy of the accounting general ledger of Empire Holdings, which we relied on in preparing the accounting for the Receivership Entities.

b. Analyzed the cash and expense accounting records of Empire Holdings' general ledger to understand how cash was being used by Empire Holdings, including the quantification of transactions that benefited Peter Prusinowski.

c. Analyzed the revenue of Empire Holdings to determine if revenue could be quantified at the product or service offering level.

d. Reviewed additional assets held at various financial institutions, such as Charles Schwab, Coinbase, and Gemini, to ensure all assets related to Empire Holdings were included in the accounting.

## OVERVIEW OF ACCOUNTING RECORDS

13. Empire Holdings engaged Empire Tax Professionals ("Empire Tax") to provide "CFO Services" on or around November 2018.[3],[4]  This engagement also included accounting services for Empire Partner Network, LLC.[5] Based on discussions with Angela Smith, the services Empire Tax provided to Empire Holdings and Empire Partner amount to basic bookkeeping and tax return preparation services.[6]

14. Empire Tax prepared and maintained the accounting records for Empire Holdings and Empire Partner using Quickbooks.  Quickbooks is an accounting software commonly used by small businesses that has the ability to connect with a customer's financial accounts in order to import transactional activity.[7]

15. As it relates to Empire Holdings, the Quickbooks system was connected to Empire Holdings' bank accounts maintained with TD Bank and Paypal, as well as credit card accounts maintained with American Express (collectively, the "Connected Accounts").[8]

---

[3] Discussion with Angela Smith, Empire Tax, on September 30, 2024.
[4] We understand Empire Tax is not related to Empire Holdings and Empire Partner, and the naming conventions are coincidental.
[5] Discussion with Angela Smith, Empire Tax, on November 5, 2024.
[6] Discussion with Angela Smith, Empire Tax, on September 30, 2024.
[7] See https://quickbooks.intuit.com/.
[8] As of the date of this memo, Quickbooks indicated 13 accounts were connected for monthly syncing:  TD Bank x9912, TD Bank x8836, Paypal (Merchant ID: x9QNE), Amex x24001, Amex x31009, Amex x82002, Amex x22007, Amex x1008, Amex x91008, Amex x42005, Amex x31002, Amex x91005, and Amex x42008.

16.    The financial transactions from the Connected Accounts were imported into the Quickbooks system each month.  Empire Tax would then prepare the accounting entries based on the nature of each financial transaction as it was described in the data received from the Connected Accounts.  For example, charges from Amazon and Target would be recorded to Office Supplies expense or charges from restaurants were recorded to Meals and Entertainment expense.

17.    To the extent Empire Tax was unsure how to record a transaction based on the information available from the downloaded data, they would seek direction from Peter Prusinowski.  Empire Tax provided Prusinowski with a report titled "Ask The Client" or "ATC" (collectively, "ATC Report"), monthly, in order for him to direct Empire Tax on how to record certain transactions.[9]  Peter Prusinowski confirmed this process during his deposition.[10]

18.    Empire Tax did not receive or review any underlying supporting documentation for the financial transactions recorded within Empire Holding's accounting records.[11,12]

19.    The accounting determinations were based solely on the information included in the data downloaded from the Connected Accounts and/or direction provided by Peter Prusinowski.[13]

20.    A&M was provided access to the Quickbooks file for Empire Holdings on September 25, 2024.  This file contained the accounting records for Empire Holdings covering the period May 16, 2018 through August 31, 2024 ("Review Period").  Given the accounting records were prepared without the review of any underlying source documentation, A&M conducted limited procedures to verify the completeness and accuracy of the accounting records for the Review Period.  Source documentation available as of the date of this Declaration includes, but is not limited to, the transaction data available from Stripe, Paypal, Wave, TD Bank

---

[9] Discussion with Angela Smith, Empire Tax, on September 30, 2024.
[10] "Q. How would you normally go about responding to the ATC reports? A. So they gave me, like, a list of categories that I would put certain things into and then I would categorize it and send it back to them. Q. Send it back via email? A. Yes. Q. Did you provide supporting documentation for what you had inputted into the Excel file? A. No. Q. Have you ever called anyone at Empire Tax to explain what you wrote in response to the ATC reports? A. I do believe so, yes." (Deposition of Peter Prusinowski on October 25, 2024 ("Prusinowski Deposition") at p. 175:05-175:17).
[11] Discussion with Angela Smith, Empire Tax, on September 30, 2024.
[12] "Q. Have you ever provided Empire Tax with underlines of work for certain Empire Holdings transactions, such as receipts, invoices, things like that? A. Like invoices for -- for what? Q. Invoices that contractors submit to Empire Holdings for payment. A. I don't think so. I don't know. Q. Do you ever recall Empire Tax requesting supporting documentation like that from you? A. Not that I remember." (Prusinowski Deposition at p. 173:10-173:20).
[13] Discussion with Angela Smith, Empire Tax, on September 30, 2024.

documents, and American Express credit card statements, pertinent to Receivership Entities accounting.

21.    On October 18, 2024, A&M was provided access to the Quickbooks file for Empire Partner.  This file contained the accounting records for Empire Partner covering the period January 1, 2021 through December 31, 2023.  A&M has not performed any analyses of these accounting records and amounts reported in this Declaration for Empire Partner are based on the Quickbooks data only.

22.    To date, A&M has not been provided the accounting records, to the extent they exist, for the remaining Receivership Entities: Atlas Fund, Atlas Trust, and Atlas Land, (collectively referred to as "Atlas Entities").  We are currently investigating whether Atlas Fund, Atlas Trust, and Atlas Land hold any additional assets.  Based on a discussion with Angela Smith, Empire Tax was engaged to prepare tax filings for Atlas Fund Limited Partnership, but did not perform accounting services for the Atlas Entities.[14]

## FINANCIAL CONDITION OF RECEIVERSHIP ENTITIES AND HISTORICAL TRANSACTIONAL ACTIVITY

23.    In order to determine the financial condition of the Receivership Entities, A&M compiled balances from the known bank, brokerage, and credit card accounts.  A&M also reviewed the available accounting records to identify any additional assets or liabilities.

24.    The financial condition of the Receivership Entities as of October 31, 2024[15] based on this approach, is summarized below in **Table 1** and further detailed in **Exhibit 2**:

---

[14] Discussion with Angela Smith, Empire Tax, on November 5, 2024.
[15] A&M reviewed the account activity after October 31, 2024 and did not identify any material transactions.

**Table 1 – Balance Sheet as of October 31, 2024:**

|  | October 31, 2024 |
|---|---|
| Assets | |
|    Cash & Cash Equivalents | $ 1,313,892 |
|    Shareholder Loan | 95,000 |
|    Other Current Assets | 399 |
| Total Assets | **1,409,291** |
| | |
| Total Liabilities[16] | **173,924** |
| | |
| Equity | **1,235,366** |
| | |
| **Total Liabilities & Equity** | **$ 1,409,291** |

25.    The cash activity is based on the available accounting records for Empire Holdings and Empire Partner and is summarized below in **Table 2** and further detailed in **Exhibit 3**. Payments made to or for the benefit of Peter Prusinowski are further detailed at **Exhibit 3.1**:

**Table 2 – Income Statement for Empire Holdings & Empire Partner:**

|  | Empire Holdings | Empire Partner |
|---|---|---|
|  | May 16, 2018 through August 31, 2024 | January 1, 2021 through December 31, 2023 |
| Income | $ 21,805,561 | $ 382,678 |
| Cost of Goods Sold | 662,187 | - |
| **Gross Profit** | **21,143,374** | **382,678** |
| Purported Operating Expenses/Other | 17,296,776 | 380,459 |
| **Gross Profit After Operating Expenses** | **3,846,598** | **2,220** |
| Payments Made to or for the Benefit of Peter Prusinowski | 3,747,754 | - |
| **Adjusted Net Income** | **$ 98,845** | **$ 2,220** |

26.    As shown above, Empire Holdings reported revenue and purported operating expenses of approximately $21.8 million and $17.3 million, respectively, during the Review Period. We further noted that, based on the available accounting records, nearly all of the funds generated by the business were transferred to Peter Prusinowski after purported expenses were paid.

---

[16] To the extent the Court finds Empire Holdings can continue to operate legally and profitably, additional liabilities may exist.

27.    Empire Partner reported revenue and operating expenses of $382,678 and $380,459, respectively, during the period January 1, 2021 through December 31, 2023.[17]

## PRELIMINARY OBSERVATIONS

28.    A&M determined the accounting records contemporaneously maintained for Empire Holdings include material errors that understated assets and misstated the operating expenses.  Examples of these errors include:

    a.  Empire Holdings maintained a brokerage account with Charles Schwab.  This account was not recorded as an asset of the Company, nor was the existence of the account disclosed to Empire Tax for accounting purposes by Peter Prusinowski.[18] Transfers to/from this account were recorded to an account titled "Personal Expenses" and treated as equity transactions.

    b.  A check written on January 10, 2024 to "CB&T"[19] (Capital Group American Funds where Peter Prusinowski's personal 401K is held) was recorded in the general ledger of Empire Holdings as a business expense under the general ledger account "Advertising and Promotion:Google Ads". The account number referenced in the memo field of the check is Prusinowski's 401K account.

29.    As shown on **Exhibit 2**, the Receivership Entities had assets and liabilities totaling $1,409,291 and $173,924, respectively, as of October 31, 2024.

    a.  A cash balance totaling $1,313,982 was held across the following accounts:[20]

        i.  $1,296,005 held in an account maintained at WSFS Bank ("Receivership Account") that was primarily funded by the following transfers:

            1.  On October 1, 2024, the Receiver transferred $50,480 and $1,465 of cash from accounts maintained at TD Bank in the name of Empire Holdings to the Receivership Account.  An additional $610,672 of cash was transferred from a brokerage account at Charles Schwab

---

[17] As of the date of this Declaration, the accounting for Empire Partner has not been updated for periods after December 31, 2023.
[18] Discussion with Angela Smith, Empire Tax, on September 30, 2024.
[19] See Check No. 10002 dated January 10, 2024, written from Empire Holdings TD Bank x9912 to CB&T.
[20] Cash balance is net of a $15 overdraft in a PayPal account in the name of Empire Holdings related to a "dispute fee".

in the name of Empire Holdings to the Receivership Account on the same date.

2. On October 18, 2024, the Receiver transferred $613,203 of cash from a brokerage account at Charles Schwab in the name of Atlas Fund to the Receivership Account.

    ii. $10,216 held in accounts maintained at TD Bank in the names of Empire Holdings and Empire Partner.

    iii. $7,685 held in accounts maintained at Stripe in the name of Ecommerce Empire Builders and StoreFunnels.net.

b. Shareholder Loan in the amount of $95,000. Based on the accounting records, this loan relates to amounts transferred to Peter Prusinowski.

c. Liabilities relate to amounts due to American Express totaling $173,924.

d. The accounting records of Empire Holdings do not include receivables owed by customers because they were prepared on a cash basis. We have not seen evidence that Empire Holdings tracked amounts owed by customers or quantified any amounts owed on contracts. While Peter Prusinowski testified that Empire Holdings tracked amounts owed by customers in a spreadsheet on Google Sheets, we reviewed the available documents on Empire Holdings' Google Drive and did not identify these documents.[21]

30.    The accounting records of Empire Partner did not identify any liabilities as of December 31, 2023, nor are we aware of any outstanding liabilities to date.

31.    As shown on **Exhibit 3**, Empire Holdings reported revenue totaling approximately $21.8 million during the Review Period.

---

[21] "Q. Does EEB keep records or have a system in place for tracking the outstanding amounts owed by customers who were making payments over time for their products? A. We didn't really do, like, payment plans or anything like that. And if there was, it would be like one or two, so we would just kind of, like, make a -- the salesperson would have to make a note of that to remember. Q. Where would that notation be recorded? A. Somewhere where the closer put it really to remember to collect that payment. Q. Do you know if the payment over time option would have been recorded in the customer contract? A. I think so. I think they did put like a two payment -- this payment due on this day, next due next month. Q. For the few customers that have had partial payment plans, is there any record keeping for tracking how much in partial payments was still outstanding and owed to EEB? A. I think I might have it somewhere, but it was like maybe four or five people that didn't end up making their second payment. It wasn't, like, a substantial amount, but I could find that. Q. Would it have been in the Google Drive? A. Yeah. Q. Do you know if there are currently any outstanding payments owed by customers that had partial payment plans? A. No. Q. No, you do not know or no, there are no outstanding payments? A. I'm pretty sure there are no outstanding payments." (Prusinowski Deposition at p. 185:08-186:17).

    a.   Of this amount, approximately \$5.3 million was recorded as "Consulting" revenue, with the remainder largely being recorded based on the financial accounts from which it was derived, i.e. Stripe, Paypal, or Wave. Empire Tax was instructed to record this revenue by Peter Prusinowski based on transactions identified in the bank statements.[22]

    b.   Based on the documentation available to date, it is unclear how the recorded revenue correlates to the products and/or services that were sold to generate the revenue.

32.    To date, we have been unable to verify the legitimacy of the expenses recorded in the accounting records due to a lack of business records.

33.    Based on the procedures performed to date, we did identify certain items that were reported as business expenses but appear to have benefited Peter Prusinowski personally. As such, we bifurcated the expenses into two categories: a) Purported Business Expenses and b) Payments Made to or for the Benefit of Peter Prusinowski.

    a.   Purported Business Expenses totaled \$17.3 million for the Review Period. This category primarily consists of the following:

        i.   \$8.1 million related to advertising and promotional expenses, largely for vendors such as Facebook and Google ads;

       ii.   \$6.2 million of contractor expenses, largely accounted for as commission expenses paid to Closer Secrets LLC ("Closer Secrets")[23,24,25] and other

---

[22] Discussion with Angela Smith, Empire Tax, on September 30, 2024.

[23] Closer Secrets, founded by Randall Grizzle, is a company designed to optimize business efficiencies and organize world class sales teams (https://randallgrizzle.com/rg-home#:~:text=Randall%20Grizzle%20is%20the%20founder,help%20businesses%20reach%20their%20potential).

[24] "A. So I had a sales manager, Randall, who I believe helped them with the script writing. I don't have access to the script, nor do I know if they followed a certain script. Q. And what's Randall's last name? A. Grizzle. Q. How do you spell that? A. G-r-i-z-z-l-e, I believe. Q. Did you give any directions to the sales team about how they should conduct their sales? A. I would lean on Randall heavily because essentially outsourced our sales team to them. They have had a lot of experience in our industry. So when we started working together, before I hired him, that's where I was more involved with them, but when I hired him probably two years ago, he had these salespeople already under him that had all this experience in this kind of industry. So I leaned on him heavily for that guidance and support of, you know, working with the sales team." (Prusinowski Deposition at p. 46:10-47:04).

[25] "Q. I'm going to pivot to some questions about Randall Grizzle and Closer Secrets, LLC, which I believe is Mr. Grizzle's entity. How did you meet Randall Grizzle? You might have said this earlier, but if you could please just remind me. A. We met a few years ago at a networking event. Q. What do you know about his entity, Closer Secrets, LLC? A. I know that's what the name is, but that --yeah. Q. Did Empire Holdings Group contract with Randall Grizzle individually or with his entity, Closer Secrets? A. I'm going to assume he sent me the contract and it was from Closer Secrets when I originally -- yeah." (Prusinowski Deposition at p. 166:20-167:11).

expenses recorded in the general ledger largely as "lead project managers" and "Funnel Builder"; and

iii.   $1.8 million related to professional fees recorded in the general ledger largely as "project managers" related to "Facebook Ad Specialists".

b.   Payments Made to or for the Benefit of Peter Prusinowski total $3.7 million for the Review Period.  This category primarily consists of:

i.   $2.1 million of cash transfers made from Empire Holdings TD Bank accounts directly to or for the benefit of Peter Prusinowski;

ii.   $1.3 million for the officer salary of Peter Prusinowski, or roughly $200,000 per year;

iii.   $256,747 of cash payments related to payroll benefits for Peter Prusinowski and his wife, Kellie Prusinowski,[26,27] such as personal 401k contributions and tax withholdings; and

iv.   $25,447 of net cash transfers made from Empire Holdings TD Bank account for crypto currency, held personally by Peter Prusinowski, on the Coinbase and Gemini platforms.[28,29]  The accounting records identify:

1.   $303,273 of outgoing cash transfers made from Empire Holdings TD Bank account to Coinbase and Gemini, and

2.   $277,826 of incoming cash deposits from Coinbase and Gemini.

34.   Transactions involving related parties include:

a.   <u>Empire Partner Network</u> – Per Peter Prusinowski, this entity earned commissions through the promotion of products using third-party software such

---

[26] "Q. At some point, your wife, Kellie Prusinowski, was an employee at the company; is that correct?  A. Yes.  Q. And what was the time period in which she provided services to the company?  A. I don't remember the exact date, but I believe two years ago, she received a salary that was primarily just put into a 401(k), the company 401(k).  Q. And how much was that salary?  A. It was whatever the maximum was allowed for a 401(k) contribution. I don't know the number off the top of my head."  (Prusinowski Deposition at p. 25:22–26:08).

[27] "Q. Did Kellie Prusinowski ever have a title at the company?  A. No.  Q. Did she perform any other tasks besides providing awards to customers?  A. No.  Q. Did she receive any compensation separate from the 401(k) contribution?  A. No."  (Prusinowski Deposition at p. 29:16-29:24).

[28] As of September 26, 2024, Coinbase asserted a total USD balance of $26,771 was held on its platform.

[29] As of October 31, 2024, the Gemini account held a balance of $114.58.

as Prime Corporate Services.[30]  Transfers from this entity to Empire Holdings totaled $425,674 during the Review Period and include:

    i.    Empire Holdings' general ledger includes a revenue account titled "Empire Partner Network". Entries recorded to this account totaled $99,604 and $77,070 for the years ended December 31, 2022 and 2023, and $60,200 for the eight months ended August 31, 2024, respectively.

    ii.    Journal entries recorded to the "Personal Expense" account totaled $188,800 for the Review Period.  It appears these entries were recorded to offset the cash withdrawn from and/or personal expenses charged to the Company by Peter Prusinowski.  It is unclear why certain transactions from this entity were treated as revenue, whereas others impacted equity.

    iii.    Peter Prusinowski testified that Empire Partner's commissions earned are transferred and recorded to Empire Holdings.[31,32]

35.    It does not appear Empire Holdings is a sustainable business without continuing its marketing efforts, which A&M understands the Receiver has determined are deceptive.

    a.    To date, we identified 466 customer contracts, available via HelloSign,[33,34] that were executed between May 2022 to September 2024 and noted the following:

---

[30] "Q. Okay. What is Empire Partner Network? A. This is a company that receives income from products that -- that we promote, so like, for example, you know, a software that we make commissions on that we refer people. Like, for example, with the – with Prime Corporate, when we refer people there, they would give us a kickback. There's other -- there's other -- it basically was just any money that we generated from promoting products, affiliate marketing products." (Prusinowski Deposition at p. 131:07-131:15).

[31] "Q. You previously represented to the receiver that commissions earned by Empire Partner are sent to Empire Holdings; is that correct? A. Yes." (Prusinowski Deposition at p. 157:06-157:09).

[32] "Q. Okay. This is the Empire Holdings Group Profit and Loss Statement for year end 2023 that you provided with your financial disclosures. And so if you can see under income at the very bottom, there's a line item that says Empire Partner Network for $77,070. Do you see that? A. Yes. Q. Is that the commissions that Empire Partner Network earned for the year 2023? A. I would say it's the money that Empire Partner Network sent to Empire Holdings. I don't -- I don't know. Q. Can you explain the clarification between commissions and -- and money sent? A. Well, I'm assuming, like, Empire Partner probably had to -- had some more money, because it had to probably pay taxes and stuff; right? So I'm assuming there was some funds left behind in that Empire Partner account to pay for those things." (Prusinowski Deposition at p. 157:16-158:09).

[33] Customer contracts are executed and signed via HelloSign, now known as DropBox Sign.  HelloSign is a tool that allows users to electronically sign and send documents (see, https://app.hellosign.com/).

[34] Peter Prusinowski testified that they tracked customer contracts, including the duration of customer contracts in Monday.com, however we have not been able to correlate the data in HelloSign and Monday.com.  "Q. Does EEB keep records or have a system in place for tracking how many of its customers signed contracts that provide an unlimited duration of support services? A. It would be in Monday. So there's a tab in Monday where it says "expired," and that -- that or "expiry." And it would say that's when their support expires. Again, we were not strict on that expire date. If it was blank, then they had the unlimited support." (Prusinowski Deposition at p. 188:06-188:15).

    i.   The accounting records of Empire Holdings do not provide sufficient detail to support revenue or cost by product offering.

    ii.   We understand the Wave system[35] was used to track income accounted for as "Consulting Income" in the accounting records of Empire Holdings. Accordingly, using transaction data extracted from Wave, along with customer contract information available on the executed contracts available in HelloSign, we were able to attribute approximately $304,000 and $1.2 million of revenue derived through Wave to the customer offering in 2023 and 2024, respectively. It is unclear how the remaining total annual revenue of $5.3 million and $1.4 million for 2023 and 2024, respectively, correlates to customer contracts or products sold for these periods based on the available documentation.

    iii.   116 executed contracts included language and offered some type of "unlimited" service(s), 28 of these contracts were executed in 2022 and currently rely on revenue generated from new customer contracts to cover back-office costs.

b.   There was insufficient revenue generated after the date of the TRO Order, specifically September 21, 2024, through October 20, 2024 ("Receivership Period"), to cover back-office costs.

    i.   We identified $19,812 of customer deposits during the Receivership Period, which is less than the average $52,000 monthly back-office costs.

    ii.   There were no customer contracts initiated or executed after the date of the TRO Order.

## FUTURE SUSTAINABILITY OF EMPIRE HOLDINGS

36.    For reasons described through this Declaration, A&M is unable to quantify the amount of revenue generated by each product or service sold by Empire Holdings, or quantify the associated operating costs to generate said revenue.

---

[35] Wave is a suite of financial management tools for small businesses that includes accounting, invoicing, and payroll software (https://www.waveapps.com/).

37.    However, the minimal amount of revenue that came in after the TRO Order suggests that Empire Holdings is not viable without ongoing marketing ads, which the Receiver has determined are deceptive.

Inadequate Accounting Records

38.    The accounting records of Empire Holdings do not provide sufficient detail needed to support revenue or cost by product offering.  For example, using the accounting records there is no way to distinguish the income derived from the Ecommerce Platinum Program or Business in a Box program.

39.    Rather, revenue in the accounting records was accounted for based on the payment platform generating the customer payments.[36]  We understand revenue derived from the payment platform Wave was booked as "Consulting Income" per the direction of Peter Prusinowski. Similarly, expenses were accounted for based on the vendor providing the service. For example, marketing and advertising performed by Google and Facebook were accounted for as "Google Ads" and "Facebook Ads Specialist", respectively.

40.    Additional customer level information, including the product purchased, is required to identify the type of product offering the customer was receiving, and to understand the profitability by customer and product offering.

41.    Using the customer transaction data available through Wave for the period October 2023 to August 2024, and executed customer contracts available from HelloSign, we were able to attribute approximately $304,000 and $1.2 million of revenue derived through Wave, and accounted for as "Consulting Income", to the customer offering for 2023 and 2024, respectively.[37] Notably, the attributed revenue to the customer offerings only accounts for a portion of total annual revenue of $5.6 million and $2.6 million for 2023 and 2024, respectively.

42.    While it may be possible to reconstruct the accounting records for the remaining revenue based on the underlying support, including invoice level detail from the remaining payment platforms such Stripe and PayPal, we believe this would be significant undertaking requiring appropriate documentation and cooperation from Peter Prusinowski.

---

[36] Discussion with Angela Smith, Empire Tax, on September 30, 2024.
[37] To the extent an executed customer contract was not available in HelloSign, we reviewed the relevant customer invoice in Wave to determine the product offering.

Lack of Analyses Performed Around Revenue and Pricing of Product Offerings

43.     To date, we have not identified any contemporaneous analyses related to the prices charged or profitability for products offered by Empire Holdings.

44.     We understand price points for customer products were potentially based on competitor research, "team costs," and advertising costs.[38]  Peter Prusinowski also testified minimum pricing was based on labor and advertising costs.[39]

45.     Peter Prusinowski testified that Empire Holdings did perform analyses and tracked customer sales data;[40] however, we reviewed the available documents on Empire Holdings' Google Drive and did not identify such analyses.

46.     Based on our review of the available executed customer contracts, it appears the pricing of products greatly varied amongst customers.

47.     Customers were offered contracts with a duration ranging from one month to "unlimited" and contract prices ranging from $2,500 to $100,000.  **Table 3** below summarizes the known 466 executed customer contracts for the period May of 2022 to September of 2024 by product offering, contract duration, and potential price offerings:

---

[38] "Q. You had talked earlier about setting price points for specific products. In order to come up with those price points, did you or anyone else perform any analysis or do any data tracking to determine those price points? A. I mean, we would kind of, like, research what competitors and things were doing, what kind of price points they were doing, what their offerings were, and then we kind of obviously looked at, hey, how much does our team cost, how much advertising would cost, and make a decision off of that. Q. Was any of that analysis recorded anywhere? A. No." (Prusinowski Deposition at p. 182:18-183:05).

[39] Q. And I know the price points you had mentioned earlier were a general range that you would offer per product. Is there a lowest minimum price established for each product? A. Again, the kind of -- the closers kind of had free reign to adjust the pricing but kind of like the lowest was around 3- to 4,000. Q. Was that established in writing anywhere? A. Like the packages and stuff? Q. The lowest would be 3- to 4,000, was that established anywhere in writing? A. I think it was like in the sales playbook somewhere. Q. Is the sales playbook something that would be in the records in your laptop or in any reference you provided? A. I believe Randall and his team controlled the playbook. Well, I don't -- yeah, they did. They did. Q. What factors or considerations went into determining the lowest minimum price per product? A. Just really cost of kind of labor. That was our biggest cost and obviously advertising." (Prusinowski Deposition at p. 183:06-184:02).

[40] "Q. Have you or anyone else that has worked for EEB done any analysis or tracked any data on EEB's customers' product sales or just customer data at all?  A. Yes. Q. Who would have done that tracking? A. A member on Ali's team. I don't know who exactly it would be, but there was somebody that would occasionally do it." (Prusinowski Deposition at p. 181:17-181:24).

**Table 3: Summary of Signed Customer Contracts[41]**

| No. | Customer Program Name | Contract Duration | Number of Contracts | Contract Price | | |
|---|---|---|---|---|---|---|
| | | | | Minimum | Maximum | Average |
| 1 | Ecommerce Platinum Program | 1 Month to Unlimited | 277 | $ 5,000 | $ 50,000 | $ 19,086 |
| 2 | Business in a Box | 3 Months to Unlimited | 148 | 5,000 | 30,000 | 14,082 |
| 3 | Ecommerce Accelerator | 1 Month to Unlimited | 15 | 2,500 | 8,000 | 4,667 |
| 4 | Ecommerce Gold Program | 3 to 6 Months | 14 | 4,000 | 5,000 | 4,607 |
| 5 | Automated Executive Program | 1 Year to Unlimited | 6 | 100,000 | 100,000 | 100,000 |
| 6 | Executive Business in a Box | Unlimited | 6 | 45,000 | 50,000 | 49,167 |
| **Total** | | | **466** | **$ 2,500** | **$ 100,000** | **$ 31,935** |

48.    We noted in certain instances, customers were offered the same exact product offering at varying prices. For example, we identified two identical 6-month contracts for the Ecommerce Platinum Program with one priced at $8,000 and the other at $15,000.[42]  It is unclear why these customers were offered the same contract with different contract prices. Peter Prusinowski testified that there was not a formal or internal policy on offering customer discounts.[43]

49.    We further noted that more than 100 customer contracts included language that offered some type of "unlimited" service(s). For example, in a contract signed on April 23, 2024, by one customer, for the Ecommerce Platinum Program, with a contract price totaling $33,000, the contract offered "unlimited" team support access as further shown below:[44]

**Figure 1: Excerpt from Customer Contract**



50.    Without having sufficient information to determine the average cost to maintain profitability of the Ecommerce Platinum Program, this contract was offered at $33,000 with unlimited access to "Three Inner Circle Zoom Calls Per Week" and "On Demand Support Within BaseCamp Dashboard".

---

[41] This population excludes six contracts where Peter Prusinowski was listed as a customer.
[42] See customer contracts dated November 22, 2023 and July 9, 2024.
[43] "Q. Okay. Does EEB have any formal or internal policies when it comes to offering discounts on products to prospective customers? A. No." (Prusinowski Deposition at p. 184:06-184:09).
[44] See customer contract dated April 23, 2024.

    a.  Both of these "unlimited" services would incur expenses to maintain the back-office that is ultimately providing the support to the customer.

    b.  We understand the Chief Operating Officer, Aliakbar "Ali" Gulshan,[45] provided Counsel with the monthly spend incurred related to the back-office for the period May 2024 through September 2024, which showed the average monthly cost was approximately $52,000.

51.    We summarized the executed customer contracts with an "unlimited" service offering, by year, based on data available from HelloSign, as shown in **Table 4** below:

**Table 4 – Summary of Contracts with Unlimited Service Offering**

| Year | No. Contracts | Total Contract Price | Annual Back-office Cost | No. Months to Sustain Operations |
|------|---------------|----------------------|-------------------------|----------------------------------|
| 2022 | 28 | $ 846,000 | $ 624,000 | 16.3 |
| 2023 | 65 | 2,039,800 | 624,000 | 39.2 |
| 2024 | 23 | 721,240 | 624,000 | 13.9 |
| **Total** | **116** | **$ 3,607,040** | **$ 1,872,000** | |

52.    Specifically, in 2022, we identified 28 customer contracts totaling $846,000 that included an unlimited service offering.

    a.  Based on the information provided by the COO for the past five months, it is estimated at least $624,000 in annual revenue (or $52,000 x 12 months = $624,000) is required to cover back-office costs.

    b.  For at least 16 months, Empire Holdings would have been able to independently sustain its operations and rely on the revenue derived from the 2022 contracts to cover the back-office costs required to service those contracts.

    c.  After 16 months, Empire Holdings would have begun relying on revenue generated from new customer contracts to cover costs associated with the 2022 unlimited contracts.

53.    As such, Empire's unlimited service offering is not sustainable without onboarding new customers.

---

[45] "…you might not know Ali. He's on our channel as well. He's our chief operating officer, our COO…" Transcript of Ecommerce Empire Builders Signup from Facebook Ad Videos from the Emergency Noticed Motion for a Temporary Restraining Order with an Asset Freeze Filed September 18, 2024 in the matter of Federal Trade Commission v. Empire Holdings Group LLC, also d/b/a Ecommerce Empire Builders and Storefunnels.Net, a limited liability company, and Peter Prusinowski (See Case 2:24-cv-04949-WB Dkt. 2, p. 342).

54.     Additionally, Empire Holdings only has $495,324[46] of liquid assets available to finance the business as of October 31, 2024.  This equates to approximately ten months of back-office support expenses, without considering any additional expenses that were reported within Empire Holdings accounting records. While it is likely that amounts may still be due related to certain contracts, the available documents and accounting records are not sufficient to identify those customers or quantify any amounts still due from customers.

Incoming Revenue Subsequent to the TRO Order

55.     It is our understanding that the marketing and advertising for Empire Holdings was suspended as of the date of the TRO Order.  We further understand, that over half of the revenue of Empire Holdings was generated from its Platinum Program sales to customers who saw Empire's marketing and advertising efforts through its website, and when changes were made to the marketing and advertising to try to make it more compliant prior to the entry of the TRO Order, Empire Holdings generated significantly less revenue.[47,48]

56.     More specifically, Peter Prusinowski testified that six months ago he made changes to his advertising and marketing by removing testimonials and added disclaimers, and the impact led to his business slowing down.[49]

57.     The Receiver has determined that Empire Holdings' marketing ads are deceptive, and thus cannot continue in the future.

---

[46] The Receivership's Entities cash balance of $1,313,892 as of October 31, 2024, includes $669,248 of cash derived from Empire Holdings accounts.  Liquid Assets for Empire Holdings of $495,324 is equal to $669,248 less the outstanding Empire Holdings liabilities of $173,924.

[47] "Q. Mr. Prusinowski, I want to continue asking some questions about the topic of compliance. You mentioned earlier that the company experienced a slowdown. What did you mean by that? A. We just weren't making many sales. Q. And for that reason, you had to let go some of your sales representatives? A. Yes. Q. And why wasn't the company making many sales? A. Our advertising changed a lot. We couldn't -- we didn't -- we were -- you know, we didn't -- again, when we were doing, like, a lot of the advertising changes for -- to be more compliant, we removed a lot of those testimonials that we were using, our award system. That social proof that we would rely on, we didn't use it." (Prusinowski Deposition at p. 53:03-53:18).

[48] "Q. Okay. So the -- the majority of the business in the recent years has come from the sale of your platinum program; correct? A. Yes. Q. What would you say, as an estimate, the1 percentage of sales coming from your platinum program were? And by 'percentage,' I mean amount of money. A. I -- I don't know the revenue, but I would say on a monthly basis, about 60 to 70 percent of the business's revenue came from it." (Prusinowski Deposition at p. 58:21-59:05).

[49] "Q. What do you mean by fighting fires in the business? A. It was just a slowdown. We were just losing a lot of money every month, and I was just trying to find ways to keep us alive, essentially. Q. And -- and is it your belief that the slowdown was happening because you removed the testimonials from the marketing? A. Yes." (Prusinowski Deposition at p. 63:10-63:18).

58.     Prior to the TRO Order, approximately 89 customer contracts were signed in 2024, or on average 10 contracts per month.

59.     There were no customer contracts initiated or executed during the Receivership Period.

60.     We further reviewed the customer activity within Stripe, PayPal and Wave for the Receivership Period, and identified $19,812 of deposits.  We did not identify any customer payments from Wave during the Receivership Period.  We further reviewed the Empire Holdings TD Bank accounts and an additional $706 was derived from Amazon.com payments during the Receivership Period.[50]  It is our understanding income derived from Amazon was primarily related to Peter Prusinowski's ecommerce and household good sales.[51]

Dated:  11/15/2024              By:  _____

                                     Michael R. Shanahan

---

[50] Based on transaction data obtained from TD Bank for Empire Holdings accounts ending x9912 and x8836.
[51] Discussion with Angela Smith, Empire Tax, on September 30, 2024.

# Exhibit 1 – Michael R. Shanahan – Professional Biography

# Exhibit 1



**Phone:** (+1) 267 507 3139
**E-mail Address:**
Michael.Shanahan@alvarezandmarsal.com

ALVAREZ & MARSAL
LEADERSHIP. ACTION. RESULTS.

# Michael Shanahan

## Managing Director

Michael Shanahan is a Managing Director and leader of the Alvarez & Marsal Disputes and Investigations Philadelphia practice. He specializes in assisting legal counsel and senior management during financial and fraud investigations, as well as with the economic and accounting aspects of litigation.

With over 25 years of experience, Mr. Shanahan has significant experience advising fiduciaries administer post-bankruptcy and receivership assets, including the pursuit of litigation for the benefit of creditors, review and evaluation of claims, and creditor distributions. He has advised boards and corporations on a range of investigative matters, including financial reporting misstatement, employee misconduct, misappropriation of assets, bid-rigging, and bribery and corruption (FCPA / U.K. Bribery Act). Additionally, he consults and testifies on litigation matters involving financial and accounting issues, including economic damages, fraudulent conveyance, lost profit analysis and business interruption claims.

Mr. Shanahan's notable engagements include an investigation into the business dealings of a leading developer of solar energy projects and advising the Unsecured Creditors Committee in connection with the company's bankruptcy proceedings. He subsequently advised the successor Trustee in connection with the reconciliation of over 6,000 claims with an asserted value exceeding $20 billion, as well with the prosecution of avoidance actions valued at over $600 million in an effort to increase the recovery for the unsecured creditors.

Additionally, Mr. Shanahan has served as the Financial Advisor to the Court-Appointed Receiver in connection with Ponzi and other fraudulent schemes. In this role, Mr. Shanahan has conducted factual investigations to identify assets and develop litigation claims to increase the recovery for the defrauded investors, reviewed and evaluated claims asserted against the Receivership, and assisted the Receiver develop an equitable distribution methodology and administer distributions related thereto.

Prior to joining A&M, Mr. Shanahan was a Senior Director with Kroll, where he assisted clients with fraud, fidelity claim investigations, due diligence and business interruption claims. He began his career with a public accounting firm where he assisted clients with forensic accounting and bankruptcy matters, in addition to audit and tax services.

Mr. Shanahan earned a bachelor's degree in accounting from Villanova University. He is a licensed Certified Public Accountant, a Certified Fraud Examiner and Certified in Financial Forensics.

**Exhibit 2 – Empire Receivership Entities Balance Sheet as of October 31, 2024**

**Exhibit 2**

**Empire Receivership Entities**
**Balance Sheet**
*As of October 31, 2024*

| | Empire Holdings | Empire Partner | Atlas Entities | Receivership Account | Total Receivership Balance |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| **Cash & Cash Equivalents** | | | | | |
| Cash Accounts | $ (1,040) | $ 11,256 | | $ 1,296,005 | $ 1,306,221 |
| Stripe Account | 7,685 | - | | - | 7,685 |
| PayPal | (15) | - | | - | (15) |
| **Cash & Cash Equivalents Subtotal** | **6,631** | **11,256** | | **1,296,005** | **1,313,892** |
| | | | | | |
| Shareholder Loan | 95,000 | - | | - | 95,000 |
| Other Current Assets | 399 | - | | - | 399 |
| **Total Assets** | **$ 102,030** | **$ 11,256** | **TBD** | **$ 1,296,005** | **$ 1,409,291** |
| | | | | | |
| **Liabilities** | | | | | |
| American Express | 173,924 | | | - | 173,924 |
| **Total Liabilities** | **173,924** | | | **-** | **173,924** |
| | | | | | |
| **Equity** | **(71,895)** | **TBD** | | **1,296,005** | **1,235,366** |
| | | | | | |
| **Total Liabilities and Equity** | **$ 102,030** | | | **$ 1,296,005** | **$ 1,409,291** |

**Notes:**
[1]Payable balance may differ to the extent additional liabilities are identified.

**Exhibit 3 – Empire Receivership Entities Restated Profit and Loss Statements**

1. **Payments Made to or for the Benefit of Peter Prusinowski - Other Payments**

**Exhibit 3**

**Empire Receivership Entities**
**Restated Profit and Loss Statements**

| | Empire Holdings | Empire Partner |
|---|---|---|
| | **May 16, 2018 through August 31, 2024** | **January 1, 2021 through December 31, 2023** |
| **Income** | | |
| Stripe | $        14,062,700 | $                    - |
| Consulting | 5,343,176 | 375,074 |
| PayPal | 1,858,217 | 7,604 |
| Other Income | 541,467 | |
| **Income Subtotal** | **21,805,561** | **382,678** |
| | | |
| **COGS** | **662,187** | **-** |
| | | |
| **Gross Profit** | **21,143,374** | **382,678** |
| | | |
| **Purported Operating Expenses** | | |
| Advertising and Promotion | 8,137,933 | - |
| Contractors | 6,198,092 | - |
| Professional Fees | 1,763,881 | 935 |
| Software | 358,816 | - |
| Travel | 184,646 | - |
| Office Supplies | 122,813 | 2,356 |
| Other | 529,620 | 377,168 |
| **Total Purported Operating Expenses Subtotal** | **17,296,776** | **380,459** |
| | | |
| **Gross Profit After Purported Operating Expenses** | **3,846,598** | **2,220** |
| | | |
| **Payments Made to or for the Benefit of Peter Prusinowski** | | |
| Officer Salary Peter Prusinowski | 1,261,520 | - |
| Payroll Benefits | 256,747 | - |
| Payments for Vehicle(s) | 53,928 | - |
| Golf Club Membership | 31,926 | - |
| Other Payments [1] | 2,143,633 | - |
| **Payments Made to or for the Benefit of Subtotal** | **3,747,754** | **-** |
| | | |
| **Adjusted Net Income** | $              98,845 | $              2,220 |

**Note:**

[1]The accounting records include journal entries that suggest Peter Prusinowski made equity contributions totaling $370,193 between May 16, 2018 and August 31, 2024, however, additional investigation is required to confirm these journal entries are supported by the actual transfer of consideration.

**Exhibit 3.1**

**Empire Receivership Entities**

**Payments Made to or for the Benefit of Peter Prusinowski - Other Payments**

*Period Ended August 31, 2024 and Years Ended 2018 to 2023*

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 8/31/2024 | Total |
|---|---|---|---|---|---|---|---|---|
| **Payments Made to or for the Benefit of Peter Prusinowski - Other** [1] | | | | | | | | |
| Incurred Expenses Credit Card/PayPal (Net of Merchant Refunds) | $ 4,944 | $ 31,878 | $ 14,676 | $ 30,094 | $ 4,002 | $ 156,086 | $ 30,275 | $ 271,954 |
| Cash Transfers from Empire Holdings (x9912/x8836) | 23,397 | 67,802 | 42,559 | 288,420 | 244,746 | 689,707 | 438,679 | 1,795,310 |
| Cash Transfers Related to Personal Crypto Accounts [2] | - | - | - | 259,500 | (117,850) | 3,283 | (119,485) | 25,447 |
| Tax Payment | - | - | - | - | 23,042 | - | - | 23,042 |
| Expenses/Loan from Stripe | 20,659 | - | - | - | - | 7,221 | - | 27,880 |
| **Payments Made to or for the Benefit of Peter Prusinowski - Other** | $ 49,000 | $ 99,680 | $ 57,234 | $ 578,014 | $ 153,939 | $ 856,297 | $ 349,468 | $ 2,143,633 |

**Notes:**

[1] The accounting records include journal entries that suggest Peter Prusinowski may have made equity contributions totaling $370,193; however, additional investigation is required to confirm these journal entries are supported by the transfer of consideration.

[2] The accounting records indicate cash transfers from Empire Holdings to crypto currency on te Coinbase and Gemini platforms. As of October 31, 2024, the Gemini account held a balance of $114.58. As of September 26, 2024, Coinbase asserted a total USD balance of $26,771 was held on its platform.