**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | : | |
| | : | |
| | : | **Civil Action** |
| **Plaintiff,** | : | |
| | : | **No. 2:24-cv-04949-WB** |
| **v.** | : | |
| | : | |
| **EMPIRE HOLDINGS GROUP LLC d/b/a** | : | |
| **ECOMMERCE EMPIRE BUILDERS d/b/a** | : | |
| **STOREFUNNELS.NET and PETER** | : | |
| **PRUSINOWSKI,** | : | |
| | : | |
| **Defendants.** | : | |

**RECEIVER, KEVIN DOOLEY KENT'S MOTION FOR APPROVAL OF
FIRST INTERIM FEE APPLICATION WITH INCORPORATED MEMORANDUM OF
LAW FOR THE PERIOD SEPTEMBER 20, 2024 THROUGH OCTOBER 31, 2024**

**CLARK HILL PLC**
Robin S. Weiss, Esquire
Vanessa L. Huber, Esquire
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
Phone: (215) 640-8500
Fax: (215) 640-8501
rsweiss@clarkhill.com
vhuber@clarkhill.com

*Attorneys for Receiver, Kevin Dooley Kent*

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     BACKGROUND OF APPOINTMENT ................................................................. 5

III.    INVESTIGATION AND CONTROL OVER ASSETS AND DATA OF
        RECEIVERSHIP ENTITIES ................................................................................ 8

        A.      Notice of TRO Order and Requests for Information/Documentation and/or
                Compliance with TRO Order ..................................................................... 8

        B.      Receivership Bank Account Opening and Collection of Funds ........................ 14

        C.      Control Over and Preservation of Assets ............................................... 16

        D.      Control Over and Preservation of Documents ...................................... 22

        E.      Control Over and Preservation of EEB Social Media ......................... 25

        F.      Investigation of Potential Assets ............................................................ 27

        G.      Depositions of Peter Prusinowski, Aliakbar Gulshan, and Kellie Prusinowski ... 27

IV.     INVESTIGATION, MANAGEMENT, AND SHUTDOWN OF EEB BUSINESS
        OPERATIONS ...................................................................................................... 28

        A.      Interviews of EEB Personnel .................................................................. 28

        B.      Consumer Outreach ................................................................................. 31

        C.      EEB Website and Receivership Website ................................................ 35

        D.      Management of EEB Business Operations ............................................ 36

        E.      Accounting Review and Analysis ........................................................... 39

        F.      Shutdown of EEB Business Operations ................................................. 43

V.      OTHER ADMINISTRATIVE MATTERS ......................................................... 54

        A.      Notices Filed with Federal District Courts ........................................... 54

        B.      Tax Form 56 ............................................................................................. 55

        C.      Diversion of Mail .................................................................................... 56

VI.     ASSETS, EXPENSES, AND LIABILITIES OF THE RECEIVERSHIP ESTATE ........ 56

VII.    CURRENT AND PREVIOUS BILLINGS ........................................................ 58

VIII.   REQUEST FOR COMPENSATION FOR FEES AND EXPENSES ............................ 60

IX.     CONCLUSION ..................................................................................................... 63

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                         **Page(s)**

*Donovan v. Robbins*,
  588 F. Supp. 1268 (N.D. Ill. 1984) ........................................................................ 60

*Fed. Trade Comm'n v. A1 Janitorial Supply Corp.*,
  2020 WL 887386 (N.D. Ill. Feb. 24, 2020) ........................................................... 61

*Gaskill v. Gordon*,
  27 F.3d 248 (7th Cir. 1994) ................................................................................... 60

*Gordon v. Dadante*,
  2008 WL 1805787 (N.D. Ohio Apr. 18, 2008) ................................................. 61, 62

*McNamara v. Allen*,
  2017 WL 10439830 (C.D. Cal. Dec. 12, 2017) ..................................................... 55

*S.E.C. v. Am. Cap. Invs., Inc.*,
  98 F.3d 1133 (9th Cir. 1996) ................................................................................. 55

*SEC v. Vision Communications, Inc.*,
  74 F.3d 287 (D.C. Cir. 1996) ................................................................................. 55

*Securities & Exch. Comm'n v. Elliot*,
  953 F. Supp. 1560 (11th Cir. 1992) ....................................................................... 60

*Securities & Exch. Comm'n v. W.L. Moody & Co.*,
  374 F. Supp. 465 (S.D. Tex. 1974) ........................................................................ 61

*Terry v. June*,
  2003 WL 22125300 (W.D. Va. Sept. 12, 2003) .................................................... 55

*U.S. S.E.C. v. Wealth Mgmt. LLC*,
  2011 WL 4479518 (E.D. Wis. Sept. 26, 2011) ..................................................... 61

*United States v. Code Products Corp.*,
  362 F.2d 669 (3d Cir. 1966) ................................................................................... 61

*United States v. Larchwood Gardens, Inc.*,
  404 F.2d 1108 (3d Cir. 1968) ................................................................................. 61

**Statutes & Court Rules**

15 U.S.C. § 45 ............................................................................................................ 47

16 C.F.R. § 255.2 ............................................................................................................... 48

16 C.F.R. § 437.1 ............................................................................................................... 47

16 C.F.R. § 437.2 ............................................................................................................... 48

16 C.F.R. § 437.3 ............................................................................................................... 48

16 C.F.R. § 437.4 ............................................................................................................... 48

28 U.S.C. § 754 ................................................................................................................. 55

L. Civ. R. 5.1.2 ................................................................................................................. 59

## I.    INTRODUCTION

Following the entry of the September 20, 2024 Temporary Restraining Order with Asset Freeze, Appointment of a Temporary Receiver, and Other Equitable Relief (ECF No. 19) (the "TRO Order"), Kevin Dooley Kent, in his capacity as Temporary Receiver (the "Receiver"), took over and assumed control of Empire Holdings Group LLC d/b/a Ecommerce Empire Builders d/b/a Storefunnels.net (hereinafter "EEB") and its existing business operations.  The Receiver thereafter identified nonparty entities Star Active Sports LLC ("Star Active") and Empire Partner Network LLC ("Empire Partner") as Receivership Entities on October 2, 2024, and Atlas Fund Limited Partnership ("Atlas Fund"), Atlas Fund Trust ("Atlas Trust"), and Atlas Fund Land Trust ("Atlas Land") (collectively, the "Atlas Entities") as Receivership Entities on October 14, 2024, and began exercising his duties with respect to those entities as well.[1,2]  The TRO Order was subsequently extended by the Stipulated Preliminary Injunction entered on November 8, 2024 ("Stipulated PI") (ECF No. 49), which extends the Receiver's duties set forth in the TRO Order.

The Receiver's duties are broad and include, *inter alia*, continuing EEB's business operations until the Receiver determined that "such operations cannot be continued legally and profitably," TRO Order § XII ¶ T, and "prioritiz[ing] the protection of legitimate business operations, if any," *id.* § XII ¶ X, while simultaneously "[c]onserv[ing], hold[ing], manag[ing], and prevent[ing] the loss of all Assets of the Receivership Entities, and perform[ing] all acts necessary or advisable to preserve the value of those Assets."  *Id.* § XII ¶ D.  Thus, in carrying out

---

[1]    The TRO Order defines "Receivership Entities" to include the "Corporate Defendant as well as any other entity that has conducted any business related to the advertising, marketing, and sale of Defendants' Products and Services, including receipt of Assets derived from any activity that is the subject of the Complaint in this matter, and that the Receiver determines is controlled or owned by any Defendant."  TRO Order, Definitions ¶ J.

[2]    The TRO Order provides that "[i]f the Receiver identifies a nonparty entity as a Receivership Entity [he is directed and authorized to] promptly notify the entity as well as the parties, and inform the entity that it can challenge the Receiver's determination by filing a motion with the Court."  TRO Order § XII ¶ U. The Receiver promptly notified the parties and entities of these determinations via letter, pursuant to the terms of the TRO Order.

his duties, the Receiver needed to focus not only on locating and controlling all documents and assets of the Receivership Entities, *see id.* § XII ¶¶ B-E, but also understanding and managing the business operations of EEB and making necessary payments to keep operations running, while simultaneously determining whether those operations could continue both legally and profitably.

Understandably, and as is typical for receiverships such as this, the weeks following the entry of the TRO Order were intense, with the Receiver, his Counsel and support staff at Clark Hill PLC ("Clark Hill," "Law Firm," or "Counsel"), and his Accountants at Alvarez & Marsal Disputes and Investigations, LLC ("A&M" or "Accountant") (collectively, "Retained Personnel") devoting significant amounts of time to carrying out the Receiver's duties. The complexities of EEB's operations in particular resulted in significant time and effort expended by the Receiver and his Retained Personnel in maintaining the business operations for existing EEB customers, which was exacerbated by the fact that EEB does not have a physical office location, operates entirely by Cloud-based/electronic means through various platforms, and has contractors all over the world. The nature of these international online business operations also made data and fact gathering complex and time-consuming.

In summary, and as described in greater detail below, the Receiver and his Retained Personnel devoted the first six weeks of the Receivership to:

    (i)     taking over control of, reviewing, and preserving EEB's social media accounts and ultimately disabling the accounts/hiding the posts on such accounts after determining that EEB's social media marketing and advertising has not been conducted legally;

    (ii)    conducting interviews of EEB back-office and other support personnel to understand the nature and value of the work they perform for EEB customers and their compensation structure;

    (iii)   contacting and gathering information from consumers, first through e-mails and phone calls and then through the creation of a Consumer Questionnaire, to enable the Receiver to understand the consumer experience, which has also included

addressing and responding to a significant number of consumer complaints and refund requests;

(iv)    managing EEB's business operations, which required ensuring continued online access necessary for back-office support personnel to continue to provide services to consumers, paying significant sums to back-office personnel until the Receiver determined that operations could not continue both legally and profitably, coordinating and making payments to White Label service provider, Simvoly Applications Ltd. ("Simvoly"), a Bulgarian-based company that manages the day-to-day operations and customer support for Storefunnels, and working through various issues related to wire transfer payments made to back-office personnel who are located in foreign countries;

(v)     providing notice of the TRO Order and Asset Freeze to various banks, financial institutions, payment processors, third parties, and EEB contractors, and engaging in multiple follow-up communications with various financial institutions and their counsel to address various issues relating to compliance with the TRO Order;

(vi)    opening a Receivership Bank Account with WSFS, arranging for the transfer of Receivership Assets to that account, and addressing numerous challenges and difficulties related thereto;

(vii)   taking over control of additional assets by taking possession of the keys to a safe deposit box and accessing and changing passwords to various financial accounts, which process was complicated by difficulties with log-in credentials and two-factor authentication challenges;

(viii)  securing and preserving data from Defendant Peter Prusinowski's personal devices and e-mail, and from various EEB sites/platforms, which was likewise complicated by log-in and two-factor authentication issues;

(ix)    frequently communicating with Defendant Prusinowski, defense counsel, and the FTC's counsel to address various and ongoing issues;

(x)     placing notice of the TRO Order on EEB's websites and creating a Receivership Website to keep consumers apprised of meaningful developments;

(xi)    notifying federal district courts and the IRS about the TRO Order and extensions of same;

(xii)   diverting mail for the Receivership Entities, which had to be re-done with each extension order that was issued;

(xiii)   reviewing EEB's financial records and engaging in numerous discussions with EEB's accountant, Angela Smith at Empire Tax Professionals ("Empire Tax")[3] in order to complete a financial and accounting analysis;

(xiv)   conducting a review and analysis of the tax reporting history for the Receivership Entities and analysis regarding additional tax obligations;

(xv)   conducting a legal and forensic analysis regarding the business operations of EEB to determine whether such operations could continue both legally and profitably;

(xvi)   preparing and filing the Reciever's First Written Report (ECF No. 38), and supplementing same with the Receiver's Declaration (ECF No. 51), pursuant to Section XII, Paragraph W of the TRO Order and Section XIII, Paragraph W of the Stipulated PI;

(xvii)   preparing an accounting as set forth in the Receiver's First Written Report (ECF No. 38), and supplementing same with the Notice of Accounting and Declaration of Michael R. Shanahan (ECF No. 53), pursuant to Section XII, Paragraph L of the TRO Order and Section XIII, Paragraph L of the Stipulated PI; and

(xviii)   taking steps to shut down all EEB business operations effective October 31, 2024, based on (1) the Court's preliminary finding that "the FTC has satisfied its burden to obtain a Temporary Restraining Order pursuant to Section 5(a) of the FTC Act, 15 U.S.C. § 45(a)[,]" TRO Order, Findings of Fact ¶ C; (2) the Receiver and his agents' review of EEB's social media; (3) the accounting analysis conducted by the Accountants at A&M; and (4) the Receiver's determination that EEB's business operations cannot be conducted both legally *and* profitably.[4]

Pursuant to Sections XVIII of the TRO Order and XIX of the Stipulated PI, the Receiver hereby submits his First Interim Fee Application for the period September 20, 2024 through October 31, 2024, and moves for approval of payment of fees and expenses invoiced by the Receiver, his Law Firm Clark Hill, and his Accountant A&M.

---

[3]   Empire Tax was engaged to provide "CFO Services" to EEB  in or around November 2018.  It is the Receiver's understanding that Empire Tax and EEB are not related entities, and the naming conventions are coincidental.  The discussions with Angela Smith revealed that Empire Tax provided basic bookkeeping and tax return preparation services.

[4]   While the Receiver has shut down EEB's business operations effective October 31, 2024, the Receiver has continued to make weekly payments to Simvoly in order to keep customer Storefunnels pages operational for the time being.  The Receiver understands that various consumers have made the decision to deactivate their individual Storefunnels pages and/or to transfer the pages to Simvoly, and are dealing with Simvoly directly in that regard.

## II.    BACKGROUND OF APPOINTMENT

On September 18, 2024, the Federal Trade Commission ("FTC") filed a Complaint for Permanent Injunction, Monetary Judgment, and Other Relief against Defendants EEB and Peter Prusinowski ("Prusinowski"), alleging that Defendants violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Business Opportunities ("Business Opportunity Rule"), 16 C.F.R. Part 437; and the Consumer Review Fairness Act ("CRFA"), 15 U.S.C. § 45b. *See* ECF No. 1 ¶ 1. The FTC alleges that "Defendants deceptively market and sell ecommerce business opportunities and self-study programs by falsely claiming that consumers will generate substantial income from online stores that are 'powered by artificial intelligence; and Defendants' 'proven' strategies." *Id.* ¶ 2. The FTC alleges that Defendants falsely promised consumers significant earnings when, in reality, the promised profits never materialize, thereby leaving clients with failed businesses that generate little, if any, profits, while Defendants enrich themselves. *Id.* The FTC also alleges that Defendants use non-disparagement clauses which violate the Consumer Review Fairness Act, and that Defendants failed to provide statements and disclosure documents required by the Business Opportunity Rule. *Id.* ¶ 3. The FTC alleges that "[s]ince 2021, Defendants have deceived consumers out of at least $14.3 million. *Id.* ¶ 4.[5]

Along with its Complaint, the FTC filed an Emergency Motion for Temporary Restraining Order with an Asset Freeze and Other Equitable Relief, and an Order to Show Cause Why a Preliminary Injunction Should Not Issue ("Motion for TRO"). (ECF No. 2). In its Motion for TRO, the FTC sought the appointment of a receiver. The FTC also filed its Recommendation for

---

[5]    The Receiver and his Retained Personnel have determined that EEB reported revenue and purported operating expenses of approximately $21.8 million and $17.3 million, respectively, from May 16, 2018 through August 31, 2024, and, based on available accounting records, nearly all funds generated by EEB were transferred to/for the benefit of Prusinowski after payment of purported expenses.

Temporary Receiver that same day, proposing the appointment of Kevin Dooley Kent as Receiver. (ECF No. 8).  The supporting materials submitted therewith set forth the following rates for the Receiver, Law Firm, and Accountant, which provide substantial discounts from their standard 2024 rates:

<u>**The Receiver**</u>

| Name | Rate |
|------|------|
| Kevin Dooley Kent | $722.50 |

<u>**The Law Firm**</u>
**Clark Hill PLC**

| Name/Position | Rate |
|---------------|------|
| Senior Counsel (Megan Guernsey) | $633.25 |
| Senior Attorney (Robin Weiss) | $562.50 |
| Associates | $292.50–$436.50 |
| Paraprofessionals | $270.00 |

<u>**The Accountant**</u>
**Alvarez & Marsal Disputes and Investigations, LLC**

| Name/Position | Rate |
|---------------|------|
| Michael Shanahan, Managing Director | $750.00 |
| Managing Directors | $850.00 |
| Senior Director | $635.00 |
| Director | $575.00 |
| Manager | $490.00 |
| Senior Associate | $450.00 |
| Associate | $350.00 |

*See id.* Ex. A.

On September 20, 2024, based upon the FTC's recommendation, the Court entered the TRO Order which appointed Kevin Dooley Kent as Receiver.  (ECF No. 19).  The TRO Order authorized the Receiver to "[c]hoose, engage, and employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deems advisable or necessary in the performance of duties and responsibilities under the authority granted by [the

TRO] Order."  TRO Order § XII ¶ F.[6]  The Receiver engaged the Law Firm and Accountant to provide professional services as permitted by the TRO Order, at the rates set forth in Exhibit A to the Recommendation for Temporary Receiver.  *See* ECF No. 8 Ex. A.

Both the TRO Order and Stipulated PI provide that "the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the Receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order and for the cost of actual out-of-pocket expenses incurred by them, from the Assets now held by, in the possession or control of, or which may be received by, the Receivership Entities."  TRO Order § XVIII; Stipulated PI § XIX.  Both the TRO Order and the Stipulated PI direct the Receiver to file and serve periodic requests for payment of such reasonable compensation, with the first request to be submitted no more than sixty (60) days after the entry of those respective orders.  *See ids.*

In light of the foregoing, the Receiver submits this First Interim Fee Application seeking reasonable compensation for the fees and out-of-pocket expenses incurred by the Receiver, Law Firm, and Accountant for the period September 20, 2024 through October 31, 2024, for the Court's consideration and approval.  This is the first application for approval of fees and expenses by the Receiver and his Retained Personnel.  Prior to the Receiver's appointment, the Receiver and his team took steps to prepare for the Receiver's appointment, including, *inter alia*, communicating and consulting with the FTC, reviewing litigation-related materials, beginning preliminary investigations into potential Receivership Assets, preparing proposed form notice letters, and preparing for 28 U.S.C. § 754 notices to be filed in all federal district courts.  The Receiver and the Law Firm have not applied for compensation for such pre-appointment activity.  Additionally, the Receiver has written off certain other fees incurred since his appointment, as indicated by the

---

[6]    The Receiver's appointment and authority to engage his Retained Personnel was extended by the Stipulated PI. *See* Stipulated PI § XIII ¶ F.

"No Charge" entries on the Receiver and Law Firm's bill submitted with this Application. In total, these adjustments have resulted in nearly $40,000.00 in costs savings to the Receivership Estate. While not billed, the Receiver asks that the Court take these significant activities into account when evaluating this Application.

## III. INVESTIGATION AND CONTROL OVER ASSETS AND DATA OF RECEIVERSHIP ENTITIES

### A. Notice of TRO Order and Requests for Information/Documentation and/or Compliance with TRO Order

Upon his appointment as Receiver, the Receiver and his agents, through a review of information and documents provided by Defendants and the FTC, identified contact information for all financial institutions, entities, and other third parties that were involved in any way with EEB business operations and sent notice of the TRO Order to all such entities and/or individuals, including a document request and/or asset turnover demand where appropriate. The Receiver sent additional notices following the entry of the Stipulated PI. Specifically, the Receiver and his agents sent notice of the TRO Order and Stipulated PI to the following entities and/or individuals:

| | |
|---|---|
| **TD Bank** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **October 10, 2024:** Sent notice of the Receiver's identification of Star Active and Empire Partner as Receivership Entities and requesting information and documentation for Star Active and Empire Partner pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 28, 2024:** Sent request for information and documentation regarding Defendant Prusinowski's personal bank accounts pursuant to Section IV, Paragraph D of TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| | **September 24, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |

| | |
|---|---|
| **Charles Schwab** | **September 27, 2024:** Sent letter request to transfer the balance of the EEB Schwab account to the Receivership Account, pursuant to Section XII, Paragraph O of the TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **October 16, 2024:** Sent notice of the Receiver's identification of Atlas Fund as a Receivership Entity and requesting the transfer of the balance of the Atlas Fund Schwab account to the Receivership Account, pursuant to Section XII, Paragraph O of the TRO Order. |
| | **October 22, 2024:** Sent letter requesting all records and documentation pertaining to the Atlas Fund account pursuant to Section IV, Paragraph D of the TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Stripe** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 4, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **October 14, 2024:** Sent notice of non-compliance with TRO Order, after observing a withdrawal processed through the EEB Stripe account, and demanding compliance with Section IV, Paragraph A of the TRO Order and a reversal of the withdrawal. |
| | **October 24, 2024:** Sent second notice of non-compliance with TRO Order, again demanding reversal of the withdrawal processed through the EEB Stripe account and advising that Stripe's intent to hold back funds after closing the EEB Stripe account would violate Sections IV, XVI, and XVII of the TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **PayPal** | **September 25, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **October 16, 2024:** Sent letter request to transfer the balance of the EEB PayPal account to the Receivership Account, pursuant to Section XII, Paragraph O of the TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Wave** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |

| | |
|---|---|
| | **October 4, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Venmo** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 4, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 19, 2024:** Sent notice of Stipulated PI. |
| **Citizens Bank** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 4, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **American Express** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 4, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **October 11, 2024:** Sent notice of non-compliance with TRO Order, after observing that American Express failed to freeze/cancel EEB's accounts, and demanding compliance with Section IV, Paragraph A of the TRO Order. |
| | **October 23, 2024:** Sent second notice of non-compliance with TRO Order, after observing that American Express still had not frozen/cancelled EEB's accounts, had imposed late fees on said accounts, and was repeatedly attempting to contact Receiver's agents in an attempt to secure payment of outstanding balances on said accounts, and advising that such actions were a direct violation of Sections IV, XVI, and XVII of the TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Capital Bank and Trust (American Funds)** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 12, 2024:** Sent notice of Stipulated PI. |
| **Capital One** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |

| | |
|---|---|
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Coinbase** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Fidelity Brokerage** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Gemini Crypto** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Payoneer** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Santander Bank** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **SunTrust Bank (Truist Bank)** | **September 23, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **United Bank** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |

| | |
|---|---|
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Veem** | **September 20, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **October 7, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32). |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Active Campaign** | **September 27, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Slack** | **September 27, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Upwork** | **September 26, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **HelloSign** | **September 27, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Docusign** | **September 27, 2024:** Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Peter Hoppenfeld (EEB's former counsel)** | **September 29, 2024:** Sent notice of TRO Order with request for information regarding whether Mr. Hoppenfeld had previously been engaged to represent Defendant Prusinowski, EEB, or both. |
| | **November 11, 2024:** Sent notice of Stipulated PI. |
| **Lodmell & Lodmell P.C. (counsel for the Atlas Entities)** | **October 1, 2024:** Sent notice of TRO Order with request for information regarding whether Mr. Hoppenfeld had been engaged to represent Defendant Prusinowski, EEB, or both. |
| | **October 10, 2024:** Sent notice of the extension of the TRO Order pursuant to the Court's October 3, 2024 Order granting Joint Motion to Extend the TRO (ECF No. 32), with request for documentation and information regarding services provided based on payments made to Lodmell seen in EEB accounting records. |
| | **October 25, 2024:** Served a Subpoena on Lodmell requesting documentation regarding the Atlas Entities. |

| | |
|---|---|
| | **October 31, 2024:**   Sent letter to Lodmell in response to Lodmell's objections to the subpoena and further demanding compliance with subpoena document requests. |
| | **November 11, 2024:**  Sent notice of Stipulated PI. |
| **MetaMask** | **October 22, 2024:**  Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:**  Sent notice of Stipulated PI. |
| **Binance** | **October 22, 2024:**  Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:**  Sent notice of Stipulated PI. |
| **BitConnect** | **October 23, 2024:**  Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:**  Sent notice of Stipulated PI. |
| **Celsius Network** | **October 25, 2024:**  Sent notice of TRO Order with request for information and documentation pursuant to Section IV, Paragraphs C & D of TRO Order. |
| | **November 11, 2024:**  Sent notice of Stipulated PI. |
| **Closer Secrets LLC** | **October 28, 2024:**  Sent notice of TRO Order with request for information and documentation pursuant to Sections IV, XIII, and XV of TRO Order. |
| | **November 11, 2024:**  Sent notice of Stipulated PI. |
| | **November 15, 2024:**  After reviewing initial production made on November 12, 2024, sent follow-up request for additional documentation pursuant to Section V, Paragraph D of the Stipulated PI. |

In addition to the above, the Receiver has also served copies of the TRO Order on all known EEB back-office contractors for whom Defendants provided contact information.  All known parties currently in possession of Receivership Assets were advised to hold, preserve, and retain any Receivership Assets, except upon other instructions from the Receiver.

As a result of these Notices, the Receiver, through his Counsel and/or Paraprofessionals, where appropriate, conducted interviews and/or exchanged communications with many individuals and/or entities served with the TRO Order, directly or through their counsel, many of whom have turned over additional documents for review.  For example, the Receiver and his agents: (1) corresponded with Stripe, American Express, and PayPal,  demanding compliance with

the TRO Order, and subsequently worked through such noncompliance with these entities and/or their counsel; (2) corresponded with Charles Schwab regarding its holdback of funds in the Atlas account in relation to a purported margin loan; (3) corresponded with special counsel to the debtors in the bankruptcy case *In re: Celsius Network, LLC, et al.*, Case No. 22-10964-MG (S.D.N.Y.) following Defendant Prusinowski's forwarding of a notification regarding a claim distribution in connection with the bankruptcy proceedings, requesting documents and information pursuant to the TRO Order and compliance with the asset freeze; (4) received and reviewed documents from Closer Secrets LLC and communicated with counsel regarding requests for additional documents after determining their production was incomplete; and (5) received documents from Lodmell & Lodmell P.C. on November 7, 2024 in response to the subpoena that the Receiver served on Lodmell on October 25, 2024.  Additionally, the Receiver and his Counsel have had extensive communications and dealings with TD Bank in person, by telephone, and by e-mail in connection with the Receiver's efforts to close EEB accounts held at the institution and arrange for the transfer of balances to the Receivership Account.

As indicated in the above chart, following the Court's approval and entry of the Stipulated PI on November 8, 2024, the Receiver and his agents sent notice of the Stipulated PI to all of the entities and individuals identified above, notifying them of the Receiver's re-appointment pursuant to the Stipulated PI and indicating that the Stipulated PI effectively extended the terms of the TRO Order.

### B.    Receivership Bank Account Opening and Collection of Funds

Pursuant to Section XII, Paragraph O of the TRO Order, the Receiver arranged for the opening of a centralized Receivership Account with WSFS Bank (the "Receivership Account"), where Receivership Assets could be deposited.  Thereafter, the Receiver requested that TD Bank and Charles Schwab ("Schwab") transfer the entire balance of accounts in the name of EEB into

the Receivership Account. On October 1, 2024, Schwab transferred the funds from EEB's Schwab brokerage account, totaling $610,672.41, into the Receivership Account. The Receiver experienced some delays in the transfer of funds from TD Bank, resulting in further communication with the institution; however, funds totaling $51,945.01 were ultimately successfully transferred from the two frozen EEB TD Bank accounts into the Receivership Account. Additionally, on October 7, 2024, Defendants' former counsel, Gordon Rees Scully Mansukhani LLC ("Gordon Rees"), transferred $77,000.00 to the Receivership Account.

After the Receiver identified Star Active, Empire Partner, and the Atlas Entities as Receivership Entities, the Receiver began conducting further investigation into the entities' financial accounts and assets in order to identify all financial accounts held by the entities and subsequently direct that the funds in such financial accounts be transferred to the Receivership Account. On October 10, 2024, the Receiver notified TD Bank of the identification of Star Active and Empire Partner as Receivership Entities, requested information and documents for all accounts held by the entities, and requested the transfer of any funds remaining in such accounts to the Receivership Account. Ultimately, after multiple lengthy visits to TD Bank and numerous follow-up communications by telephone and e-mail, TD Bank finally transferred $10,211.26 from Empire Partner's TD Bank Account to the Receivership Account on November 12, 2024.[7]

On October 16, 2024, the Receiver notified Schwab of the identification of the Atlas Entities as Receivership Entities, and requested that they liquidate the securities in the Atlas Fund Schwab account and transfer the entire balance of the account to the Receivership Account. On October 18, 2024, Schwab transferred $613,202.79 to the Receivership Account from Atlas Fund's brokerage account. Upon receipt of these transferred funds, the Receiver and his agents observed

---

[7]    The Receiver also closed down the EEB TD Bank accounts during this visit.

that Charles Schwab did not transfer the full balance of the Atlas account and had retained over $300,000, which the Receiver assumed was held back due to an asserted margin loan that Schwab claimed it was owed by Atlas. Accordingly, on October 22, 2024, the Receiver sent a follow-up letter to Schwab indicating such, informing Schwab that such acts of self-help were not authorized under the TRO Order, and demanding copies of all records and documents pertaining to the Atlas account pursuant to Section IV, Paragraph D of the TRO Order, in order for the Receiver to better understand the basis for Schwab's asserted secured interest in the held-back funds. On October 23, 2024, in response to the Receiver's letter, Schwab sent Receiver's counsel a copy of the Application completed by Defendant Prusinowski regarding the margin loan taken out on Atlas's Schwab account and, on November 18, 2024, the Receiver received a document production from Schwab regarding, *inter alia*, the Atlas account. The Receiver and his counsel are still reviewing and analyzing these records.

Finally, on November 12, 2024, Gordon Rees transferred an additional $18,642.00 to the Receivership Account, representing the balance of funds held in its trust/IOLTA account following the Court's entry of the Order granting Defendant Prusinowski's Motion for Fees Incurred to Date, and Additional Fees to Continue to Defend (ECF No. 43), and consistent with Section IV, Paragraph 1 of the Stipulated PI.

As of November 18, 2024, the balance in the Receivership Account was $1,318,641.08.

### C.    Control Over and Preservation of Assets

As described above, the Receiver has secured the transfer of EEB and Empire Partner funds from TD Bank, and EEB and Atlas Fund Assets from Schwab to the Receivership Account.

Following the entry of the TRO Order, the Receiver became aware of a Safe Deposit Box located at the TD Bank in Jamison, Pennsylvania that was controlled by Defendant Prusinowski and held assets such as Rolex watches, gold and silver bullion, gold and silver coins, as well as

16

various documentation, including documents regarding EIN numbers for the Receivership Entities. The Receiver has taken possession of the keys to access the Safe Deposit Box and has taken inventory its contents.  Because the Receiver now possesses the keys and is thus the only person who may currently access the Box, its contents currently remain at TD Bank.

Pursuant to Section XII, Paragraphs B-E of the TRO Order, and in order to prevent further dissipation of assets, the Receiver requested access for all online financial, payment processing, and credit card accounts from Defendants.

Upon receipt of the log-in information, the Receiver and his agents changed the passwords for all accounts he and his agents have been able to access, including specifically:

- TD Bank (Balances as of 11/19/24 – Empire Holdings 1: account closed; Empire Holdings 2: account closed; Empire Partner $0.00);

- Stripe (Balance as of 10/31/24: $7,685.00);

- PayPal (Balance as of 10/31/24: -$15.00);

- NMI;

- Wave (Balance as of 10/31/24: $0.00);

- Authorize.net;

- American Express (Total Balances as of 11/19/24 – EEB Business Gold Card x24001: $27,306.02;  EEB Business Platinum Card x22007: $68,832.18; EEB Business Gold Card x94002: $375.00; EEB Business Gold Card x93004: $790.61; EEB Business Gold Card x92003: $25,526.27; EEB Business Gold Card x82002: $15,258.10; EEB Business Gold Card x42008: $13,436.40; EEB Business Gold Card x42005: $923.22; Business Gold Card x32000: $25,051.26;[8]

- Charles Schwab (password changed, but unable to log into account due to security restrictions to confirm balance);

---

[8]    The Receiver has excluded from this list Defendant Prusinowski's personal Charles Schwab Platinum Card (x91000) and High Yield Savings Account ("HYSA") (x8569; Balance as of 11/19/24: $0.03).  Neither the TRO Order nor the Stipulated PI forbid Mr. Prusinowski from incurring charges on personal credit cards.  *See* TRO Order § III ¶ C & § IV ¶ A; Stipulated PI § III ¶ C & § V ¶ A.

- Fidelity Brokerage (Personal Health Savings Account; Balance as of 11/19/24: $6,211.74;

- Capital One (Balances as of 10/17/24 – Personal Savings Account: $0.59; Explore Rewards & Benefits: $1.39; Quicksilver: $0.00);

- Gemini Crypto (Account frozen; Balance as of 10/31/24: $114.58); and

- Robinhood (Not used since approximately March 2020; Balance as of 10/17/24: $0.00).

However, the Receiver has not been able to access some accounts due to restrictions placed in response to the TRO order, issues with Two-Factor Authentication ("2FA") codes sent to unknown and/or inaccessible email addresses and/or phone numbers,[9] and/or incorrect and/or non-functioning log-in credentials provided by Defendant Prusinowski.  Specifically, the Receiver has been either unable to access and/or unable to change the passwords for the following financial accounts provided and/or identified by Mr. Prusinowski: (1) Binance Cryptocurrency Exchange (log-in attempt failed due to issues with username, password, or account); (2) Payoneer (log-in attempts failed; account locked); (3) Bitconnect (cryptocurrency exchange shut down 1/16/18 due to cease and desist order); (4) Celsius Network (platform closed 1/31/24 due to bankruptcy); (5) MetaMask (unable to access due to security restrictions); (6) Capital Bank and Trust (log-in not working; however, Capital Bank & Trust advised that it holds a Solo 401K for Defendant Prusinowski, as Trustee for EEB, account x-1362, with a balance of $232,083.69 as of 9/24/24); (7) Citizens Bank (unable to access due to two factor authentication issues; however, Citizens Bank advised that the balance in account x5523, apparently belonging to EEB, holds $1 and has not had any activity since 5/21/24); (8) Coinbase (log-in not working; however, Coinbase has only been able to locate personal accounts in the name of Defendant Prusinowski, which Mr. Prusinowski identified in his 9/25/24 financial disclosures as having a current balance of

---

[9]    To the extent two-factor authentication codes have been sent to Defendant Prusinowki, he has indicated that he has forwarded all codes he received to the Receiver and his agents.

$25,077.41, and Coinbase identified as having a balance of $26,771 on 9/26/24); and (9) Venmo (account suspended; able to access account but unable to change password; Balance as of 10/31/24: $0.00).

Additionally, the Receiver had difficulties securing compliance with the TRO Order from American Express, Stripe, and PayPal.  Although the Receiver changed the passwords on these accounts and sent multiple notice letters to these institutions regarding the TRO Order, these entities refused to prevent the incurrence of additional charges.

With regard to American Express, the Receiver discovered that additional charges were being incurred on multiple EEB accounts since September 20, 2024, many of which did *not* appear to have been initiated by Defendants, but rather by third party service providers, likely partly or largely through automatic recurring payments.  The vast majority appeared to relate to advertising and/or marketing charges through sites like Google, Facebook, and Amazon, even though Defendant Prusinowski advised that all such services had been cut off and cancelled.  However, other charges appeared to relate to services that the Receiver believed were necessary for EEB back-office support and/or customer Storefunnels operations to continue.  Most of these charges were through account x2207, and included payments to sites like GoDaddy, Simvoly, Google/GSuite, Twilio, and Digital Ocean.  While this account appears to have been used by Mr. Prusinowski for a combination of business and personal purposes prior to the date of the entry of the TRO Order, and features a $20,000.00 payment to Gordon Rees on September 18, 2024, it appears that personal use of the card stopped after September 20, 2024, with the exception of $1,166.93 paid to Keystone Health Plan East HMO Member Services between two payments on September 27 and September 20, 2024, which may have been automatic payments.[10]

---

[10]    On 9/20/24, there was a $40.20 charge at Sunoco, a $4,800.00 PayPal payment to SonnyEnterp 4029357733, and a $15,000.00 mobile payment (possibly to partially cover the $20,000.00 paid to Gordon Rees) on the American

After realizing that American Express had not honored the asset freeze in that it had failed to stop charges on the credit cards and began charging late fees for late payments on the accounts, the Receiver sent a follow-up letter to American Express on October 11, 2024, advising that it was in direct violation of Sections IV, Paragraphs A and C of the TRO Order, and directing it to immediately cancel/freeze all accounts in the name of EEB.  Because the Receiver did not receive a response from American Express, the Receiver sent a second notice of non-compliance with TRO Order on October 23, 2024.  Following the second notice of non-compliance letter, American Express subsequently contacted Receiver's counsel to inform them that all EEB accounts had been frozen since October 7, 2024, and produced a one-page account listing on November 7, 2024.[11]

PayPal and Stripe were likewise in violation of the TRO Order as they were processing customer chargebacks despite receiving notice of the asset freeze.  The Receiver sent noncompliance letters to Stripe and PayPal on October 14 and 16, 2024, respectively.  In the letter to Stripe, the Receiver demanded that it immediately reverse the $1,908.73 that Stripe withdrew from one of EEB's TD Bank accounts on October 10 (which caused an overdraft), return the withdrawn funds, and cease the withdrawal of all funds from the EEB TD Bank Account.  In the letter to PayPal, the Receiver noted that he had observed an apparent chargeback of $179.33 identified as an "amount due to PayPal" and demanded that PayPal suspend its internal processes to prevent any further chargebacks during the pendency of the TRO Order.

---

Express account, but it is unknown whether these charges and payments were made before or after the entry of the TRO Order.

[11]    When American Express did not respond to the Receiver's first notice of non-compliance with the TRO Order sent out on October 11, 2024, the Receiver and his agents took steps manually freeze all but one of the EEB American Express credit cards.  The Receiver did not freeze account x2207 out of concern that the consequences of non-payment to websites like GoDaddy would interfere with the operation of customer Storefunnels and/or back-office support for existing EEB customers.  He did, however, direct Mr. Prusinowski to ensure that all personal recurring auto-payments, including payments for his health insurance, need to be taken off of that card.  Mr. Prusinowski confirmed that this was done on October 16, 2024.  As for the other accounts, customer-initiated freezes only last one week, so the Receiver had to repeat this process on a weekly basis.

Stripe did not respond to the Receiver's non-compliance letters. However, on October 18, 2024, Stripe sent an email to Defendant Prusinowski's personal Gmail account—rather than responding to the Receiver— advising that EEB's business presented a higher level of credit risk than Stripe was able to support, and that it would be closing EEB's Stripe account on October 31, 2024. Stripe further advised that "[i]n order to cover any disputes or unforeseen refunds on your account, we will also hold 100% of your account balance and future transactions in reserve for 90 days. The remaining funds will be paid out to your bank account at the end of this period." Based on this, the Receiver sent Stripe a second notice of non-compliance with the TRO Order on October 24, 2024, again demanding reversal of the withdrawal processed through the EEB Stripe account and advising that Stripe's intent to hold back funds after closing the EEB Stripe account would violate Sections IV, XVI, and XVII of the TRO Order. After sending the second notice of non-compliance letter to Stripe, counsel for Stripe contacted Receiver's counsel to work through the issues asserted in the non-compliance letters. In working through Stripe's noncompliance with the TRO Order with Stripe's counsel, Receiver's counsel confirmed that (1) Stripe would make efforts to reverse the withdrawal processed through the EEB Stripe account, (2) there was no positive balance in the Stripe EEB account that would warrant the hold back of any funds upon account closure, and that (3) Stripe's closure of the EEB account would not in any way impact the Storefunnels Stripe account, which has been—and continues to—collect Storefunnels subscription payments for individuals who have active websites on Storefunnels. Moreover, as for the Storefunnels Stripe account, Receiver's counsel confirmed with Stripe's counsel that Stripe would pause payouts, but would otherwise continue to allow EEB customers' Storefunnels' subscription payments to process and accrue in the Storefunnels Stripe account and that, once the Receiver and

his agents formally took steps to shut down Storefunnels, that the Receiver would then direct Stripe to transfer the balance of the Storefunnels Stripe account to the Receivership Account.[12]

As for PayPal, Receiver's counsel had numerous e-mail communications with PayPal's outside counsel, followed by a phone call on November 11, 2024.  During the call, PayPal's counsel advised that PayPal had sent the Receiver a check for the balance in the PayPal account— which has not yet been received as of the date of this filing—that they are required to allow customer chargebacks to go through when customer disputes are timely submitted, and that this happens through an automated process.  However, PayPal has covered the cost for the previous chargeback submitted after the entry of the TRO Order, and will continue to do so in the event additional chargebacks are initiated.  Given the losses PayPal has or may incur in connection with this chargeback process in order to comply with the TRO Order and Stipulated PI, PayPal may submit a claim in the future through the Receivership Estate for those losses.  PayPal is also banning EEB and its principals from using its services in the future.

### D.    Control Over and Preservation of Documents

Pursuant to Section XII, Paragraphs B, C, and E of the TRO Order, the Receiver and his agents have worked continuously to gain control over, and preserve, the Documents of EEB, as that term is defined in the TRO Order.  Since EEB does not have a physical office location and operates entirely via electronic and/or Cloud-based means, and because EEB has contractors all over the world including, *inter alia*, Dubai, the Philippines, Pakistan, Jamaica, and Colorado—and the Receiver has faced challenges accessing various accounts and/or obtaining documents from third parties—this has been a very difficult task that is ongoing.  Both the FTC's Digital Forensic Unit and the Receiver's Law Firm, including its in-house e-discovery vendor and internal staff,

---

[12]    As of November 7, 2024, the balance in the Storefunnels Stripe account was $24,216.07.  *See* ECF No. 51 ¶ 23.

have assisted with the preservation of Documents as contemplated by Section XII, Paragraph F of

the TRO Order and Section XIII, Paragraph F of the Stipulated PI.  The following Documents

and/or devices have been backed up and/or preserved:

- Defendant Prusinowski's personal cell phone that has also been used for business purposes (preserved by the FTC's Digital Forensic Unit);

- Defendant Prusinowski's personal laptop (together with his personal cell phone, "personal devices") that has also been used for business purposes (preserved by the FTC's Digital Forensic Unit);[13]

- Defendant Prusinowski's personal Gmail account, pruspeter@gmail.com (preserved by Clark Hill's in-house e-discovery team);

- GSuite/Google Drive (preserved by the FTC's Digital Forensic Unit);

- All data from the Google domain @ecommerceempirebuilder.com, including 16 company e-mail addresses (preserved by the FTC's Digital Forensic Unit);

- All data from the three company e-mail addresses that used the Microsoft domain @ecommerceempirebuilders.com, belonging to Defendant Prusinowski (peter@ecommerceempirebuilders.com), EEB Chief Operating Officer Aliakbar Gulshan (ali@ecommerceempirebuilders.com), and Jordan Strauss (jordan@ecommerceempirebuilders.com) (preserved by the FTC's Digital Forensic Unit);

- All extractable data available from Defendant Prusinowski's Basecamp account (preserved by the FTC's Digital Forensic Unit).  Basecamp is the primary way EEB contractors communicate with customers;

- All extractable data available from Defendant Prusinowski's Monday account (preserved by the FTC's Digital Forensic Unit).  Monday is project management software that EEB's back-office personnel use to manage and track the status of projects;

- All extractable data available from two slack channels accessible with Defendant Prusinowski's log-in credentials: (1) Ecommerce Empire Builders and (2) Ecom-

---

[13]    There was a several-day delay before Mr. Prusinowski turned over these personal devices.  There remains an open question regarding whether any data or information was deleted from these personal devices before they were turned over to the Receiver; Mr. Prusinowski represented during his deposition that he did not delete and data or information from these personal devices before they were turned over to the Receiver.  After the FTC completed its extraction/preservation of data from Defendant Prusinowski's personal devices, and after confirming that password changes necessary to cut off control to financial and other necessary accounts to the extent feasible had been accomplished, the Receiver returned the personal devices to Mr. Prusinowski following representations from him and his counsel that access to these personal devices was necessary for them to prepare a defense in this action.

empire-builders (preserved by the FTC's Digital Forensic Unit).[14] Slack is a program through which back-office personnel communicate with one another, including with respect to customer project requests.

The Receiver learned that complete extraction of all data is difficult and/or not feasible from many websites, but extracted and/or otherwise compiled select important data from the following websites: (1) American Express; (2) Basecamp data from select back-office personnel; (3) Clickfunnels; (4) Hellosign; (5) Docusign; (6) Jotform; (7) Morevago; (8) PipeDrive; (9) Storefunnels.net; (10) Stripe; (11) TD Bank; (12) Wave; and (13) App Members Pro.

Additionally, the Receiver has taken over administrative control of and/or changed the passwords to the following non-financial accounts: (1) Gsuite; (2) Google Drive; (3) Defendant Prusinowski's company email (peter@ecommerceempirebuilders.com); (4) Storefunnels Management Console; (5) Cloudfare.com; (6) Basecamp;[15] (7) Clickfunnels; and (8) DocuSign; (9) Instagram (@eccommerce.empire.builders); (10) YouTube (@ecommerce.empire.builders); (11) X/Twitter (@OffPeterPru); and (12) Speaker (Ecommerce Empire Builders Podcast).  The Receiver has been unable to access the non-financial account ActiveCampaign, which is a customer experience automation platform that helps businesses engage with customers, because EEB has not provided the correct log-in credentials despite multiple requests for such.  Since receiving notice of the TRO Order, Active Campaign has suspended EEB's account. In subsequent communications with Active Campaign, Active Campaign has advised Receiver's counsel that the

---

[14]    Only public-facing information can be extracted from Slack.  Direct and private messages cannot be extracted, though they can be accessed by logging in to the account.  There were four other Slack spaces associated with Mr. Prusinowki's account, but Mr. Prusinowski did not have sufficient access to download from those channels because he is not an administrator of those accounts: (3) Aliakbar Ecommerce, (4) The dropshipping council, (5) Scaleable, and (6) eCom Empire.  Mr. Prusinowski advised that he does not know what Aliakbar Ecommerce is—though the Receiver suspects it may be a separate channel for EEB's COO, Aliakbar Gulshan—that the dropshipping council and Scaleable slack pages are unrelated to EEB, and that eCom Empire is a slack channel controlled by a former outsourced sales company called Closer Secrets LLC.

[15]    Other contractors had their own logins for Basecamp, so they were still able to provide back-office support to existing EEB customers before the Receiver ceased EEB business operations.

log-in credentials provided by Mr. Prusinowski are not correct, and that the only way to access the account would be for Active Campaign to reactivate the account to allow Mr. Prusinowski to reset his password.  Because the account is currently suspended and no one has access to the account, and because—as explained in Section IV.F, *infra*—the Receiver has formally shut down EEB business operations as of October 31, 2024, the Receiver has allowed the Active Campaign account to remain suspended.

In addition to the above, Defendant Prusinowski turned over to the Receiver certain hard-copy documents in his possession, including documents relating to the Atlas Entities.  The Receiver has also obtained financial documents and records from EEB's accountant, Angela Smith at Empire Tax Professionals ("Empire Tax")[16] and has obtained log-in credentials from and/or obtained certain documents from EEB back-office personnel as needed.

The Receiver has also received document productions from certain financial institutions and third parties in response to notice letters and/or subpoenas, which he and his Retained Personnel continue to review.  The Receiver and his Retained Personnel continue to analyze all available documents in order to identify, locate, and secure additional assets of the Receivership Entities.

### E.   Control Over and Preservation of EEB Social Media

Pursuant to Section XII, Paragraphs B, E, and I of the TRO Order, the Receiver and his agents expended considerable effort to gain control over and preserve EEB's social media accounts and the posts on each account.  Based in part on information from Defendant Prusinowski, the Receiver identified the following social media accounts through which EEB marketed its Products

---

[16]   Empire Tax was engaged to provide "CFO Services" to EEB  in or around November 2018.  It is the Receiver's understanding that Empire Tax and EEB are not related entities, and the naming conventions are coincidental.  The discussions with Angela Smith revealed that Empire Tax provided basic bookkeeping and tax return preparation services.

and  Services:  (1)  Instagram  (@ecommerce.empire.builders);  (2)  YouTube (@ecommerce.empire.builders); (3) Facebook (@Ecommerce Empire Builders); (4) X/Twitter (@OffPetterPru); (5) TikTok (@ecomm.empire.builders); (6) Spreaker (Ecommerce Empire Builders Podcast).  The Receiver faced numerous difficulties accessing and/or deactivating the accounts due to Two-Factor Authentication and administrative issues.

As noted in Section III.D, *supra*, the Receiver has taken over administrative control and/or changed the passwords of all of the above social media accounts except for TikTok, due to security verification issues, and the Facebook page, for which the Receiver's agents tried, unsuccessfully, to take over administrative control.[17]  And due to the volume of posts and activity on each social media account, the Receiver evaluated various options for preserving the social media in a manner that would be both cost-effective and expeditious, ultimately utilizing the Receiver's Law Firm's internal e-discovery team to preserve the social media accounts.  To date, all of the above EEB social media accounts (Instagram, Facebook, YouTube, X/Twitter, TikTok, and Spreaker) have been preserved.

---

[17]     Unlike EEB's other social media accounts, EEB did not have its own Facebook "account"; rather, it had a Facebook page, which was run and operated by EEB personnel through their own individual Facebook accounts. Therefore, the only way for the Receiver and his agents to have gained control over the EEB Facebook page was to either mandate that an existing administrator of the EEB Facebook page make one of the Receiver's agent's individual Facebook accounts the head administrator of the EEB Facebook page, or to gain access to the Facebook page through one of the existing administrator's own individual Facebook accounts.  The Receiver initially requested that Defendant Prusinowski provide the log-in credentials to his own Facebook account so that the Receiver could access the EEB Facebook page, but Mr. Prusinowski informed the Receiver that his Facebook account is deactivated.  Because, understandably, neither the Receiver nor his agents wished to utilize their own personal Facebook accounts in an official capacity to gain administrative control of the EEB Facebook page, the Receiver's agents created a Facebook account (the "Receiver FB Account") solely for the purpose of gaining control of the Facebook page, and subsequently met with one of the Facebook page administrators, James Zeller, via Zoom, during which Mr. Zeller walked Receiver's agents through the administrative functions of the Facebook page and also set up the Receiver FB Account to have full administrative control of the Facebook page.  *See* Section IV.A, *infra*.  Unfortunately, the Receiver was not able to access the Facebook page because Facebook did not allow the Receiver to start using the Receiver FB Account. Facebook, presumably for security reasons, asked the Receiver's agents to provide more information for the Receiver FB Account, but despite the Receiver's agent's prompt furnishing of such information to Facebook, Facebook did not grant the Receiver access to the Receiver FB Account.  The Receiver's agents thus worked with Mr. Zeller to oversee the deactivation of the EEB Facebook page, as explained in Section IV.A, *infra*.

**F.     Investigation of Potential Assets**

The Receiver and his Retained Personnel are still in the process of investigating the assets and liabilities of the Receivership Entities.  On October 25, 2024, the FTC and the Receiver took the deposition of Defendant Prusinowski, who provided more insight as to where assets may be located.  Additionally, the Receiver's agents are in the process of conducting a thorough review of all materials that have been preserved from various e-mail accounts and drives, as well as all materials produced by various entities/individuals, in order to learn more information regarding Receivership Entities. The Receiver is actively investigating whether the Atlas Entities may be holding additional assets.  For example, the Receiver is investigating whether Atlas Land owns any property and whether certain Atlas funds may be held in Belize.  Additionally, the Receiver and his agents are also investigating other entities owned and operated by Defendant Prusinowski to determine whether they have received assets derived from EEB or would otherwise qualify as Receivership Entities.

**G.     Depositions of Peter Prusinowski, Aliakbar Gulshan, and Kellie Prusinowski**

As noted above, on October 25, 2024, the FTC and the Receiver's counsel deposed Defendant Prusinowski.  And on November 4, 2024, the FTC and the Receiver's counsel deposed EEB Chief Operating Officer Aliakbar Gulshan and Mr. Prusinowksi's wife, Kellie Prusinowski.

Defendant Prusinowski and Mr. Gulshan both provided testimony that supports the Receiver's conclusion that EEB's business operations cannot be conducted both legally and profitably.  *See* Section IV.F, *infra*.  Defendant Prusinowski and Mr. Gulshan both testified that EEB started making changes to its marketing and advertising earlier this year in attempt to be in compliance with the law, and that EEB experienced a slowdown in business around the same time. *See* ECF No. 51 Ex. B at 49:5-12.  Mr. Prusinowski specifically testified that EEB was "losing a lot of money every month," that he "was just trying to find ways to keep [EEB] alive," and that

27

the business was suffering as a result of the changes made to EEB's marketing and advertising. *See id.* at 63:1-18. Mr. Gulshan testified that due to the business slowdown and prior to the entry of the TRO Order, EEB had reduced nearly all of its contractors' pay and terminated one of its contractors. Additionally, Mr. Prusinowski testified that EEB did not have any guidelines or budgets for how much it spent on marketing and advertising, did not have a limit on Mr. Prusinowski's or Mr. Gulshan's expense approval authority, gave free range to the sales team to set price points for product sales to prospective customers, and that back office contractors would continue to provide support services to customers whose support services had already expired per their contract if the customer still reached out for support through the Basecamp platform. *See id.* at 37:18-25; 74:7–75:10; 84:2-16; 183:6-12; 184:10-15.

## IV.    INVESTIGATION, MANAGEMENT, AND SHUTDOWN OF EEB BUSINESS OPERATIONS

### A.    Interviews of EEB Personnel

The Receiver and/or his Retained Personnel had multiple meetings and calls, and exchanged many emails, with key EEB personnel to gain further information regarding company records, assets, and operations, including Defendant Prusinowski, COO Aliakbar Gulshan, and accountant Angela Smith from Empire Tax.

The Receiver's counsel and agents communicated with and/or interviewed the following EEB contractors:[18]

| | |
|---|---|
| **James Zeller** | Mr. Zeller is an advertising manager who is an administrator of EEB's Facebook page. Upon learning that the only way for the Receiver and his agents to gain control over the EEB Facebook page was to either mandate that an existing administrator of the EEB Facebook page make one of the Receiver's agent's individual Facebook accounts the head administrator of the Facebook page, or to gain access to the Facebook page through |

---

[18]    EEB only had four (4) 1099 contractors: Steve Swiat, James Zeller, Jordan Strauss, and Paul Murano. Mr. Strauss handled marketing for EEB, and Mr. Murano handled automation.

| | one of the existing administrator's own individual Facebook accounts, the Receiver's agents created a Facebook account (the "Receiver FB Account") solely for the purpose of gaining control of the Facebook page, and subsequently met with Mr. Zeller via Zoom, during which Mr. Zeller walked the Receiver's agents through the administrative functions of the Facebook page and also set up the Receiver FB Account to have full administrative control of the Facebook page.  After efforts working with Facebook to allow for the use of the Receiver FB Account were unsuccessful, *see* ECF No. 38 at 19 n.19—and following the preservation of the EEB Facebook page—the Receiver's agents met once again with Mr. Zeller via Zoom, requested that he manually deactivate the Facebook page, and observed him do so in real-time during the Zoom call. |
|---|---|
| **Steve Swiat** | Mr. Swiat provided consulting services for EEB customers since July 2020. Specifically, Mr. Swiat stated that he assisted new customers with onboarding and funnel builds, coached new customers, and participated in strategy sessions with the customers prior to the launch of their own ecommerce business. While he executed a Consulting Agreement that defined the scope of services he provided to EEB customers, the agreement is silent as to his compensation structure. His compensation was solely pursuant to a verbal agreement, which he told Receiver's counsel was purely commission-based, based upon the products and/or services that he sold for EEB. |

The Receiver's counsel and agents also communicated with and/or interviewed the following EEB back-office personnel:[19]

| | |
|---|---|
| **Khalid Angelo Manalundong (Video Editor)** | Mr. Manalundong was a video editor, who made TikTok ads for customers' Storefunnels brands, which were intended to promote their products. Mr. Manalundong worked full time hours, and serviced 4-6 customers per day, and 28-30 customers per week. He did not interface directly with customers, and received his assignments through the Monday platform.  At the time of the interview, he was the only active video editor for EEB and was paid a set monthly base fee. |

---

[19]    Back-office personnel were not employees.  They were considered contractors, though they were not issued 1099's. The vast majority of them are outside the United States.  They had consulting agreements with EEB that are silent as to compensation structure.  Historically, they submitted invoices each month and were paid through applications like Payoneer, PayPal, and Stripe.  They were involved with the creation of customer Storefunnels and providing ongoing support to existing customers.

| | |
|---|---|
| **Sheldon Garwood (Production Manager)** | Mr. Garwood was a production manager who reviewed requests submitted to Slack, put them into Monday for assignment to back-office staff, and managed the overall Monday platform. He provided technical assistance with customer Storefunnels, which often required logging in to customer Storefunnels to make the necessary adjustments.  Mr. Garwood worked 6-8 hours per day. He was the sole production manager and received a flat monthly base pay. |
| **Ruby Gull (Account Executive)** | Ms. Gull, Mr. Siddiqui, and Mr. Kamil were account executives[20] who handled customer outreach/ communications and conducted research/made recommendations for EEB customers.  Every EEB customer was assigned an account executive who was their primary point of contact and stayed with them through the life of their relationship with EEB, including assisting with launches and relaunches.  As account executives, Ms. Gull, Mr. Siddiqui, and Mr. Kamil primarily communicated with customers through Basecamp or Zoom, helped customers determine what services are needed, and then inputted those requests into Slack for assignment.  Ms. Gull, Mr. Siddiqui, and Mr. Kamil worked full-time hours.   Additionally, certain of the account executives worked with higher-level customers who purchased additional services/more inclusive packages, *e.g.*, Automated Ads Management ("AAM") or the Automated Executive Platinum Program ("Auto Exec"), in which case they provided additional services including assisting with marketing, tracking performance with greater frequency, etc. Ms. Gull, Mr. Siddiqui, and Mr. Kamil were paid a set monthly base fee. |
| **Laraib Ahmed Siddiqui (Account Executive)** | |
| **Kasib Kamil (Account Executive)** | |
| **Muhammad Adeel (Website/Funnel Builder)** | Mr. Adeel was a website and funnel builder who designed and built customers' Storefunnels pages, both for launches and re-launches.  He was the only contractor who performed this work for EEB.  He worked roughly 25 to 30 hours per week and received a set monthly base pay. |
| **Haya Kamil (Virtual Assistant)** | Ms. Kamil and Mr. Awan were virtual assistants who provided customer service for EEB customer Storefunnels. Ms. Kamil and Mr. Awan assisted with fulfilling orders, dealt with vendors and suppliers, and handled other customer service issues. They worked for AAM clients only. Ms. Kamil and Mr. Awan worked approximately 40 hours per week and had set monthly base pays. |
| **Owais Ali Awan (Virtual Assistant)** | |

---

[20]    The Receiver's counsel was not able to connect with Account Executive Abdul Ghaffar or Account Executive Manager Tareq Alrefae.  However, based upon information received from the other account executives and from discussions with the COO, the Receiver has a general understanding of the services that these two individuals provided for EEB.

| | |
|---|---|
| **Ruben Hernandez (Copywriter)** | Mr. Hernandez was a copywriter who did research for copywriting and provided copywriting for EEB customers. He assisted with launches and relaunches. He provided the copy for informational products, like e-books. He serviced 35 to 50 clients per week and worked 40 hours per week. He was the only back-office copywriter and had a set monthly base pay. |
| **Arianne Franco (Graphic Designer)** | Ms. Franco was a graphic designer who used a combination of Adobe Photoshop, Adobe Illustrator, and CANVA to provide graphic design services for EEB customers. She handled the design for informational products and assisted with advertisements and website graphics. Ms. Franco serviced an average of 3 to 5 clients at a time and generally worked 40 hours per week. At the time of her interview, Ms. Franco was the only remaining back-office graphic designer for EEB and had a set monthly base pay. |
| **Muhammad Arsalan (Media Buyer)** | Mr. Arsalan and Mr. Nadar were media buyers who assisted clients with placing ads, primarily through Facebook and Instagram, with the goal of bringing in orders for customers. For AAM clients, Mr. Arsalan and Mr. Nadar placed and managed the ads directly. For customers who purchase a lower level of service, Mr. Arsalan and Mr. Nadar had calls with their clients to guide them on how and where to buy media. Mr. Arsalan was paid based upon the number of active clients he worked for over a specified period of time. Mr. Nadar was paid a flat rate consulting fee every month. |
| **Jijo William Nadar (Media Buyer)** | |
| **Rubeena Kousar (Influencer Marketer)** | Ms. Kousar was an influencer marketer who identified and coordinated with influencers to market customers Storefunnels' products. She typically worked 15 hours per week, and was paid based on the number of influencers she was able to secure who successfully posted a product. |

### B.    Consumer Outreach

In order to gain further insight on EEB's business operations, the Receiver and his agents also conducted outreach to EEB customers. On September 26, 2024, Receiver's counsel emailed 26 individuals (comprised of both current and former EEB customers) attaching the TRO Order, informing them of the Receiver's appointment, and requesting to speak to them about the EEB services provided to them so that the Receiver could gain further insight into EEB's business

operations.  These 26 customers were identified and selected from Monday.  Receiver's counsel randomly chose the customers based on package level, assigned account executive, and Storefunnels website launch date in an effort to get a varied mix of customers that may more widely represent the overall customer experience.  On September 29, 2024, Receiver's counsel emailed an additional six (6) individuals who were listed on a parallel EEB website's list of customers who had purportedly amassed 100k, 50k, and/or 10k in profits and who counsel found records for in at least one of EEB's platforms/databases.

Receiver's counsel ended up speaking to nine (9) of the 32 individuals.  The overwhelming majority stated that they first learned of EEB through EEB's social media advertising on Facebook, Instagram, TikTok, and/or YouTube, that the social media advertising and/or EEB staff (in initial, pre-purchase discussions) touted the ability to achieve high profits within a certain timeframe after purchasing EEB's services, and that—after they purchased EEB's services and had a fully functional online storefront—they did not achieve the number of sales that they expected and ultimately paid far more to EEB than they made in total profits. Several individuals told Receiver's counsel that they were led to believe that certain costs (e.g., advertising costs) were included in their EEB purchase, only to find out post-purchase that they were *not* included and that they would have to pay those costs out-of-pocket.  Several individuals also told Receiver's counsel that they had seen EEB advertise "money back guarantees," but when they asked for a refund, EEB personnel either deflected and tried to convince the customer to stay, or told the individuals that they did not qualify for a refund because they did not invest enough money into their own success. Only one of the nine individuals suggested that they were close to breaking even or surpassing the amount they paid to EEB with the amount of profits from their own online storefront; the other eight individuals explicitly told Receiver's counsel that they paid EEB far more than they made in

total profits from their own online storefronts.  And notably, while one of the nine individuals did not express dissatisfaction with EEB or the services that EEB provided, the individual stated that they did not achieve the level of profits they thought they would have had since their storefront launched.  This individual also told Receiver's counsel that they did not question EEB's products or services because they were promised they would achieve $500,000 in profits over 4 years, and they had only been an EEB customer for less than one year.

Because the Receiver acknowledged the risk of selection bias when conducting outreach to a sample size of all EEB customers and understood that satisfied customers were likely less inclined to speak to Receiver's counsel as compared to dissatisfied customers, after conducting interviews of the nine abovementioned EEB customers, and recognizing the time and expense involved in a more expansive customer outreach, the Receiver sought to collect information from as many current and former EEB customers as possible in a streamlined manner.  After placing a Notice of Receivership on the EEB website and creating a Receivership Website—both of which are detailed in Section IV.C, *infra*—the Receiver's agents reviewed all signed contracts between EEB and the customers who purchased EEB's services,[21] compiled customer emails from the contracts, created an email address specifically for the Receivership (empireholdingsrcvr@clarkhill.com) (The "Receivership Email"), and sent a mass bcc email[22] from the Receivership Email to those EEB customers informing them of the Receivership and inviting them to complete a Consumer Questionnaire[23] regarding their experience with EEB.

---

[21]    Receiver's agents extracted all signed Service Agreements found in EEB's HelloSign and DocuSign platforms.

[22]    The Receiver compiled and sent the mass bcc email to 481 EEB customer emails.  Of the 481, 25 emails were returned as undeliverable, and 1 was returned as the recipient's inbox is full.

[23]    The Consumer Questionnaire was attached as Exhibit C to the Receiver's First Written Report (ECF No. 38-3).

As of November 19, 2024, approximately 120 individuals have submitted Consumer Questionnaires to the Receiver, with more continuing to be submitted each day. Of the Consumer Questionnaires reviewed thus far, the overall reported customer experience is overwhelmingly negative and generally similar to what customers reported during the aforementioned interviews— customers have reported that their experience did not align with their expectations, that they have had very few sales, if any, and that they suffered significant financial losses. Some notable customer responses include the following:

- "I am extremely disappointed and I have stopped funding the ads and closed the storefunnel. The company has been terrible and I feel taken advantage of. They are amateurs at best, scam artists most likely. . . . I am losing money every day with no sign of any change."

- "The sales tactic[s] to get customers to join was very predatory. I told them this was a big risk for me and my family financially and the sales agent only doubled down on his promise of sales and financial success. wish I had never signed up with [EEB] as I was tricked into a false promise of wealth and only incurred losses."

- "It started out great, but then when the original product that they selected for me had zero sales, I realized I had made a huge mistake."

- "The experience and result has been absolutely stressful and not what has been promised, I was promised I'll be profitable within first 2 months, but almost after six months, not a single dollar in profit."

- "We were told they would create an ecomm business for us that was 'guaranteed' to bring in at least $10k a month. We only lost money. . . . They couldn't even come close to delivering on what they promised."

- "We are not getting the product that's been promised to us."

- "There were plenty of sales people trying to tell us we needed to go 'all in' and buy a bigger package, but they in no way deliver what they promised so we weren't about to be scammed again."

- "Empire is dishonest, crooked in every way, provide no support when needed. PROVEN products were cheap dropshipped bad products from China and the ads were worthless."

- "Nothing that was promised to me happened in a way that produced profitable results."

34

- "For the price that I paid [for] this and the result that they gave me, I knew that I just got scammed."

- "In 2 years, defendant has not selected a single product that has reliably earned more income per month than it has cost to advertise it. Furthermore, Defendant repeatedly declined to provide me their commitment to performance goals be it for engagement or revenue. I contracted for a managed – or, delegated—service. . . . I have not received my fair share of the transaction."

- "I believe EEB knowingly defrauded me and many other clients and promised many things upfront that they could not deliver or accomplish and they charged a lot of money for services they were not intending to provide.  I put my life savings in to this business based on all what I heard and was assured of future potential income and now I am left with nothing!"

- "I feel like they used me and took my money for ransom."

- "A lot of time, money, and effort have been wasted on my part, and nothing to show for it."

- "I feel like I was taken advantage of. They assure[d] me of results and never came through on their promises."

- "I do not feel like my experience from my StoreFunnel page aligns with anything that I have expected or what I have purchased . . . .  This company is nothing but a scam, and the employees of ecommerce empire do nothing to help, or support you with what they promised."

## C.    EEB Website and Receivership Website

Pursuant to Section XII, Paragraph V of the TRO Order (and consistent with Section XIII, Paragraph V of the Stipulated PI), and as indicated in the Receiver's October 8, 2024 letter to the Court, the Receiver's agents placed the following notice on the EEB website, https://ecommerceempirebuilders.com/:[24]

> NOTICE: PLEASE NOTE THAT AS OF SEPTEMBER 20, 2024, A TEMPORARY RECEIVER HAS BEEN APPOINTED TO ASSUME FULL CONTROL OF EMPIRE HOLDINGS GROUP LLC AND ITS BUSINESS OPERATIONS OF ECOMMERCE EMPIRE BUILDERS.
>
> 2024-09-20 Temporary Restraining Order with Asset Freeze and Appointment of a Temporary Receiver
> 2024-10-03 Order Extending TRO and Rescheduling PI Hearing
>
> Please visit Empire Holdings Group Receivership for additional information and updates.

---

[24]    The Court Orders listed in the notice are hyperlinks to the filed copies of the Orders, and "Empire Holdings Group Receivership" is hyperlinked to the Receivership Website.

The Receiver's agents also posted notices regarding the TRO Order and Receivership Website on two additional websites associated with Defendants, https://peterpru.com and https://empireplr.com.  The Receiver is in the process of further updating these notices to reflect the entry of the Stipulated PI.

Additionally, the Receiver created a website[25] (the "Receivership Website") in order to provide consumers with a centralized platform containing information regarding the Receivership and through which EEB customers can submit their completed Consumer Questionnaires.  The Receiver's agents routinely update the Receivership Website with important developments and court filings, and will continue to utilize the Receivership Website to provide updates to consumers and other members of the public.

### D.    Management of EEB Business Operations

Pursuant to Section XII, Paragraph X of the TRO Order—and as discussed between the Court and counsel for the parties during the September 20, 2024 TRO Hearing[26]—the Receiver allowed business operations to continue for existing EEB customers through October 31, 2024.

Specifically, the Receiver and his agents, using information from Defendant Prusinowski and EEB COO Aliakbar Gulshan, identified all contractors who provided services to current EEB customers as well as the specific platforms through which they provide services.  The Receiver obtained Mr. Prusinowski's login credentials to the identified platforms but allowed such platforms to remain operational and accessible to both EEB contractors and existing customers.  Additionally, the Receiver obtained Mr. Prusinowski's login credentials to Storefunnels but has allowed Storefunnels to remain fully operational, as EEB customers operate their own online storefronts through Storefunnels.

---

[25]    https://empireholdingsgroupreceivership.com/.

[26]    *See* Sept. 20, 2024 TRO Hearing Trx. at 68:9–69:11.

In order to continue business operations for existing EEB customers, and pursuant to Section XII, Paragraph O of the TRO Order, the Receiver and his agents continued making payments to EEB back-office personnel and Simvoly (the company that manages the day-to-day operations and customer support for Storefunnels), from the Receivership Account. After a preliminary review of EEB's assets and conducting interviews of personnel, the Receiver and his agents implemented certain staffing cuts and pay reductions for back-office personnel in order to make such payments more manageable during the pendency of the TRO, and the Receiver made payments according to that reduced schedule to keep back-office operations running for existing customers through October 31, 2024.

Through a review of Storefunnels and communications with Simvoly's CTO, Ivan Nikolchov, the Receiver learned that Simvoly submits an invoice to Defendant Prusinowski's Storefunnels administrator account every Tuesday, and the amount Simvoly is paid each week depends on the number of active Storefunnels websites that EEB customers either activate or renew. While Mr. Nikolchov informed the Receiver that Simvoly is normally paid through EEB's PayPal, which was connected to Mr. Prusinowski's administrator Storefunnels account, Mr. Nikolchov provided Simvoly's bank information for the Receiver to make further payments to Simvoly via direct bank-to-bank wire transfer. The Receiver has successfully wired payments to Simvoly and Mr. Nikolchov has confirmed receipt of each payment.

That said, due to Simvoly and a majority of EEB personnel residing in international countries, the Receiver and his agents faced substantial difficulties in making payments to continue business operations. The Receiver's agents created PayPal and Payoneer accounts with the intention of making payments through those platforms since Simvoly has historically been paid via PayPal and, as mentioned in Note 19, *supra*, EEB personnel have historically submitted

monthly invoices to EEB to be paid through platforms such as Payoneer, PayPal, and Stripe. However, the Receiver's agents were not ultimately able to make payments through PayPal or Payoneer due to security and verification questions requested by the platforms, which the Receiver could not expeditiously resolve with those platforms due to the nature of the Receivership.[27] Therefore, the Receiver's WSFS bankers set up wire transfer capabilities for the Receivership Account in order for the Receiver to make payments via direct bank-to-bank wire transfer. The Receiver's agents have not experienced any issues with the wire payments made to Simvoly; however, the Receiver's agents have experienced various issues with wire payments made to EEB personnel, some of which still have not been resolved. Several wire payments made to EEB personnel were unilaterally cancelled by Payoneer[28] and thus returned to the Receivership Account, while other wire transfers were returned by the recipient bank for unknown reasons. These issues led the Receiver to work directly with EEB personnel to arrange for alternative methods of wiring payment, such as, for example, wiring a lump sum payment (for three EEB personnel's pay) to their one EEB coworker who did not experience any issues receiving the wire payments to his bank account. A few EEB personnel have informed the Receiver's agents that

---

[27]    For example, in order to link the WSFS Receivership Account to the Receiver's Payoneer account, Payoneer requested that the Receiver submit verifying information for Empire Holdings Group LLC—which is the name on the Receivership Account and the Receiver's Payoneer account—such as information regarding EEB's owner (Mr. Prusinowski) and entity formation and registration documentation, so that Payoneer could see whether that information matched the information listed on the Payoneer account. Because of the nature of the Receiver having assumed full control of EEB during the pendency of the Receivership, however, the verification information requested by Payoneer would not align with the information listed on the Receiver's Payoneer account, as the account was set up in the Receiver's, not Mr. Prusinowski's, name. Any attempts to link the Receivership Account to the Payoneer account would thus require the Receiver or his agents calling Payoneer to explain the nature of the Receivership in order to work through and/or bypass the verification process with the assistance of Payoneer's legal department— which the Receiver and his agents determined would not be a good use of time, effort, or expense in light of alternative methods to make payment (i.e., direct bank-to-bank wire transfer).

[28]    It is unclear why Payoneer unilaterally cancelled the wire payments or how Payoneer had the ability to cancel the wire payments in the first place, because the Receiver's agents did not initiate the wire payments in a way that involved the Payoneer platform whatsoever; the Receiver's agents initiated direct wire transfers from the Receivership Account to the EEB personnels' bank accounts. The Receiver believes that Payoneer may have been able to access the EEB personnel's bank activity if the bank account linked to their Payonner account is the same bank account to which Receiver initiated the wire transfer, but the Receiver cannot say for certain.

they still have not received their wire payments, but because neither the Receivership Account nor the Receiver's WSFS bankers have received any indication that the wires failed or are being returned, the Receiver's agents suggested that the EEB personnel talk to their own banks to alert them of the expected wire payments. For one EEB contractor, ongoing issues related to his wire transfer payment being intercepted by a third-party intermediary, Skydo, resulted in the Receiver's agents working directly with WSFS bankers to issue a recall request for the wire transfer. Upon receipt of the recalled wire, the Receiver's agents intend to work with the EEB contractor to determine an alternative method and/or bank account to send his payment.

> ### E.   Accounting Review and Analysis

Pursuant to Section XII, Paragraph F of the TRO Order and Section XIII, Paragraph F of the Stipulated PI, the Receiver engaged Alvarez & Marsal Disputes and Investigations, LLC ("A&M") to provide accounting support to the Receiver and assist him in carrying out his duties under the TRO Order and Stipulated PI. In connection with this engagement, the Receiver and his counsel provided A&M access to the available accounting records of EEB and Empire Partner, as well as access to financial accounts available to the Receiver, among other documents. The procedures performed by A&M in preparing its accounting involved the following: (1) reviewing available transaction data to verify completeness and accuracy of the accounting general ledger of EEB, which A&M relied on in preparing the accounting for the Receivership Entities; (2) analyzing the cash and expense accounting records of EEB's general ledger to understand how cash was being used by EEB, including the quantification of transactions that benefited Defendant Prusinowski; (3) analyzing EEB's revenue to determine if revenue could be quantified at the product or service offering level; and (4) reviewing additional assets held at various financial institutions, such as Charles Schwab, Coinbase, and Gemini, to ensure all assets related to EEB were included in the accounting.

Based upon discussions with Angela Smith from Empire Tax and a review of the corresponding records, the Receiver and A&M learned that EEB engaged Empire Tax to provide "CFO Services" on or around November 2018, and that this engagement also included accounting services for Empire Partner. The services Empire Tax provided to EEB and Empire Partner amounted to basic bookkeeping and tax return preparation services. Empire Tax prepared and maintained the accounting records for EEB and Empire Partner using Quickbooks. As it related to EEB, the Quickbooks system was connected to EEB's accounts maintained with TD Bank and PayPal, along with the American Express accounts (collectively, the "Connected Accounts").[29] The financial transactions from the Connected Accounts were imported into Quickbooks each month. Empire Tax would then prepare the accounting entries based on the nature of each financial transaction as it was described in the data received from the Connected Accounts. For example, charges from Amazon and Target would be recorded as "Office Supplies" expenses, while charges from restaurants would be recorded as "Meals and Entertainment" expenses. To the extent Empire Tax was unsure how to record a transaction based on the information available from the downloaded data, they would seek direction from Defendant Prusinowski by sending him an "Ask the Client" or "ATC" Report so that he could direct Empire Tax on how to record certain transactions. Empire Tax asserts that it did not receive or review any underlying supporting documentation for the financial transactions recorded within EEB's accounting records, and that the accounting determinations were based solely on the information included in the data downloaded from the Connected Accounts and/or direction provided by Mr. Prusinowski.

---

[29]    As of November 15, 2024, Quickbooks indicated 13 accounts were connected for monthly syncing: TD Bank x9912, TD Bank x8836, PayPal (Merchant ID: x9QNE), Amex x24001, Amex x31009, Amex x82002, Amex x22007, Amex x1008, Amex x91008, Amex x42005, Amex x31002, Amex x91005, and Amex x42008.

A&M received access to EEB's Quickbooks file on September 25, 2024. Given that the accounting records were prepared without the review of any underlying source documentation, A&M conducted limited procedures to verify the completeness and accuracy of the accounting records for the period May 16, 2018 through August 31, 2024 (the "Review Period"), relying upon available source documentation from Stripe, PayPal and Wave, TD Bank documents, and American Express card statements.[30] A&M has made some important observations through the procedures performed to date:

- EEB reported revenue and purported operating expenses of approximately $21.8 million and $17.3 million, respectively, during the Review Period.

- Based on the available accounting records, nearly all of the funds generated by EEB were transferred to Defendant Prusinowski after purported expenses were paid.

- The accounting records contemporaneously maintained for EEB include material errors that understate assets and misstate the operating expenses. For example:

  o EEB's Charles Schwab brokerage account was not recorded as an asset of EEB, nor did Mr. Prusinowski disclose the existence of this account to Empire Tax. Instead, transfers to/from this account were recorded to an account titled "Personal Expenses" and treated as equity transactions.

  o A check written on January 10, 2024 to "CB&T" (Capital Group American Funds where Mr. Prusinowski's personal 401K is held) was recorded in the general ledger of EEB as a business expense under the general ledger account "Advertising and Promotion: Google Ads." The account number referenced in the memo field of the check is Mr. Prusinowski's 401K account.

- Of the $21.8 million in revenue reported during the Review Period, approximately $5.3 million was recorded as "Consulting Revenue," with the remainder largely based upon the financial accounts from which the funds were derived, *i.e.*, Stripe, PayPal, or Wave. Angela Smith advised that Mr. Prusinowski instructed Empire Tax to record this revenue based on transactions identified in the bank statements.

---

[30] Additional review of supporting source documentation will likely need to be completed when such information becomes available. Additionally, further financial analysis will be needed with respect to the Atlas Entities when the corresponding records become available. To date, neither the Receiver for A&M have been provided with accounting records, to the extent they exist, for the Atlas Entities. A&M is currently investigating whether the Atlas Entities hold any assets. Based on a discussion with Angela Smith on November 5, 2024, A&M learned that Empire Tax was engaged to prepare tax filings for Atlas Fund, but that Empire Tax did not perform accounting services for the Atlas Entities.

- A&M has been unable to verify the legitimacy of the expenses recorded in the accounting records due to a lack of business records. However, based on procedures performed to date, they have determined that certain items were reported as business expenses which appear to have benefitted Mr. Prusinowski personally. More specifically, $3.7 million of the $17.3 million in purported business expenses[31] appear to have benefitted Mr. Prusinowski personally, including (1) $2.1 million in cash transfers made from EEB TD Bank accounts directly to or for the benefit of Mr. Prusinowski; (2) $1.3 million in officer salary for Mr. Prusinowski (roughly $200,000.00 per year); (3) $256,747 of cash payments related to payroll benefits for Mr. Prusinowski and his wife, Kellie Prusinowski, such as personal 401K contributions and tax withholdings; and (4) $25,447 of net cash transfers ($303,273.00 outgoing; $277,826.00 incoming) made from EEB's TD Bank account for the purchase of cryptocurrency personally held by Mr. Prusinowski on the Coinbase and Gemini platforms.

- A&M identified $425,674 in total transfers made from Empire Partner to EEB during the Review Period. EEB's general ledger includes a revenue account titled "Empire Partner Network," and entries recorded to this account totaled $99,604 for 2022, $77,070 for 2023, and $60,200 through the end of August 2024. Moreover, journal entries recorded to the "Personal Expense" account totaled $188,800 for the Review Period, which appear to have been recorded to offset the cash withdrawn from and/or personal expenses charged to EEB by Defendant Prusinowski. It is unclear why certain transactions from Empire Partner were treated as revenue, whereas others impacted equity.

- The accounting records of EEB do not include receivables owed by customers because they were prepared on a cash basis. A&M has not seen evidence that EEB tracked amounts owed by customers or quantified any amounts owed on contracts. While Defendant Prusinowski testified during his deposition that EEB tracked amounts owed by customers in a spreadsheet on Google Sheets, A&M reviewed the available documents on EEB's Google Drive and did not identify these documents.

- A&M made several observations with respect to the 466 customer contracts available via HelloSign and executed between May of 2022 and September 2024:

  - EEB's accounting records do not provide sufficient detail to support revenue or cost by product offering. While Mr. Prusinowski testified during his deposition that EEB performed analyses and tracked customer sales data, A&M reviewed the available documents on EEB's Google Drive and did not identify such analyses.

---

[31]     The purported business expenses primarily consisted of: (i) $8.1 million related to advertising and promotional expenses, largely for vendors such as Facebook and Google ads; (ii) $6.2 million of contractor expenses largely accounted for as commission expenses paid to Closer Secrets LLC (which Defendant Prusinowski identified as an outside sales company) and other expenses recorded in the general ledger largely as "lead project managers" and "Funnel Builder;" and (iii) $1.8 million related to professional fees recorded in the general ledger largely as "project managers" related to "Facebook Ad Specialists."

- o Using executed contracts and transaction data extracted from Wave, A&M was only able to attribute approximately $305,000.00 and $1.2 million of revenue derived through Wave and accounted for as "Consulting Income" to the customer offering in 2023 and 2024, respectively. It is unclear how the remaining revenue of $5.3 million in 2023 and $1.4 million in 2024, correlates to customer contracts or products sold for these time periods, based on available documentation.

- o 116 executed contracts included language offering some type of "unlimited" service(s), 28 of which were executed in 2022 and relied on revenue generated from new customer contracts to cover back-office costs.

Additionally, because no new customer contracts were initiated or executed following the entry of the TRO Order, there was insufficient revenue generated between September 21, 2024 through October 20, 2024 to cover back-office costs, which averaged $52,000.00 per month. Between September 21 and October 20, 2024, there was only $19,812.00 of customer deposits, which were primarily derived from Storefunnels subscription fees.

On October 18, 2024, Empire Tax provided A&M with access to the Quickbooks file for Empire Partner. This Quickbooks file contained the accounting records for Empire Partner covering the period January 1, 2021 through December 31, 2023. Other than the transactions noted above involving Empire Partner which were found in the EEB Quickbooks file, A&M has not performed any analyses of Empire Partner's accounting records. Based solely on the Quickbooks data, however, A&M observed that Empire Partner reported revenue and operating expenses of $382,678 and $380,459, respectively, during the period January 1, 2021 through December 31, 2023. Moreover, A&M observed that Empire Partner's accounting records do not identify any liabilities as of December 31, 2023, and that the accounting for Empire Partner has not been updated for periods after December 31, 2023.

## F.    Shutdown of EEB Business Operations

As discussed between the Court and the parties during the September 20, 2024 TRO Hearing—and as indicated in the Receiver's First Written Report to the Court—the Receiver and

his agents took steps to shut down all aspects of EEB's business operations related to the advertising, marketing, promoting, or offering for sale of EEB's products and services to prospective purchasers following the Receiver's initial appointment pursuant to the TRO Order. In initial discussions with Defendant Prusinowski to obtain log-in credentials for EEB platforms, Mr. Prusinowski informed Receiver's counsel that he had already taken all of the "buy" buttons off of the EEB website, which Receiver's counsel subsequently confirmed.  After receiving the log-in credentials to/taking control of the EEB payment platforms, the Receiver and his agents observed that most, if not all, purchases of EEB's products and services have been processed through Wave since approximately October 2023.  In addition to changing the password on Mr. Prusinowski's owner account, the Receiver cancelled all pending customer invoices and changed the status of all other EEB Wave users to "viewer" only, so they could no longer generate new customer invoices.  The last payment received through Wave was on September 17, 2024, before the TRO Order was entered.

Upon gaining control of EEB's social media accounts and subsequently preserving said social media accounts, *see* Section III.E, *supra*, the Receiver and his agents meticulously reviewed each social media account and posts made thereon to determine whether EEB's social media marketing and advertising had been conducted legally.  In reviewing EEB's Instagram account, the Receiver's agents observed that EEB's Instagram contains 4,127 posts, most of which the Receiver believe contained Earnings Claims.  The following are examples of captions that were found on EEB Instagram posts:

- June 18, 2022: "Here's how I launched a dropshipping business and got it to 1k per day in 3 days!"

- September 14, 2024: "Comment digital to get your $12k per month digital drop-shipping road map."

- August 28, 2024: "$25 MILLION ONLINE SUCCESS STORY! Imagine turning a simple idea into a $25 million empire! What took years for one person to achieve, YOU can now do in a fraction of the time thanks to AI and the latest tools at your fingertips."

- August 23, 2024: "Achieve $70k in sales with one product. Comment 'FREE COURSE' to learn the secrets."

- August 22, 2024: "Learn how to make $50K with these steps. Comment 'LAUNCH ME' to launch your store with our support."

EEB's Instagram videos similarly promoted that viewers can "achieve results like this," while showing accounts with the amounts of $40,009.58, $6,325.65, $10,922.84, and $23,888.76. EEB made no mention of the risks associated with drop-shipping; conversely, EEB regularly posted about the easy and streamlined process of earning large sums of money, *i.e.*, "achieve success with AI IN 5 EASY STEPS," "BOOST YOUR SALES WITH THESE EASY STEPS," "3 EASY STEPS TO MAKE $10K/MONTH," "TRY DROPSHIPING WITH ZERO RISK." Moreover, in nearly every Instagram post, prospective customers were encouraged to seek more information by interacting with the posts—examples include "DM 'LAUNCH ME' to launch your success story," "comment digital to get your $21k per month digital dropshipping road map," "Comment 'FREE COURSE' to learn the secrets," and "Comment 'LAUNCH ME' to launch your store with our support." Because EEB regularly asserted in its Instagram posts that its purchasers were likely to earn substantial income in an "easy" manner, the Receiver formed the opinion that EEB's Instagram advertisements were misleading prospective purchasers to believe that that they would easily be able to earn the same or similar amounts of money if they purchased EEB's Products and Services.

As for EEB's YouTube account, the Receiver's agents observed that it contained numerous videos that seemingly demonstrated how a prospective purchaser could earn a specific amount of money through drop-shipping. The Receiver's agents found two notable playlists of videos within the EEB YouTube account—both of which contained videos that claim someone could make a

certain amount of money by following the steps outlined within the videos ("Ecom Vault: Spy On & Build 7 Figure Ecommerce Stores + Funnels!" and "[FREE COURSE] From ZERO to $1000/Day with Dropshipping STEP BY STEP").  Similar to the Instagram posts, the Receiver believes that EEB's YouTube videos have deceptive titles that constitute Earnings Claims.  The following are examples of EEB YouTube video titles:

- July 5, 2024: "How You Can Replicate $450,000 Dropshipping Store In Your Account! (Download & Start)"

- June 12, 2024: "How To Sell 7 Figures In Digital Products | Digital Dropshipping 2024"

- May 22, 2024: "$6500 Every 2 Weeks With This Digital Dropshipping Store!"

- March 22, 2019: "$0 to $100k First MONTH Dropshipping! – Ecommerce Empire Academy Revie and Student Success!"

- June 3, 2019: "[FREE COURSE] From ZERO to $1000/DAY with Dropshipping STEP BY STEP | Finding Winning Products (1/5)"

Similar to EEB's Instagram posts, nearly every YouTube video encouraged prospective customers to seek more information by going directly to EEB's website; videos included captions stating "Have Us Build & Launch Your Entire Ecommerce Business" with a link to the EEB website. Because EEB's YouTube videos focused on inflated earnings and made no attempt to disclose the risks to prospective customers, the Receiver formed the opinion that the YouTube videos misrepresented to prospective consumers what they would likely earn if they purchased EEB's Products and Services.

As for EEB's Facebook page and TikTok account, the Receiver's agents found that the majority (if not all) of the videos posted were identical to those posted on EEB's Instagram and YouTube accounts.  In fact, most of EEB's posts on X/Twitter were direct links to EEB's YouTube videos.  And as for EEB's podcast on Spreaker, there were 1,459 episodes that also contained deceptive titles and subject matter, *i.e.*, "How to get FREE $10K/Month Digital Products To Sell

TODAY," "This $71,000 Digital Dropshipping Product Method Gets INSTANT PROFITS!," "5 Mins To Build A $20,000 / Month Dropshipping Store With Free AI Tools & Chrome Extensions!".  Again, the Receiver formed the opinion that these videos/podcasts were misleading because they misrepresented and overstated the profits that an average person would make, thereby inducing people to purchase EEB's Products and Services.

Based on the above, the Receiver formed the opinion that EEB's social media usage violated Section 5(a) of the FTC Act.[32]  The Receiver believes that EEB's social media posts constituted "unfair or deceptive acts," as a substantial amount of the social media posts included or displayed statements that fit within the definition of deceptive "Earnings Claims."[33]  The Receiver also believes that EEB violated the Business Opportunity Rule[34]—which in and of itself constitutes a violation of Section 5(a) of the FTC Act.  And lastly, the Receiver believes that EEB's social media posts violated Section 5(a) of the FTC Act as neither EEB, nor Defendant Prusinowski

---

[32]   Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

[33]   The TRO Order defines Earning Claims as "[a]ny oral, written, or visual representation to a prospective purchaser that conveys, expressly or by implication, a specific level or range of actual or potential sales, or gross or net income or profits. Earnings Claims include, but are not limited to: (1) any chart, table, or mathematical calculation that demonstrates possible results based upon a combination of variables; and (2) any statements from which a prospective purchaser can reasonably infer that her or she will earn a minimum level of income."  TRO Order, Definitions ¶ E. This definition parallels the definition of "Earnings Claims" found in Code of Federal Regulations; however, the CFR's definition includes specific examples of prohibited Earnings Claims, such as: "earn enough to buy a Porsche," "earn a six-figure income," or "earn your investment back within one year."  16 C.F.R. § 437.1.  The TRO Order provides that "Defendants . . . in connection with advertising, marketing, promoting or offering for sale of any goods or services, are temporarily restrained and enjoined from making any Earnings Claims to a prospective purchaser."

[34]   The Business Opportunity Rule requires sellers to provide prospective purchasers with a disclosure document in the form and using the language set forth in the Business Opportunity Rule and its Appendix A, and any required attachment. The Business Opportunity Rule prohibits sellers from making earnings claims unless the seller: (1) has a reasonable basis for the claim at the time it is made; (2) has in its possession written materials to substantiate the claim at the time it is made; (3) furnishes an Earnings Claim statement to prospective purchasers in conjunction with the disclosure document, containing, among other things, information regarding the time frame captured by the earnings claim, the characteristics of the purchasers, and the number and percentage of all persons who purchased the business opportunity within the time frame who achieved at least the stated level of earnings; and (4) makes written substantiation of the earnings claim available to any prospective purchaser who requests it.  16 C.F.R. § 437.1(b).

personally, provided prospective customers with disclosure documentation[35] substantiating the Earnings Claims made in any social media posts—in fact, Defendant Prusinowski told the Receiver that EEB did *not* keep records of its customer's own sales data,[36] thereby rendering EEB incapable of providing substantiation that the Earnings Claims made in its social media posts were "representative of what consumers will generally achieve."  16 C.F.R. § 255.2.  Accordingly, the Receiver and his agents took steps to deactivate EEB's social media accounts.  As of November 5, 2024, the Receiver's agents deactivated the Instagram, TikTok, X/Twitter, and Facebook social media accounts/pages.  On October 30, 2024, the Receiver's agents oversaw the deactivation of the EEB Facebook Page done by James Zeller, who had full administrative control over the Facebook Page.  *See* Section IV.A, *supra*.  The EEB Spreaker podcast episodes remain private so that no member of the public has access to them.  Additionally, all of EEB's YouTube videos remain "unlisted," which prevents the public from accessing the videos.

As noted in Section IV.E, *supra*, due to the lack of detail in the accounting records and limited underlying support in the available documents, A&M was not able to quantify the amount of revenue that EEB generated through the sale of its Products and Services, or the associated operating costs to generate said revenue.  That said, based on A&M's accounting analysis of the available information from the Connected Accounts and information provided by Defendant

---

[35]     With respect to disclosures, an advertiser will be found liable for failing to provide any consumer, potential purchaser, or investor with disclosure documents in the form and manner required by 16 C.F.R. §§ 437.2, 437.3(a)(1)-(5), and 437.4.  The FTC released "Guides Concerning Use of Endorsement and Testimonials in Advertising," *see* 16 C.F.R. § 255 *et seq.*, in which it details the need for disclosures where an "advertiser does not have substantiation that the endorser's experience is representative of what consumers will generally achieve[.]"  16 C.F.R. § 255.2(b).  The FTC explained that advertisements containing the language "results not typical," or "these testimonials are based on the experiences of a few people and you are not likely to have similar results," do not sufficiently prevent an ad from being deceptive "because consumers will still interpret the ad as conveying that [it is] representative of what consumers can generally expect."  § 255.2(e)(2).

[36]     It is worth noting that, after Mr. Prusinowski made this representation to the Receiver, he testified during his deposition that EEB performed analyses and tracked customer sales data.  However, A&M reviewed the available documents on EEB's Google Drive and did not identify any such analyses.

Prusinowski, the Receiver formed the opinion that EEB could not be profitable without its social media marketing and advertising—which was the primary, if not sole, method through which EEB acquired new customers.  The following factors led the Receiver to reach this conclusion.

*First*, EEB's accounting records do not provide sufficient detail needed to support revenue or cost by product offering.  A&M determined that revenue in the accounting records was accounted for based on the payment platform that generated customer payments.[37]  Expenses were similarly accounted for based on the vendor providing the service (*e.g.*, marketing and advertising performed by Google and Facebook were accounted for as "Google Ads" and "Facebook Ads Specialist," respectively).  Through the customer transaction data available through Wave for the period October 2023 to August 2024, and executed customer contracts available from HelloSign, A&M was able to attribute nearly $304,000 and $1.2 million of revenue derived through Wave and accounted for as "Consulting Income" to the customer offerings in 2023 and 2024, respectively.  However, the attributed revenue to customer offerings only accounted for a portion of total revenue in 2023 ($5.6 million) and 2024 ($2.6 million).  Moreover, even if sufficient detail had been included, the problems observed with EEB's accounting records, as detailed in Section IV.E, *supra*, would raise serious concerns regarding whether that information is even reliable or accurate.[38]

*Second*, a review of the executed customer contracts found in HelloSign show that the pricing of EEB products varied greatly amongst its customers.  While Mr. Prusinowski testified during his deposition that price points for customer products were based on competitor research,

---

[37]    For example, per the direction of Defendant Prusinowski, EEB revenue derived from Wave was booked as "Consulting Income."

[38]    A&M represented that while it may be possible to them reconstruct the accounting records for the remaining revenue based on the underlying support, including invoice level detail from the remaining payment platforms such Stripe and PayPal, A&M believes this would be a significant undertaking that would require appropriate documentation and cooperation from Defendant Prusinowski.

"team costs," and advertising costs, he stated that the related analyses were not recorded anywhere.[39] Indeed, A&M did not identify any contemporaneous analyses related to the process charged or profitability for products offered by EEB. Through its accounting analysis, A&M observed that EEB customers were offered contracts with durations ranging from one month to "unlimited" and contract prices ranging from $2,500 to $100,000 and, in certain instances, customers were offered the exact same product at different prices.[40] Moreover, of the 466 customer contracts found in HelloSign, over 100 contracts included language that offered some form of "unlimited" service(s). As an example, A&M observed that one customer contract executed on April 23, 2024 for the Ecommerce Platinum Program was priced at $33,000 and offered the following "unlimited" team support access:



The unlimited access to "Three Inner Circle Zoom Calls Per Week" and "On Demand Support Within BaseCamp Dashboard" would necessarily incur expenses to maintain the EEB personnel that are ultimately providing the back-office support to the customer, and according to the EEB COO, the average monthly costs to maintain back-office support for May through September 2024 was approximately $52,000. Even more notable, A&M observed that 28 customer contracts

---

[39]    *See* ECF No. 53-1 at 14 n.38. Mr. Prusinowski also testified that minimum pricing was based on labor and advertising costs, and that he believed the minimum pricing for products would have been recorded somewhere in the EEB sales playbook, which Mr. Prusinowski believes was controlled by Randall Grizzle (owner of Closer Secrets LLC). *See id.* n.39. The sales playbook is one of the documents that the Receiver is seeking to obtain from Closer Secrets. *See* Section III.A, *supra*.

[40]    For example, A&M identified two identical 6-month contracts for the Ecommerce Platinum Program, with one priced at $8,000 and the other at $15,000. Why these customers were offered the same contract with different contract prices is not clear, and Mr. Prusinowski testified during his deposition that EEB did not have a formal or internal policy for offering customer discounts. *See* ECF No. 53-1 at 15 n.43.

executed in 2022 included an unlimited service offering and collectively totaled to $846,000. Based on the information provided by the COO for May through September 2024, A&M estimated that at least $624,000 in annual revenue (or $52,000 x 12 months = $624,000) was required to cover back-office costs. This means that for at least 16 months, EEB was able to independently sustain its operations and rely on the revenue derived from the 2022 contracts to cover the back-office costs required to service those 28 contracts, but after 16 months, EEB would have had to begin relying on revenue generated from new customer contracts to cover costs associated with those contracts. This observation—coupled with the fact that EEB only has $495,324 of liquid assets available to finance its business as of October 20, 2024[41]—shows that EEB's unlimited service offering was clearly not sustainable without onboarding new customers.

   **Third**, following the entry of the TRO Order when EEB halted customer acquisition, the revenue that EEB generated from its existing customers has been minimal. A&M reviewed the customer activity within Stripe, PayPal, and Wave after the entry of the TRO Order and identified $19,812 in total deposits from Stripe and PayPal.[42] Even assuming that the total deposit amount could be extrapolated for an entire month (30 days), it would not be enough to cover the monthly costs to maintain back-office support. But even prior to the entry of the TRO Order, Mr. Prusinowski testified that over half of EEB's revenue was generated from its Platinum Program sales to customers who saw EEB's marketing and advertising efforts through its website, and when changes were made to the marketing and advertising to try to make it more compliant prior to the

---

[41]   The Receivership's cash balance of $1,313,892 as of October 31, 2024 includes $669,248 of cash derived from EEB accounts. Liquid Assets for EEB of $495,324 is equal to $669,248 less the outstanding EEB liabilities of $173,924. The $495,324 in liquid assets equates to approximately ten months of back-office support expenses, without considering any additional expenses that were reported within EEB's accounting records. While it is likely that amounts may still be due related to certain contracts, A&M found that the available documents and accounting records are not sufficient to identify those customers or quantify any amounts still due from customers.

[42]   A&M did not identify any customer activity within Wave because, as noted above, the last payment received through Wave was on September 17, 2024, before the entry of the TRO Order.

entry of the TRO Order, EEB generated significantly less revenue.[43]   More specifically, Mr. Prusinowski testified that six months ago he made changes to his advertising and marketing by removing testimonials and added disclaimers, and the impact led to his business slowing down.[44]

In sum, the Receiver took steps to suspend EEB's social media accounts after concluding, through his and his agent's review of EEB's social media accounts, that EEB's social media marketing and advertising were not conducted legally.   And with the assistance of A&M's accounting analysis, the Receiver concluded that EEB could be profitable without its social media marketing and advertising.   Based on these two conclusions, the Receiver and his agents made the decision to suspend *all* EEB business operations pursuant to Section XII, Paragraph T of the TRO Order (now Section XIII, Paragraph T of the Stipulated PI).   In making this decision, the Receiver placed particular significance on the fact that the TRO Order and Stipulated PI direct him to suspend business operations if "such operations cannot be continued legally ***and*** profitably."   TRO Order § XII ¶ T; Stipulated PI § XIII ¶ T (emphasis added).   Even *if* EEB personnel were providing legitimate back-office support to existing EEB customers—which was questionable given the methods used to bring in those customers—and even if Simvoly is providing legitimate services to maintain Storefunnels, these business operations do not generate profit.   Absent both legality *and* profitability, the TRO Order and Stipulated PI direct the Receiver to suspend business operations.

Accordingly, the Receiver made the decision to formally shut down EEB business operations on October 31, 2024.   Receiver's counsel sent a letter to all EEB contractors[45] notifying

---

[43]   *See* ECF No. 53-1 at 17 nn.47-48.

[44]   *See* ECF No. 53-1 at 17 n.49.

[45]   Defense counsel and Defendant Prusinowski were copied on the letter.

them of this decision, and that their status as contractors for EEB would thus officially terminate on October 31, 2024. Counsel further informed the contractors that no further payments would be issued to them for work beyond October 31, but to the extent the Receiver and his agents discovered that any additional services would be needed from them in order to assist with the shutdown of business operations, that the Receiver would reach out to them directly to make the necessary arrangements. Following Receiver's counsel's letter to EEB contractors, four contractors reached out to the Receiver and his agents requesting final pay. Upon receiving proof from the contractors that they were normally paid for work already performed—as opposed to pay in advance of work performed—the Receiver's agents facilitated final wire transfer payments to the four contractors, which totaled to $13,747.26. Receiver's counsel has continued to address payment difficulties relating to prior payments made to back-office contractors that have been returned due to issues with international wire transfers, as explained in Section IV.D, *supra*.

Following the decision to formally shut down EEB business operations on October 31, 2024, the Receiver also sent a letter to current and former EEB customers notifying them of the plan to start formally shutting down EEB business operations on October 31, 2024, but making clear that Storefunnels.net would remain fully operational through at least November so that they could have time to decide whether they would like to keep their websites active, and/or whether they would like to move their online storefronts to a different platform.[46] The Receiver's agents have thus continued—and will continue—to make weekly payments to Simvoly in order to keep Storefunnels operational for the time being. As set forth in Section VI, *infra*, the following payments have been made to Simvoly: $1,426.00 paid on October 29, 2024, $1,197.00 paid on

---

[46]    The Receiver understands that many EEB customers are in the process of exploring alternative options, and some have reached out to Simvoly directly to request the transfer of their websites from Storefunnels to the Simvoly platform so they can avoid having to rebuild their websites. The Receiver has advised Simvoly that he has no objection to the platform honoring customer requests to transfer their websites from Storefunnels to Simvoly.

November 7, 2024; $1,116.50 paid on November 13, 2024, and $950.10 paid on November 19, 2024. Additionally, the Receiver's agents have made payments to other service providers/platforms, including GoDaddy, to ensure that Storefunnels.net remains fully operational. Specifically, the following payments have been made to GoDaddy: $48.88 paid on October 23, 2024; $9.71 paid on October 29, 2024; $9.71 paid on November 7, 2024; and $9.71 on November 18, 2024.

A number of EEB customers have reached out to the Receiver and his agents with various questions after the Receiver sent the letter notifying them of the formal shutdown of EEB business operations. The Receiver and his agents have been—and will continue to—respond to the customer inquiries through the Receivership Email and/or are directing further inquiries to be directed to the Receivership Email so that all customer correspondence can be centralized, collected, and tracked in the Receivership Email inbox. The Receiver and his agents are likewise requesting that customers continue to check the Receivership Website, where the Receiver and his agents will continue to provide updates regarding important developments and court filings.

## V.    OTHER ADMINISTRATIVE MATTERS

### A.    Notices Filed with Federal District Courts

As described in the First Written Report, the Receiver, through his counsel, worked diligently to comply with the requirements of 28 U.S.C. § 754 by filing copies of the Complaint, TRO Order, and extensions to the TRO Order in the following United States District Courts: (i) Middle District of Pennsylvania; (ii) Western District of Pennsylvania; (iii) District of New Jersey; (iv) Northern District of California; (v) District of Wyoming; (vi) District of Columbia; (vii) District of Arizona; (viii) District of Nevada; (ix) Western District of Wisconsin; and (x) Eastern

District of Wisconsin.[47]   Additionally, following entry of the Stipulated PI, the Receiver filed §

754 Notices in every United States District Court.[48]   The filing of these § 754 Notices enables the

Receiver to obtain complete jurisdiction and control over any Receivership Assets located within

other federal districts.[49, 50]

### B.      Tax Form 56

The Receiver promptly submitted a Tax Form 56 to the Internal Revenue Service for EEB

following the entry of the TRO Order.  On October 17, 2024, the Receiver submitted a Tax Form

56 for additional Receivership Entities Empire Partner, Star Active, and Atlas Fund, as well as an

updated Tax Form 56 for EEB.  The Receiver also promptly submitted another Tax Form 56 for

EEB, Empire Partner, Star Active, and Atlas Fund following the entry of the Stipulated PI.

---

[47]   These federal district courts were selected based upon where the Receivership Entities are incorporated, registered, and/or where the Receiver believes assets of the Receivership Entities may be held.

[48]   The filing fees for the § 754 Notices are reflected on Clark Hill's invoice.

[49]   Section 754 provides as follows:

> A receiver appointed in any civil action or proceeding involving property, real, personal or mixed, situated in different districts shall, upon giving bond as required by the court, be vested with complete jurisdiction and control of all such property with the right to take possession thereof.

> He shall have capacity to sue in any district without ancillary appointment, and may be sued with respect thereto as provided in section 959 of this title.

> Such receiver shall, within ten days after the entry of his order of appointment, file copies of the complaint and such order of appointment in the district court for each district in which property is located. The failure to file such copies in any district shall divest the receiver of jurisdiction and control over all such property in that district.

28 U.S.C. § 754.

[50]   A court order renewing, extending, or reappointing a Receiver resets the 10-day period to file § 754 Notices with federal district courts.  *See S.E.C. v. Am. Cap. Invs., Inc.*, 98 F.3d 1133, 1142-43 (9th Cir. 1996) (citing *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C. Cir. 1996) ("[T]he court may reappoint the receiver and start the ten-day clock of § 754 ticking once again.")); *McNamara v. Allen*, 2017 WL 10439830, at *1 (C.D. Cal. Dec. 12, 2017) (citing *Am. Cap. Invs.*, *supra*) ("Under 28 U.S.C. § 754, the receiver must have filed, in the district court where the person and receivership property is believed to be located, copies of the complaint and order of appointment within ten days after the entry of the order of appointment.  The entry of a renewed appointment order starts a new ten-day period."); *Terry v. June*, 2003 WL 22125300, at *3 (W.D. Va. Sept. 12, 2003) (explaining that "[s]ection 754 does not, by its terms, distinguish between initial orders of appointment and later reappointment of the receiver" but "[c]ourts having addressed this issue unanimously suggest that an order of reappointment will renew the ten-day filing deadline mandated by section 754" and collecting cases holding same).

C.      **Diversion of Mail**

The Receiver submitted change of address/forwarding forms for EEB to the United States Postal Service in-person on September 21, 2024 and received confirmation of the change of address on October 10, 2024.  The Receiver thereafter informed USPS of the TRO extensions to November 1, 2024 and then November 12, 2024, and then again after the Stipulated PI was entered. The Receiver's updated change of address/forwarding forms included all Receivership Entities. The process of diverting mail was more time consuming than expected, ultimately requiring multiple visits and communications with Postal Service personnel.

On September, 30, 2024, the Receiver took possession of the keys for EEB's P.O. Box and collected mail from both Defendant Prusinowski and the post office that had arrived since the entry of the TRO Order.

## VI.      ASSETS, EXPENSES, AND LIABILITIES OF THE RECEIVERSHIP ESTATE

As of November 18, 2024, the total balance in the Receivership Account was $1,318,641.08.  As outlined above, this is based upon the following wire and transfer activity:

Since the opening of the Receivership Account through November 18, 2024, the Receivership Account has received (a) $610,672.41 in funds from Schwab from the EEB account on 10/1/24; (b) $0.07 cents in Preauthorized ACH Credit from PayPal in connection with the Receiver's set up of a PayPal account in an attempt to pay back-office staff through that platform; (c) $77,000.00 from Gordon Rees on 10/7/24, (d) $51,945.01 from TD Bank from the EEB accounts on 10/10/24, (e) $613,202.79 in funds from Schwab from the Atlas Fund account 10/18/24, (f) $10,211.26 in funds from TD Bank from the Empire Partner account on 11/12/24, and (g) $18,642.00 from Gordon Rees on 11/12/24.

Through communications with Stripe's counsel—and as explained in Section III.C, *supra*—the Receiver identified the existence of two separate Stripe accounts that are related to

EEB and were both located on Stripe using the log-in credentials provided by Defendant Prusinowski—an EEB Stripe account (which Stripe closed on October 31, 2024), and a Storefunnels Stripe account.  The Storefunnels Stripe account remains active and continues to collect Storefunnels subscription payments from individuals who have active websites through the Storefunnels platform.  As explained in Section III.C, *supra*, Stripe has confirmed, through its counsel, that Stripe is complying with the terms of the TRO Order and Stipulated PI by pausing payouts from the Storefunnels account, but that it is allowing EEB customers' Storefunnels subscription payments to continue to process and accrue in the Storefunnels Stripe account until the Receiver and his agents take steps to formally shut down Storefunnels, at which point the Receiver will direct Stripe to transfer the balance of the Storefunnels Stripe account to the Receivership Account.  As of November 7, 2024, the balance in the Storefunnels Stripe account was $24,216.07.

Meanwhile, the Receiver has paid a total of $9,776.95 to Simvoly through weekly payments made on 10/3/24 ($856.19), 10/8/24 ($2,288.65), 10/15/24 ($1,163.35), 10/22/24 ($779.16), 10/29/24 ($1,426.00), 11/7/24 ($1,197.00), 11/13/24 ($1,116.50), and 11/19/24 ($950.10 ), and a total of $78.01 to GoDaddy through the following payments: 10/23/24 ($48.88), 10/29/24 ($9.71), 11/7/24 ($9.71), and 11/18/24 ($9.71).  These payments have been made to ensure that Storefunnels.com, and certain e-mail addresses, remain operational for the time being, in order to keep EEB customers' Storefunnels pages up and running.

A total of $53,986.10 has been wired to former EEB personnel through November 19, 2024, representing a combination of reduced payments of flat rates for October 2024 and/or based on past work performed upon receipt of sufficient proof.  The Receiver does not anticipate making any further payments to EEB back-office personnel, though his staff continues to address payment

difficulties relating to prior payments that have been returned, and has continued to reissue payments from failed international wire transfers upon the return of such funds.  Additional administrative expenses include the payment of $141.50 in WSFS Account Activity Fees on October 22, 2024.

As shown in the Balance Sheet attached as Exhibit 2 to the Receiver's Accounting as set forth in the Declaration of Michael R. Shanahan,[51] A&M has determined that the Receivership Entities had assets totaling $1,409,291 and known liabilities totaling $173,924 as of October 31, 2024.  (ECF No. 53-1 Ex. 2).  This is broken down as follows:

- A cash balance totaling $1,313,892 was held across the following accounts: (1) $1,296,005 held in the Receivership Account; (2) $10,216 held in EEB and Empire Partner TD Bank accounts; and (3) $7,685 held in EEB and Storefunnels Stripe accounts.

- A Shareholder Loan in the amount of $95,000.

- Liabilities primarily related to amounts due to American Express totaling $173,924.

(ECF No. 53-1 ¶¶ 29-30).

## VII.    CURRENT AND PREVIOUS BILLINGS

The total fees incurred by the Receiver and the Law Firm for the period covered by this Application are $396,104.94, and the total fees incurred by the Accountant for the period covered by this Application are $153,203.  The total expenses incurred by the Receiver and the Law Firm for the period covered by this Application are $6,176.56,[52] and the Accountant has not incurred

---

[51]    A&M has not analyzed the accounting records for Empire Partner, and has not been provided with the accounting records, to the extent they exist, for the Atlas Entities.  The Receiver and his Retained Professionals continue to investigate whether the Atlas Entities hold any additional assets. reviewed the accounting records for Receivership Entities other than EEB, to the extent they are even available.  As such, A&M's observations on the balance sheet are based on actual account balances and amounts owed by the Receivership Entities as seen in other documentation. (ECF No. 53-1 ¶¶ 21-22).

[52]    Clark Hill's invoice includes expenses totaling $6,354.46.  However, the Receiver identified some duplicate charges in connection with certain Section 754 filings that had to be submitted and paid for online, but for which checks were already issued.  The Receiver also discovered a charge associated with another case inadvertently billed

any expenses.  Since this is the first Interim Fee Application, the Receiver and his Retained Personnel have not requested, nor received, any fee compensation or expense reimbursement for work performed in connection with this action.

As evidence of the substantial time and effort the Receivership has required, and in support of the fee compensation and expense reimbursement sought herein, the Receiver will be submitting the following exhibits to the Clerk, to be filed under seal,[53] for the Court's review and consideration:

- Exhibit "A"—Summary of Legal Professional & Paraprofessional Time and Expenses by the Receiver and his Counsel; and

- Exhibit "B"—Summary of Accounting Professional & Paraprofessional Time.

These exhibits, as well as the narrative descriptions in this Application, evidence the time and labor employed in this matter.

The following is a breakdown of the Receiver's hours and fees for the reporting period:

| Name/Position | Hourly Rate | Hours | Fee Amount |
|---|---|---|---|
| Kevin Dooley Kent, Receiver | $722.50 | 156.10 | $112,782.25 |

The following includes a breakdown of the Law Firms' hours and fees, broken down by biller:

| Name/Position | Hourly Rate | Hours | Fee Amount |
|---|---|---|---|
| Robin Weiss, Senior Attorney | $562.50 | 180.10 | $101,306.25 |
| Vanessa Huber, Associate | $436.50 | 261.70 | $114,232.05 |
| Madison Mull, Associate | $265.00 | 83.10 | $22,021.50 |

---

to this file.  Accordingly, the Receiver crossed out these duplicate/unrelated costs on the invoice, and has reduced the expenses sought accordingly, resulting in a revised total of $6,176.56.

[53]    Following the submission of this First Interim Fee Application, the Receiver will send Exhibits A&B, along with a proposed Motion to Seal the Exhibits, to the Clerk's Office pursuant to Local Civil Rule 5.1.2(6), and will publicly file the Motion to Seal following the Clerk's uploading of the sealed Exhibits to the ECF docket.

| | | | |
|---|---|---|---|
| Justin Russell, Paralegal | $270.00 | 132.10 | $35,667.00 |
| Michael J. Boland, Executive Director of IG360 | $352.75 | 6.50 | $2,292.89 |
| Ching Chew, Project Manager of Litigation | $270.00 | 58.90 | $7,803.00 |
| **Totals** | | **692.40** | **$283,322.69** |

The following includes a breakdown of the Accountant's hours and fees, broken down by biller:

| Name/Position | Hourly Rate | Hours | Fee Amount |
|---|---|---|---|
| Michael Shanahan, Managing Director | $750.00 | 60.20 | $45,150.00 |
| Tracy Gosau, Director | $575.00 | 107.60 | $61,870.00 |
| Alison Cox, Manager | $490.00 | 5.20 | $2,548.00 |
| Amee Mehta, Senior Associate | $450.00 | 79.70 | $35,865.00 |
| Madeline Alderfer, Associate | $350 | 22.20 | $7,770.00 |
| **Totals** | | **274.90** | **$153,203.00** |

## VIII.  REQUEST FOR COMPENSATION FOR FEES AND EXPENSES

This Court has the power to award fees to the Receiver for his services and for expenses he incurred in the performance of his duties.  *See Donovan v. Robbins*, 588 F. Supp. 1268, 1272 (N.D. Ill. 1984) ("[T]he receiver diligently and successfully discharged the responsibilities placed upon him by the Court and is entitled to reasonable compensation for his efforts."); *see also Securities & Exch. Comm'n v. Elliot*, 953 F. Supp. 1560 (11th Cir. 1992) (noting that the receiver is entitled to compensation for faithful performance of his duties).  This Court has discretion to determine compensation to be awarded to a court-appointed receiver and his counsel and "may consider all of the factors involved in a particular receivership in determining the appropriate fee." *Gaskill v. Gordon*, 27 F.3d 248, 253 (7th Cir. 1994).  The Third Circuit has stated that relevant considerations include "the time and labor required . . . in the proper performance of the duties

imposed by the court upon the receivers, the fair value of such time, labor and skill measured by conservative business standards, the degree of activity, integrity and dispatch with which the work is conducted and the result obtained."  *United States v. Larchwood Gardens, Inc.*, 404 F.2d 1108, 1110 (3d Cir. 1968) (citing *United States v. Code Products Corp.*, 362 F.2d 669, 673 (3d Cir. 1966)); *see also Securities & Exch. Comm'n v. W.L. Moody & Co.*, 374 F. Supp. 465, 483, 485 (S.D. Tex. 1974), *aff'd*, 519 F. 2d 1087 (5th Cir. 1975) (explaining that a "basic consideration is the nature and complexity of the legal problems confronted and the skill necessary to resolve them" and that "[t]ime spent cannot be ignored."); *Fed. Trade Comm'n v. A1 Janitorial Supply Corp.*, 2020 WL 887386, at *4 (N.D. Ill. Feb. 24, 2020) (quoting *U.S. S.E.C. v. Wealth Mgmt. LLC*, 2011 WL 4479518, at *1 (E.D. Wis. Sept. 26, 2011)) ("[C]ourts evaluate fee awards by considering (1) 'the time records presented,' (2) 'the benefits to the receivership estate,' and (3) 'the quality of the work performed.'").  Moreover, courts have recognized that the fees and expenses incurred in the beginning of a receivership will not necessarily be typical of future fee applications, due to the extent of initial start-up work required to secure and liquidate the assets and to wind up the business entities. *See Gordon v. Dadante*, 2008 WL 1805787, at *11 (N.D. Ohio Apr. 18, 2008) (recognizing that, with receivership, as is "common in cases of this nature, the bulk of the effort— and expense—is frontloaded.").

Under these standards, and given the extensive time and effort the Receiver and his Retained Personnel have devoted to this matter, as shown in detail above, the Receiver has adequately demonstrated that the amount of fees requested is appropriate.  The Receiver has attempted to maximize cost savings as much as possible, by, for example, assigning professionals and paraprofessionals with the lowest billable rate appropriate for the task at issue.  The Receiver and his counsel have utilized non-billing administrative personnel where appropriate—*e.g.*, having

the Law Firm's office manager assist with fees for the filings submitted pursuant to 28 U.S.C. § 754; utilizing administrative and secretarial staff to communicate with courts in connection with issues and procedures relating to filings pursuant to 28 U.S.C. § 754; and utilizing non-billing staff to assist with change of address procedures. Moreover, as reflected in the Summary of Time and Expenses submitted by the Receiver and the Law Firm as Exhibit A to this Motion, the time and effort expended by the Receiver and his counsel was significantly greater in the weeks immediately following the Receiver's appointment, as compared to the latter half of October. Indeed, as courts have recognized, *see Gordon*, 2008 WL 1805787, at *11, the Receiver and his counsel had to perform various time-consuming tasks immediately following the Receiver's appointment to *inter alia* secure Receivership Assets and Documents and investigate, take control of, and manage EEB's business operations, in accordance with the TRO Order. Now that the Receiver has shut down EEB's business operations and A&M has completed its initial accounting analysis, the Receiver and his Retained Personnel will be able to expend less time and effort on this matter generally, and can focus their efforts going forward primarily on locating and securing additional Receivership Assets.

The Receiver and his Law Firm have not sought compensation for any pre-appointment time, and the Receiver has written off certain other fees incurred since his appointment, as indicated by the "No Charge" entries on the Receiver and Law Firm's bill submitted with this Application. In total, these adjustments have resulted in nearly $40,000.00 in costs savings to the Receivership Estate. Additionally, the Receiver and his Retained Personnel are handling this matter at substantially discounted billing rates, with the Receiver and the Law Firm operating at a 10-15% discount from their standard 2024 rates, and the Accountant operating at a discount of 26-38% discount from their standard 2024 rates.

The Receiver and his Retained Personnel's compensation in this matter is subject to the final approval of this Court. The Receiver and his team have not received any compensation for their services or unreimbursed costs incurred during the first application period.  The Receiver respectfully requests that the Court consider that the Receiver and his Retained Personnel have assumed the risk of non-payment and/or substantial delay in payment in accepting the Court appointment, particularly with so little known at case inception regarding the amount and availability of Receivership Assets.

Based on the foregoing, the Receiver respectfully submits that the compensation sought by the Receiver and his Retained Personnel is reasonable and warranted.

## IX.    CONCLUSION

**WHEREFORE**, the Receiver respectfully requests that the Court grant the Receiver's Motion for Approval of the First Interim Fee Application for the Time Period September 20, 2024 through October 31, 2024, and thereby authorize the following:

1.      Payment to Clark Hill PLC in the amount of $112,782.25, representing fees incurred for the Receiver's services performed between September 20, 2024 through October 31, 2024;

2.      Payment to Clark Hill PLC in the amount of $283,322.69, representing fees incurred for the Receiver's counsel's services performed between September 20, 2024 through October 31, 2024;

3.      Payment to Clark Hill PLC in the amount of $6,176.56, representing expenses incurred by Clark Hill PLC between September 20, 2024 through October 31, 2024; and

4.      Payment to Alvarez & Marsal Disputes and Investigations, LLC in the amount of  in the amount of $153,203.00, representing fees incurred for the Receiver's accountant's services performed between September 20, 2024 through October 31, 2024.

Dated: November 19, 2024                    Respectfully Submitted,

*s/ Robin S. Weiss*
Robin S. Weiss, Esquire
Vanessa L. Huber, Esquire
**CLARK HILL PLC**
Two Commerce Square
2001 Market Street, Suite 2620
Philadelphia, PA 19103
Phone: (215) 640-8500
Fax: (215) 640-8501
rsweiss@clarkhill.com
vhuber@clarkhill.com

*Attorneys for Receiver,*
*Kevin Dooley Kent*